**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **Constellation Enterprises LLC, *et al.*,**[1] | ) | **Case No. 16-_____ (_____)** |
| | ) | |
| Debtors. | ) | **Joint Administration Pending** |
| | ) | |

**DECLARATION OF TIMOTHY B. STALLKAMP**
**IN SUPPORT OF CHAPTER 11 PETITIONS**
**AND FIRST DAY MOTIONS**

I, Timothy B. Stallkamp, hereby declare under penalty of perjury:

1.     I am a managing director of Conway MacKenzie Management Services, LLC ("Conway"), which provides financial and operational interim management to underperforming companies with several locations throughout the United States and affiliate locations in the United Kingdom and Romania.  The Debtors originally engaged Conway in September 2015 to provide crises management and turnaround services and, since that time, I have been staffed on the engagement.  On or around May 12, 2016, the above-captioned debtors (collectively, the "Debtors") engaged Conway to continue to assist the Debtors with their restructuring activities and to provide the Debtors with a Chief Restructuring Officer (the "CRO"), a Chief Restructuring Manager (the "CRM") and certain other temporary employees. Pursuant to that engagement, Conway has provided Donald MacKenzie and myself to the Debtors to serve as the Debtors' CRO and CRM, respectively.

---

[1]   The debtors in these cases, along with the last four digits of the federal tax identification number for each of the debtors, where applicable are:  Constellation Enterprises LLC (9571); Columbus Steel Castings Company (8153); The Jorgensen Forge Corporation (1717); Eclipse Manufacturing Co. (1493); Zero Manufacturing, Inc. (8362); Metal Technology Solutions, Inc. (7203); Columbus Holdings Inc. (8155); Zero Corporation (0538); JFC Holding Corporation (0312); and Steel Forming, Inc. (4995).  The debtors' mailing address is 50 Tice Boulevard, Suite 340, Woodcliff Lakes, NJ  07677.

2.      I have fourteen (14) years of experience in the restructuring and turnaround industry, including ten (10) years while being employed by Conway.  I specialize in providing turnaround and crisis management services to distressed and under-performing businesses.  I have experience in providing financial analysis, financial modeling and cash flow management in a variety of industries, including metal, automotive, retail, consumer products and services, business services and health care.  Additionally, and of particular relevance to this engagement and my role with the Debtors, I have acted as interim management, including as Chief Restructuring Officer, for companies experiencing distress.

3.      Concurrently with the filing of this declaration (this "Declaration") on May 16, 2016 (the "Petition Date"), each of the Debtors has filed in this Court a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code").

4.      The Debtors have requested certain relief in "first day" applications and motions filed with the Court (collectively, the "First Day Motions")[2] in order to minimize certain of the potential adverse effects of the commencement of these chapter 11 cases and to maximize the value of their estates.  I submit this Declaration to assist the Court and other parties in interest in, among other things, understanding the circumstances that led to the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions for relief and the First Day Motions.

5.      Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge, my discussions with the Debtors' professionals and advisors, the CRO and members of the Debtors' senior management and other personnel, my review of

---

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the First Day Motions.

relevant documents, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

6.      I am familiar with the contents of each First Day Motion (including the exhibits to such motions) and believe the relief sought in each First Day Motion will allow for an orderly transition of the Debtors into these chapter 11 cases and permit the Debtors to consummate one or more sales of their assets in a manner that maximizes the value of their businesses.  Further, it is my belief that the relief sought in the First Day Motions is in each case narrowly tailored and necessary to achieve the goals identified above, and, accordingly, best serves the interests of the Debtors' estates and their stakeholders.

7.      Parts I and II of this Declaration provide an overview of the Debtors' businesses, organizational structure, and capital and debt structure.  Part III provides an overview of the circumstances leading to the commencement of these chapter 11 cases. Part IV discusses the objectives of the chapter 11 cases.  Finally, part V discusses the bases for relief sought in the First Day Motions, which the Debtors believe are critical to administering these chapter 11 cases and preserving and maximizing the value of the Debtors' estates.

## I.      Description of the Debtors

### A.      The Debtors' Businesses

8.      Constellation Enterprises LLC ("Constellation") is a shell holding company and is the direct and indirect parent of the nine (9) other Debtors.  As described below, the Debtors comprise holding companies and operating companies that operate four (4) separate businesses that principally operate as manufacturers of metal-based products, including metal-stamped products, steel castings, and custom-forged metal products.  Such businesses include:   (i)

Columbus Castings ("CC"); (ii) Commercial Metal Forming ("CMF"); (iii) ZERO and (iv) Jorgensen Forge ("JFC"). Each business is discussed below in turn.

### a. Columbus Castings

9. CC is operated through Debtor Columbus Steel Castings Company. Debtor Columbus Holdings, Inc., which is a shell holding company, wholly owns Columbus Steel Castings Company.

