IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Constellation Enterprises LLC, *et al.*,[1] | ) Case No. 16-11213 (CSS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) Hearing Date: June 1, 2016 |
| | ) Related Documents: 13, 24 |

**BRIEF OF THE DDTL PARTIES IN OPPOSITION TO ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION SECURED FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE**

---

[1] The debtors in these cases, along with the last four digits of the federal tax identification number for each of the debtors, where applicable are: Constellation Enterprises LLC (9571); JFC Holding Corporation (0312); The Jorgensen Forge Corporation (1717); Columbus Holdings Inc. (8155); Columbus Steel Castings Company (8153); Zero Corporation (0538); Zero Manufacturing, Inc. (8362); Metal Technology Solutions, Inc. (7203); Eclipse Manufacturing Co. (1493); and Steel Forming, Inc. (4995). The debtors' mailing address is located at 50 Tice Boulevard, Suite 340, Woodcliff Lakes, NJ 07677.

1

**TABLE OF CONTENTS**

**PRELIMINARY STATEMENT** .................................................................................................. **4**

**BACKGROUND** ........................................................................................................................ **5**

**THE DDTL PARTIES HAVE NOT CONSENTED TO A PRIMING LIEN** ......................... **7**

A.   The Plain Language of the 2011 Intercreditor Agreement Prohibits the Prepetition Noteholders from Seeking to Obtain a Priming Lien. ........................................................ 7

B.   The 2011 Intercreditor Agreement Was "Ratified" and "Confirmed" in January 2016. ..... 8

C.   The PNC Facility Agent's Ability to Cause the DDTL Lenders to Consent to a Priming DIP is Limited by the 2011 Intercreditor Agreement ........................................................ 9

  i.   *Any Consent by the PNC Facility Agent is Limited by the 2011 Intercreditor Agreement.* ................................................................................................................ 12

  ii.  *In the Event of a Conflict, the 2011 Intercreditor Agreement Governs and Controls.* ................................................................................................................. 12

**CONCLUSION** ........................................................................................................................ **14**

## TABLE OF AUTHORITIES

**Cases**

*Greenfield v. Philles Records*, 98 N.Y.2d 562 (N.Y. 2002) .......................................................... 7

*In re GWLS Holdings, Inc.*, 2009 Bankr. LEXIS 378 (Bankr. D. Del. 2009) ............................... 7

*NML Capital v. Republic of Argentina*, 17 N.Y.3d 250, 260 (N.Y. 2011) .................................... 7

*OppenheimerFunds, Inc. v. TD Bank, N.A.*, 2014 N.Y. Slip Op. 30379, No. 653299/2011 (Sup.
   Ct. 2014) ................................................................................................................................... 13

**Statutes**

11 U.S. Code § 364(d)(1)(B) ......................................................................................................... 4

**PRELIMINARY STATEMENT**

By the DIP Motion,[2] the Debtors are seeking approval of a DIP Facility to be provided by holders of the Debtors' Prepetition First Lien Notes (the "Prepetition Noteholders") that would prime the liens of the DDTL Parties in the Revolving Priority Collateral. Recognizing that they could never satisfy the requirements under Section 364(d)(1)(B) by providing the DDTL Parties with adequate protection, the Debtors' DIP Motion relies upon the "deemed" consent of the DDTL Parties pursuant to a provision in the 2015 Intercreditor Agreement[3] between the PNC Facility Agent and the DDTL Agent. The Debtors' reliance on the 2015 Intercreditor Agreement, however, is misplaced. That agreement is, by its own express terms, subject in all respects to the provisions and limitations of the 2011 Intercreditor Agreement,[4] that governs the relationship between the Prepetition Noteholders, the PNC Facility Lenders and the DDTL Lenders with regards to the Prepetition Collateral securing the various credit facilities. Under the clear and unambiguous language of the 2011 Intercreditor Agreement, the Prepetition Noteholders are prohibited from seeking a priming lien on the Revolving Priority Collateral and therefore the "deemed" consent under the 2015 Intercreditor Agreement is not effective. Since the DDTL Parties have not consented to the DIP Facility, the non-consensual priming lien sought by the Prepetition Noteholders must be denied.

