IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| Constellation Enterprises LLC, et al.,[1] | ) ) ) | Case No. 16-11213 (CSS) |
| Debtors. | ) ) ) | Jointly Administered |

**RESPONSE OF THE PROPOSED NEW MONEY DIP LENDERS
IN SUPPORT OF THE DEBTORS' DIP MOTION AND IN RESPONSE
TO THE DDTL PARTIES' OBJECTION TO THE DIP MOTION**

The proposed New Money DIP Lenders (the "**Proposed New Money DIP Lenders**") respectfully submit this response (the "**Response**") to the *Objection of DDTL Parties* (the "**DDTL Objection**") to the *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Secured Financing Pursuant to Section 364 of the Bankruptcy Code, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Adequate Protection to the Adequate Protection Parties, (D) Scheduling a Final Hearing, and (E) Granting Related Relief* (the "**DIP Motion**").[2]  In support of this Response, the Proposed New Money DIP Lenders respectfully state as follows:

**PRELIMINARY STATEMENT**

1.     In September 2015, Private Equity Opportunities LP, as the DDTL Agent (as defined below), executed two related documents:  the 2015 Intercreditor Agreement and the PEO New Representative Joinder (as defined below).  By their clear terms, both documents restrict the

---

[1] The debtors in these cases, along with the last four digits of the federal tax identification number for each of the debtors, where applicable are:  Constellation Enterprises LLC (9571); JFC Holding Corporation (0312); The Jorgensen Forge Corporation (1717); Columbus Holdings Inc. (8155); Columbus Steel Castings Company (8153); Zero Corporation (0538); Zero Manufacturing, Inc. (8362); Metal Technology Solutions, Inc. (7203); Eclipse Manufacturing Co. (1493); Steel Forming, Inc. (4995).  The debtors' mailing address is located at 50 Tice Boulevard, Woodcliff Lakes, NJ  07677.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the DIP Motion.

rights of the DDTL Parties to interfere with PNC's decisions with respect to how best to protect and maximize the value of the Revolving Priority Collateral, including whether to permit a priming debtor-in-possession facility funded by whomever PNC sees fit.  The 2015 Intercreditor Agreement and the PEO New Representative Joinder, drafted at the time of the incurrence of the DDTL Facility (as defined below), should guide the Court's analysis.

2. The Proposed New Money DIP Lenders submit that the unambiguous provisions of the 2015 Intercreditor Agreement provide that the DDTL Parties (as defined below) are deemed to have consented to this DIP Facility, and the 2011 Intercreditor Agreement, when read (as it must) with due consideration for the PEO New Representative Joinder, does not afford the DDTL Parties the right to argue to the contrary.  Accordingly, for the reasons set forth below, the Court should deny the DDTL Objection.

## BACKGROUND

3. The Debtors' capital structure comprises three secured debt facilities.  **First**, a revolving credit facility provided by PNC (the "**Prepetition PNC Facility**"), secured by a first lien on the Revolving Priority Collateral and with an outstanding principal amount of approximately $17.8 million as of the Petition Date.  **Second**, a delayed-draw term loan facility (the "**DDTL Facility**"), also secured by a first lien on the Revolving Priority Collateral, but "second-out" and subordinated to the Prepetition PNC Facility, and with an outstanding principal amount of approximately $10.6 million as of the Petition Date.  **Third**, the 10.625% First Priority Senior Secured Notes (the "**Prepetition First Lien Notes**"), secured by a first lien on the Fixed Asset Priority Collateral and with an outstanding principal amount of approximately $130 million as of the Petition Date.

