# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | **Chapter 11** |
| | ) | |
| **Constellation Enterprises LLC, *et al.*,**[1] | ) | **Case No. 16-11213 (CSS)** |
| | ) | |
| Debtors. | ) | **Jointly Administered** |
| | ) | |
| | ) | Hearing Date:  June 15, 2016 at 10:00 a.m. (ET) |
| | ) | Obj. Deadline:  June 8, 2016 at 4:00 p.m. (ET) |

## DEBTORS' MOTION FOR ENTRY OF
## (I) AN ORDER AUTHORIZING THE SALE OF
## CSC'S ASSETS TO THE PRIVATE SALE PURCHASER
## OR, IN THE ALTERNATIVE, (II) (A) AN ORDER ESTABLISHING
## BIDDING PROCEDURES AND GRANTING RELATED RELIEF AND (B) AN
## ORDER APPROVING THE SALE OF CSC'S ASSETS TO THE SUCCESSFUL BIDDER

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors")

hereby submit this motion (the "Motion") for (A) entry of an order (the "Private Sale Order"),

(i)     authorizing and approving the sale (the "Private Sale") of substantially all of the assets (the "Assets")[2] of Debtor Columbus Steel Castings Company ("CSC") to a private purchaser (the "Private Sale Purchaser");

(ii)    authorizing the Debtors to enter into, and approving the *Asset Purchase Agreement by and Between the Private Sale Purchaser as Purchaser and Columbus Steel Castings Company as Seller* (the "Private Sale APA");[3]

---

[1]  The debtors in these cases, along with the last four digits of the federal tax identification number for each of the debtors, where applicable are:  Constellation Enterprises LLC (9571); JFC Holding Corporation (0312); The Jorgensen Forge Corporation (1717); Columbus Holdings Inc. (8155); Columbus Steel Castings Company (8153); Zero Corporation (0538); Zero Manufacturing, Inc. (8362); Metal Technology Solutions, Inc. (7203); Eclipse Manufacturing Co. (1493); and Steel Forming, Inc. (4995).  The debtors' mailing address is located at 50 Tice Boulevard, Suite 340, Woodcliff Lakes, NJ  07677.

[2]  As part of the Private Sale or any other Sale Transaction (as defined below), it is contemplated that CSC's real property assets may be acquired by another party pursuant to a separate purchase agreement.  In such a circumstance, the Debtors will seek approval of that transaction in the Private Sale Order or the Sale Order, as applicable.

[3]  The Debtors and the Private Sale Purchaser are in the process of negotiating the terms and provisions of the Private Sale APA.  The Debtors intend to finalize the Private Sale APA with the Private Sale Purchaser on or prior to June 3, 2016 and file the final or substantially final agreement with the Court on that date.  In the event that the Debtors and the Private Sale Purchaser are unable to finalize the Private Sale APA by June 3, 2016, the Debtors will, in any event, file the form of Private Sale APA with the Court on such date.

(iii)    approving procedures for the assumption and assignment of executory contracts and unexpired leases to the Private Sale Purchaser, including notice of proposed cure amounts (the "<u>Assumption and Assignment Procedures</u>");

(iv)    granting the Private Sale Purchaser the protections afforded to a good faith purchaser, and

(v)    granting certain other related relief (collectively, the "<u>Private Sale Option</u>");

or, alternatively, in the event that the Debtors, in the exercise of their fiduciary duties and in consultation with the official committee of unsecured creditors (the "<u>Committee</u>"), the Ad Hoc Group of Secured Notes, the DIP Lenders, Private Equity Opportunities LP and PNC Bank (together, the "<u>Consultation Parties</u>"),[4] determine that a stalking horse should be designated and/or a formal auction should be held with respect to the Assets, (B) entry of an order, substantially in the form attached hereto as <u>Exhibit A</u> (the "<u>Bidding Procedures Order</u>"),

(i)    approving the proposed bidding procedures attached hereto as <u>Exhibit B</u> (the "<u>Bidding Procedures</u>") by which the Debtors will solicit and select the highest or otherwise best offer for the sale of the Assets (a "<u>Sale Transaction</u>" or "<u>Sale</u>");

(ii)    establishing and approving the Assumption and Assignment Procedures with respect to the Successful Bidder;

(iii)    to the extent the Debtors' seek such approval, approving the Debtors' selection of a stalking horse bidder (a "<u>Stalking Horse Bidder</u>"), if any, and the provision of Bid Protections (as defined below) to such Stalking Horse Bidder, if any;

(iv)    scheduling (a) an auction (the "<u>Auction</u>") if the Debtors receive two or more Qualified Bids (as defined below); and (b) a final hearing (the "<u>Sale Hearing</u>") to approve one or more Sales of the Assets; and

(v)    granting related relief.

---

[4]  In each instance in the Bidding Procedures where the Consultation Parties are provided with consultation rights, such rights are subject to the consent rights, as applicable, provided for under the DIP Facility and any order approving the *Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Secured Financing Pursuant to Section 364 of the Bankruptcy Code, (B) Authorizing the Debtors to use Cash Collateral, (C) Granting Adequate Protection to the Adequate Protection Parties, (D) Scheduling a Final Hearing, and (E) Granting Related Relief* [D.I. 13].

In the event the Bidding Procedures Order is entered, the Debtors further request that at the Sale Hearing, this Court enter an order (the "Sale Order"), which will be filed before the Sale Hearing,

(i)     authorizing the sale of the Assets free and clear of liens, claims, interests and encumbrances to the Successful Bidder (collectively, the "Interests");

(ii)    authorizing the assumption and assignment of certain executory contracts and unexpired leases; and

(iii)   granting related relief (the Bidding Procedures Order and the Sale Order concepts are collectively referred to herein as the "Bid and Sale Option").

In support of this Motion, the Debtors state as follows:

## PRELIMINARY STATEMENT

1.     The Debtors, with the assistance of their advisors, including an investment banker, have marketed CSC's assets for sale for over a year.  As a result of that extensive marketing process, the Debtors received numerous indications of interest but, until the Debtors received a letter of intent from the Private Sale Purchaser (the "Private Sale LOI") in the weeks leading up to the Petition Date, no offer materialized.

2.     The Debtors believe that consummating a prompt private sale to the Private Sale Purchaser is in the best interest of the Debtors' estates for three reasons.  First, given the extensive pre-petition marketing process, the Debtors do not believe that further marketing the Assets pursuant to an extended and formal bid process would result in a higher or better bid that can close as quickly as the Private Sale.  In fact, the Debtors believe that such a process would cause both delay and significant administrative expenses without any real or demonstrable attendant benefit.  Second, the Debtors believe that a significant portion of the value of the Assets is CSC's employees, many of whom boast technical and specialized skills.  However, due to CSC's operational issues, nearly all of those employees have been temporarily laid off pre-

3

petition pursuant to WARN Act notices.  If the marketing process extends for a prolonged period

of time, those employees may find other employment which, the Debtors believe, would

significantly depress the value of any bids that the Debtors would receive for the Assets.  Third,

and building upon the preceding concern of the risk of delay adversely affecting the ability to

consummate any sale of CSC as a going concern, the Private Sale Purchaser -- the only party to

express a genuine interest in purchasing CSC on an expedited basis to preserve operations -- has

expressed concerns about proceeding with any Sale Transaction following an extended sale

process due to concerns about the instability surrounding CSC's currently idled business.

3.       Nevertheless, by the Motion, the Debtors are seeking approval of a process that

permits the Debtors to run a formal bid process if the Debtors, in the continued exercise of their

fiduciary duties and in consultation with the Consultation Parties, determine that running such a

process will maximize the value of the Debtors' estates.  In other words, the Motion preserves

the flexibility necessary in this fluid circumstance to allow the Debtors to preserve CSC as a

going concern and maximize the value of the Debtors' estates for the benefit of the Debtors'

stakeholders.

4.       In sum, the Debtors believe that the Motion -- whether it seeks approval of a

private sale to the Private Sale Purchaser or the sale to the winning bidder at an auction -- is

designed to maximize the value of the Assets for the benefit of the Debtors' stakeholders.

Accordingly, the relief being sought in the Motion is a valid exercise of the Debtors' business

judgment and, therefore, should be approved.

## **JURISDICTION**

5.       This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and

1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue is proper pursuant to

28 U.S.C. §§ 1408 and 1409.

4

6.      The statutory bases for the relief requested herein are sections 105, 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code"); rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and rules 2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## BACKGROUND

**A.      General Background**

7.      On May 16, 2016 and May 17, 2016 (together, the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing the above-captioned chapter 11 cases (the "Chapter 11 Cases"). The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Additional information regarding the Debtors' businesses and the background relating to events leading up to the Chapter 11 Cases can be found in the *Declaration of Timothy B. Stallkamp in Support of First Day Motions* [Docket No. 12] (the "Stallkamp Declaration"). On May 25, 2016, the Office of the United States Trustee (the "U.S. Trustee") appointed the Committee. As of the date hereof, no trustee or examiner has been appointed in the Chapter 11 Cases.