10. On May 9, 2016, as is discussed in greater detail below, as a result of continuing losses due to operational and other issues, CC ceased all production operations. Less than one (1) month ago, CC employed 752 full-time employees, two (2) part-time employees and two (2) independent contractors. However, as of the Petition Date and due to the idling of CC's production operations, CC employs only twenty-three (23) active employees.

11. When it was operational, CC was the largest single site steel foundry in North America and manufactured steel castings for freight and passenger rail cars, locomotives, mining equipment, industrial magnets, construction equipment and heavy industrial industries. CC owns its sole manufacturing facility, which is located in Columbus, Ohio and covers an area of more than ninety (90) acres.

### b. Commercial Metal Forming

12. CMF is operated through Debtor Steel Forming, Inc. Debtor Eclipse Manufacturing Co., which is a shell holding company, wholly owns Steel Forming, Inc. Debtor Metal Technology Solutions Inc., which is also a shell holding company, wholly owns Debtor Eclipse Manufacturing Co.

13. CMF is a major U.S. supplier of tank heads and tank accessories in the air receivers, petrochemical, liquefied petroleum (LP) gas, oil field, construction equipment, rail and truck transportation, oil and gas separation, food processing and filtration markets. Additionally,

CMF produces custom stampings for truck axle manufactures, with an expertise in heavy gauge and deep-drawn stampings in up to 2,000-ton presses.

14.     CMF owns and operates three (3) manufacturing facilities located in Youngstown, Ohio, Saginaw, Texas and Orange, California.  CMF also leases three (3) separate distribution centers in close proximity to each manufacturing facility.  As of the Petition Date, CMF employs 164 full-time employees, two (2) interns and three (3) independent contractors.

### c.     *ZERO*

15.     ZERO is operated through Debtor Zero Manufacturing, Inc. Debtor Zero Corporation, which is a shell holding company, wholly owns Zero Manufacturing, Inc.

16.     ZERO operates out of a 300,000 square foot facility located in North Salt Lake, Utah, which ZERO leases.  As of the Petition Date, ZERO employed 156 full-time employees and five (5) part-time employees.  ZERO is a global supplier of protective cases and enclosures and specializes in quality, deep-drawn and fabricated aluminum and molded plastic cases, enclosures and assemblies for the aerospace, industrial, medical, oil and gas, logistics, electronics and telecommunications markets.  ZERO's products take the form of both a standard product line and a customized product made to fulfill any specific client's request.

17.     Zero Manufacturing. Inc. wholly owns Zero Cases (UK) Limited and Zero Cases Europe, Ltd., which are non-Debtors.  Zero Cases (UK) Limited is the U.K. arm of ZERO's operations.  Zero Cases Europe, Ltd. is a dormant entity with no significant assets or liabilities.

### d.     *Jorgenson Forge*

18.     JFC is operated through Debtor Jorgensen Forge Corporation. Debtor JFC Holding Corporation, which is a shell holding company, wholly owns Jorgensen Forge Corporation.

19.     JFC owns and operates a twenty-two (22) acre site with 250,000 square feet of manufacturing space in Tukwila, Washington.  As of the Petition Date, JFC employs 103 full-time employees and two (2) part-time employees.  JFC manufactures high-quality forgings for the aircraft, aerospace, oil and gas, marine, defense, power generation (both conventional and nuclear) and general industrial markets.  JFC employs policies and practices designed to reduce waste and time cycles, improve efficiency and responsiveness, and provide quality products at low prices.

**B.      Organizational Structure**

20.     A chart showing the Debtors' organizational structure as of the Petition Date is attached hereto as Exhibit A.  As reflected in the organizational structure chart, Constellation is wholly owned by two (2) non-Debtors: Private Equity Opportunities LP and Protostar Equity Partners II, LP.  As is also reflected in the organizational structure chart, each of the other Debtors is wholly owned by another Debtor with the exception of JFC Holding Corporation and Columbus Holdings Inc.  Constellation owns 98.9% of the issued and outstanding shares of JFC Holding Corporation and the balance of such shares are held by former employees of JFC.  Constellation owns 99.8% of the issued and outstanding shares of Columbus Holdings, Inc. and the balance of such shares are held by a former employee of CC.  With respect to the state of formation or incorporation of each of the Debtors, Constellation is a Delaware limited liability company, Jorgensen Forge Corporation is a Washington corporation and the balance of the Debtors are Delaware corporations.

RLF1 14510005v.3

## II.    Prepetition Indebtedness[3]

21.    As of the Petition Date, the Debtors' unaudited balance sheets reflected total assets of approximately $196 million and total liabilities of approximately $238 million (each on a consolidated basis).  As of the Petition Date, the Debtors' material debt obligations principally consist of $165.1 of secured funded debt and $61.5 million of unsecured debt.