---

[2] *Motion For Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Secured Financing Pursuant to Section 364 of the Bankruptcy Code, (B) Authorizing The Debtors To Use Cash Collateral, (C) Granting Adequate Protection To The Adequate Protection Parties, (D) Scheduling A Final Hearing, And (E) Granting Related Relief* (the "DIP Motion") [D.I. 13]. Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to such terms in the DIP Motion.
[3] A copy of the 2015 Intercreditor Agreement is attached hereto as Exhibit A.
[4] A copy of the 2011 Intercreditor Agreement is attached hereto as Exhibit B.

**BACKGROUND**[5]

1.      On January 28, 2011, the Debtors (1) entered into a Financing Agreement with the PNC Facility Lenders and the PNC Facility Agent for a $35 million revolving credit facility (the "PNC Facility") and (2) issued $130 million of Prepetition First Lien Notes. *See DIP Motion* at 5 & 6.  In connection therewith, on January 28, 2011, the PNC Facility Agent and Prepetition First Lien Notes Trustee entered into the 2011 Intercreditor Agreement, which governs the relationship between the PNC Facility Agent and Prepetition First Lien Notes Trustee with respect to the Prepetition Collateral.

2.      On September 17, 2015, the Debtors entered into a Term Loan Agreement (the "DDTL") with the DDTL Lenders and the DDTL Agent (the "DDTL Parties"), providing for a $13 million delayed draw term loan.  *See DIP Motion* at 8.  The DDTL and the PNC Facility are secured by the same liens on the Revolving Priority Collateral.  *See DIP Motion* at 8.  Accordingly, on September 17, 2015, the DDTL Agent and PNC Facility Agent entered into the 2015 Intercreditor Agreement, which governs the relationship between the PNC Facility Agent and the DDTL Agent with respect to the Revolving Priority Collateral.

3.      The PNC Facility Lenders and the DDTL Lenders have a first lien on the Revolving Priority Collateral and a second lien on the Fixed Asset Priority Collateral.  The Prepetition Noteholders have a first lien on the Fixed Asset Priority Collateral and a second lien on the Revolving Priority Collateral.

4.      On January 29, 2016, the PNC Facility Agent, the DDTL Agent and the Notes Collateral Agent entered into Amendment No. 2 to the 2011 Intercreditor Agreement

---

[5]      Additional background information is contained in the DIP Motion and the Declaration of Timothy B. Stallkamp in Support of Chapter 11 Petitions and First Day Motions (the "Stallkamp Declaration") [D.I. 12].

(the "Second Amendment"), acknowledging that the DDTL constitutes Revolving Obligations under the 2011 Intercreditor Agreement ratifying and confirming the 2011 Intercreditor Agreement.[6]

5.  On the Petition Date, the Debtors filed the DIP Motion seeking approval of a DIP Facility to be provided by the Prepetition Noteholders, that would prime the liens of the DDTL Parties in the Revolving Priority Collateral.

6.  On May 17, 2016, the DDTL Parties filed an objection [D.I. 24] to the DIP Motion on the grounds that the DDTL Parties have not consented to the proposed priming lien on the Revolving Priority Collateral.

7.  At the hearing on the DIP Motion, the Court scheduled a hearing to be held on June 1, 2016, to consider whether the PNC Facility Agent can compel the DDTL Parties to consent to a priming DIP provided by the Prepetition Noteholders notwithstanding the clear language in the 2011 Intercreditor Agreement prohibiting the Prepetition Noteholders from seeking a priming lien.

---

[6] A copy of the Second Amendment is attached hereto as Exhibit C.