4.      In January 2011, (a) PNC Bank, National Association ("**PNC**"), as administrative and collateral agent for the revolving Prepetition PNC Facility (the "**Revolving Collateral Agent**"), on behalf of the lenders under the Prepetition PNC Facility and (b) Wells Fargo Bank, National Association, as collateral agent (the "**Notes Collateral Agent**") for the Prepetition First Lien Notes, on behalf of the holders of the Prepetition First Lien Notes (the "**Prepetition First Lien Noteholders**"), entered into the 2011 Intercreditor Agreement.[3] As noted above, the borrowings under the Prepetition PNC Facility are secured by a first lien on the Revolving Priority Collateral and the Prepetition First Lien Notes are secured by a first lien on the Fixed Asset Priority Collateral. However, the Prepetition PNC Facility and the Prepetition First Lien Notes are also secured by a second lien on the Fixed Asset Priority Collateral and the Revolving Priority Collateral, respectively. The 2011 Intercreditor Agreement documents these respective lien priorities and otherwise regulates the conduct of the Revolving Collateral Agent and the Notes Collateral Agent with respect to the Revolving Priority Collateral and the Fixed Asset Collateral.

5.      By its terms, the 2011 Intercreditor Agreement envisions only two types of financing transactions occurring subsequent to the incurrence of the obligations under the Prepetition PNC Facility and the issuance of the Prepetition First Lien Notes: (a) refinancings[4] and (b) the incurrence of additional debt secured by liens that would be pari passu with those securing the Prepetition First Lien Notes.[5] The 2011 Intercreditor Agreement, however, (x) does

---

[3] The 2011 Intercreditor Agreement is attached hereto as **Exhibit A**.
[4] *See* 2011 Intercreditor Agreement, § 2.06 (Refinancing).
[5] The concept of "Additional Pari Passu Obligations" is only used in relation to the Prepetition First Lien Notes. *See, e.g.,* 2011 Intercreditor Agreement, § 1.01 (defining "**Maximum Fixed Obligation Amount**" as "the sum of the Maximum Addition Pari Passu Amount and the Maximum Notes Amount"; defining "**Senior Liens**" as "(a) with respect to the Revolving Priority Collateral, all Liens securing the Revolving Facility Claims and (b) with respect to the Fixed Asset Priority Collateral, all Liens securing the Notes Claims or the Additional Pari Passu Claims.").

not contain any provisions addressing the incurrence of additional debt secured by liens that would be pari passu with those securing the Prepetition PNC Facility and (y) explicitly disclaims that the agreement envisions any debt subordination.[6] As such, the scope of the 2011 Intercreditor Agreement was limited and never intended to apply to a capital structure that included a facility like the DDTL Facility (as defined, and discussed further, below), which is secured by liens on the Revolving Priority Collateral and subordinated to the Prepetition PNC Facility.

6. In September 2015, the Debtors' financial performance declined, which significantly reduced availability under the Prepetition PNC Facility. *Declaration of Timothy B. Stallkamp in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 12], at ¶ 31. Private Equity Opportunities LP ("**PEO**" or the "**DDTL Agent**"), the Debtors' equity sponsor, agreed to provide the needed liquidity to the Debtors through the DDTL Facility, secured by a lien on the Revolving Priority Collateral. Given the limitations of the 2011 Intercreditor Agreement, and in order to ensure that the Debtors' equity sponsor, as lender under the DDTL Facility, could not impede the rights of PNC with respect to the Revolving Priority Collateral, (a) PNC, as Revolving Collateral Agent and on behalf of the lenders under the Prepetition PNC Facility, and (b) PEO, as DDTL Agent and on behalf of the lenders under the DDTL Facility (collectively, the "**DDTL Parties**") entered into the 2015 Intercreditor Agreement.[7] Pursuant to the 2015 Intercreditor Agreement, the obligations under the Prepetition PNC Facility are "First-Out Obligations" and the obligations under the DDTL Facility are "Last-Out Obligations." The 2015 Intercreditor Agreement described the First-Out Obligations as "fundamentally different

---

[6] 2011 Intercreditor Agreement, § 2.08 ("Nothing in this agreement is intended to subordinate any debt claim by any Junior Secured Party to a debt claim by any Senior Secured Party. All debt claims, including the Revolving Obligations, the Notes Obligations and the Additional Pari Passu Obligations are and are intended to be pari passu").