**B.      Specific Background**

8.      As is set forth in greater detail in the Stallkamp Declaration, following operational challenges at CSC's facility, the Debtors decided in early 2015 to market CSC for sale. In late 2015, the Debtors engaged Lincoln International ("Lincoln") as an investment banker to assist with the marketing process and focused their efforts on selling CSC. Lincoln contacted fifty-five parties (both global strategic and domestic financial buyers) regarding the sale of CSC, which resulted in thirty-one parties executing confidentiality agreements. Thereafter, twelve parties

5

submitted indications of interest, and seven of those parties attended management presentations, which resulted in the submission of two letters of intent. Unfortunately, neither letter of intent materialized into a formal offer to buy CSC. Furthermore, the pre-petition sale process was complicated by problems with equipment at CSC's facility and the need for material new capital expenditures. The inability to sell CSC prior to the Petition Date contributed to the operational drain of the Debtors and the commencement of the Chapter 11 Cases, and CSC continues to burden the Debtors' operations.

9.    However, in the weeks leading up to the Petition Date, the Debtors received the Private Sale LOI, which contemplated a sale of the Assets to the Private Sale Purchaser pursuant to section 363 of the Bankruptcy Code. As of the Petition Date, the Debtors were still evaluating the bid in the Private Sale LOI. However, over the last week, the Debtors made the determination that seeking to consummate that bid pursuant to the Private Sale APA but with the option, through the Bidding Procedures, to designate a Stalking Horse Bidder and/or hold an Auction, is the course of action most likely to maximize value. Accordingly, on the date hereof, the Debtors filed the Motion.

**C.    The Proposed Timeline**

*i.    Proposed Timeline for the sale of the Assets*

10.    The Debtors propose the following timeline for the sale of the Assets:[5]

| Deadline | Action |
|---|---|
| May 31, 2016 | The Debtors will file and serve: <br><br>(i) notice of potential assumption and assignment of contracts and leases and related cure amounts; and <br><br>(ii) the form of Private Sale Order |
| June 3, 2016 | The Debtors will file and serve the final or substantially final Private Sale APA or the form of Private Sale APA |

---

[5]    The Debtors, in the exercise of their business judgment and in consultation with the Consultation Parties, reserve the right to change these sale-related dates to achieve the maximum value for the Assets.

| | The Debtors will file and serve a notice of one of the following: |
|---|---|
| June 8, 2016 at 4:00 p.m. (ET) | (i) designating a Stalking Horse Bidder and indicating that the Debtors intend to seek entry of the Bidding Procedures Order and approval of Bid Protections at the hearing scheduled for June 15, 2016; |
| | (ii) indicating that the Debtors are not designating a Stalking Horse Bidder (or approval of Bid Protections) but intend to seek entry of the Bidding Procedures Order at the hearing scheduled for June 15, 2016; or |
| | (iii) stating that Debtors are proceeding with the Private Sale |
| June 8, 2016 at 4:00 p.m. (ET) | Deadline to object to the Motion, including the Private Sale |
| June 10, 2016 at 4:00 p.m. (ET) | Deadline to object to (i) potential assumption and assignment of contracts and leases, (ii) related cure amounts and (iii) adequate assurance of future performance with respect to the Private Sale Purchaser |
| June 15, 2016 at 10:00 a.m.[6] | Hearing on approval of (i) Private Sale or (ii) the Bidding Procedures and the Stalking Horse Bidder (and Bid Protections) (if any) |
| June 30, 2016 at 5:00 p.m. (ET) | Deadline to submit Qualified Bids |
| July 1, 2016 at 10:00 a.m. (ET) | Auction (if necessary) |
| July 5, 2016 at 4:00 p.m. (ET) | Deadline to object to the Sale to the Successful Bidder, including adequate assurance of future performance of such bidder |
| July 7, 2016 at a time to be determined by the Court | Hearing on approval of the Sale to the Successful Bidder |

The Debtors submit that this proposed timeline is reasonable and will not prejudice any parties in interest.

**D.    The Private Sale Option**

11.    The Debtors and their advisors are in the process of finalizing the Private Sale APA with the Private Sale Purchaser and, as indicated above, intend to file the final or substantially final Private Sale APA by no later than June 3, 2016.  If the Debtors and the Private Sale Purchaser are unable to finalize the Private Sale APA by June 3, 2016, then the Debtors will file the form of Private Sale APA.  If the Debtors file the final or substantially final Private Sale

---

[6]  If the approval of the Private Sale goes forward at the June 15, 2016 hearing, then the dates and deadlines listed thereafter are no longer applicable.

APA with the Private Sale Purchaser, then the Debtors will include with such filing, among other things, a notice that identifies the salient terms of such agreement in accordance with Local Rule 6004-1.

**E.        The Bid and Sale Option**

12.        In the event that the Debtors, in consultation with the Consultation Parties, determine that, instead of proceeding with the Private Sale, a stalking horse should be designated and/or a formal auction should be held with respect to the Assets, the Debtors will seek approval of the Bidding Procedures.  The Bidding Procedures are designed to maximize value for the Debtors' estates, while ensuring an orderly and efficient sale process.  The Bidding Procedures describe, among other things, (i) the procedures for interested parties to access due diligence materials, submit bids and become qualified as a Stalking Horse Bidder or to participate in the Auction; (ii) the time, place and process of any Auction; (iii) the selection and approval of any ultimately successful bidders; and (iv) the deadlines with respect to the foregoing.  The Debtors believe that the Bidding Procedures provide for a sale process that will maximize the value of their estates and encourage robust participation in the bid process from all potential bidders.

13.        A summary of the principal terms of the Bidding Procedures, a complete copy of which is attached hereto as <u>Exhibit B</u>, including the terms that are required to be highlighted in accordance with Local Rule 6004-1, is as follows:[7]

| **Assets to Be Sold** | All or substantially all of CSC's assets, properties, rights and interests[8] |
|---|---|

---

[7]    The following summary is qualified in its entirety by reference to the provisions of the Bidding Procedures.  In the event of any inconsistencies between the provisions of the Bidding Procedures and the terms herein, the terms of the Bidding Procedures shall govern.  Capitalized terms used in this table and not otherwise defined have the meaning ascribed to them in the Bidding Procedures.

[8]    For the avoidance of doubt, the "Assets" subject to this Motion do not include any of the assets being sold pursuant to the *Debtors' Motion for (I) an Order Establishing Bidding Procedures and Granting Related Relief and (II) an Order or Orders Approving the Sale of the Assets*, which is being filed contemporaneously herewith.

8

| | |
|---|---|
| **Access to Diligence Materials** | To receive access to due diligence materials and to participate in the bidding process, an interested party must submit to the Debtors or already be bound by (i) an executed confidentiality agreement in form and substance satisfactory to the Debtors, (ii) evidence demonstrating the party's financial ability to consummate a Sale Transaction for the Assets and (iii) a statement that such party has a bona fide interest in purchasing all or some of the Assets.

A party who, in the Debtors' reasonable discretion, satisfies the requirements set forth in the immediately preceding sentence for receiving access to diligence materials shall be a "Diligence Party." As promptly as practicable after the Debtors determine that a party is a Diligence Party, the Debtors will deliver to the Diligence Party access to the Debtors' confidential electronic data room. The Debtors will afford any Diligence Party the time and opportunity to conduct reasonable due diligence before the earlier of (i) entry of an order approving the Private Sale or (ii) the Bid Deadline. Notwithstanding the foregoing, the Debtors reserve the right to withhold any diligence materials that the Debtors determine are sensitive or otherwise not appropriate for disclosure to a Diligence Party who the Debtors determine is a competitor of the Debtors or is affiliated with any competitor of the Debtors. Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be a Diligence Party. The Debtors shall not exclude a party from diligence who has complied with subsections (i) and (ii) of the preceding paragraph, unless they have first consulted with the Consultation Parties regarding such determination. |
| **Qualification of Bidders and Qualified Bids** | To be eligible to participate in the Auction, each offer, solicitation or proposal (each, a "Bid"), and each party submitting such a Bid (each, a "Bidder") must satisfy each of the conditions set forth below, as determined by the Debtors. A Bid will not be considered qualified for the Auction if such Bid does not satisfy each of the following conditions:

    (a)    Good Faith Deposit: Each Bid for all or a portion of the Assets must be accompanied by a deposit (a "Good Faith Deposit") submitted by wire transfer of immediately available funds to an account identified by the Debtors. Each Good Faith Deposit must equal (1) in the case of a Bid for all or a portion of the Assets, the amount of five percent (5%) of the purchase price, or (2) such other amount as the Debtors determine, in consultation with the Consultation Parties.

    (b)    Bids for Portions of the Assets: A Bid may offer to purchase all or substantially all of the Debtors' Assets or only a portion of the Assets. The Debtors may, in consultation with the Consultation Parties, waive or modify the application of the Qualified Bid conditions in respect of Bids for a portion of the |

Assets, including, *inter alia*, the amount of the Good Faith Deposit.

(c)     Same or Better Terms:  To the extent a Stalking Horse Bidder is selected, each subsequent Bid for any Assets subject to the Stalking Horse Agreement (alone or combined with Bids for other Assets subject to the Stalking Horse Agreement) must be on terms that, in the Debtors' business judgment, in consultation with the Consultation Parties, are the same or better than the terms of the Stalking Horse Agreement.