### A.    Secured Debt

22.    On January 28, 2011, the Debtors entered into that certain Financing Agreement, dated as of January 28, 2011 (as amended from time to time, the "PNC Financing Agreement"), among Constellation, as parent and guarantor, the other Debtors, as borrowers, the lenders thereunder (collectively, the "PNC Facility Lenders") and PNC Bank, NA, as agent (the "PNC Facility Agent").  The PNC Financing Agreement provided for a $35 million revolving credit facility (the "PNC Facility"), subject to certain borrowing base and minimum liquidity requirements.  The borrowings under the PNC Facility are secured by a first lien on the Debtors' inventory and accounts receivable (the "PNC First Lien Collateral") and a second lien on the Debtors' other assets (the "PNC Second Lien Collateral").  As of the Petition Date, there is approximately $17.8 million outstanding under the PNC Facility.

23.    On September 17, 2015, the Debtors entered into that certain Amended and Restated Term Loan Agreement (as amended, the "DDTL Agreement") among Constellation, as parent and guarantor, the other Debtors, as borrowers, the lenders thereunder (the "PEO Facility Lenders"), and Private Equity Opportunities LP, as agent (the "PEO Facility Agent").  The DDTL Agreement provided for a delayed draw term loan facility in the aggregate amount of $13

---

[3] The following summary is qualified in its entirety by reference to the operative documents, agreements, schedules, and exhibits.

million, which amount was subsequently increased to $18 million[4] and then refinanced so that the principal amount was $10.6 million (the "DDTL Facility").  The DDTL Facility is secured by the same priority liens as the PNC Facility, but pursuant to that certain Intercreditor Agreement, dated as of September 17, 2015, between the PNC Facility Agent and the PEO Facility Agent, the liens securing the DDTL Facility are subordinated to the PNC Facility.  As of the Petition Date, there is approximately $10.6 million outstanding under the DDTL Facility (excluding any interest, fees, and costs).

24.    Also on January 28, 2011, Constellation issued $130 million of 10.625% First Priority Senior Secured Notes due February 1, 2016 (the "Secured Notes") pursuant to that certain Indenture, dated as of January 28, 2011 (as amended from time to time, the "Indenture"), with Wells Fargo Bank, NA as trustee and collateral agent (the "Notes Trustee").  The Secured Notes are secured by a second lien on the PNC First Lien Collateral and a first lien on the PNC Second Lien Collateral.  On February 1, 2016, the Debtors and the Notes Trustee entered into an amended and restated Indenture, increasing the interest rate under the Secured Notes from 10.625% to 11.125% and extending the maturity date to February 1, 2018. As of the Petition Date, there is approximately $130 million outstanding under the Secured Notes (excluding any interest, fees and costs).

**B.    Unsecured Debt**

25.    As of the Petition Date, of the Debtors' $61.5 million of unsecured debt, approximately $32.5 million consists of pension liabilities, tax liabilities and customers advances and the balance consists of miscellaneous trade debt.

---

[4] The $5 million increase in the availability under the DDTL Facility was agreed to by the PNC Facility Lenders and the holders of the Secured Notes.

III.    **Key Events Leading to Commencement of the Chapter 11 Cases**

26.    The following is a description of the events and other material issues dating back to 2014 that ultimately culminated in the Debtors commencing these chapter 11 cases.

A.    **The Debtors' 2014 Performance**

27.    Due to the nature of the Debtors' businesses and the fact that the Debtors, as manufacturers of steel and related products, have high fixed costs, the Debtors' financial performance has historically been subject to market changes and adverse forces in their respective industries and, in 2014, such changes and forces unquestionably had a negative impact on the Debtors.   In that year, of the Debtors' four business sectors, only CMF operated profitably.   Further, while the Debtors (on a consolidated basis) experienced earnings before interest, taxes, depreciation, and amortization (EBITDA) of $24 million, the Debtors cash flow was negative by more than $6 million (excluding adjustments for goodwill impairment).

28.    Also in 2014, two of the Debtors' businesses, JFC and ZERO, were negatively impacted by the U.S. defense sector sequestration.  With respect to JFC, sequestration resulted in major delays with respect to anticipated customer purchase orders.   With respect to ZERO, sequestration, along with reduced military spending on a global basis, also negatively affected sales.