## THE DDTL PARTIES HAVE NOT CONSENTED TO A PRIMING LIEN

    A.    <u>The Plain Language of the 2011 Intercreditor Agreement Prohibits the Prepetition Noteholders from Seeking to Obtain a Priming Lien.</u>

8.    Pursuant to Section 12.06 of the 2011 Intercreditor Agreement, the 2011 Intercreditor Agreement is governed by New York law.[7] Under New York law, it is well-settled "that a 'written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.'" *In re GWLS Holdings, Inc.*, 2009 Bankr. LEXIS 378 (Bankr. D. Del. 2009) (citing *Greenfield v. Philles Records*, 98 N.Y.2d 562 (N.Y. 2002)). The Court's responsibility is to enforce the parties' agreement as written, particularly in a case "involving interpretation of documents drafted by sophisticated, counseled parties and involving the loan of substantial sums of money." *NML Capital v. Republic of Argentina*, 17 N.Y.3d 250, 260 (N.Y. 2011).

9.    The 2011 Intercreditor Agreement is complete, clear and unambiguous – the Prepetition Noteholders are prohibited from seeking a priming lien on the Revolving Priority Collateral. Specifically, Section 5.03(a) of the 2011 Intercreditor Agreement provides that:

> **[i]n no event will any of the Senior Secured Parties seek to obtain a priming Lien on any of the Junior Collateral**.

*2011 Intercreditor Agreement*, §5.03(a) (emphasis added).

10.    The relevant definitions are equally clear. Senior Secured Parties means "(b) with respect to the Fixed Asset Priority Collateral, all Notes Secured Parties." *2011 Intercreditor Agreement*, Definition of Senior Secured Parties. Notes Secured Parties means "the holders of the Notes," with "the Notes" referring to the secured notes issued pursuant to

---

[7]   "Governing Law. This Agreement has been delivered and accepted at and shall be deemed to have been made at New York, New York and shall be interpreted, and the rights and liabilities of the parties bound hereby determined, in accordance with the laws of the State of New York, without regard to the conflicts of law principles thereof." *2011 Intercreditor Agreement*, §12.06.

the Indenture. *2011 Intercreditor Agreement*, Definition of Notes Secured Parties & Recitals. Thus, the Prepetition Noteholders – the proposed New Money DIP Lenders (*see DIP Motion* at 9) – are "the holder of the Notes." Finally, Junior Collateral means "(a) with respect to any Notes Secured Party . . . any Revolving Priority Collateral." *2011 Intercreditor Agreement*, Definition of Junior Collateral.

11. Accordingly, pursuant to the clear and unambiguous language of Section 5.03 of the 2011 Intercreditor Agreement, the Prepetition Noteholders (as "Senior Secured Parties") are prohibited from seeking a priming lien on the Revolving Priority Collateral (i.e., the collateral securing the PNC Facility and the DDTL). Yet that is precisely what the Prepetition Noteholders are seeking through the proposed DIP Facility. The 2011 Intercreditor Agreement must be enforced as written and the Prepetition Noteholders are prohibited from seeking a priming lien on the Revolving Priority Collateral.

    B.    <u>The 2011 Intercreditor Agreement Was "Ratified" and "Confirmed" in January 2016.</u>

12. Although the 2011 Intercreditor Agreement was entered into before the DDTL was put in place, all of the parties – including the Prepetition Noteholders – subsequently ratified and confirmed the 2011 Intercreditor Agreement. As part of the recapitalization transactions described in the Stallkamp Declaration (*see* paragraphs 22 through 32), on January 29, 2016, the PNC Facility Agent, on behalf of the PNC Facility Lenders, the DDTL Agent on behalf of the DDTL Lenders <u>and the Notes Collateral Agent on behalf of the Prepetition Noteholders</u>, entered into the Second Amendment to the 2011 Intercreditor Agreement. As part of the Second Amendment, the parties:

- Acknowledged that the DDTL constituted Revolving Obligations subject to any limitation set forth in the 2011 Intercreditor Agreement. *Second Amendment*, §2;

- Reaffirmed the 2011 Intercreditor Agreement and agreed that the "terms of the [2011] Intercreditor Agreement shall remain in full force and effect" and that the 2011 Intercreditor Agreement was "ratified and confirmed in all respects." *Second Amendment*, §5 and §9; and

- Agreed that the Second Amendment "shall not operate as a waiver of any right, power or remedy of the Secured Parties under the [2011] Intercreditor Agreement . . . nor constitute a waiver of any provision of the [2011] Intercreditor Agreement." *Second Amendment*, §7.

13. Thus, although it was already clear, to avoid any doubt, the Prepetition Noteholders confirmed through the Second Amendment that the DDTL was a Revolving Obligation under the 2011 Intercreditor Agreement and that the terms and conditions of the 2011 Intercreditor Agreement not specifically modified by the Second Amendment were "ratified and confirmed in all respects" and "remain in full force and effect."

14. In January 2016, the Prepetition Noteholders were well aware of the terms of the 2011 Intercreditor Agreement – including the prohibition on seeking a priming lien in the Revolving Priority Collateral – and still ratified it. Had the Prepetition Noteholders desired to obtain the ability to prime the DDTL Parties in the Revolving Priority Collateral, the Prepetition Noteholders could have sought that right in connection with the Second Amendment, but chose not to.

    C.    <u>The PNC Facility Agent's Ability to Cause the DDTL Lenders to Consent to a Priming DIP is Limited by the 2011 Intercreditor Agreement</u>

15. In the DIP Motion, the Debtors state that, by reason of the 2015 Intercreditor Agreement, the DDTL Parties are "deemed" to consent to the priming lien granted under the DIP Facility. *DIP Motion* at 32. Specifically, Section 3.2 of the 2015 Intercreditor Agreement provides that in the event that the PNC Facility Agent has consented to

9

postpetition financing provided by the PNC Facility Lenders or "any other Person," the DDTL Lenders have agreed to consent to such financing and have agreed to subordinate their liens to the extent that the liens securing the PNC Facility Agent are *pari passu* or subordinated to such postpetition financing. *See 2015 Intercreditor Agreement*, §3.2(a).

16. The 2015 Intercreditor Agreement, however, cannot be read in isolation. The 2015 Intercreditor Agreement must be read in tandem with the other documents governing the Debtors' prepetition capital structure, most especially the 2011 Intercreditor Agreement.

17. With respect to how the various agreements are to be read together, the 2015 Intercreditor Agreement provides that (i) the rights of the PNC Facility Agent under the 2015 Intercreditor Agreement are subject to the "limitations and provisions" of the 2011 Intercreditor Agreement, and (ii) if there is conflict between the 2015 Intercreditor Agreement and the 2011 Intercreditor Agreement, the 2011 Intercreditor Agreement governs and controls. Specifically, Section 8.19 of the 2015 Intercreditor Agreement provides:

> **NOTES INTERCREDITOR AGREEMENT. NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, (I) THE EXERCISE OF ANY RIGHTS OR REMEDIES BY EACH AGENT OR ANY OTHER CLAIMHOLDER IS SUBJECT TO THE LIMITATIONS AND PROVISIONS CONTAINED IN THAT CERTAIN INTERCREDITOR AGREEMENT, DATED AS OF JANUARY 28, 2011 (AS AMENDED, RESTATED, AMENDED AND RESTATED, SUPPLEMENTED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "NOTES INTERCREDITOR AGREEMENT" [THE "2011 INTERCREDITOR AGREEMENT"]), AMONG PNC BANK, NATIONAL ASSOCIATION AND WELLS FARGO BANK, NATIONAL ASSOCIATION. IN THE EVENT OF ANY CONFLICT BETWEEN THE TERMS OF THE NOTES INTERCREDITOR AGREEMENT AND THE TERMS OF THIS AGREEMENT, THE TERMS OF THE NOTES INTERCREDITOR AGREEMENT SHALL GOVERN AND CONTROL.**
>
> *2015 Intercreditor Agreement*, §8.19 (bold and capitalization in original) (the "Controlling Agreement Provision").