[7] The 2015 Intercreditor Agreement is attached hereto as **Exhibit B.**

from the Last-Out Obligations" "because of, among other things, their differing rights in the Collateral." 2015 Intercreditor Agreement, § 3.9(b).

7. In addition to imposing a variety of restrictions on the actions that the DDTL Parties can take with respect to the Revolving Priority Collateral,[8] the 2015 Intercreditor Agreement also addresses the respective rights of PNC and the DDTL Parties with respect to debtor-in-possession financing. Specifically, Section 3.2 of the 2015 Intercreditor Agreement provides that, subject to satisfying certain other criteria,[9] if PNC consents to any debtor-in-possession financing that primes the existing liens on the Revolving Priority Collateral, the DDTL Parties are deemed to have consented to such priming debtor-in-possession financing (a "**Permitted Priming DIP Financing**"):

> Until the [obligations under the Prepetition PNC Facility] are Paid in Full, if any Loan Party shall be subject to an Insolvency Proceeding and the Revolver Agent[10] . . . shall desire . . . to permit such Loan Party to obtain financing, whether from a [lender under the Prepetition PNC Facility] or any other Person under Sections 363 or 364 of the Bankruptcy Code or any similar Bankruptcy Law each, a "Post-Petition Financing"), then, the [DDTL Parties] agree that none of them will contest, protest or object to . . . and each [of the DDTL Parties] will be deemed to have consented to, such . . . Post-Petition Financing and, to the extent the Liens securing the [obligations under the Prepetition PNC Facility] are subordinated or pari passu with the liens securing such Post-Petition Financing, the [DDTL Parties] will subordinate their Liens in the [Revolving Priority] Collateral to (x) the Liens securing such Post-Petition Financing (and all obligations relating thereto)…

---

[8] *See, e.g.,* 2015 Intercreditor Agreement § 2.3(d) (imposing a standstill on enforcement actions by the DDTL Parties); § 2.3(f) (imposing a non-interference obligation on the DDTL Parties).

[9] The deemed consent of the DDTL Parties to Post-Petition Financing is subject to the satisfaction of four criteria set forth in Section 3.2(a)(i)-(iv) of the 2015 Intercreditor Agreement, each of which is satisfied with respect to the DIP Facility. *See* DIP Motion at ¶¶ 34-37.

[10] The "Revolver Agent" under the 2015 Intercreditor Agreement and the "Revolving Collateral Agent" under the 2011 Intercreditor Agreement are different defined terms intended to reference the same entity: PNC as administrative and collateral agent for the Prepetition PNC Facility.

2015 Intercreditor Agreement, § 3.2.  The definition of "Person" in the 2015 Intercreditor Agreement contains no restrictions or carve outs, but rather is broadly defined as "any person, individual, sole proprietorship, partnership, joint venture, corporation, limited liability company, trust, business trust, joint stock company, unincorporated organization, association, institution, party, including any Governmental Authority or any other entity of whatever nature."  2015 Intercreditor Agreement, § 1.1 (Definitions).

8. As a consequence of the DDTL Facility being secured by liens on the Revolving Priority Collateral, which collateral was subject to the 2011 Intercreditor Agreement, PEO, as DDTL Agent, executed a joinder to the 2011 Intercreditor Agreement.  The 2011 Intercreditor Agreement provides for two joinder options—a "New Representative Joinder" and an "Additional Joinder Agreement"—and forms of each were attached to the 2011 Intercreditor Agreement.[11]  In September 2015, contemporaneous with signing the 2015 Intercreditor Agreement, PEO signed a "New Representative Joinder" (the "**PEO New Representative Joinder**").[12]  Consistent with the Form New Representative Joinder, the PEO New Representative Joinder provides that PEO agrees to be bound by the 2011 Intercreditor Agreement as "a Revolving Collateral Agent."  However, the PEO New Representative Joinder deviated from the form of New Representative Joinder by also including the following clarifying and limiting language:

> Notwithstanding the execution, delivery and performance of this New Representative Joinder, the Term Loan Agreement or the documents to be delivered in connection therewith, *PNC Bank, National Association, in its capacity as Revolving Collateral Agent, shall remain the "Revolving Collateral Agent" for all purposes under the Intercreditor Agreement until the Revolving*

---

[11] The form of New Representative Joinder (the "**Form New Representative Joinder**") and the form of Additional Joinder Agreement are Exhibits B and C, respectively, to the 2011 Intercreditor Agreement.

[12] The PEO New Representative Joinder is attached hereto as **Exhibit C**.  As discussed further below, it is significant that PEO signed a New Representative Joinder, as opposed to an Additional Joinder Agreement.

> ***Obligations under the Revolving Credit Agreement are paid in full***, after which time the New Representative shall be the "Revolving Collateral Agent" for all purposes under the Intercreditor Agreement.

PEO New Representative Joinder (emphasis added).

9. On the Petition Date, the Debtors filed the DIP Motion, seeking approval of the DIP Facility that, with the consent of PNC, would prime the liens of the DDTL Parties on the Revolving Priority Collateral. The DDTL Parties objected to the DIP Motion, arguing that despite the plain language of Section 3.2 of the 2015 Intercreditor Agreement, the 2011 Intercreditor Agreement provides that the DDTL Parties' consent is required for the Permitted Priming DIP Financing. As the Court is aware, PNC agreed to provide the Debtors with $3 million of interim debtor-in-possession financing under the DIP Facility in order to provide liquidity for the Debtors' operations and allow time for the parties to brief the intercreditor issues raised in the DDTL Objection.

## ARGUMENT

10. The 2015 Intercreditor Agreement unambiguously provides that if PNC consents to a Permitted Priming DIP Financing provided by any person, the DDTL Parties are deemed to have consented to such financing. The DDTL Objection, premised on the argument that there is a conflict between the 2015 Intercreditor Agreement and the 2011 Intercreditor Agreement, must be overruled because (a) consistent with the 2015 Intercreditor Agreement, the PEO New Representative Joinder provides that until the obligations to PNC are paid in full, PNC remains in control, as Revolving Collateral Agent, with respect to the decision to permit a priming lien on the Revolving Priority Collateral and (b) the DDTL Parties' execution of a "New Representative Joinder" as opposed to an "Additional Joinder Agreement" is further proof that the parties intended for PNC to maintain such control.

### A. The Legal Standard

11. The 2011 Intercreditor Agreement and the 2015 Intercreditor Agreement (collectively, the "**Intercreditor Agreements**") are both governed by, and are to be construed in accordance with, the laws of the State of New York. *See* 2011 Intercreditor Agreement, § 12.06; 2015 Intercreditor Agreement, § 8.8(a). Interpretation of provisions in credit documents or their corresponding intercreditor agreements is a matter of basic contract law. *In re Smurfit-Stone Container Corp.*, 444 B.R. 111, 118 (Bankr. D. Del. 2011) (applying New York contract law). Courts interpreting a contract under New York law will enforce the contract according to the plain meaning of its clear and unambiguous terms, "so as to give effect to the intent of the parties." *In re Yes! Entm't Corp.*, 336 B.R. 203, 206 (Bankr. D. Del. 2006). Where the agreement is clear and unambiguous on its face, "the Court need not look 'outside the four corners' of a complete document to determine what the parties intended." *In re Energy Future Holdings Corp.*, 548 B.R. 79, 88 (Bankr. D. Del. 2016) (citing *W.W.W. Assoc's., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162, 566 N.E.2d 639, 642 (1990)); *see also In re Delta Mills, Inc.*, 404 B.R. 95, 106 (Bankr. D. Del. 2009) (the parties' intent is to be "gleaned from within the four corners of the instrument"). When analyzing the parties' intent in entering into a contract, "courts are to construe contract terms so as, where possible, to give rational meaning to all provisions in the document." *Glencore Ltd. v. Degussa Engineered Carbons L.P.*, 848 F. Supp. 2d 410, 433 (S.D.N.Y. 2012) (citing *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.,* 626 F.3d 699, 729 (2d Cir. 2010) (The "primary concern when interpreting a contract is to ascertain and give effect to the intent of the parties as that intent is expressed in the contract. To discern this intent, we examine and consider *the entire writing* in an effort to harmonize and give