(d)     Executed Agreement:    Each Bid must include an asset purchase agreement that is based on the Private Sale APA and must include executed transaction documents, signed by an authorized representative of such Bidder, pursuant to which the Bidder proposes to effectuate a Sale Transaction (the "Modified Purchased Agreement").  A Bid shall also include a copy of the Modified Purchase Agreement marked against the Private Sale APA to show all changes requested by the Bidder (including those related to purchase price).

(e)     Designation of Assigned Contracts and Leases, Payment of Cure Amounts:  A Bid must identify any and all executory contracts and unexpired leases of the Debtors that the Bidder wishes to have assumed and assigned to it at closing and provide for the payment of all cure amounts payable with respect to such contracts and leases under the Bankruptcy Code.

(f)     Corporate Authority:  A Bid must include written evidence reasonably acceptable to the Debtors demonstrating appropriate corporate authorization to consummate the proposed Sale Transaction, *provided* that, if the Bidder is an entity specially formed for the purpose of effectuating the Sale Transaction, then the Bidder must furnish written evidence reasonably acceptable to the Debtors of the approval of the Sale Transaction by the equity holder(s) of such Bidder.

(g)     Disclosure of Identity of Bidder:  A Bid must fully disclose the identity of each entity that will be bidding for or purchasing the Assets or otherwise participating in connection with such Bid (including any equity holder or other financial backer if the Bidder is an entity specifically formed for the purpose of effectuating the Sale Transaction), and the complete terms of any such participation, including any binding agreements, arrangements or understandings concerning a collaborative or joint bid or any other

10

combination concerning the proposed Bid.

(h)  Proof of Financial Ability to Perform: A Bid must include written evidence that the Debtors reasonably conclude, in consultation with their advisors and the Consultation Parties, demonstrates that the Bidder has the necessary financial ability to (i) close the Sale Transaction and (ii) provide adequate assurance of future performance under all contracts to be assumed and assigned in such Sale Transaction. Such information must include, *inter alia*, the following:

(1)  contact names and numbers for verification of financing sources;

(2)  evidence of the Bidder's internal resources and proof of unconditional debt funding commitments from a recognized financial institution and, if applicable, equity commitments in an aggregate amount equal to the cash portion of such Bid (including, if applicable, the Bidder's payment of cure amounts) or the posting of an irrevocable letter of credit from a recognized banking institution issued in favor of the Debtors in such amount, in each case, as are needed to close the Sale Transaction;

(3)  the Bidder's current financial statements (audited if they exist) or other similar financial information reasonably acceptable to the Debtors;

(4)  a description of the Bidder's pro forma capital structure; and

(5)  any such other form of financial disclosure or credit-quality support information or enhancement reasonably requested by the Debtors, in consultation with the Consultation Parties, demonstrating that such Bidder has the ability to close the Sale Transaction.

(i)  Regulatory and Third Party Approvals: A Bid must set forth each regulatory and third-party approval required for the Bidder to consummate the Sale Transaction, if any, and the time period within which the Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the Modified Purchase Agreement, those actions the Bidder will take to ensure receipt of such

11

approval(s) as promptly as possible).

(j)    <u>Contingencies</u>:    Each Bid may not be conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence.

(k)    <u>Irrevocable</u>:  Each Bid must expressly provide that (1) the Bidder is prepared to consummate the transaction set forth in the Modified Purchase Agreement promptly following entry of the Sale Order and satisfaction of the closing conditions (if any) set forth in the Modified Purchase Agreement, and (2) the offer reflected in such Bid shall remain open and irrevocable until the conclusion of the Auction, *provided* that if such Bid is accepted as the Successful Bid or the Backup Bid, such Bid shall continue to remain open and irrevocable as provided under "Closing the Auction; Successful Bidder" and "Backup Bidder" below.

(l)    <u>Bid Deadline</u>:  Each Bid must be received by each of the following parties, in writing, on or before June 30, 2016 at 5:00 p.m. (ET) (the "<u>Bid Deadline</u>"):  (a) the Debtors, 50 Tice Boulevard, Suite 340, Woodcliff Lakes, NJ 07677, Attn.: Donald S. MacKenzie (dmackenzie@conwaymackenzie.com);  (b) counsel to the Debtors, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York, 10036 Attn:  Adam Rogoff (arogoff@kramerlevin.com);  (c) co-counsel to the Debtors, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington Delaware 19801, Attn:    Daniel  J.  DeFranceschi  (defranceschi@rlf.com); (d) counsel to the Roll-up DIP Lenders, Hahn & Hessen LLP, 488 Madison Avenue, New York, New York 10002 Attn: William  C.  Robertson  (wrobertson@hahnhessen.com); (e) counsel to the DIP Lenders, Akin Gump Strauss Hauer & Feld, 1333 New Hampshire Avenue NW, Washington, DC 20036 Attn: Scott L. Alberino (salberino@akingump.com) and One Bryant Park, New York, New York, Attn: Jason P. Rubin (jrubin@akingump.com);  and  (f)  counsel  to  the Committee.

A Bid received from a Bidder on or before the Bid Deadline that meets the requirements set forth above for the applicable Assets shall constitute a "<u>Qualified Bid</u>" for such Assets, and such Bidder shall constitute a "<u>Qualified Bidder</u>" for such Assets.

| | |
|---|---|
| **Option to Select Stalking** | Subject to the provisions set forth in the Bidding Procedures and in consultation with the Consultation Parties, the Debtors reserve the right, at |

| | |
|---|---|
| **Horse with Bid Protections** | any time before June 8, 2016, to designate a Stalking Horse Bidder (which may be the Private Sale Purchaser) and to enter into a purchase agreement, in substantially the form of the Private Sale APA (the "<u>Stalking Horse Agreement</u>"), subject to higher or otherwise better offers at the Auction, with such bidder. The Stalking Horse Agreement may contain certain customary terms and conditions, with the consent of the Ad Hoc Group of Secured Notes and the DIP Lenders, including expense reimbursement and a break-up fee in favor of the Stalking Horse Bidder (the "<u>Bid Protections</u>") in amounts to be determined by the Debtors in consultation with the Consultation Parties. To the extent the Debtors enter into a Stalking Horse Agreement, the Debtors shall seek approval of their entry into such agreement and any Bid Protections included therein together with the terms and conditions under which such Bid Protections would be payable to the Stalking Horse Bidder at the hearing on June 15, 2016. The Debtors shall serve notice of the Stalking Horse Agreement and the hearing on approval of the Stalking Horse Agreement on all parties on the Debtors' Rule 2002 Notice List, all parties expressing interest in the Assets and all parties holding liens on the Assets (each, a "<u>Stalking Horse Notice</u>"). Each Stalking Horse Notice will include (i) the identity of the proposed Stalking Horse Bidder, (ii) a summary of the key terms of the Stalking Horse Agreement, (iii) a summary of the type and amount of Bid Protections, if any, proposed to be afforded to the Stalking Horse Bidder, and (iv) a correct and complete copy of the Stalking Horse Agreement. Notwithstanding anything in the Bidding Procedures Order or the Bid Protections to the contrary, all parties in interest shall have the right, at any time before the start of the hearing on approval of the Stalking Horse Agreement, to object to the designation of a Stalking Horse Bidder, the provision of Bid Protections to such Stalking Horse Bidder and the terms and conditions under which such Bid Protections would be payable to the Stalking Horse Bidder.<br><br>Any Stalking Horse Agreement executed by the Debtors and the transactions contemplated thereby will be deemed a Qualified Bid for all purposes, and any Stalking Horse Bidder party to a Stalking Horse Agreement executed by the Debtors will be deemed to be Qualified Bidder. |
| **Auction** | If two or more Qualified Bids for the same Assets are received by the Bid Deadline, the Debtors will conduct the Auction to determine the highest or otherwise best Qualified Bid. If less than two Qualified Bids are received by the Bid Deadline with respect to any portion of the Assets, the Debtors shall not conduct the Auction with respect to such Assets. If only one Qualified Bid is received with respect to all or a portion of the Assets, the Debtors may, after consultation with the Consultation Parties, designate such Qualified Bid as a Successful Bid. Only Qualified Bidders may participate in the Auction.<br><br>The Auction shall take place on July 1, 2016 at 10:00 a.m. (ET) at the offices of co-counsel for the Debtors, Richards, Layton & Finger, P.A., One Rodney Square, 920 N. King Street, Wilmington, Delaware 19801, or such other place and time as the Debtors shall notify all Qualified Bidders and the |

13

Consultation Parties. The Auction shall be conducted according to the following procedures:

The Auction will be conducted openly and all creditors may be permitted to attend. However, only Qualified Bidders will be entitled to make any Overbids (as defined below) at the Auction.