B.    **The Debtors' 2015 Performance**

29.    The Debtors' consolidated liquidity position continued to deteriorate during 2015. On a consolidated basis, the Debtors generated less than $10 million of adjusted EBITDA for the year.  Further, the same macroeconomic forces that affected JFC and ZERO in 2014 continued into 2015.  In addition, CMF, JFC, and ZERO were adversely affected by the precipitous decline in energy prices in the first quarter of 2015 as sales dropped to customers in the related end markets.  Between 2014 and 2015, CMF's profitability declined by approximately forty percent

9

(40%), which was primarily due to volume deterioration related to the energy sector.  JFC, which continued to experience adverse sales trends as a result of sequestration, was also affected by the energy price declines, translating to a year-over-year profitability decrease of $3 million, to negative $7 million in 2015, before any earnings adjustments.

30.    While, in 2015, CMF, JFC and ZERO were all negatively affected by macroeconomic forces, CC's financial struggles were largely the result of internal forces, including operational and equipment issues.  In the third quarter of 2015, CC experienced a furnace failure that left it unable to produce shipments for approximately six (6) weeks.  As a result, CC lost approximately $12 million of firm shipment opportunities and incurred over $3 million of labor and expenses attributable to the failure.  For the year, CC reflected negative $8 million in earnings on an unadjusted basis.

31.    In September 2015, due to the Debtors' declining financial performance over the course of the year, the Debtors' borrowing availability under the PNC Facility was reduced from $33 million to $22 million.  Also in September 2015, to address the Debtors' liquidity needs, the Debtors entered into the DDTL Facility which, at that time, permitted borrowings of up to $13 million.  Shortly after the closing of the DDTL Facility, the Debtors drew down $7 million of the permitted borrowings.  For the balance of 2015, the Debtors continued to primarily rely on the DDTL Facility to address any liquidity shortfalls.  Prior to the end of 2015, the DDTL Facility was fully drawn.

### C.    2016 Recapitalization

32.    In the last quarter of 2015, the Debtors' stakeholders engaged in negotiations related to a recapitalization of the Debtors' balance sheet to provide needed liquidity for the Debtors' businesses.  To that end, in late 2015, the permitted borrowings under the DDTL Facility were increased by $5 million.  The additional $5 million of incremental liquidity was

10

intended to provide the Debtors with bridge financing in advance of a broader recapitalization, which was completed in late January 2016.  Under that recapitalization transaction, Goldman Sachs Private Equity Opportunities made a $30 million capital contribution to Constellation.  The proceeds of that contribution re-paid the DDTL Facility (which, at that time, totaled $18 million), interest under the Senior Notes and certain transaction-related fees.  As part of the January 2016 recapitalization, the DDTL Facility was re-paid in full but it was replaced with an amended DDTL Facility with the same lender (the PEO Facility Lender), agent (the PEO Facility Agent), interest rate and other key terms but with a commitment amount of $10.6 million, $3.0 million of which was blocked.  Following the closing of the January 2016 recapitalization, the Debtors were left with approximately $8 million of borrowing availability under the new DDTL Facility.

> ### D.    CC's Operational Challenges and Marketing Process

33.    While operational challenges at CC were continuously addressed during late 2015 and early 2016, the aged state of CC's production equipment resulted in persistent challenges to produce and ship customer orders.  During February and March 2016, CC required an additional $490,000 on average per week to support operations.  While CC attempted to address the liquidity shortfall by reducing the number of its employees, the business continued to incur losses.  On or around May 9, 2016, CC was shut down and ceased all production operations and, consequently, has reduced its workforce to only a skeleton staff.

34.    Due to CC's operational challenges, the Debtors had decided in early 2015 to market CC for sale.  To that end, the Debtors engaged Lincoln International as an investment banker to assist with the marketing process.  While that marketing process resulted in a number of parties expressing an interest in acquiring CC, only two (2) non-binding letters of intent were submitted and those bids ultimately did not materialize.  However, in the weeks leading up to the

Petition Date, the Debtors received another letter of intent (subject to definitive documentation) (the "CC LOI") to purchase CC pursuant to a sale under section 363 of the Bankruptcy Code. The Debtors, with the assistance of their advisors, are in the process of evaluating the CC LOI. The Debtors are optimistic that the CC LOI will, in the first few weeks of the chapter 11 cases, result in an executed asset purchase agreement and that the Debtors will file a motion, pursuant to section 363, to consummate a sale of CC pursuant to such agreement.

### E.    2016 Liquidity Pressure and Stakeholder Negotiations

35.    For most of 2016, the Debtors' primary source of liquidity remained the DDTL Facility.  However, by the end of April 2016, the DDTL Facility was fully drawn, including $.6 million of the blocked commitment amount.   Prior to exhausting that liquidity, the Debtors, with the assistance of Imperial Capital, attempted to obtain additional financing from third party lenders but, due to a number of issues, including the Debtors' liquidity position and financial forecast, it was determined in mid-April 2016, that such financing was likely not available. Therefore, beginning in April 2016, as it became apparent that liquidity would be exhausted and additional funding from third party lenders would be unavailable, the Debtors' stakeholders attempted to reach a negotiated solution that would prevent the Debtors from having to file for bankruptcy protection.  Those negotiations continued up to the Petition Date.  However, despite those negotiations, no agreement for an "out-of-court" transaction was reached and the Debtors were faced with the only option of filing for bankruptcy protection in order to preserve enterprise value.