18.	This was a bargained-for provision in the 2011 Intercreditor Agreement, as Section 9.04 of the 2011 Intercreditor Agreement provides:

"[E]ach Junior Agent agrees that each applicable Collateral Document to which it is a party shall include the following language . . . :

NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, (I) THE LIENS AND SECURITY INTERESTS GRANTED TO THE AGENT PURSUANT TO THIS AGREEMENT AND THE EXERCISE OF ANY RIGHT OR REMEDY BY THE AGENT HEREUNDER ARE SUBJECT TO THE PROVISIONS OF THE INTERCREDITOR AGREEMENT DATED AS OF JANUARY [ ]. 2011 (AS AMENDED, RESTATED, SUPPLEMENTED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "INTERCREDITOR AGREEMENT" [THE "2011 INTERCREDITOR AGREEMENT"]), AMONG PNC BANK, NATIONAL ASSOCIATION AND WELLS FARGO BANK, NATIONAL ASSOCIATION.  IN THE EVENT OF ANY CONFLICT BETWEEN THE TERMS OF THE [2011] INTERCREDITOR AGREEMENT AND THE TERMS OF THIS AGREEMENT, THE TERMS OF THE [2011] INTERCREDITOR AGREEMENT SHALL GOVERN."

*2011 Intercreditor Agreement*, §9.04 (capitalization in original).

19.	The term Collateral Documents includes the 2011 Intercreditor Agreement, "the Revolving Collateral Documents, the Notes Collateral Document . . . and all other security agreements, pledged agreements, mortgages, guaranties and other documents executed and/or delivered by any of the Transaction Parties and accepted by any agent." *2011 Intercreditor Agreement*, Definition of Collateral Documents.

20.	The clear language of the 2011 Intercreditor Agreement and the 2015 Intercreditor Agreement provide that the 2011 Intercreditor Agreement is and shall always be the preemptive document controlling the parties' actions with respect to the Prepetition Collateral.  Since the Prepetition Noteholders are specifically precluded from seeking priming liens on the Revolving Priority Collateral by the controlling document, it is not possible to "deem" consent on the part of the DDTL Parties to a priming lien under the 2015 Intercreditor Agreement.

11

      i.      *Any Consent by the PNC Facility Agent is Limited by the 2011 Intercreditor Agreement.*

21.      Although Section 3.2(a) of the 2015 Intercreditor Agreement grants the PNC Facility Agent the right to consent to certain priming DIP facilities to be provided by "any other Person" and to effectively drag along the DDTL Parties, that right, like all other rights provided to the PNC Facility Agent are "subject to the limitations and provisions" contained in the 2011 Intercreditor Agreement. These limitations include the express prohibition against the Prepetition Noteholders seeking priming lien on the Revolving Priority Collateral. In light of the Controlling Agreement Provision and the limitations in the 2011 Intercreditor Agreement, the PNC Facility Agent's consent is ineffective to cause the DDTL Parties to consent to a priming lien in favor of the Prepetition Noteholders.

      ii.      *In the Event of a Conflict, the 2011 Intercreditor Agreement Governs and Controls.*

22.      Section 8.19 of the 2015 Intercreditor Agreement also provides that, in the event of a conflict between the 2011 Intercreditor Agreement and the 2015 Intercreditor Agreement, the terms of the 2011 Intercreditor Agreement govern and control. Here, no conflict exists as the PNC Facility Agent's ability to cause the DDTL Lenders "deemed" consent is expressly limited by the 2011 Intercreditor Agreement as a result of Section 8.19 of the 2015 Intercreditor Agreement. Nevertheless, to the extent the terms of the 2015 Intercreditor Agreement and the 2011 Intercreditor Agreement are in conflict, since the priming lien granted under the DIP Facility is prohibited under the 2011 Intercreditor Agreement and the 2011 Intercreditor Agreement governs and controls in the event of a conflict, any "deemed" consent to the priming under the 2015 Intercreditor Agreement is not effective.