effect to *all the provisions* of the contract so that none will be rendered meaningless") (emphasis in original).

12. Further, when two contracts govern substantially the same parties and expected performance, courts will attempt, if at all possible, to read those two contracts as being consistent with one another and imposing consistent contractual responsibilities. *See Liberty USA Corp. v. Buyer's Choice Ins. Agency LLC.*, 386 F. Supp. 2d 421, 425 (S.D.N.Y. 2005) (recognizing that "[i]n New York, it is the general rule that written contracts executed simultaneously and for the same purpose must be read and interpreted together") (citing 22 N.Y. Jur 2d, Contracts § 258 ("In the absence of anything to indicate the contrary intention, instruments executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction will be read and interpreted together, it being said that they are, in the eyes of the law, one instrument")); *see also In re: Residential Capital, LLC,* 533 B.R. 379, 396 (Bankr. S.D.N.Y. 2015) ("Generally, separate writings are construed as one agreement if they relate to the same subject matter and are executed simultaneously") (citing *Polner v. Monchik Realty Co.*, 9 Misc. 3d 755, 803 N.Y.S.2d 370 (N.Y. Sup. Ct. 2005) ("These two documents were executed at substantially the same time by the same parties, concern the same subject matter, and refer to each other. Consequently, they were contemporaneous writings, forming part of the same transaction and their provisions must be read and interpreted together and harmonized")).

**B. It is Undisputed that the Plain Meaning of Section 3.2 of the 2015 Intercreditor Agreement Provides the DDTL Parties Cannot Object to the Priming Liens Granted by the DIP Facility**

13. The meaning of Section 3.2 of the 2015 Intercreditor Agreement is not in dispute. As the DDTL Parties concede, "assuming compliance with all other terms and conditions of Section 3.2 of the 2015 Intercreditor Agreement, the DDTL Parties are deemed to consent to a

priming lien" and "in the event that the Prepetition PNC Credit Facility Agent has consented to postpetition financing provided by PNC or 'any other Person,' the Prepetition DDTL Lenders have agreed to consent to such financing and have agreed to subordinate their liens to the extent that the liens securing the Prepetition PNC Credit Facility Agent [sic] are *pari passu* or subordinated to such post-petition financing." DDTL Objection at ¶ 3. Despite the clear and unambiguous language of Section 3.2 of the 2015 Intercreditor Agreement, the DDTL Parties argue that (a) Section 5.03(a) of the 2011 Intercreditor Agreement, which states that "[i]n no event will any of the Senior Secured Parties seek to obtain a priming lien on any of the Junior Collateral," means that the DDTL Parties' consent is required for the Permitted Priming DIP Financing provided by the Prepetition First Lien Noteholders and (b) Section 8.19 of the 2015 Intercreditor Agreement provides that in the event of a conflict between the Intercreditor Agreements, the 2011 Intercreditor Agreement controls. *See id.* at ¶¶ 5-6. As discussed below, the DDTL Objection fails.