The Debtors and their advisors shall direct and preside over the Auction, which shall be transcribed. Other than as expressly set forth in the Bidding Procedures, the Debtors (in consultation with the Consultation Parties or, to the extent provided in the Bidding Procedures) may conduct the Auction in the manner they determine will result in the highest or otherwise best offer for any of the Assets. Prior to the commencement of the Auction, the Debtors shall use their best efforts to provide the Consultation Parties and each Qualified Bidder participating in the Auction with a copy of the Modified Purchase Agreement associated with the highest or otherwise best Qualified Bid with respect to the Assets for which such Qualified Bidder is bidding, as determined by the Debtors in consultation with the Consultation Parties (such highest or otherwise best Qualified Bid, the "Auction Baseline Bid"). In the event that the Debtors enter into a Stalking Horse Agreement with respect to any Assets, such Stalking Horse Agreement shall be the Auction Baseline Bid with respect to such Assets. At the start of the Auction, the Debtors shall describe the material terms of the Auction Baseline Bid and each Qualified Bidder participating in the Auction must confirm that (a) it has not engaged in any collusion with respect to the bidding or sale of any of the Assets described in the Bidding Procedures, (b) it has reviewed, understands and accepts the Bidding Procedures, (c) it has consented to the core jurisdiction of the Bankruptcy Court (as described more fully below), and (d) its Qualified Bid is a good faith bona fide offer that it intends to consummate if selected as the Successful Bidder.

| | |
|---|---|
| **Terms and Announcement of Overbids** | An "Overbid" is any bid made at the Auction, in accordance with the requirements set forth in the Bidding Procedures, subsequent to the Debtors' announcement of the respective Auction Baseline Bid. To submit an Overbid for purposes of this Auction, a Bidder must comply with the following conditions:<br><br>(a)    Minimum Overbid Increments: The initial Overbid, if any, shall provide for total consideration to the Debtors with a value that exceeds the value of the consideration under the Auction Baseline Bid by an incremental amount that is not less than the sum of (x) $250,000 (the "Minimum Overbid Increment") plus (y) in the event that the Debtors have entered into a Stalking Horse Agreement with respect to the Assets to which the Overbid relates, the aggregate amount of any Bid Protections under such Stalking Horse Agreement, and each successive Overbid shall exceed the then-existing Overbid by an incremental amount that is not less than the |

Minimum Overbid Increment.  The Debtors reserve the right, in consultation with the Consultation Parties, to announce reductions or increases in the Minimum Overbid Increment at any time during the Auction.  Additional consideration in excess of the amount set forth in the respective Auction Baseline Bid may include cash and/or noncash consideration, *provided, however,* that the value for such non-cash consideration shall be determined by the Debtors in their reasonable business judgment in consultation with the Consultation Parties.

(b)    Remaining Terms are the Same as for Qualified Bids:  Except as modified in the Bidding Procedures, an Overbid at the Auction must comply with the conditions for a Qualified Bid set forth above, provided, however, that the Bid Deadline shall not apply.  Any Overbid must include, in addition to the amount and the form of consideration of the Overbid a description of all changes requested by the Bidder to the Modified Purchase Agreement.  For the avoidance of doubt, any Overbid shall be irrevocable and shall remain open and binding on the Bidder in accordance with these Bidding Procedures and the conditions for a Qualified Bid.

At the Debtors' discretion, to the extent not previously provided (which shall be determined by the Debtors in consultation with the Consultation Parties), a Bidder submitting an Overbid at the Auction must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors), as the Debtors, in their reasonable business judgment in consultation with the Consultation Parties, may request, demonstrating such Bidder's ability to consummate the Sale Transaction proposed by such Overbid.

**Announcement and Consideration of Overbids.**

(a)    Announcement of Overbids:  A Bidder submitting an Overbid at the Auction shall announce at the Auction the material terms of such Overbid, including the total amount and type of consideration offered in such Overbid.

(b)    Consideration of Overbids:  The Debtors reserve the right, in their reasonable business judgment in consultation with the Consultation Parties, to make one or more continuances of the Auction to, among other things:   facilitate discussions between the Debtors and individual Qualified Bidders; allow

15

|  | individual Qualified Bidders to consider how they wish to proceed; and give Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment in consultation with the Consultation Parties, may require, that the Qualified Bidder has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed Sale Transaction at the prevailing Overbid amount. |
| --- | --- |
| **Closing the Auction; Successful Bidder** | The Auction shall continue until there is only one Qualified Bid for the Assets that the Debtors determine in their reasonable business judgment, in consultation with the Consultation Parties, is the highest or otherwise best Qualified Bid at the Auction.    Thereafter, the Debtors shall select such Qualified Bid, in consultation with the Consultation Parties, as the overall highest or otherwise best Qualified Bid (such Bid, the "<u>Successful Bid</u>," and the Bidder submitting such Successful Bid, the "<u>Successful Bidder</u>").    In making this decision, the Debtors shall consider the Bid Assessment Criteria.<br><br>The Auction shall close when the Successful Bidder(s) submits fully executed sale and transaction documents memorializing the terms of the Successful Bid(s).<br><br>Promptly following the Debtors' selection of the Successful Bid(s) and the conclusion of the Auction, the Debtors shall announce the Successful Bid(s) and Successful Bidder(s) and shall file with the Bankruptcy Court notice of the Successful Bid(s) and Successful Bidder(s).<br><br>The Debtors shall not consider any Bids submitted after the conclusion of the Auction.  The Successful Bidder(s) shall be required to keep the Successful Bid(s) open and irrevocable until the closing of the transactions contemplated thereby. |
| **Closing with Alternative Backup Bidders** | Notwithstanding anything in the Bidding Procedures to the contrary, the Qualified Bid for the Assets that the Debtors determine in their reasonable business judgment, in consultation with the Consultation Parties, is the next highest or otherwise best Qualified Bid at the Auction after the Successful Bid, will be designated as the "<u>Backup Bid</u>" and the Bidder submitting such Backup Bid, the "<u>Backup Bidder</u>."  The Backup Bidder shall be required to keep the Backup Bid open and irrevocable until the earlier of 5:00 p.m. (ET) on the date that is forty-five (45) days after the date of entry of the Sale Order (the "<u>Outside Backup Date</u>") or the closing of the transaction with the Successful Bidder (defined herein).<br><br>Following entry of the Sale Order, if the Successful Bidder fails to consummate the Successful Bid, the Debtors may, in consultation with the Consultation Parties, designate the Backup Bid to be the new Successful Bid and the Backup Bidder to be the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the transaction with the |

16

| | |
|---|---|
| | Backup Bidder without further order of the Bankruptcy Court.  In such case of a breach or failure to perform on the part of the Successful Bidder, the defaulting Successful Bidder's deposit shall be forfeited to the Debtors.  The Debtors specifically reserve the right to seek all available damages, including specific performance, from any defaulting Successful Bidder (including any Backup Bidder designated as a Successful Bidder) in accordance with the terms of the Bidding Procedures. |
| **Modification of Bidding and Auction Procedures** | The Debtors (in consultation with the Consultation Parties), in the exercise of their fiduciary duties for the purpose of maximizing value for their estates from the sale process, may modify the Bidding Procedures and implement additional procedural rules for conducting the Auction.  Specifically, among other things, the Debtors, in consultation with the Consultation Parties, may determine to select more than one Successful Bid and more than one Successful Bidder (and/or more than one Backup Bid and more than one Backup Bidder, in which event such Backup Bids may provide for groupings of Assets that are different from the groupings of Assets reflected in the Successful Bid(s)) for separate portions of the Assets. |

### i.    *Reservation of Rights Regarding Potential Stalking Horse Bidder(s)*

14.    As discussed above, the Debtors have determined, in a reasonable exercise of their business judgment, that seeking to consummate the Private Sale without entering into a Stalking Horse Agreement is warranted and necessary.  However, the Debtors, in accordance with the Bidding Procedures, may enter into a purchase agreement with any Stalking Horse Bidder acceptable to the Debtors (the "Stalking Horse Agreement") at any time before June 8, 2015, to establish a minimum Qualified Bid at, and subject to higher or otherwise better offers during, the Auction.

15.    To facilitate a competitive, value-maximizing Sale Transaction, the Debtors are requesting authority, in the exercise of their business judgment and in accordance with the Bidding Procedures, to offer any Stalking Horse Bidder: (i) a break-up fee (the "Break-Up Fee"); (ii) reimbursement of the Stalking Horse Bidder's reasonable fees and expenses (the "Expense Reimbursement"); and/or (iii) initial overbid protection (the "Minimum Overbid Increment" and each of the forgoing is a "Bid Protection" as previously defined).

17

*i.   Notice Procedures*

16.     The Debtors propose the following notice procedures to be implemented in connection with the sale process.

*a.   Notice of Sale, Auction and Sale Hearing*

17.     Within three (3) business days after the entry of the Bidding Procedures Order (if such order is entered), or as soon as reasonably practicable thereafter (the "<u>Mailing Date</u>"), the Debtors shall serve a sale notice, substantially in the form attached hereto as <u>Exhibit C</u> (the "<u>Sale Notice</u>"), the Bidding Procedures Order and the Bidding Procedures by first-class mail, postage prepaid or, for those parties who have consented to receive notice by the Electronic Case Files ("<u>ECF</u>") system, by ECF, upon (i) all entities reasonably known to have expressed an interest in a transaction with respect to all or part of the Assets within the past two years; (ii) all entities known to have asserted any lien, claim, interest, or encumbrance in or upon any of the Assets; (iii) counsel to the Committee; (iv) counsel to the Roll-up DIP Lenders; (v) counsel to the DIP Lenders; (vi) counsel to the Prepetition DDTL Lenders; and (vii) the U.S. Trustee.