## IV.    The Objectives of the Chapter 11 Cases

36.    While, as noted above, the Debtors' key stakeholders were unable to consummate an "out-of-court" transaction that made the filing of these cases unnecessary, the Debtors and certain of their key stakeholders have agreed to the principal terms of a transaction that will

allow CMF, ZERO and JFC to continue operating with a deleveraged balance sheet. Specifically, the Debtors and certain holders of the Secured Notes are in the process of finalizing a term sheet (the "Sale Term Sheet") (which will be subject to the finalization of definitive documentation) that will provide for the sale of CMF, ZERO and JFC to such holders as part of a credit bid transaction pursuant to section 363 of the Bankruptcy Code (the "Credit Bid Sale"). Pursuant to the Sale Term Sheet, such holders of the Secured Notes will form a new entity (the "Proposed Purchaser") that will serve as a stalking horse purchaser whose bid will be subject to higher and better bids pursuant to a Court-approved bidding process.  In order to facilitate the Credit Bid Sale, such holders and the Roll-up DIP Lenders (as defined in the DIP Motion) have also agreed to provide the Debtors with $32.5 million in debtor-in-possession financing (the "DIP Facility"), which will provide the Debtors with an additional $15 million of incremental liquidity.[5]

37.    Moreover, as noted above, the Debtors are also in the process of evaluating the CC LOI and are hopeful that it will result in an executed asset purchase agreement that will allow the Debtors to sell CC in the near term pursuant to section 363 of the Bankruptcy Code (the "CC Sale").

38.    The Debtors believe that consummation of the Credit Bid Sale, which will be subjected to an open and competitive market process during these chapter 11 cases, and consummation of the CC Sale on the terms set forth in the CC LOI or pursuant to another transaction as a result of continued marketing, represent the best strategy to maximize value for

---

[5] Additional information regarding the proposed DIP Facility, including the marketing process, the need for the DIP Facility, and the evidentiary support for the motion seeking authorization to enter into the DIP Facility and use cash collateral (the "DIP Motion") can be found in (i) the Declaration of Erich Hobelmann of Imperial Capital in Support of the DIP Motion (the "Hobelmann Declaration") and (ii) the Declaration of Timothy B. Stallkamp in Support of DIP Motion (the "Supplemental Stallkamp Declaration").  Both such declarations were filed substantially contemporaneously herewith.

their various stakeholders.  Moreover, given the financial and operational health of the Debtors, the Debtors believe it is critical that any sale of the Debtors' assets proceed on an expedited time frame in order to maximize the return on any sale of the Debtors' assets, and accordingly, intend to seek approval of such sales on such a time frame.

## V.   First Day Motions

39.   Concurrently with its chapter 11 petitions, the Debtors are filing the following First Day Motions:

a.   *Debtors' Motion for Entry of an Order Directing Joint Administration of their Related Chapter 11 Cases* ("Joint Administration Motion");

b.   *Debtors' Application for Entry of an Order Pursuant to 28 U.S.C. § 156(c) (I) Approving the Retention and Appointment of Epiq Bankruptcy Solutions, LLC as the Claims and Noticing Agent to the Debtors, Effective* Nunc Pro Tunc *to the Petition Date, and (II) Granting Related Relief* ("Epiq Application");

c.   *Debtors' Motion for Entry of an Order (I) Authorizing Debtors to Continue Use of Cash Management System, Bank Accounts and Business Forms and (II) Extending the Debtors' Time to Comply with Section 345 of the Bankruptcy Code* ("Cash Management Motion");

d.   *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing, but not Directing, Debtors to Pay Certain Prepetition (I) Wages, Salaries and Other Compensation, (II) Reimbursable Employee Expenses, and (III) Employee Medical and Similar Benefits; and (B) Authorizing Financial Institutions to Honor all Related Checks and Electronic Payment Requests* ("Employee Wages Motion");

e.   *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Debtors to Continue Prepetition Insurance Coverage and (B) Authorizing Financial Institutions to Honor Related Checks and Electronic Payment Requests* ("Insurance Motion");

f.   *Debtors' Motion for Entry of Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services* ("Utilities Motion");

g.   *Debtors' Motion for Entry of Interim and Final Orders Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for Authorization to Pay Prepetition Taxes and Other Charges* ("Taxes Motion");

> h.   *Debtors' Motion for Entry of Interim and Final Orders Authorizing Them to Pay Prepetition Claims of Certain Unsecured Critical Vendors* ("Critical Vendors Motion");
>
> i.   *Debtors' Motion for Entry of Interim and Final Orders Authorizing Payment of Certain Prepetition Common Carrier, Warehouse and Related Obligations* ("Shippers Motion"); and
>
> j.   *Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Secured Financing Pursuant to Section 364 of the Bankruptcy Code, (B) Authorizing the Debtors to use Cash Collateral, (C) Granting Adequate Protection to the Adequate Protection Parties, (D) Scheduling a Final Hearing, and (E) Granting Related Relief* (the "DIP Motion").