23.     Where the terms of two operative documents conflict, New York courts enforce the operative agreement that is expressly given governing authority. *OppenheimerFunds, Inc. v. TD Bank, N.A.*, 2014 N.Y. Slip Op. 30379, No. 653299/2011 (Sup. Ct. 2014).  In *OppenheimerFunds*, the plaintiffs, who were holders of notes issued pursuant to an indenture, argued that the indenture at issue gave the bondholders authority to enforce their rights as bondholders under an intercreditor agreement to which the bondholders were not a party.  The intercreditor agreement, for its part, stated that there were no third party beneficiaries to the agreement and that third parties would not have any legal or equitable rights or remedies under the intercreditor agreement.  The indenture noted that in the event of any conflict between the indenture and the intercreditor agreement, the intercreditor agreement would govern and control.  The court held that the indenture did not give the plaintiffs standing to pursue any claims under the intercreditor agreement as the intercreditor agreement explicitly precluded third-party beneficiaries and stated that, in the event of a conflict between the indenture and the intercreditor agreement, the intercreditor agreement would govern and control.  *OppenheimerFunds*, 2014 N.Y. Slip Op. 30379 *20.

24.     To the extent a conflict exists here, the circumstances are analogous to those in *OppenheimerFunds*.  The Controlling Agreement Provision dictates that in the event of a conflict between the 2015 Intercreditor Agreement and the 2011 Intercreditor Agreement, the 2011 Intercreditor Agreement governs and controls.  Pursuant to the clear and unambiguous language of the 2015 Intercreditor Agreement and the 2011 Intercreditor Agreement – both of which make clear that the 2011 Intercreditor Agreement controls – and governing New York law, the Court should enforce the Controlling Agreement Provision.

## **CONCLUSION**

The plain language of the 2011 Intercreditor Agreement prohibits the Prepetition Noteholders from seeking a priming lien.  The 2015 Intercreditor Agreement, including the "deemed" consent provision upon which the Debtors rely, is subject to and limited by the terms of 2011 Intercreditor Agreement.  Thus, the Prepetition Noteholders are prohibited from seeking a priming lien on the Revolving Priority Collateral – the collateral securing the DDTL – and any consent by the PNC Facility Agent is ineffective to cause the DDTL Parties to consent to a priming lien.

For the reasons set forth in this Brief, the DDTL Parties respectfully request that this Court deny the DIP Motion insofar as the Prepetition Noteholders seek to obtain a priming lien on the Revolving Priority Collateral.

| | |
|---|---|
| Dated:  May 25, 2016<br>　　　Wilmington, Delaware | /s/ Robert Dehney<br>Robert J. Dehney<br>Andrew R. Remming<br>Morris, Nichols, Arsht & Tunnell LLP<br>1201 North Market Street, 16th Floor<br>P.O. Box 1347<br>Wilmington, Delaware 19811<br>Telephone: (302) 658-9200<br>Facsimile: (302) 658-3989<br>Email: rdehney@mnat.com<br>aremming@mnat.com<br><br>– and –<br><br>FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP<br><br>Gary L. Kaplan (*pro hac* admission pending)<br>Matthew M. Roose (*pro hac* admission pending)<br>Fried, Frank, Harris, Shriver & Jacobson LLP<br>One New York Plaza<br>New York, New York 10004<br>Telephone: (212) 859-8000<br>Facsimile: (212) 859-4000<br>Email: gary.kaplan@friedfrank.com<br>matthew.roose@friedfrank.com<br><br>*Co-Counsel to Private Equity Opportunities LP* |