14. In addition to considering arguments below, the Proposed New Money DIP Lenders submit that the Court cannot overlook the use of the phrase "any other Person" in Section 3.2 of the 2015 Intercreditor Agreement. In order to sustain the DDTL Objection, the Court must read "any other Person" to mean "any other Person, ***other than the Prepetition First Lien Noteholders***." Surely, had the parties to the 2015 Intercreditor Agreement intended to so limit PNC's authority to consent to debtor-in-possession financing, one would expect to have seen such limiting language in the 2015 Intercreditor Agreement. *See In re South Side House, LLC*, 451 B.R. 248, 262 (Bankr. E.D.N.Y. 2011), *aff'd* 2012 WL 273119 (E.D.N.Y. Jan. 30, 2012) (applying New York law) ("[C]ourts should be extremely reluctant to interpret an

agreement as impliedly stating something which the parties have neglected to specifically include . . .") (internal quotations omitted).

### C. The PEO New Representative Joinder Forecloses the DDTL Parties' Ability to Avoid the Clear Language in Section 3.2 of the 2015 Intercreditor Agreement

15. The DDTL Parties were not originally a party to the 2011 Intercreditor Agreement, and any right of the DDTL Parties to object to the DIP Facility pursuant to the 2011 Intercreditor Agreement exists through the PEO New Representative Joinder. Therefore, the PEO New Representative Joinder, executed contemporaneously with the 2015 Intercreditor Agreement, is crucial to this dispute. If the Court considers the PEO New Representative Joinder and the contemporaneously executed 2015 Intercreditor Agreement together – as the case law requires – it becomes clear that the conflict alleged by the DDTL Parties does not exist. Rather, the 2015 Intercreditor Agreement and the PEO New Representative Joinder evince a common understanding: (a) Section 3.2 of the 2015 Intercreditor Agreement unambiguously provides that PNC has sole discretion with respect to whether to allow a Permitted Priming DIP Financing provided by any person and (b) for the two reasons discussed below, the PEO New Representative Joinder makes clear that, "notwithstanding" that the DDTL Agent is joining the 2011 Intercreditor Agreement, until the obligations owed to PNC are paid in full, PNC, as the Revolving Collateral Agent, maintains sole discretion with respect to decisions regarding the Revolving Priority Collateral.

16. **First**, the modifications to the form New Representative Joinder contained in the PEO New Representative Joinder make clear that until such time as the PNC obligations are paid in full, PNC and the DDTL Parties intended for PNC, as Revolving Collateral Agent, to maintain exclusive decision-making authority with respect to all matters relating to the Revolving Priority Collateral, including whether to permit priming debtor-in-possession financing. Rather than sign

the Form New Representative Joinder, PEO signed a modified version, which included additional language making it explicit that "notwithstanding the execution" of the joinder, PNC was to retain all rights and decision-making authority under the 2011 Intercreditor Agreement as "***the*** Revolving Collateral Agent for ***all purposes*** under the Intercreditor Agreement until the Revolving Obligations under the Revolving Credit Agreement are ***paid in full***."  *See* PEO New Representative Joinder (emphasis added).[13]   Indeed, it is difficult to fathom that PNC would sign the 2015 Intercreditor Agreement, which explicitly provides PNC with exclusive decision-making authority vis-à-vis a junior creditor (that is also Debtors' equity sponsor) with respect to whether to permit priming debtor-in-possession financing, and, on the very same day have that junior creditor execute another agreement that would not likewise preserve that very same exclusive decision-making authority.  Accordingly, supplementing the Form New Representative Joinder with the additional language found in the PEO New Representative Joinder is logical and consistent with the contemporaneously executed 2015 Intercreditor Agreement.  Guiding principles of contract interpretation mandate that this additional language be given meaning.  *See Glencore Ltd.*, 848 F. Supp. 2d at 433.