18.     In addition, within three (3) business days after the entry of the Bidding Procedures Order or as soon as reasonably practicable thereafter, the Debtors shall serve the Sale Notice by first-class mail, postage prepaid or, for those parties who have consented to receive notice by the ECF system, by ECF, upon (i) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief granted herein; (ii) the United States Attorney's offices for the District of Delaware and the Southern District of Ohio; (iii) the SEC; (iv) the Internal Revenue Service; (v) all parties entitled to notice pursuant to Local Rule 2002-1(b); and (vi) all known creditors of CSC, including its contract counterparties.  The Debtors request that such notice be deemed sufficient and proper notice of the Sale Transaction with respect to known interested parties.

18

*b.  Notice of Hearing on the Stalking Horse Agreement*

19.     To the extent the Debtors enter into a Stalking Horse Agreement, the Debtors shall seek approval of their entry into such agreement, any Bid Protections included therein and the terms and conditions under which such Bid Protections would be payable to the Stalking Horse Bidder, at the hearing on June 15, 2016.  By June 8, 2016, the Debtors shall serve a Stalking Horse Notice on all parties that have requested notice in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002 (the "Rule 2002 Notice List"), all parties expressing interest in the Assets and all parties holding liens on the Assets.  Each Stalking Horse Notice will include (i) the identity of the proposed Stalking Horse Bidder, (ii) a summary of the key terms of the Stalking Horse Agreement, (iii) a summary of the type and amount of Bid Protections, if any, proposed to be afforded to the Stalking Horse Bidder, and (iv) a copy of the Stalking Horse Agreement.

*ii.  Date, Time, Place and Notice of Auction*

20.     The Auction, if any, shall take place on July 1, 2016 at 10:00 a.m. (ET) at the offices of co-counsel for the Debtors, Richards, Layton & Finger, P.A., One Rodney Square, 920 N. King Street, Wilmington, Delaware 19801, or such other place and time as the Debtors shall notify all Qualified Bidders and the Consultation Parties.

*iii.  Notice of Successful Bidder*

21.     As soon as reasonably practicable after the conclusion of the Auction, the Debtors shall file on the docket, but not serve, a notice identifying any Successful Bidder(s) (the "Post-Auction Notice").

*iv.  Date, Time and Place of Sale Hearing*

22.     The Sale Hearing shall be conducted by the Bankruptcy Court on **July 7, 2016 at a time to be determined by the Court** or such other date as the Court is available and may, in

accordance with the Bidding Procedures Order, be adjourned or rescheduled without notice.  At the Sale Hearing, the Debtors will seek Bankruptcy Court approval of the Successful Bid and the Backup Bid (if any).  Unless the Bankruptcy Court orders otherwise, the Sale Hearing shall be an evidentiary hearing on matters relating to the Sale Transaction and there will be no further bidding at the Sale Hearing.  In the event that the Successful Bidder cannot or refuses to consummate the Sale because of the breach or failure on the part of the Successful Bidder, the Backup Bidder will be deemed the new Successful Bidder and the Debtors shall be authorized, but not required, to close with the Backup Bidder on the Backup Bid without further order of the Bankruptcy Court.

### *v.   Objection Deadline*

23.    Any and all objections, if any, to any Sale Transaction (other than to the Private Sale, which must be filed by June 8, 2016) (a "Sale Objection"), must be filed by **July 5, 2016 at 4:00 p.m. (ET)** (the "Sale Objection Deadline") and served on (a) the Debtors, 50 Tice Boulevard, Suite 340, Woodcliff Lakes, NJ 07677, Attn.: Donald S. MacKenzie (dmackenzie@conwaymackenzie.com); (b) counsel to the Debtors, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York, 10036 Attn:  Adam Rogoff (arogoff@kramerlevin.com); (c) co-counsel to the Debtors, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington Delaware 19801, Attn:  Daniel J. DeFranceschi (defranceschi@rlf.com); (d) counsel to the Roll-up DIP Lenders, Hahn & Hessen LLP, 488 Madison Avenue, New York, New York 10002 Attn:   William C. Robertson (wrobertson@hahnhessen.com); (e) counsel to the DIP Lenders, Akin Gump Strauss Hauer & Feld, 1333 New Hampshire Avenue NW, Washington, DC 20036 Attn: Scott L. Alberino (salberino@akingump.com) and One Bryant Park, New York, New York, Attn: Jason P. Rubin (jrubin@akingump.com); (f) counsel to the Prepetition DDTL Lenders, Fried, Frank, Harris,

Shriver & Jacobson LLP, One New York Plaza, New York, New York 10004, Attn: Matthew M. Roose (matthew.roose@friedfrank.com); (g) counsel to any statutory committee appointed in these cases; (h) Office of The United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Linda Casey (linda.casey@usdoj.gov) (collectively (a)-(g), the "Objection Recipients"); and (i) counsel to any Successful Bidder(s), if known on the Sale Objection Deadline.

24.     All replies to any Sale Objection, Designated Contract Objection (as defined below) or Adequate Assurance Contract Objection (as defined below) must be filed by **July 6, 2016 at 11:59 p.m. (ET)**.

25.     Any party failing to timely file an objection to any Sale Transaction will be forever barred from objecting and will be deemed to have consented to any Sale Transaction, including the transfer of the Debtors' right, title and interest in, to, and under the Assets free and clear of any and all liens and other Interests in accordance with a definitive agreement for any Sale Transaction.

*i.   Assumption and Assignment Procedures*

26.     The Debtors propose the procedures set forth below for notifying counterparties to executory contracts and unexpired leases of proposed cure amounts in the event the Debtors decide to assume and assign such contracts or leases.

*a.   Notice of Assumption and Assignment*

27.     On or before May 31, 2016 (any such date, the "Assumption and Assignment Service Date"), the Debtors shall file with the Court, and post on the website maintained for these Chapter 11 Cases at http://dm.epiq11.com/COE (the "Case Website"), a notice of assumption and assignment (the "Notice of Assumption and Assignment") and, included therewith, a list (the "Designated Contracts List") that specifies (i) each of CSC's executory

21

contracts and unexpired leases (the "Designated Contracts") and (ii) the proposed amount necessary, if any, to cure all monetary defaults, if any, under each Designated Contract (the "Cure Costs"). If no Cure Cost is listed on the Designated Contracts List, the Debtors believe that there is no Cure Cost, as of the date of such notice. The Debtors shall serve, via first class mail, a customized version of the Notice of Assumption and Assignment, without the Designated Contracts List, which will include (a) instructions regarding how to view that list on the Case Website (the "DCL Instructions"), (b) information necessary and appropriate to provide notice of the relevant proposed assumption and assignment of Designated Contract(s) and rights thereunder, (c) Cure Costs, if any, and (d) the procedures for objecting thereto ((b)-(d) collectively, the "Necessary Notice Information") on all counterparties to the Designated Contracts. The Debtors shall serve, via first class mail, a modified version of the Notice of Assumption and Assignment that contains the DCL Instructions and Necessary Notice Information on the Rule 2002 Notice List. Service as set forth herein shall be deemed proper, due, timely, good and sufficient notice and no other or further notice is necessary.

28.     A counterparty to a Designated Contract listed on the Notice of Assumption and Assignment may file an objection (a "Designated Contract Objection"). All Designated Contract Objections must (i) state, with specificity, the legal and factual basis for the objection as well as what Cure Costs are required, if any, (ii) include appropriate documentation in support thereof, and (iii) be filed and served on the Objection Recipients no later than 4:00 p.m. (ET) on June 10, 2016 (the "Assumption and Assignment Objection Deadline").

29.     If a counterparty to a Designated Contract files a Designated Contract Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute prior to the June 15, 2016 hearing, the amount to be paid or

reserved with respect to such objection will be determined at such hearing, such later hearing date that the Debtors determine in their discretion or such other date determined by this Court.

*b. Supplemental Notice of Assumption and Assignment*

30.    Although the Debtors intend to make a good-faith effort to identify all Designated Contracts that may be assumed and assigned in connection with a Sale Transaction, the Debtors may discover certain contracts inadvertently omitted from the Designated Contracts list or the Successful Bidder(s) may identify other executory contracts or unexpired leases that they desire to assume and assign in connection with a Sale Transaction.  Accordingly, the Debtors reserve the right, at any time after the Assumption and Assignment Service Date and before the closing of a Sale Transaction, to (i) supplement the list of Designated Contracts on the Notice of Assumption and Assignment with previously omitted Designated Contracts in accordance with the definitive agreement for a Sale Transaction, (ii) remove a Designated Contract from the list of contracts ultimately selected as a Designated Contract that a Successful Bidder proposes be assumed and assigned to it in connection with a Sale Transaction, and/or (iii) modify the previously stated Cure Cost associated with any Designated Contract.