40.    As noted above, the relief sought in the various First Day Motions will allow the Debtors to, among other things, continue operating in chapter 11 with minimal disruption.

41.    I have reviewed each of the First Day Motions or had their contents explained to me, and I believe the Debtors would suffer immediate and irreparable harm absent the ability to continue their business operations as sought in the First Day Motions.  In my opinion, approval of the relief sought in the First Day Motions will be critical to the Debtors' efforts to sell their assets in bankruptcy in a manner that preserves and maximizes value for the benefit of all stakeholders.

42.    Several of the First Day Motions request authority to pay certain prepetition claims.  I am told by the Debtors' advisors that Bankruptcy Rule 6003 provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, the Debtors have limited their request for immediate authority to pay prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.

43.     Below is a brief discussion of the Debtors' First Day Motions (other than the DIP Motion, which is addressed and discussed in detail in the Hobelmann Declaration and the Supplemental Stallkamp Declaration) and an explanation of why, in my belief, the relief requested in such motions is critical to the successful prosecution of these chapter 11 cases. More fulsome descriptions of the facts regarding the Debtors' operations, and the bases for the relief requested in the operational motions, can be found in each relevant First Day Motion.

**Joint Administration Motion**

44.     The Debtors seek the joint administration of their chapter 11 cases, ten (10) in total, for procedural purposes only.  Many of the motions, hearings and other matters involved in the chapter 11 cases will affect all of the Debtors.   Therefore, I believe that the joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications and orders, thereby saving considerable time and expense for the Debtors and resulting in substantial savings for their estates.

**Epiq Application**

45.     The Debtors filed the Epiq Application to retain Epiq Bankruptcy Solutions, LLC ("Epiq"), as claims and noticing agent pursuant to section 156(c) of the Judicial Code, sections 105(a) and 503(b) of the Bankruptcy Code and Local Rule 2002-1(f).  Epiq is a leading chapter 11 administrator, with significant experience in noticing, claims administration, solicitation, balloting and other administrative aspects of chapter 11 cases.  Appointing Epiq as the claims and noticing agent in these chapter 11 cases will relieve the administrative burden on the clerk of the Court.  Moreover, Local Rule 2002-1(f) requires a chapter 11 debtor to retain a claims agent in all cases where such debtor has more than two-hundred (200) creditors.  Here, the Debtors have well in excess of two-hundred (200) creditors.

46.     The Debtors' selection of Epiq to act as claims and noticing agent has complied with the Court's *Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c)*, in that the Debtors have obtained and reviewed engagement proposals from at least two (2) other court-approved claims and noticing agents to ensure selection through a competitive process.  Moreover, the Debtors submit, based on all engagement proposals obtained and reviewed, that Epiq's rates are competitive and reasonable given Epiq's quality of services and expertise.

47.     The Epiq Application pertains only to the work to be performed by Epiq under the clerk's designation of duties permitted by Judicial Code Section 156(c) and Local Rule 2002-1(f), and any work to be performed by Epiq outside of the scope of such duties is not covered under the Epiq Application or by any other order granting approval thereof.  A separate retention application addressing Epiq's services outside of the scope of Judicial Code Section 156(c) will be filed by the Debtors in the near future.

48.     Accordingly, for the foregoing reasons and those additional reasons set forth in the Epiq Application, I believe the Court should approve the Epiq Application and appoint Epiq as the claims and noticing agent in these cases.

**Cash Management Motion**

49.     In the ordinary course of business, the Debtors utilize a centralized cash management system to collect and disburse funds (the "Cash Management System").

50.     The Debtors' Cash Management System is similar to those commonly employed by corporate entities of comparable size and complexity to the Debtors.  Indeed, large, multiple-entity businesses use such systems because of the numerous benefits provided, including, without limitation, the ability to:  (a) quickly create status reports on the location and amount of

17

funds, which allows management to track and control such funds; (b) ensure cash availability; and (c) reduce administrative costs through a centralized method of coordinating the collection and movement of funds.

51.    By the Cash Management Motion, the Debtors seek entry of an order authorizing them to continue using the Cash Management System.  I believe that such relief is necessary to ensure a smooth transition in these chapter 11 cases.