17.     **Second**, it is also significant that PEO signed a New Representative Joinder, rather than an Additional Joinder Agreement.  The 2011 Intercreditor Agreement provided two options for joinders, depending upon the circumstances under which a party was joining the 2011 Intercreditor Agreement.  One the one hand, a "New Representative Joinder" was intended to be used in connection with a refinancing when a "new" Revolving Collateral Agent or Notes Collateral Agent was stepping into the shoes of, and replacing, an "old" Revolving Collateral Agent and/or Notes Collateral Agent and inheriting the rights of such party.  *See* 2011

---

[13]   The Revolving Collateral Agent and the Notes Collateral Agent are the only two signatories to the 2011 Intercreditor Agreement (along with the Debtors who signed an acknowledgement) and, therefore, are the two parties through whom all rights under the 2011 Intercreditor Agreement flow.

Intercreditor Agreement, § 2.06 (noting that the "holders of such Refinancing Indebtedness . . . bind themselves in writing to the terms of this Agreement pursuant to a joinder substantially in the form of Exhibit B (New Representative Joinder)).  On the other hand, an "Additional Joinder Agreement" was intended to be used when an "additional" collateral agent, with rights side-by-side (or *pari passu*) with those of the Revolving Collateral Agent and Notes Collateral Agent joined the 2011 Intercreditor Agreement.  *See* 2011 Intercreditor Agreement, at pp. 3-4 (noting that an Additional Joinder Agreement must be executed in connection with the Debtors' incurrence of "Additional Pari Passu Obligations").  As discussed above, however, the 2011 Intercreditor Agreement did not envision the agent for a facility such as DDTL Facility, with obligations subordinate to those of the Prepetition PNC Facility, joining the 2011 Intercreditor Agreement.

18.     Thus, when faced with the decision as to whether PEO would sign a New Representative Joinder or an Additional Joinder Agreement, the documents reflect that PEO and PNC determined that the DDTL Parties were not "additional" parties, which would have afforded the DDTL Parties rights under the 2011 Intercreditor Agreement equivalent to those of PNC.  Rather, the documents reflect that PNC and PEO agreed that the DDTL Parties were akin to a refinancing party that would ultimately replace PNC as Revolving Collateral Agent, with all rights attendant thereto, ***but not until the PNC obligations were paid in full.***  Accordingly, the use of a the PEO New Representative Joinder, as opposed to the Additional Joinder Agreement, further supports the notion that PNC and the DDTL Parties did not intend to give back to the DDTL Parties the right to object to the Permitted Priming DIP Financing provided by the Prepetition First Lien Noteholders, which right was explicitly taken away from the DDTL Parties in the 2015 Intercreditor Agreement.

19. Together, the 2015 Intercreditor Agreement and the PEO New Representative Joinder make clear that until the obligations to PNC are paid in full, PNC has exclusive discretion with respect to whether to allow a Permitted Priming DIP Financing provided by any person. The DIP Facility is a Permitted Priming DIP Financing, and this Court should not grant additional rights to the DDTL Parties that they have not contractually bargained for, and have explicitly deferred.

*[Remainder of page intentionally left blank]*

## CONCLUSION

20. **WHEREFORE**, the Proposed New Money DIP Lenders and Ad Hoc Group request that the Court (i) overrule the DDTL Parties' Objection in its entirety, (ii) grant the interim relief requested by the DIP Motion, (iii) proceed with a final hearing to consider the relief proposed in the DIP Motion and (iv) grant other such and further relief as the Court may deem just, proper and equitable.

Dated: May 25, 2016
      Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

By: /s/ *M. Blake Cleary*

M. Blake Cleary (No. 3614)
Elizabeth S. Justison (No. 5911)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

AKIN GUMP STRAUSS HAUER & FELD LLP
Scott L. Alberino, Esq. (admitted *pro hac vice*)
Robert S. Strauss Building
1333 New Hampshire Avenue, NW
Washington, DC 20036
Telephone: (202) 887-4000
Facsimile: (202) 887-4288

Abid Qureshi, Esq. (admitted *pro hac vice*)
Jason P. Rubin, Esq. (admitted *pro hac vice*)
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

*Counsel to the Proposed New Money DIP Lenders*