31.    In the event that the Debtors exercise any of the rights reserved above, the Debtors will promptly serve a supplemental notice of assumption and assignment (a "Supplemental Notice of Assumption and Assignment").  The Supplemental Notice of Assumption and Assignment will be served by electronic transmission, hand delivery or overnight mail on the counterparty (and its attorney, if known) to each impacted Designated Contract at the last known address available to the Debtors.  Each Supplemental Notice of Assumption and Assignment will include the same information with respect to listed Designated Contracts as was included in the Notice of Assumption and Assignment.

23

32.    Any counterparty to a Designated Contract listed on a Supplemental Notice of Assumption and Assignment may file an objection (a "Supplemental Designated Contract Objection").  All Supplemental Designated Contract Objections must (i) state, with specificity, the legal and factual basis thereof as well as what Cure Costs the objecting party believes are required, if any, (ii) include appropriate documentation in support of the objection, and (iii) be filed and served on the Objection Recipients no later than ten days from the date of service of such Supplemental Notice of Assumption and Assignment, which date will be set forth in the Supplemental Notice of Assumption and Assignment.

33.    If a counterparty to a Designated Contract files a Supplemental Designated Contract Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute, the Debtors will seek an expedited hearing before the Court (a "Supplemental Designated Contract Hearing") to determine the Cure Costs, if any, and approve the assumption of the relevant Designated Contracts.  If there is no such objection, then the Debtors will obtain an order of this Court, including by filing a certification of no objection (a "Supplemental Designated Contract Order") fixing the Cure Costs and approving the assumption of any Designated Contract listed on a Supplemental Notice of Assumption and Assignment.

*c.  Additional Procedures*

34.    In the event that the Private Sale is not approved at the June 15, 2016 hearing and the Court enters the Bidding Procedures Order, a counterparty to a Designated Contract listed on the Notice of Assumption and Assignment (or any Supplemental Notice of Assumption and Assignment) may file an objection only if such objection is to the ability of the Successful Bidder (other than the Private Sale Purchaser) to demonstrate adequate assurance of future performance (an "Adequate Assurance Contract Objection").  Any Adequate Assurance Contract

24

Objection must be filed and served on the Objection Recipients by no later than 4:00 p.m. (ET) on July 5, 2016.

35.    If the counterparty to a Designated Contract does not file and serve, as applicable, a Designated Contract Objection, a Supplemental Designated Contract Objection and/or an Adequate Assurance Contract Objection in a manner that is consistent with the requirements set forth above, such counterparty will be deemed to have consented to the assumption and assignment of the Designated Contract to the Successful Bidder as an Acquired Contract (as defined below), notwithstanding any anti-alienation provision or other restriction on assumption or assignment in the Designated Contract, and shall be forever barred from asserting any objection with regard to such assumption and assignment.

36.    Absent the filing of a Designated Contract Objection or Supplemental Designated Contract Objection and a subsequent order of the Court establishing an alternative Cure Cost, (i) the Cure Costs, if any, set forth in the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment) shall be controlling, notwithstanding anything to the contrary in any Designated Contract or any other document, and (ii) the counterparty to the Designated Contract will be deemed to have consented to the assumption, assignment and sale of the Designated Contract and the Cure Costs, if any, and will be forever barred from asserting any other claims related to such Designated Contract against the Debtors or the applicable Successful Bidder, or the property of any of them.

37.    The inclusion of a Designated Contract on the Notice of Assumption and Assignment (or any Supplemental Notice of Assumption and Assignment) will not (a) obligate the Debtors to assume any Designated Contract listed thereon or the Successful Bidder(s) to take assignment of such Designated Contract or (b) constitute any admission or agreement of the

25

Debtors that such Designated Contract is an executory contract.  Only those Designated Contracts that are included on a schedule of assumed and acquired contracts attached to the final asset purchase agreement with the Successful Bidder(s) (each, an "Acquired Contract") will be assumed and assigned to the Successful Bidder(s).

### RELIEF REQUESTED

38.    By this Motion, the Debtors seek authorization to proceed with the Private Sale Option or the Bid and Sale Option, as determined by the Debtors in the exercise of their fiduciary obligations.  Thus, the Debtors request entry of the Private Sale Order, which will authorize and approve, among other things: (i) the Private Sale; (ii) entry into and the Private Sale APA; (iii) protections afforded to a good faith purchaser to the Private Sale Purchaser; and (iv) granting related relief.  Alternatively, in the event that the Debtors, in the exercise of their fiduciary duties and in consultation with the Consultation Parties, determine that a stalking horse should be designated and/or a formal auction should be held with respect to the Assets, the Debtors request entry of the Bidding Procedures Order, which will authorize and approve, among other things:  (i) the Bidding Procedures for soliciting bids; (ii) the Assumption and Assignment Procedures; (iii) the form and manner of notice with respect to certain procedures, protections, schedules, and agreements described herein and attached hereto; (iv) the Stalking Horse Agreement (if any), the Auction (if any), and the Sale Hearing; and (v) granting related relief.  At the Sale Hearing, the Debtors will also request entry of the Sale Order (or Sale Orders) that will approve the Sale Transaction or Sale Transactions.

26

**BASIS FOR RELIEF**

A.    **The Sale of the Assets through the Private Sale Option or the Bid and Sale Option is Appropriate under Bankruptcy Code Sections 363(b) and 105(a)**

39.    Bankruptcy Code section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Courts in this Circuit and others, in applying this section, have required that the sale of a debtor's assets be based upon the sound business judgment of the debtor.  See, e.g., Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147 (D. Del. 1999) (holding that an asset sale may be authorized under Bankruptcy Code section 363 if the court finds a "sound business purpose" for the sale) (citing Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983)); see also Official Comm. of Unsecured Creditors v. LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 143 (2d Cir. 1992) (holding that a judge reviewing a section 363(b) application must find from the evidence presented a good business reason to grant such application).

40.    "Under Delaware law, the business judgment rule operates as a presumption 'that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest.'"  Continuing Creditors' Comm. of Star Telecomms., Inc. v. Edgecomb, 385 F. Supp. 2d 449, 462 (D. Del. 2004) (quoting Grobow v. Perot, 539 A.2d 180, 187 (Del. 1988) overruled on other grounds, Brehm v. Eisner, 746 A.2d 244 (Del. 2000)); see also Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford, 554 F. Supp. 2d 538, 555 n.111 (D. Del. 2008) (same).  Thus this Court should grant the relief requested in the Motion if the Debtors

27

demonstrate a sound business justification therefor.  See In re Del. & Hudson Ry. Co., 124 B.R. 169, 179 (D. Del. 1991).

41.      The Debtors have sound business justifications for selling the Assets at this time, and with the process and in the manner described in this Motion.  The Debtors are committed to carrying out their fiduciary obligation to maximize distributable value for their creditors through realignment of their operating cost structure and implementing a process to advance these cases to an expedient, successful exit from chapter 11.  In so carrying out their fiduciary obligation, the Debtors seek to engage a toggling sale process, providing for either the Private Sale Option or the Bid and Sale Option, which is calculated to return CSC to an operational state and maximize returns for the Debtors' estates and creditors.  Specifically, by using this toggling sale process— moving forward with the Private Sale but reserving the option of using the Bidding Procedures to designate a Stalking Horse Bidder and/or conduct a formal auction if parties express genuine interest in purchasing the Assets—the Debtors are providing a floor at which to sell the Assets and expeditiously return CSC to an operational state but also ensuring that no obstacles prevent the Debtors from making a better deal for the Assets.  CSC's current idle state presents the Debtors with dire circumstances whereby operations are losing value daily.  The longer CSC's operations remain idle, the more difficult it becomes for the Debtors to recover from this financial and operational burden and gain value from a sale.  Additionally, the Debtors' secured creditors are supportive of the toggling sale process.

42.      Accordingly, the Debtors submit that the Private Sale, with the option of proceeding through the Bidding Procedures to designate a Stalking Horse Bidder and/or conduct an Auction, is designed to maximize the value of the Assets and that the sale of the Assets to the

28

Private Sale Purchaser or, in the alternative, to a Successful Bidder (or Successful Bidders), is in the Debtors' best interests and should be approved.

**B.      The Private Sale Option is Appropriate under Bankruptcy Code Sections 363(b) and 105(a)**

43.     The Debtors' decision to enter into the Private Sale APA and to sell the Assets on the terms set forth therein reflects a reasonable exercise of their business judgment. Specifically, the Debtors believe that the proposed sale of the Assets is in the best interest of their estates and creditors because it will provide for (i) the return of CSC to an operational state, (ii) a large number of CSC's employees to go back to work, (iii) a pay down of the Debtors' secured debt relating to the working capital assets, (iv) the assumption by the Private Sale Purchaser of certain of CSC's liabilities, and (v) the elimination of any administrative expenses associated with maintaining the CSC's facility. As discussed above, the Debtors have actively and extensively marketed the Assets and went to great lengths to secure a favorable offer. Those efforts resulted in the Private Sale APA that was negotiated at arm's-length, and that the Debtors strongly believe represents the fair and reasonable offer for the Assets. Accordingly, the Debtors submit that the Private Sale is an exercise of their reasonable business judgment, is in the best interest of their estates and creditors, and should be approved.