52.    It is my understanding that any checks that the Debtors issue after the Petition Date must include the "debtor-in-possession" legend and the corresponding case number of the Debtor that issued the check.  By the Cash Management Motion, the Debtors are seeking a thirty-day temporary waiver of such requirement.  The Debtors believe that such waiver is necessary because the Debtors manually print their own checks and the Debtors must retain a computer programmer in order to alter their checks to reflect the debtor-in-possession legend and the corresponding case number.  Because it will take some time to complete this process, I believe such relief is appropriate.

53.    Based on the foregoing and those additional reasons set forth in the Cash Management Motion, I believe that the relief requested in the Cash Management Motion is both necessary and appropriate to allow the Debtors to successfully prosecute these Chapter 11 Cases, to optimize the Debtors' postpetition business performance, and to maximize the value of the Debtors' estates.

**Employee Wages Motion**

54.    By the Employee Wages Motion, the Debtors are seeking entry of interim and final orders (a) authorizing, but not directing, the Debtors to pay in the ordinary course of business certain prepetition (i) wages, salaries and other compensation, (ii) reimbursable

employee expenses, and (iii) employee medical and similar benefits; (b) authorizing financial institutions to receive, process, honor and pay all checks presented for payment and electronic payment requests relating thereto and (c) authorizing, but not directing, the Debtors to honor and continue various employee wages and benefits programs.

55.    Honoring the Debtors' employee wage obligations and continuing the Debtors' employee benefits programs will benefit the Debtors' estates and their stakeholders by allowing the Debtors' business operations to continue during these chapter 11 cases with minimal disruption.  The Debtors' employees and independent contractors boast valuable skill sets, institutional knowledge and understanding of the Debtors' operations and customer relations. Without such relief, the Debtors may lose the valuable services that such employees and independent contracts provide.  Such a result would be to the extreme detriment of the Debtors and their estates and may even jeopardize the Debtors' ability consummate any sale of the Debtors' assets.    Similarly, as the Debtors depend on their employees and independent contractors to operate, the employees and independent contractors depend on the Debtors for their livelihood.  Accordingly, based on the foregoing and those additional reasons set forth in the Employee Wages Motion, I believe that the relief requested in such motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtors' estates and their creditors and all other parties in interest.

**Insurance Motion**

56.    By the Insurance Motion, the Debtors are seeking entry of interim and final orders (a) authorizing the Debtors to continue prepetition insurance coverage and (b) authorizing financial institutions to receive, process, honor and pay checks presented for payment and electronic payment requests related thereto.  The Debtors maintain twenty-six (26) insurance

19

policies, most of which are managed by the Debtors' insurance broker (Lockton Companies, LLC), through a variety of insurance carriers that provide coverage for, among other things, property and equipment breakdown, commercial general liability, commercial automobile liability, foreign commercial general liability, foreign commercial automobile liability, foreign voluntary compensation and employers' liability, foreign commercial travel accident and sickness, foreign commercial property, kidnap and ransom, executive risk, directors and officers, credit, pollution and remediation legal liability, marine open cargo, business travel accident and flooding (the "Policies").

57.     The Debtors' businesses involve extensive manufacturing operations that present a high degree of operational risk and hazards.  Ordinary course operations can result in damage to property, personal injury, pollution or environmental damage and suspension of operations. Therefore, I believe it is crucial that the Debtors protect themselves against such risk and hazards by maintaining the Policies and continuing such as they existed prior to the filing of the chapter 11 cases.  Accordingly, based on the foregoing and those additional reasons set forth in the Insurance Motion, I believe that the relief requested in such motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtors' estates and their creditors and all other parties in interest.

**Utilities Motion**

58.     By the Utilities Motion, the Debtors request that the Court determine adequate assurance of payment for future utility services, establish procedures for determining adequate assurance of payment, and prohibit Utility Companies from altering, refusing, or discontinuing utility services.

RLF1 14510005v.3

59.     To ensure adequate assurance of payment for future utility services, the Debtors will deposit, for the benefit of the Debtors' utility providers, $183,000.00 into a newly created, segregated, interest-bearing account within twenty (20) days of the Petition Date.  This amount represents a sum equal to 50% of the Debtors' projected estimated monthly cost of utility services.[6]  The establishment of such account, together with the fact that the Debtors anticipate having sufficient liquidity to pay, and intend to pay, all valid postpetition obligations for utility services in a timely manner, provide the Debtors' utility providers with adequate assurance of future payment.