**C.      The Bidding Procedures are Fair, Designed to Maximize the Value Received for the Acquired Assets and are Consistent with the Debtors' Reasonable Business Judgment.**

44.     The Bidding Procedures are consistent with the Debtors' reasonable business judgment and should be approved. Courts have made clear that a debtor's business judgment is entitled to substantial deference. See, e.g., Stanizale v. Nachtomi (In re Tower Air, Inc.), 416 F.3d 229, 234 (3d Cir. 2005) (indicating the "business judgment rule creates a presumption that directors making a business decision, not involving self-interest, act on an informed basis, in

good faith and in the honest belief that their actions are in the corporation's best interest" (quotations omitted)).    To that end, courts recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales.  See, e.g., Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 659 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993) (noting that such procedures "encourage bidding and to maximize the value of the debtor's assets"); see also In re Cal Dive Int'l, Inc., No. 15-10458 (CSS) (Bankr. D. Del. June 25, 2015) [D.I. 539].

45.    The Debtors believe that the Bidding Procedures are appropriate under Bankruptcy Code sections 105 and 363 to ensure that the bidding process, if the Debtors elect to use such, is fair and reasonable and will yield the maximum value for their estates and creditors. The currently proposed Bidding Procedures will establish parameters pursuant to which the value of the Assets may be fully tested at the Auction and ensuing Sale Hearing.  Such procedures have the potential to increase the likelihood that the Debtors receive the greatest possible consideration for the Assets because they will ensure a competitive and fair bidding process that will encourage participation by financially capable bidders who demonstrate the ability to close such a transaction.  Indeed, the Debtors have put limited (if any) constraints on the ability of prospective purchasers to bid on the Assets, and instead have encouraged bid flexibility by, *inter alia*, allowing the Debtors to consider all competing offers—including offers for all or some Assets—and to select, in their reasonable business judgment, and after consultation with the Consultation Parties (as defined in the Bidding Procedures), the highest or otherwise best offer for the Assets.  The Bidding Procedures also provide potential bidders with sufficient notice and an opportunity to acquire information necessary to submit a timely and informed bid.  Further,

30

the Debtors have instituted mechanisms to ensure an open and robust bidding process at the Auction.

46.     Accordingly, for all of the foregoing reasons, the Debtors believe that the Bidding Procedures (i) will encourage robust bidding for the Assets, (ii) are consistent with other procedures previously approved by courts in this District and (iii) are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings and should be approved.

**D.     Bid Protections may be Necessary to Preserve the Value of the Debtors' Estates.**

47.     By the Motion, the Debtors reserve the right to enter into a Stalking Horse Agreement, as an exercise of their business judgment and in accordance with the Bidding Procedures, and to offer Bid Protections in connection therewith.  Specifically, the Debtors may offer any Stalking Horse Bidder some or all of the following Bid Protections:  (i) a Break-Up Fee; (ii) an Expense Reimbursement; and/or (iii) a Minimum Overbid Increment.  Any Bid Protections afforded to a Stalking Horse Bidder shall be subject to further approval of this Court on no less than seven (7) days' notice.

48.     Approval of these forms of Bid Protections in connection with the sale of significant assets pursuant to Bankruptcy Code section 363 has become established practice in chapter 11 cases.  See, e.g., Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527 (3d Cir. 1999); Integrated Res., Inc., 147 B.R. at 656-57 (noting that overbid procedures and break-up fee arrangements that have been negotiated by a debtor are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"); In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (holding that the business judgment standard protects break-up fees and other contractual provisions negotiated in good faith).  The United States

31

Court of Appeals for the Third Circuit has approved bidding incentives in the bankruptcy context.  In re O'Brien, 181 F.3d 527; see also Reliant Energy Channelview LP v. Kelson Channelview LLC (In re Reliant Energy Channelview LP), 594 F.3d 200, 206–08 (3d Cir. 2010).  The court in O'Brien held that even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context.  Accordingly, to be approved, bidding incentives must provide some post-petition benefit to the debtor's estate.  See In re O'Brien, 188 F.3d at 533.

49.    The Debtors believe that the Bid Protections increase the likelihood of a sale to a contractually committed bidder in exchange for consideration the Debtors believe is fair and better than that in the Private Sale APA, while providing the Debtors with an opportunity to enhance the value to their estate through an auction process.  Without the Bid Protections, a Stalking Horse Bidder may not be willing to enter into a Modified Purchase Agreement.  The Bid Protections will be negotiated in good faith.  Further, the amount of the Bid Protections will be reasonable and appropriate in light of the size and nature of the Sale Transaction and the efforts that likely will be expended by a Stalking Horse Bidder.  Payment of the Bid Protections also will not diminish the value of Debtors' estates, as the Debtors do not intend to terminate the Modified Purchase Agreement and pay the Bid Protections, unless doing so would permit the Debtors to accept a better Bid, which would also pay for any Bid Protections.

50.    Additionally, any such Bid Protections to be provided here would be within the range, and of a type, of such protections which this Court previously has approved in other section 363 sale cases.

**E.    Approval of the Sale, through the Private Sale APA or a Modified Purchase Agreement, is Warranted under Bankruptcy Code Section 363(b).**

51.    As set forth above, a debtor may be authorized to sell assets out of the ordinary course of business pursuant to Bankruptcy Code section 363 and before obtaining a confirmed plan of reorganization when it demonstrates a sound business purpose for doing so.  See In re Abbotts Dairies of Pa., Inc., 788 F.2d 143, 147-49 (3d Cir. 1986) (implicitly adopting the "sound business judgment test" of Lionel); In re Dura Auto. Sys., Inc., No. 06-11202 (KJC), 2007 WL 7728109, at *5 (Bankr. D. Del. Aug. 15, 2007) (finding that "[t]he Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the Sale prior to, and outside of, a plan of reorganization"); Dai-Ichi Kangyo Bank Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate under [section 363(b)], courts require the debtor to show that a sound business purpose justifies such actions . . . ."); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991) (sale of substantially all of debtor's assets outside of reorganization plan is appropriate when a sound business reason justifies such a sale); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983) (concluding that "there must be some articulated business justification, other than appeasement of major creditors, for using, selling or leasing property out of the ordinary course of business before the bankruptcy judge may order such disposition under section 363(b)"); Titusville Country Club v. Pennbank (In re Titusville Country Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991) (stating that the "sound business purpose test" is appropriate).  Once a court has determined there is a sound business justification for a sale outside of a plan, the court must also determine that (i) the trustee has provided the interested parties with adequate and reasonable notice, (ii) the sale price is fair and

33

reasonable and (iii) the purchaser is proceeding in good faith.  Delaware & Hudson, 124 B.R. at 176.

52.     The Debtors submit that the sale of the Assets is based upon their sound business judgment.  As explained above, the Debtors have determined that a sale, whether through the Private Sale Option or, if other parties express a bona fide and value-enhancing interest in the Assets, then through the Bid and Sale Option, is in the best interest of their estates.  The Debtors believe that commencing a two-track sale process at this time will allow them to obtain the highest market value available for the Assets while preserving the Debtors' right to exercise their fiduciary duties should a value-maximizing alternative materialize.

53.     The Debtors also meet the additional requirements necessary to approve a sale under Bankruptcy Code section 363.  As stated herein, the Debtors will provide adequate notice of the Private Sale or any Sale Transaction to interested parties, and the Debtors believe that the notice procedures described herein are reasonable and adequate under the circumstances.  Additionally, the Debtors will enter into a Modified Purchase Agreement only if such presents a better deal for the Debtors than the Private Sale APA and after a substantial and deliberate effort to market the Assets and if the sale price is fair and reasonable.  Accordingly, the Debtors submit that it is a valid exercise of their business judgment to seek the relief requested by this motion.

**F.      The Proposed Private Sale Option and the Bid and Sale Option Satisfy the Requirements of Bankruptcy Code Section 363(f) for a Sale Free and Clear of Interests.**

54.     Bankruptcy Code section 363(f) provides that a sale of encumbered property "free and clear of any interest" is permissible, only if "applicable non-bankruptcy law permits sale of such property free and clear of such interest," entities holding interests in the property consent to the sale, "such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property, such interest is in bona fide dispute, *or* such

34

entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." 11 U.S.C. § 363(f) (emphasis supplied).

55.     Bankruptcy Code section 363(f) is drafted in the disjunctive and, as such, it is necessary to meet only one of these five conditions.  To the extent any entity with liens on the Assets does not consent to the Private Sale APA or any proposed Sale Transaction, the Debtors believe that they will be able to meet the requirements of Bankruptcy Code section 363(f) at the hearing on approval of such transaction.  Alternatively, the Debtors may sell the Assets free and clear of any other interests under section 363(f)(5), because the liens on any Assets sold will attach to the proceeds of such a sale and entities holding such interests could be compelled to accept money satisfaction in legal or equitable proceedings.   Accordingly, pursuant to Bankruptcy Code section 363, the Debtors may sell the Assets free and clear of all liens, claims, and encumbrances.

56.     The Debtors also submit that it is appropriate to sell the Assets free and clear of successor liability relating to the Debtors' business.  Such a provision ensures that the Successful Bidder is protected from any claims or lawsuits premised on the theory that the Successful Bidder is a successor in interest to one or more of the Debtors.  Courts have consistently held that a buyer of a debtor's assets pursuant to a Bankruptcy Code section 363 sale takes free and clear from successor liability relating to the debtor's business.