60.     I believe the relief requested in the Utilities Motion is necessary and appropriate because it will ensure that there is a process to address any utility provider that may make a demand to the Debtors for adequate assurance or otherwise threaten to alter, refuse, or discontinue utility service.  I am informed and believe that the proposed adequate assurance procedures are consistent with procedures that are typically approved in chapter 11 cases in this District.  Accordingly, based on the foregoing and those additional reasons set forth in the Utilities Motion, I believe that the relief requested in such motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtors' estates and their creditors and all other parties in interest.

**Taxes Motion**

61.     By the Taxes Motion, the Debtors are seeking an order authorizing, but not directing, the Debtors to remit and pay business and occupation taxes, commercial activity taxes, franchise taxes, property and real estate taxes, sales taxes, use taxes and Canadian goods and services taxes and such other taxes and fees as the Debtors deem necessary.  The Debtors incur

---

[6]  I note that, with respect to CC, the estimated future utility costs for CC reflects the fact that CC's factory is now in an idle state.

various tax liabilities and fees and historically, have paid such liabilities to the relevant federal, state and local authorities as they have become due in the ordinary course. The Debtors estimate that approximately $615,000 in such taxes relating to periods prior to the Petition Date are outstanding and past due (collectively, the "Prepetition Taxes"). The Debtors seek authority to pay $220,000 of such amount in the interim period and the balance upon entry of a final order approving the Taxes Motion.

62.    I believe the Debtors' ability to pay the Prepetition Taxes is critical to their continued and uninterrupted operations and ultimately will preserve the resources of the Debtors' estates. It is my understanding that the Debtors' failure to pay the Prepetition Taxes could materially and adversely impact the Debtors' business operations, by among other means, causing the Debtors to incur penalties, interest and/or attorneys' fees relating to the Prepetition Taxes. Furthermore, it is my understanding that certain federal, state and local statues could impose personal liability on officers or directors of companies on account of failing to pay certain of the Prepetition Taxes. Any such lawsuit or criminal prosecution (and ensuing potential liability) would, in my opinion, distract the Debtors and their officers, directors and executives from devoting their full attention to the Debtors' businesses, the orderly administration of these chapter 11 cases and the proposed sales of the Debtors' assets. Accordingly, based on the foregoing and those additional reasons set forth in the Taxes Motion, I believe that the relief requested in the Taxes Motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtors' estates and their creditors and all other parties in interest.

**Critical Vendors Motion**

63.    By the Critical Vendors Motion, the Debtors are seeking an order, authorizing, but not directing, the Debtors to pay the pre-petition claims of certain Critical Vendors.

64.    I believe the relief requested in the Critical Vendors Motion is necessary and appropriate in order to avoid any unnecessary disruptions to the Debtors' operations and any resulting deterioration in the value of the Debtors' estates.  I believe paying the Critical Vendor Claims (in an amount not to exceed approximately $1.5 million on an interim basis and $4.2 million on a final basis (inclusive of the amounts being paid on an interim basis), but subject to the budget that is being approved pursuant to the DIP Motion) is critical to ensuring that the Debtors continue to operate and preserve their businesses. Specifically, in the absence of paying the Critical Vendor Claims, the Debtors run the risk that certain vendors will refuse to provide them with postpetition goods and services, which may lead to disruption of the Debtors' businesses and may interfere with the Debtors' ability to consummate one or more sales of their assets.  Accordingly, based on the foregoing and those additional reasons set forth in the Critical Vendors Motion, I believe that the relief requested in the Critical Vendors Motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtors' estates and their creditors and all other parties in interest.

**Shippers Motion**

65.    By the Shippers Motion, the Debtors are seeking an order, authorizing, but not directing, the Debtors to pay certain prepetition claims of the Common Carriers totaling approximately $56,000 on an interim basis and $400,000 on a final basis (inclusive of the amounts being paid on an interim basis).  In the ordinary course of business, the Debtors rely on the Common Carriers to assist with the transport of materials and goods and to store related inventory.  As is set forth in the Shippers Motion, the value of goods and materials held by shippers and warehousemen on the Petition Date far exceeds the prepetition payments owed to such shippers and warehousemen.

66.     It is my understanding that if the Common Carriers are not paid by the Debtors for prepetition services, the Common Carriers could (i) retain the Debtors' materials and goods that they currently hold in their possession, (ii) assert liens on such materials and goods, and (iii) withhold future services.  Any such actions would severely disrupt the Debtors' businesses by interrupting the flow of necessary materials and the distribution of finished goods and, therefore, potentially interfere with the Debtors' ability to consummate any sale of their assets. Accordingly, based on the foregoing and those additional reasons set forth in the Shippers Motion, I believe that the relief requested in the Shippers Motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtors' estates and their creditors and all other parties in interest.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  May 17, 2016

                                                   */s/ Timothy B. Stallkamp*
                                                   Timothy B. Stallkamp
                                                   Chief Restructuring Manager