57.     Specifically, with respect to any Sale Transaction, the purpose of an order purporting to authorize the transfer of assets free and clear of all liens, claims, encumbrances and all other interests would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against a purchaser arising from a seller's pre-sale conduct.  Moreover, without such assurances, the Debtors would run the risk that potential bidders may not enter the auction

or, if they did, would do so with reduced bid amounts.  To that end, the Successful Bidder should not be liable under any theory of successor liability relating to the Debtors' businesses, but should hold the Assets free and clear.

**G.      The Private Sale Purchaser or any Successful Bidder should be Entitled to the Protections of Bankruptcy Code Section 363(m).**

58.      Pursuant to Bankruptcy Code section 363(m), a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  <u>Mark Bell Furniture Warehouse, Inc., v. D. M. Reid Assocs., Ltd.</u> (<u>In re Mark Bell Furniture Warehouse, Inc.</u>), 992 F.2d 7, 8 (1st Cir. 1993); <u>In re Willemain v. Kivitz</u>, 764 F.2d 1019, 1023 (4th Cir. 1985); <u>In re Congoleum Corp.</u>, No. 03-51524, 2007 WL 1428477, *2 (Bankr. D. N.J. May 11, 2007); <u>Abbotts Dairies of Pa.</u>, 788 F.2d 143, 147 (3d Cir. 1986).

59.      The Private Sale APA has been negotiated at arm's-length by sophisticated parties, each represented by their own advisors, and any Modified Purchase Agreement will be negotiated at arm's-length by sophisticated parties, each represented by their own advisors. Accordingly, the Debtors request that the Private Sale Order or the Sale Order (or Sale Orders) include a provision that the Private Sale Purchaser or the Successful Bidder (or Successful Bidders), respectively, is a "good faith" purchaser within the meaning of Bankruptcy Code section 363(m).  The Debtors believe that providing the Private Sale Purchaser or any Successful Bidder with such protection will ensure that the maximum price will be received by the Debtors for the Assets and closing of the same will occur promptly.

**H.      Notice of the Auction and Sale Hearing is Reasonable and Appropriate.**

60.      The Debtors submit that service of the Sale Notice as set forth above on the Mailing Date or as soon as reasonably practicable thereafter is reasonable and appropriate and will be adequate to ensure that all interested parties are aware of the Private Sale and have an

36

opportunity to object, or, in the alternative, have the opportunity to bid for the Assets, and/or object to the proposed sale of the Debtors' Assets.  Accordingly, the Debtors submit that the foregoing method of notice is reasonable under the circumstances.

**I.      Assumption and Assignment of Executory Contracts and Unexpired Leases should be Authorized.**

61.      Bankruptcy Code section 365(a) provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  The standard governing a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection.  See, e.g., In re HQ Global Holdings, Inc., 290 B.R. 507, 511 (Bankr. D. Del. 2003) (debtor's decision to assume or reject executory contract is governed by business judgment standard and can only be overturned if decision was product of bad faith, whim or caprice); In re Market Square Inn, Inc., 978 F.2d 116, 121 (3d Cir. 1992) (assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court" (citation omitted)); Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 39-40 (3d Cir. 1989) (same).  If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract. See Grp. of Inst. Investors v. Chicago M. St. P. & P.R.R. Co., 318 U.S. 523 (1943); Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d at 39-40.  The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the contract will benefit the estate."  Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting In re Stable Mews Assocs., 41 B.R. 594, 596 (Bankr. S.D.N.Y 1984)).  Any more exacting scrutiny would slow the administration of a debtor's estate, increase costs, interfere with the Bankruptcy

37

Code's provision for private control of administration of the estate and threaten the court's ability to control a case impartially.  See Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985) (citation omitted).  In addition, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1)(A).

62.     Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract.  See L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home Ctr., Inc.), 209 F.3d 291, 299 (3d Cir. 2000) (indicating that "[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); Leonard v. General Motors Corp. (In re Headquarters Dodge, Inc.), 13 F.3d 674, 682 (3d Cir. 1994) (noting that purpose of Bankruptcy Code section 365(f) is to assist trustee in realizing the full value of the debtor's assets).

63.     Bankruptcy Code section 365(f) provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided."  11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction."  In re DBSI, Inc., 405 B.R. 698, 708 (Bankr. D. Del. 2009); EBG Midtown S. Corp. v. McLaren/Hart Env. Eng'g Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 592 (S.D.N.Y. 1992); In re Decora Indus., 2002 U.S. Dist. LEXIS 27031, at * 23 (D. Del. 2002) ("adequate assurance falls short of an absolute guaranty of payment" (citation omitted)); Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

38

64.     Adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding).

65.     To facilitate and effectuate the Private Sale or any Sale Transaction, the Debtors request approval of the assumption and assignment of any Acquired Contracts to the Private Sale Purchaser, or, in the alternative, to any Successful Bidder under Bankruptcy Code section 365. The Debtors further request that the Sale Order(s) provide that the Acquired Contracts will be transferred to, and remain in full force and effect for the benefit of, the Private Sale Purchaser, or, in the alternative, the Successful Bidder(s) notwithstanding any provisions in the Acquired Contracts, including those described in Bankruptcy Code sections 365(b)(2) and (f)(1) and (3) that prohibit such assignment.

66.     The Private Sale Purchaser or any Successful Bidder must (i) submit evidence sufficient to demonstrate its financial wherewithal and ability to consummate the Private Sale or Sale Transaction, respectively, including the assumption of the Acquired Contracts at the closing and (ii) provide adequate assurance of future performance in connection with any assigned executory contracts and leases.  Furthermore, to the extent that any defaults exist under any executory contract or unexpired lease that is to be assumed and assigned in connection with the sale of the Assets, the Private Sale Purchaser or the Successful Bidder will cure any such default prior to such assumption and assignment.

67.     The Debtors will present facts at the hearing on approval of the Private Sale, or, alternatively, at the Sale Hearing to demonstrate the financial credibility, willingness and ability

of the Private Sale Purchaser, or, alternatively, the Successful Bidder to perform under the Acquired Contracts.  The hearing on approval of the Private Sale or the Sale Hearing will afford the Court and other interested parties the opportunity to evaluate the ability of the Private Sale Purchaser or the Successful Bidder to provide adequate assurance of future performance under the Acquired Contracts, as required under Bankruptcy Code section 365(b)(1)(C).  Further, as set forth above, the Debtors will give notice to all parties to the Acquired Contracts of their intention to assume the Acquired Contracts, and what the Debtors believe are the Cure Amounts.

68.    Accordingly, the Debtors submit that implementation of the proposed Assumption and Assignment Procedures is appropriate in these cases.  The Court therefore should have a sufficient basis to authorize the Debtors to reject or assume and assign contracts as will be set forth in the Private Sale APA or the Successful Bidder's Modified Purchase Agreement.

**J.    Request for Relief pursuant to Bankruptcy Rules 6004(h) and 6006(d)**

69.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  Bankruptcy Rule 6006(d) further provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

70.    The Debtors believe that the Private Sale or any Sale Transaction should be consummated as soon as practicable to preserve and maximize value.  Accordingly, the Debtors request that the Private Sale Order or any other Sale Order approving the sale of the Assets and the assumption and assignment of the Designated Contracts be effective immediately upon entry of such order and that the fourteen-day stay under Bankruptcy Rules 6004(h) and 6006(d) be waived.

RLF1 14573569v.3

### NOTICE

71.     The Debtors shall provide notice of this Motion to: (a) the Office of the United States Trustee for the District of Delaware; (b) each of the Debtors' creditors holding the thirty (30) largest unsecured claims on a consolidated basis; (c) counsel to the Roll-Up DIP Lenders; (d) counsel to the DIP Lenders; (e) counsel to the Prepetition DDTL Lenders; (f) the Internal Revenue Service; (g) the SEC; (h) all entities known by the Debtors to have asserted any lien, claim, encumbrance or other interest in the Assets; (i) local and state environmental and taxing authorities; (j) counsel to any statutory committee appointed in these cases; (k) all parties known to have expressed an interest in acquiring the Assets; and (l) all parties entitled to notice pursuant to Local Rule 2002-1(b).  The Debtors respectfully submit that no further notice of this Motion is required.

WHEREFORE, the Debtors respectfully request that the Court (a) enter the Private Sale Order, or, in the alternative, (b) enter the Bidding Procedures Order, (c) after the Sale Hearing, enter the Sale Order(s) and/or (d) grant such other and further relief as is just and proper.

Dated: May 25, 2016
      Wilmington, Delaware

Respectfully submitted,

   /s/ *Rachel L. Biblo*
Daniel J. DeFranceschi (No. 2732)
Zachary I. Shapiro (No. 5103)
Rachel L. Biblo (No. 6012)
Joseph C. Barsalona II (No. 6102)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

-and-

Adam C. Rogoff (admitted *pro hac vice*)
Joseph A. Shifer (admitted *pro hac vice*)
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 715-9100
Facsimile:  (212) 715-8000

*Proposed Attorneys for the Debtors and Debtors-in-Possession*