**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Constellation Enterprises LLC *et al.*,[1] | ) Case No. 16-11213 (CSS) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |
| | ) Bid Proc. Hearing:  June 15, 2016 at 10:00 a.m. (ET) |
| | ) Bid Proc. Obj. Deadline:  June 8, 2016 at 4:00 p.m. (ET) |
| | ) |

**DEBTORS' MOTION FOR (I) AN ORDER ESTABLISHING BIDDING
PROCEDURES AND GRANTING RELATED RELIEF AND
(II) AN ORDER APPROVING THE SALE OF THE ASSETS**

The debtors and debtors in possession in the above-captioned chapter 11 cases

(collectively, the "**Debtors**") seek entry of an order, substantially in the form attached hereto as

**Exhibit A** (the "**Bidding Procedures Order**"), (i) approving the proposed bidding procedures

attached hereto as **Exhibit B** (the "**Bidding Procedures**") by which the Debtors will solicit and

select the highest or otherwise best offer for the sale (the "**Sale Transaction**") of substantially all

or a portion of the Debtors' assets (as more specifically defined below, the "**Subject Assets**"),

other than the assets of Columbus Holdings Inc. and Columbus Steel Castings Company

(collectively, the "**Columbus Debtors**"),[2] including the approval of an expense reimbursement

to the Stalking Horse Purchaser (as defined below), scheduling an auction (the "**Auction**"), if

necessary; (ii) establishing procedures for the assumption and assignment of executory contracts

and unexpired leases in connection with the Sale Transaction (collectively, the "**Assigned**

---

[1]      The debtors in these cases, along with the last four digits of the federal tax identification number for each of the debtors, where applicable are:  Constellation Enterprises LLC (9571); JFC Holding Corporation (0312); The Jorgensen Forge Corporation (1717); Columbus Holdings Inc. (8155); Columbus Steel Castings Company (8153); Zero Corporation (0538); Zero Manufacturing, Inc. (8362); Metal Technology Solutions, Inc. (7203); Eclipse Manufacturing Co. (1493); and Steel Forming, Inc. (4995).  The debtors' mailing address is located at 50 Tice Boulevard, Suite 340, Woodcliff Lakes, NJ  07677.

[2]      The Columbus Debtors are filing a separate motion for the sale of all or substantially all of their assets.

**Contracts and Leases**"), including notice of proposed cure amounts, including the form and manner and notice in connection therewith; (iv) scheduling a final hearing (the "**Sale Hearing**") to approve the Sale Transaction with the Stalking Horse Purchaser or the winning bid at the Auction; and (v) granting related relief.  The Debtors further request that, at the Sale Hearing, this Court enter an order (the "**Sale Order**"), which will be filed before the Sale Hearing, (i) authorizing the sale of the Subject Assets free and clear of liens, pledges, security interests, charges, options, claims, interests, and encumbrances (collectively, the "**Interests**") to the Stalking Horse Purchaser or the Successful Bidder (as defined below); (ii) authorizing the assumption and assignment of certain executory contracts and unexpired leases; and (iii) granting related relief.  In support of this motion, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.      As discussed at the first day hearing, to preserve and maximize the value of the Subject Assets (consisting of three of the four business lines operated by the Debtors), and transition these businesses to a new operator with an intact employee, customer, and vendor base, there is the urgent need to implement an expedited auction and sale process.  By the relief requested herein, the Debtors hope to achieve that sale either pursuant to stalking horse credit bid by the Supporting Noteholders or to the prevailing bidder(s) at auction.

2.      The Debtors are cognizant of the need to balance an expeditious sale process with providing due process to affected creditors.  Accordingly, by the procedures proposed herein, the Debtors seek to strike a fair and reasonable balance to preserve the value of the Subject Assets as going concern businesses for the benefit of numerous stakeholders.  The Debtors believe that the process proposed by this Motion will give them an appropriate timeframe under the circumstances to market the Subject Assets (a process that has already begun as of the Petition Date), and ensure that the credit bid proposed by the Subject

Noteholders is market-tested.   Further, the Debtors are aware that the proposed bidding procedures have not yet been discussed with the official creditors' committee (the "**Committee**").   Nonetheless, to provide adequate notice while preserving the opportunity for the orderly transition of business operations, the Debtors filed this Motion with the expectations of immediately engaging the Committee to consensually resolve any questions and obtain its support for an effective and expeditious sale process.

## JURISDICTION

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).[3]

4.      Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The predicates for the relief requested herein are sections 105, 363, and 365 of title 11 of the United States Code (the "**Bankruptcy Code**"); rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"); and Local Rules 2002-1 and 6004-1.

## BACKGROUND

**A.      General Background**

6.      On May 16, 2016 and May 17, 2016 (as applicable, the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court.  The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  These chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant

---

[3]      Under rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors hereby confirm their consent to the entry of a final order by this Court in connection with this motion if it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection therewith consistent with Article III of the United States Constitution.

to Bankruptcy Rule 1015 and Local Rule 1015-1.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.  On May 25, 2016, the United States Trustee appointed an official committee of unsecured creditors.

7.      A description of the Debtors and their business is set forth in greater detail in the *Declaration of Timothy B. Stallkamp in Support of Chapter 11 Petitions and First Day Motions* [D.I. 12] (the "**First Day Declaration**") filed on the Petition Date and is incorporated herein by reference.

**B.      Specific Background**

8.      In connection with their postpetition financing, the Debtors entered into that Senior Secured Super Priority Debtor-In-Possession Amended and Restated Financing Agreement, dated as of May 19, 2016 (the "**DIP Credit Agreement**") among the Debtors and certain of the Debtors' prepetition secured lenders.  *See* Exhibit A to *Interim Order (A) Authorizing the Debtors to Obtain Postpetition Secured Financing Pursuant to Section 364 of the Bankruptcy Code, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Adequate Protection to the Adequate Protection Parties, (D) Scheduling A Final Hearing, and (E) Granting Related Relief Included in the DIP Credit Agreement* [D.I. 71] (the "**Interim DIP Order**").

9.      Contained in the DIP Credit Agreement are a number of milestones, including milestones for the filing this Motion, the entry of the Bidding Procedures Order, the Bid Deadline (defined below), the Auction, and the closing of the Sale Transaction. *See* DIP Credit Agreement § 7.01(q).

10.      In addition, attached as Exhibit J to the Credit Agreement was a term sheet for the sale of the Subject Assets, along with a copy of the Bidding Procedures (the "**Sale Term**

**Sheet**”. *See Notice of Filing Exhibit "J" to DIP Credit Agreement* [D.I. 23].   For the Court's convenience, a copy of the Sale Term Sheet is attached hereto as **Exhibit C.**

11.    Pursuant to the Sale Term Sheet, the Debtors, other than the Columbus Debtors, will sell the Subject Assets to a newly formed entity to be organized by certain of the noteholders identified on <u>Annex A</u> to the Sale Term Sheet (collectively, the “**Supporting Noteholders**”) and to be capitalized by the Supporting Noteholders (such newly formed entity, the “**Purchaser**”).   The Sale Term Sheet also provides the Purchaser with an expense reimbursement of up to $250,000, payable under certain conditions (the “**Expense Reimbursement**”).

12.    The Sale Term Sheet included many of the salient terms of the Sale Transaction, but remains subject to further definitive documentation in the form of an Asset Purchase Agreement (the “**Stalking Horse APA**”) and the form of Sale Order approving such Stalking Horse APA.   The Debtors anticipate filing the Stalking Horse APA and the Sale Order no later than 5 days prior to the hearing on this Motion.

**C.    The Proposed Bidding, Notice, and Assumption and Assignment Procedures**

*i.   Proposed Timeline for the Sale*

13.    In accordance with the Sale Term Sheet, the Debtors propose the following timeline for the Sale:[4]

| Deadline | Action |
|---|---|
| July 6, 2016 at 5:00 p.m. (prevailing Eastern Time) | Bid Deadline |

---

[4]        The Debtors are aware of the Court's view that any milestones are subject to approval as part of the final order approving the DIP Credit Agreement and, therefore, that the proposed sale-related milestone dates are subject to discussion with the Committee and Court approval.

| Deadline | Action |
|---|---|
| July 7, 2016,  at 4:00 p.m. (prevailing Eastern Time) | Sale Objection Deadline & Assumption and Assignment Hearing (defined below) |
| July 11, 2016 at 10:00 a.m. (prevailing Eastern Time) | Auction |
| July 12, 2016 at 12:00 p.m. (prevailing Eastern Time) | Reply Deadline (defined below) |
| July 14, 2016 at 10:00 a.m. (prevailing Eastern Time) | Sale Hearing |

The Debtors submit that this proposed timeline, under the circumstances, is appropriate to preserve values while allowing the opportunity to market-test the various businesses.

### ii.   The Bidding Procedures

14.    The Bidding Procedures are designed to ensure an orderly and efficient sale process.  The Bidding Procedures describe, among other things, (i) the procedures for interested parties to access due diligence materials, submit bids, and become a Qualified Bidder (as defined below); (ii) the time, place, and process of any Auction; (iii) the selection and approval of any ultimately successful bidders; and (iv) the deadlines with respect to the foregoing.  The Debtors believe, with the support of various of their secured creditors, that the Bidding Procedures provide for a sale process that preserves the businesses as going-concerns.  Indeed, moving forward with this process at this time, and in the manner described herein, also supports two other important goals: (a) encouraging participation from wide group of potential bidders for the Subject Assets; and (b) minimizing the impact of negative operating "cash burn" on these estates during a prolonged auction and sale process.

15.    A summary of the principal terms of the Bidding Procedures, a complete copy of which is attached hereto as **Exhibit B**, including the terms that are required to be highlighted in accordance with Local Rule 6004-1, is as follows:[5]

| Assets to Be Sold (pp. 1-2) | "Subject Assets" shall include all assets of the Company except the Excluded Assets (as defined below), including without limitation: (i) all accounts receivable, notes receivable, pre-paid expenses, cash and cash equivalents, (ii) all intellectual property rights, including all trade names, trademarks and the like, which relate to or are used in the business conducted by any of the Sellers (the "Business"), (iii) all of the Sellers' personal property, inventory, equipment, fixtures, and other assets customarily considered 'PP&E', (iv) all deposits and prepaid or deferred charges and expenses of the Sellers, (v) all right, title, and interest of the Sellers in each owned real property and under each real property lease which is an Assumed Contract (as defined below), (vi) all of the documents that are used or useful in, held for use in or intended to be used in, or that arise primarily out of, the Business, including any customer lists, vendor lists or supplier lists and financial and/or accounting books and records (vii) all Assumed Contracts, (viii) all insurance proceeds, including any insurance proceeds from or with respect to any third party property or casualty insurance, in each case of this clause (viii), to the extent received or receivable by any of the Sellers in respect of the Business or the Subject Assets, (ix) all general intangibles of the Sellers, (x) all goodwill associated with the Subject Assets, (xi) all claims, causes of action, and rights of recovery related to the Subject Assets, including against counterparties to the Assumed Contracts, actions arising under chapter 5 of the Bankruptcy Code, and for taxes relating to the Subject Assets or the Business, (xii) any permits, licenses, certificates or similar documents from any governmental entity, in each case, to the extent transferrable, (xiii) any equity interests held by Zero Manufacturing, including 100% of the equity interests of Zero Cases (UK) Limited and Zero Cases Europe Limited (collectively the "Zero Equity Interests")[6], (xiv) all of the rights and claims of any Seller for preference or avoidance actions available to any Seller under the Bankruptcy Code, of whatever kind or nature, including, without limitation, those set forth in Sections 544 through 551 and any other applicable provisions of the Bankruptcy Code, against any party asserting claims against any Seller, and any related claims and actions arising under such sections by operation of law or otherwise, including any and all proceeds of the foregoing (other than Excluded Avoidance Actions (as defined below)), and (xv) any claim, right, or interest in any credit, refund, rebate, abatement, or other recovery relating to the Subject Assets or the Business, for taxes or otherwise, including those arising under the Assumed Contracts; provided, however, that, the Purchaser may, in its sole discretion, elect to exclude the Zero Equity from the |
|---|---|

[5]    The following summary is qualified in its entirety by reference to the provisions of the Bidding Procedures. In the event of any inconsistencies between the provisions of the Bidding Procedures and the terms herein, the terms of the Bidding Procedures shall govern. Capitalized terms not defined in this table shall have the meaning ascribed to them in the Bidding Procedures.

[6]    To the extent the Zero Equity Interests are not acquired and subject to the limitations and amounts set forth in the wind-down budget, Wind-Down Expenses to be funded for these entities through, and a specific line item for such Wind-Down Expenses to be reflected in, the wind-down budget.

| | |
|---|---|
| | purchase of the Subject Assets, by written notice to the Sellers, and, in such event, the Zero Equity shall be an Excluded Asset. |
| **Diligence Materials (p. 3)** | To receive access to due diligence materials and to participate in the bidding process, an interested party must submit to the Debtors (i) an executed confidentiality agreement in form and substance satisfactory to the Debtors (which, for the avoidance of doubt, may be substantially in the form attached to the Bidding Procedures as Exhibit 2) and (ii) reasonable evidence demonstrating the party's financial ability to consummate a sale transaction for the Subject Assets (an "<u>Alternate Transaction</u>").<br><br>A party who, a determined by the Debtors in consultation with the Consulting Parties, satisfies the requirements set forth in the immediately preceding sentence for receiving access to diligence materials shall be a "Preliminary Interested Investor." As promptly as practicable after the Debtors determine that a party is a Preliminary Interested Investor, the Debtors will deliver to the Preliminary Interested Investor access to the Debtors' confidential electronic data room. The Debtors will afford any Preliminary Interested Investor the time and opportunity to conduct reasonable due diligence before the Bid Deadline. Notwithstanding the foregoing, the Debtors reserve the right to withhold any diligence materials that the Debtors, in consultation with the Consulting Parties, determine are sensitive or otherwise not appropriate for disclosure to a Preliminary Interested Investor who the Debtors determine is a competitor of the Debtors or is affiliated with any competitor of the Debtors. Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be a Preliminary Interested Investor. The Debtors shall not exclude a party from diligence who has complied with subsections (i) and (ii) of the preceding paragraph, unless they have first consulted with the Consultation Parties regarding such determination. |
| **Qualification of Bidders and Qualified Bids; Expense Reimbursement (pp. 3-7)** | To be eligible to participate in the Auction, each offer, solicitation or proposal (each, a "**Bid**"), and each party submitting such a Bid (other than the Stalking Horse Purchaser) (each, a "**Bidder**"), must be reasonably determined by the Debtors, in consultation with the Consultation Parties, to satisfy each of the following conditions:<br><br>(a)    **Good Faith Deposit**: Each Bid must be accompanied by a cash deposit in the amount of ten percent (10%) of the purchase price contained in the Modified Asset Purchase Agreement, which deposit shall be held in an interest-bearing escrow account to be identified and established by the Debtors (the "**Good Faith Deposit**").<br><br>(b)    **Same or Better Terms**: Each Bid must be on terms that the Debtors, in their business judgment and after consulting with the Consultation Parties, determine are the same or better for the Debtors than the terms of the Stalking Horse Agreement.<br><br>(c)    **Executed Agreement**: Each Bid must be based on the Stalking Horse Agreement and must include binding, executed transaction documents, signed by an authorized representative of such Bidder, pursuant to which the Bidder proposes to effectuate an Alternate |

Transaction (a "**Modified Asset Purchase Agreement**"). Each Bid must also include a copy of the Modified Asset Purchase Agreement (including all exhibits thereto, including the form of Sale Order) marked against the Stalking Horse Agreement to show all changes requested by the Bidder (including those related to purchase price and to remove any provisions that apply only to the Stalking Horse Purchaser, such as the expense reimbursement provision contained in the Stalking Horse Agreement, which shall not be in any Modified Asset Purchase Agreement). Each Modified Asset Purchase Agreement must provide a representation that the Qualified Bidder will (a) make all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "**HSR Act**"), if applicable, (b) submit and pay the fees associated with all necessary filings under the HSR Act as soon as reasonably practicable; provided, however, that the timing and likelihood of receiving HSR Act approval will be a consideration in determining the highest and best Bid, and (c) pay the expense reimbursement of the Stalking Horse Purchaser as contemplated by the Stalking Horse Agreement.

(d)     **Scope of Bid**: Each Bid must be for the purchase of all, and not less than all, of the Subject Assets and the assumption of all, and not less than all, of the Assumed Liabilities; provided, however, that, notwithstanding anything to the contrary contained in these Bid Procedures, at the written request of a Bidder, the Debtors and the Ad Hoc Group may consent, in their sole and absolute discretion, to waive this requirement and permit the modification or limitation of this requirement in order to permit Bids for portions of the Subject Assets and to permit for an assumption of only certain Assumed Liabilities.

(e)     **Minimum Bid**: Each Bid must, individually or in conjunction with one or more other Bids, have a purchase price, including any assumption of liabilities, that in the Debtors' reasonable business judgment (after consultation with the Consultation Parties) has a value greater than the sum of (i) the Purchase Price (as defined in the Stalking Horse Agreement)[7], *plus* (ii) the amount of the Expense Reimbursement (as defined in the Stalking Horse Agreement), *plus* (iii) $500,000 (the "**Minimum Bid**") and, in any event, provide for sufficient cash at the closing of such Bid to repay, in full and in immediately available funds, the full amount of the Obligations owed by the Debtors arising under the DIP Facility. In addition, each Bid must expressly provide for the payment of the expense reimbursement of the Stalking Horse Purchaser as contemplated by the Stalking Horse Agreement in cash upon selection as, and to the extent selected as, the Successful Bid.

(f)     **Designation of Assigned Contracts and Leases**: Each Bid must

---

[7]     The amount of the Wind-down Expenses will be shared with potential bidders as part of the due diligence process.

identify with particularity each and every executory contract and unexpired lease with respect to which the Bidder seeks assignment from the Sellers.

(g)    **Designation of Assumed Liabilities**: Each Bid must identify all liabilities which the Bidder proposes to assume.

(h)    **Corporate Authority**: Each Bid must include written evidence reasonably acceptable to the Debtors demonstrating appropriate corporate authorization to consummate the proposed Alternate Transaction; provided, however, that, if the Bidder is an entity specially formed for the purpose of effectuating the Alternate Transaction, then the Bidder must furnish written evidence reasonably acceptable to the Debtors of the approval of the Alternate Transaction by the equity holder(s) of such Bidder.

(i)    **Disclosure of Identity of Bidder**: Each Bid must fully disclose the identity of each entity that will be bidding for or purchasing the Subject Assets, including any equity holders, in the case of a Bidder which is an entity specially formed for the purpose of effectuating the contemplated transaction, or otherwise participating in connection with such Bid, and the complete terms of any such participation, including any agreements, arrangements or understandings concerning a collaborative or joint bid or any other combination concerning the proposed Bid. Each Bid must also fully disclose any connections or agreements with the Debtors, the Stalking Horse Purchaser or any other known, potential, prospective Bidder or Qualified Bidder, and/or any officer, director or equity security holder of the Debtors. All information disclosed pursuant to this paragraph shall be made available by the Debtors to the Ad Hoc Group promptly upon Debtors' receipt thereof but in any event no later than one (1) business day following the Bid Deadline.

(j)    **Proof of Financial Ability to Perform**: Each Bid must include written evidence that the Debtors may conclude, in consultation with the Consultation Parties, demonstrates that the Bidder has the necessary financial ability to close the Alternate Transaction and comply with section 365 of the Bankruptcy Code, including providing adequate assurance of future performance under all contracts to be assumed and assigned in such Alternate Transaction. Such information must include, *inter alia*, the following:

(1)    contact names and numbers for verification of financing sources;

(2)    evidence of the Bidder's internal resources and proof of unconditional debt funding commitments from a recognized banking institution and, if applicable, equity commitments in an aggregate amount equal to the cash portion of such Bid or the posting of an irrevocable letter of

credit from a recognized banking institution issued in favor of the Debtors in the amount of the cash portion of such Bid, in each case, as are needed to close the Alternate Transaction;

(3)     the Bidder's current financial statements (audited if they exist) or other similar financial information reasonably acceptable to the Debtors;

(4)     a description of the Bidder's pro forma capital structure; and

(5)     any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors, in consultation with the Consultation Parties, demonstrating that such Bidder has the ability to close the Alternate Transaction.

(k)     **Regulatory and Third Party Approvals**: Each Bid must set forth each regulatory and third-party approval required for the Bidder to consummate the Alternate Transaction, and the time period within which the Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the Modified Asset Purchase Agreement, those actions the Bidder will take to ensure receipt of such approval(s) as promptly as possible).

(l)     **Contact Information and Affiliates**: Each Bid must provide the identity and contact information for the Bidder and full disclosure of any affiliates of the Bidder.

(m)     **Contingencies**: Each Bid (i) may not contain representations and warranties, covenants, or termination rights materially more onerous in the aggregate to the Debtors than those set forth in the Stalking Horse Agreement, as determined by the Debtors in good faith, and (ii) may not be conditioned on obtaining financing, any internal approvals or credit committee approvals, or on the outcome or review of due diligence, including with respect to any environmental, health or safety Laws or employee, labor, health or safety matters.

(n)     **Irrevocable**: Each Bid must be irrevocable until five (5) business days after the Sale Hearing; provided, however, that if such Bid is accepted as the Successful Bid or the Backup Bid (each as defined herein), such Bid shall continue to remain irrevocable until the closing of the sale of the Subject Assets.

(o)     **Compliance with Diligence Requests**: Each Bidder submitting a Bid must have complied with reasonable requests for additional information and due diligence access from the Debtors to the

<table>
<tr><td></td><td>reasonable satisfaction of the Debtors, in consultation with the Consultation Parties.</td></tr>
</table>

|  | | |
|---|---|---|
|  | (p) | **Confidentiality Agreement**: To the extent not already executed, each Bid must include an executed confidentiality agreement in the form attached as <u>Exhibit A</u> to the Bidding Procedures. |
|  | (q) | **Termination Fees**: Each Bid (other than the Stalking Horse Purchaser's Bid pursuant to the Stalking Horse Agreement which provides for certain expense reimbursements) must not entitle the Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment or reimbursement and, by submitting the Bid, the Bidder waives the right to pursue a substantial contribution claim under 11 U.S.C. § 503 related in any way to the submission of its Bid or participation in any Auction. |
|  | (r) | **Closing Date**: Each Bid must include a commitment to close the transactions contemplated by the Modified Asset Purchase Agreement by no later than September 11, 2016. |
|  | (s) | **Bid Deadline**: The following parties must receive a Bid in writing (in both PDF and Word format), on or before the Bid Deadline: (i) the Debtors, Constellation Enterprises LLC, 50 Tice Boulevard, Suite 340, Woodcliff Lakes, NJ 07677, Attn: Donald MacKenzie (dmackenzie@conwaymackenzie.com); (ii) counsel to the Debtors, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas New York, New York 10036, Attention: Adam C. Rogoff (arogoff@kramerlevin.com ) and Joseph A. Shifer(jshifer@kramerlevin.com); (iii) co-counsel to the Debtors, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801, Attn: Daniel J. DeFranceschi (defranceschi@rlf.com); and (v) counsel to the Ad Hoc Group, Akin Gump Strauss Hauer & Feld LLP, 1333 New Hampshire Ave NW, Washington, DC 20036, Attention: Scott L. Alberino (salberino@akingump.com). |
|  | | Subject to certain provisos, a Bid received from a Bidder on or before the Bid Deadline that meets the requirements set forth above for the applicable Assets shall constitute a "**Qualified Bid**" for the Assets, and such Bidder shall constitute a "**Qualified Bidder**" for such Assets. |
| **Credit Bidding (p. 9)** | | The Stalking Horse Purchaser shall be permitted to credit bid the full amount, or any portion, of the Indenture Obligations pursuant to any Overbid in connection with each round of bidding in the Auction. |
| **Auction (pp. 7-9)** | | If one or more Qualified Bids, other than the Stalking Horse Agreement, for all, or substantially all, of the Subject Assets are submitted (or, if Qualified Bids are submitted for all, or substantially all, of the Subject Assets, in the aggregate with the other Qualified Bids to the extent permitted and not mutually exclusive or for the same respective assets and liabilities) by the Bid Deadline, the Debtors shall |

|  | conduct the Auction on July 11, 2016 at 9:00 a.m.. (prevailing Eastern Time) at the offices of Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas New York, New York 10036 or such other place and time as the Debtors shall notify all Qualified Bidders, the Stalking Horse Purchaser, the Ad Hoc Group, the Official Committee of Unsecured Creditors (the "<u>Creditors' Committee</u>"), the Trustee and each of their respective counsel and advisors. The Auction shall be conducted according to the following procedures:<br><br>Only the Debtors, the Consultation Parties, the Creditors' Committee, the Stalking Horse Purchaser, and any other Qualified Bidder, in each case, along with their representatives and counsel, may attend the Auction (such attendance to be in person) and only the Stalking Horse Purchaser and such other Qualified Bidders will be entitled to make any Bids at the Auction; <u>provided</u>, <u>however</u>, that any other creditor may attend (but not participate in) the Auction if it provides the Debtors written notice of its intention to attend the Auction on or before the Bid Deadline. Such written notice must be sent to counsel for the Debtors via electronic mail, to Adam C. Rogoff (arogoff@kramerlevin.com) and Joseph A. Shifer (jshifer@kramerlevin.com).<br><br><br>The Debtors and their professionals shall direct and preside over the Auction and the Auction shall be transcribed. Other than as expressly set forth herein, the Debtors (in consultation with the Consultation Parties) may conduct the Auction in the manner they reasonably determine will result in the highest or otherwise best Qualified Bid.<br><br>One (1) day prior to the Auction, the Debtors will:<br><br>(a)  notify each Qualified Bidder that has timely submitted a Qualified Bid that its Bid is a Qualified Bid;<br><br>(b)  provide each Qualified Bidder participating in the Auction with a copy of the Modified Asset Purchase Agreements associated with all Qualified Bids received before the Bid Deadline and, with respect to such Qualified Bids, an indication as to which Qualified Bid (or aggregate of Qualified Bids) is highest or best, as determined by the Debtors in consultation with the Consultation Parties (such highest or otherwise best Qualified Bid or Qualified Bids, the "**Auction Baseline Bid**").<br><br>In addition, at the start of the Auction, the Debtors shall describe the terms of the Auction Baseline Bid. Each Qualified Bidder participating in the Auction must confirm that it (a) has not engaged in any collusion with respect to the bidding or sale of any of the assets described herein, (b) has reviewed, understands and accepts the Bidding Procedures and (c) has consented to the core jurisdiction of the Bankruptcy Court. |
|---|---|
| **Terms and Announcement of Overbids (pp. 9-10)** | An "<u>**Overbid**</u>" is any bid made at the Auction subsequent to the Debtors' announcement of the respective Auction Baseline Bid. To submit an Overbid for purposes of this Auction, a Bidder must comply with the following conditions:<br><br>(b)  <u>**Minimum Overbid Increments**</u>: Any Overbid for all of the Subject Assets after and above its respective Auction Baseline Bid |

shall be made in increments in cash or in cash equivalents, or other forms of consideration acceptable to the Debtors, after consulting with the Consultation Parties and with the consent of the Ad Hoc Group, or in such other higher amounts as the Debtors will announce from time to time during the Auction. The Stalking Horse Purchaser shall be entitled to submit Overbids in cash, cash equivalents or other forms of consideration, as described above, or additional credit bid amounts up to the full amount of the Obligations owed by the Debtors arising under the Indenture (the "**Indenture Obligations**"), in each case, as determined by the Stalking Horse Purchaser in its sole and absolute discretion.

(c)    **Stalking Horse Purchaser May Credit Bid the Indenture Obligations**: The Stalking Horse Purchaser shall be permitted to credit bid the full amount, or any portion, of the Indenture Obligations pursuant to any Overbid in connection with each round of bidding in the Auction.

(d)    **Remaining Terms Are the Same as for Qualified Bids**: Except as modified herein, an Overbid at the Auction must comply with the conditions for a Qualified Bid set forth above; provided, however, that the Bid Deadline shall not apply to such Overbids. Any Overbid must include, in addition to the amount and the form of consideration of the Overbid, a description of all changes requested by the Bidder to the Stalking Horse Agreement or Modified Asset Purchase Agreement, as the case may be, in connection therewith. Any Overbid must remain open and binding on the Bidder.

At the Debtors' discretion, to the extent not previously provided (which shall be determined by the Debtors in consultation with the Consultation Parties), a Bidder submitting an Overbid at the Auction must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors, in consultation with the Consultation Parties) reasonably demonstrating such Bidder's ability to close the Alternate Transaction proposed by such Overbid.

*Announcement and Consideration of Overbids.*

(a)    **Announcement of Overbids**: The Debtors shall announce at the Auction the material terms of each Overbid, the total amount of consideration offered in each such Overbid, and the basis for calculating such total consideration.

(b)    **Consideration of Overbids**: Subject to the deadlines set forth herein, the Debtors reserve the right, in their reasonable business judgment in consultation with the Consultation Parties, to make one or more continuances of the Auction to, among other things: facilitate discussions between the Debtors and individual Qualified Bidders; allow individual Qualified Bidders to consider how they

| | |
|---|---|
| | wish to proceed; aggregate Qualified Bids for only certain assets with other such bids (to the extent permitted and not mutually exclusive or for the same respective assets and liabilities); or give Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors in their reasonable business judgment (after consulting with the Consultation Parties) may require, that the Qualified Bidder has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed Alternate Transaction at the prevailing Overbid amount. When comparing Overbids to the Qualified Bid made by the Stalking Horse Purchaser, the Debtors shall treat the credit bid (including any Overbid) made by the Stalking Horse Purchaser as being made in cash or in cash equivalents. |
| **Closing the Auction; Successful Bidder (p. 11)** | The Auction shall continue in additional rounds of bidding until the Debtors select, after consultation with the Consultation Parties, the Bid that is the highest or otherwise best offer, or collection of offers, which produces the highest or best recovery to the estates (the "**Successful Bid**," and the Bidder submitting such Successful Bid, the "**Successful Bidder**"). The Successful Bidder(s) shall have the rights and responsibilities of the purchaser(s) as set forth in the applicable Stalking Horse Agreement or Modified Asset Purchase Agreement. In selecting the Successful Bid, the Debtors and the Consultation Parties shall consider the Bid Assessment Criteria.<br><br>The Auction shall close when the Successful Bidder submits fully executed sale and transaction documents memorializing the terms of the Successful Bid.<br><br>Promptly following the Debtors' selection, after consulting with the Consultation Parties, of the Successful Bid and the conclusion of the Auction, the Debtors shall announce the Successful Bid and Successful Bidder and shall file with the Bankruptcy Court notice of the Successful Bid and Successful Bidder.<br><br>The Debtors shall not consider any Bids submitted after the conclusion of the Auction. |
| **Closing with Alternative Backup Bidders (p. 11)** | Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next highest or otherwise best Bid at the Auction, as determined by the Debtors, in the exercise of their business judgment and after consulting with the Consultation Parties, will be designated as the backup bidder (the "**Backup Bidder**"). The Backup Bidder shall be required to keep its initial Bid (or if the Backup Bidder submitted one or more Overbids at the Auction, the Backup Bidder's final Overbid) (the "**Backup Bid**") open and irrevocable until the closing of the transaction with the Successful Bidder.<br><br>Following the Sale Hearing, if the Successful Bidder fails to consummate the purchase of the Subject Assets, the Debtors may, after consultation with the Consultation Parties, deem the Backup Bidder to have the new Successful Bid, and the Debtors will be authorized, without further order of the Bankruptcy Court, to consummate the transaction with the Backup Bidder. All Qualified Bids (other than the Successful Bid and Backup Bid) shall be deemed rejected by the Debtors on and |

| | |
|---|---|
| | as of the date of approval of the Successful Bid and Backup Bid by the Bankruptcy Court. The Debtors, on their behalf and on behalf of each of their respective estates, specifically reserve the right to seek all available damages, including specific performance, from any defaulting Successful Bidder (including any Backup Bidder designated as a Successful Bidder) in accordance with the terms of the Bidding Procedures. |
| **Modification of Bidding and Auction Procedures (p. 12)** | Except as otherwise provided in the Stalking Horse Agreement, the Bidding Procedures or the Bidding Procedures Order, the Debtors further reserve the right as they may reasonably determine to be in the best interest of their estates, after consultation with the Consultation Parties, to: (a) determine which Bidders are Qualified Bidders; (b) determine which Bids are Qualified Bids; (c) determine which Qualified Bid is the highest or best proposal and which is the next highest or best proposal; (d) reject any Bid that is (1) inadequate or insufficient, (2) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code or (3) contrary to the best interests of the Debtors and their estates; (e) waive terms and conditions set forth herein with respect to all potential Bidders; (f) impose additional terms and conditions with respect to all potential Bidders; (g) extend the deadlines set forth herein; (h) continue or cancel the Auction and/or Sale Hearing in open court, or by filing a notice on the docket of the Debtors' Chapter 11 Cases, without further notice to creditors or other parties in interest; and (i) modify the Bidding Procedures and implement additional procedural rules that the Debtors determine, in their business judgment, after consultation with the Consultation Parties, will better promote the goals of the bidding process and discharge the Debtors' fiduciary duties; provided, however, that any modification or additions to the Bidding Procedures shall not be inconsistent with the Stalking Horse Agreement, the Bidding Procedures Order or any other Order of the Bankruptcy Court, unless otherwise ordered by the Bankruptcy Court. |

## D.    Notice Procedures

16.    The Debtors propose the following notice procedures to be implemented in connection with the sale process.

### i.    *Notice of Sale, Auction, and Sale Hearing*

17.    Within five (5) days following the entry of the Bidding Procedures Order or as soon as reasonably practicable thereafter (the "**Mailing Date**"), the Debtors shall serve a sale notice, substantially in the form attached hereto as **Exhibit D** (the "**Sale Notice**"), the Purchase Agreement, the Bidding Procedures Order, and the Bidding Procedures by first-class mail, postage prepaid, or, for those parties who have consented to receive notice by the Electronic Case Files ("**ECF**") system, by ECF, upon (i) all entities reasonably known to have expressed an

interest in a transaction with respect to all or part of the Subject Assets within the past two years; (ii) all entities known to have asserted any lien, claim, interest, or encumbrance in or upon any of the Subject Assets; (iii) counsel for the Committee; (iv) counsel to the Ad Hoc Group of Secured Notes, (v) counsel to Private Equity Opportunities LP, and (vi) counsel to PNC Bank; and (vii) the U.S. Trustee; *provided, however*, that to the extent email addresses are available, such parties may be served by email.

18.    In addition, on the Mailing Date, the Debtors shall serve the Sale Notice by first-class mail, postage prepaid or, for those parties who have consented to receive notice by the ECF system, by ECF, upon (i) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief granted herein; (ii) the United States Attorney's offices for the District of Delaware; (iii) the SEC; (iv) the Internal Revenue Service; (v) all parties entitled to notice pursuant to Local Rule 2002-1(b); and (vi) all known creditors of the Debtors, including their contract counterparties.  The Debtors request that such notice be deemed sufficient and proper notice of the Sale Transaction with respect to known interested parties.

19.    The Debtors have determined that it may also be in the best interest of their estates to provide notice by publication.  Pursuant to Bankruptcy Rules 2002 and 6004, the Debtors propose to publish the Sale Notice in a form substantially similar to Sale Notice, in the *New York Times*, and the *American Metals Market* (a metals industry daily journal) on one occasion on the Mailing Date or as soon as reasonably practicable thereafter.  In addition, the Debtors (i) respectfully request the authority, but not the direction, to publish the Sale Notice in additional publications as the Debtors deem appropriate and (ii) will cause the Sale Notice to be posted on their case information website at http://dm.epiq11.com/COE/ (the "**Case Website**").

*ii.  Date, Time, Place, and Notice of Auction*

20.    The Auction, if any, shall take place on July 11, 2016 at 10:00 a.m. (prevailing Eastern Time) at the offices of counsel for the Debtors, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, or such other place and time as the Debtors shall notify all Qualified Bidders and the Consultation Parties.

*iii.  Notice of Successful Bidder*

21.    As soon as reasonably practicable after the conclusion of the Auction, the Debtors shall file on the docket, but not serve, a notice identifying any Successful Bidder(s) (the "**Post-Auction Notice**"), substantially in the form attached hereto as **Exhibit E**.

*iv.  Date, Time, and Place of Sale Hearing*

22.    The Debtors request that the Sale Hearing be conducted by the Bankruptcy Court on **July 14, 2016 at 10:00 a.m. (prevailing Eastern Time)** or such other date as the Court is available and may, in accordance with the Bidding Procedures Order, be adjourned or rescheduled without notice.  At the Sale Hearing, the Debtors will seek Bankruptcy Court approval of the Successful Bid and the Backup Bid (if any).  Unless the Bankruptcy Court orders otherwise, the Sale Hearing shall be an evidentiary hearing on matters relating to the Sale Transaction and there will be no further bidding at the Sale Hearing.  In the event that the Successful Bidder cannot or refuses to consummate the Sale because of the breach or failure on the part of the Successful Bidder, the Backup Bidder will be deemed the new Successful Bidder and the Debtors shall be authorized, but not required, to close with the Backup Bidder on the Backup Bid without further order of the Bankruptcy Court.

*v.  Objection Deadline*

23.    Any and all objections, if any, to the Sale Transaction (a "**Sale Objection**"), must be filed by **July 7, 2016**, **2016 at 4:00 p.m. (prevailing Eastern Time)** (the "**Sale**

**Objection Deadline**") and served on (a) the Debtors, Constellation Enterprises LLC, c/o Conway MacKenzie Management Services, LLC, 600 Fifth Avenue, 25th Floor, New York, New York 10020, Attn: Donald MacKenzie (dmackenzie@conwaymackenzie.com); (b) counsel to the Debtors, Kramer Levin Naftalis & Frankel LLP, 1777 Avenue of the Americas, New York, New York, 10036, Attn: Adam C. Rogoff (arogoff@kramerlevin.com) and Joseph A. Shifer (jshifer@kramerlevin.com); (c) co-counsel to the Debtors, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801, Attn: Daniel J. DeFranceschi (defranceschi@rlf.com); (d) counsel to the Roll-up DIP Lenders, Hahn & Hessen LLP, 488 Madison Avenue, New York, New York 10022 Attn: Joshua I. Divack (jdivack@hahnhessen.com); (e) counsel to the Prepetition DDTL Lenders, Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, New York 10004 Attn: Matthew M. Roose (matthew.roose@friedfrank.com); (f) counsel to the DIP Agent, DIP Lenders and Ad Hoc Group, Akin Gump Strauss Hauer & Feld, 1333 New Hampshire Avenue NW, Washington, DC 20036 Attn: Scott L. Alberino (salberino@akingump.com) and One Bryant Park, New York, New York Attn: Jason P. Rubin (jrubin@akingump.com); (g) co-counsel to the DIP Agent, DIP Lenders and Ad Hoc Group, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn: M. Blake Cleary; (h) counsel to any statutory committee appointed in these cases; and (i) Office of The United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Linda Casey ((linda.casey@usdoj.gov)  (collectively (a)-( i), the "Objection Recipients"); and counsel to any Successful Bidder(s), if known on the Sale Objection Deadline.

24.    All replies to any Sale Objection or Designated Contract Objection (as defined below) must be filed by **July 12, 2016 at 12:00 p.m.  (prevailing Eastern Time)** (the "**Reply Deadline**").

25.    Any party failing to timely file an objection to any Sale Transaction will be forever barred from objecting and will be deemed to have consented to any Sale Transaction, including the transfer of the Debtors' right, title and interest in, to, and under the Subject Assets free and clear of any and all liens, claims, encumbrances and other interests in accordance with a definitive agreement for any Sale Transaction.

**E.    Assumption and Assignment Procedures**

26.    The Debtors propose the following procedures set forth below for notifying counterparties to executory contracts and unexpired leases of proposed cure amounts in the event the Debtors decide to assume and assign such contracts or leases (the "**Assumption and Assignment Procedures**").

*i.  Notice of Assumption and Assignment*

27.    As soon as practicable after entry of the Bidding Procedures Order (any such date, the "**Assumption and Assignment Service Date**"), the Debtors shall file with the Court, and post on the Case Website, a notice of assumption and assignment, substantially in the form attached hereto as **Exhibit F** (the "**Notice of Assumption and Assignment**") and, included therewith, a list (the "**Designated Contracts List**") that specifies (i) each executory contracts and unexpired leases (the "**Designated Contracts**") of each of the Debtors (other than the Columbus Debtors) and (ii) the proposed amount necessary, if any, to cure all monetary defaults, if any, under each Designated Contract (the "**Cure Costs**").  If no Cure Cost is listed on the Designated Contracts List, the Debtors believe that there is no Cure Cost.  The Notice of Assumption and Assignment shall also contain adequate assurance of future performance

information about the Purchaser (the "**Stalking Horse Adequate Assurance Information**"). The Debtors shall serve, via first class mail, a customized version of the Notice of Assumption and Assignment, without the Designated Contracts List, which will include (a) instructions regarding how to view that list on the Case Website (the "**DCL Instructions**"), (b) information necessary and appropriate to provide notice of the relevant proposed assumption and assignment of Designated Contract(s) and rights thereunder, (c) the applicable Cure Costs, if any, (d) the Stalking Horse Adequate Assurance Information, and (e) the procedures for objecting thereto ((b)-(e) collectively, the "**Necessary Notice Information**") on all counterparties to the Designated Contracts.  The Debtors shall serve, via first class mail, a modified version of the Notice of Assumption and Assignment that contains the DCL Instructions and Necessary Notice Information on the Rule 2002 Notice List.  Service as set forth herein shall be deemed proper, due, timely, good, and sufficient notice and no other or further notice is necessary.

28.    The inclusion of a Designated Contract on the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment (defined below)) will not (a) obligate the Debtors to assume any Designated Contract listed thereon, or Purchaser or the Successful Bidder to take assignment of such Designated Contract or (b) constitute any admission or agreement of the Debtors that such Designated Contract is an executory contract or unexpired lease.  Only those Designated Contracts that are included on a schedule of assumed and Acquired Contracts attached to the final Stalking Horse APA or the purchase agreement with the Successful Bidder(s) (each, an "**Acquired Contract**") will be assumed and assigned to the Purchaser or the Successful Bidder, as appropriate

29.    A counterparty to a Designated Contract listed on the Notice of Assumption and Assignment may file an objection (a "**Designated Contract Objection**") solely with respect

21

to the proposed assumption and assignment of the applicable Designated Contract,  the proposed Cure Costs, if any, or the adequacy of the Stalking Horse Adequate Assurance Information.  All Designated Contract Objections must (i) state, with specificity, the legal and factual basis for the objection as well as what Cure Costs are required, if any, (ii) include appropriate documentation in support thereof, and (iii) be filed and served on the Objection Recipients no later than 4:00 p.m. (prevailing Eastern Time) fourteen (14) days following the Assumption and Assignment Service Date (the "**Assumption and Assignment Objection Deadline**").

30.    If a counterparty to a Designated Contract files a Designated Contract Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute, the amount to be paid or reserved with respect to such objection will be determined at a hearing to be held on July 7, 2016 (the "**Assumption and Assignment Hearing**"), at the Sale Hearing, or such other date determined by this Court.  The Debtors may submit a reply to any Designated Contract Objection that will be heard on the Assumption and Assignment Hearing by July 5, 2016.

*ii.  Supplemental Notice of Assumption and Assignment*

31.    Although the Debtors intend to make a good-faith effort to identify all Designated Contracts that may be assumed and assigned in connection with a Sale Transaction, the Debtors may discover certain contracts inadvertently omitted from the Designated Contracts list or Successful Bidder(s) may identify other executory contracts or unexpired leases that they desire to assume and assign in connection with the Sale.  Accordingly, the Debtors reserve the right, at any time after the Assumption and Assignment Service Date and before the closing of a Sale Transaction, to (i) supplement the list of Designated Contracts on the Notice of Assumption and Assignment with previously omitted Designated Contracts in accordance with the definitive agreement for a Sale Transaction, (ii) remove a Designated Contract from the list of contracts

ultimately selected as a Designated Contract that a Successful Bidder proposes be assumed and assigned to it in connection with a Sale Transaction, and/or (iii) modify the previously stated Cure Cost associated with any Designated Contract.

32.    In the event that the Debtors exercise any of the rights reserved above, the Debtors will promptly serve a supplemental notice of assumption and assignment (a "**Supplemental Notice of Assumption and Assignment**").    The Supplemental Notice of Assumption and Assignment will be served by electronic transmission, hand delivery, or overnight mail on the counterparty (and its attorney, if known) to each impacted Designated Contract at the last known address available to the Debtors.    Each Supplemental Notice of Assumption and Assignment will include the same information with respect to listed Designated Contracts as was included in the Notice of Assumption and Assignment.

33.    Any counterparty to a Designated Contract listed on a Supplemental Notice of Assumption and Assignment may file an objection (a "**Supplemental Designated Contract Objection**").    A Supplemental Designated Contract Objection may be filed only if such objection is to the proposed assumption and assignment of the applicable Designated Contract or the proposed Cure Costs, if any.    All Supplemental Designated Contract Objections must (i) state, with specificity, the legal and factual basis thereof as well as what Cure Costs the objecting party believes are required, if any, (ii) include appropriate documentation in support of the objection, and (iii) be filed and served on the Objection Recipients no later than fourteen days from the date of service of such Supplemental Notice of Assumption and Assignment, which date will be set forth in the Supplemental Notice of Assumption and Assignment.

34.    If a counterparty to a Designated Contract files a Supplemental Designated Contract Objection in a manner that is consistent with the requirements set forth above, and the

parties are unable to consensually resolve the dispute, the Debtors will seek an expedited hearing before the Court (a "**Supplemental Designated Contract Hearing**") to determine the Cure Costs, if any, and approve the assumption of the relevant Designated Contracts.  If there is no such objection, then the Debtors will obtain an order of this Court, including by filing a certification of no objection, (a "**Supplemental Designated Contract Order**") fixing the Cure Costs and approving the assumption of any Designated Contract listed on a Supplemental Notice of Assumption and Assignment.

### iii. Additional Procedures

35.    If the counterparty to a Designated Contract does not file and serve a Designated Contract Objection or Supplemental Designated Contract Objection in a manner that is consistent with the requirements set forth above, such counterparty will be deemed to have consented to the assumption and assignment of the Designated Contract to a Successful Bidder as an Acquired Contract (as defined below), notwithstanding any anti-alienation provision or other restriction on assumption or assignment in the Designated Contract, and shall be forever barred from asserting any objection with regard to such assumption and assignment, except with respect to the adequate assurance of future performance by such Successful Bidder.

36.    Any objections to a Successful Bidder's proposed form of adequate assurance of future performance must be raised at the Sale Hearing or Supplemental Designated Contract Hearing, as applicable, and will be resolved at the hearing at which it is raised or, in the Debtors' discretion, adjourned to a later hearing.

37.    Absent the filing of a Designated Contract Objection or Supplemental Designated Contract Objection and a subsequent order of the Court establishing an alternative Cure Cost, (i) the Cure Costs, if any, set forth in the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment) shall be controlling, notwithstanding

anything to the contrary in any Designated Contract or any other document, and (ii) the counterparty to the Designated Contract will be deemed to have consented to the assumption, assignment, and sale of the Designated Contract and the Cure Costs, if any, and will be forever barred from asserting any other claims related to such Designated Contract against the Debtors or the applicable Successful Bidder, or the property of any of them.

### RELIEF REQUESTED

38.    By this motion, the Debtors request entry of the Bidding Procedures Order, which will authorize and approve, among other things: (i) the Bidding Procedures for soliciting bids; (ii) the Assumption and Assignment Procedures; (iii) the form and manner of notice with respect to certain procedures, protections, schedules, and agreements described herein and attached hereto;[8] (iv) the scheduling of the Stalking Horse Hearing (if any), the Auction (if any), and the Sale Hearing; and (v) granting related relief.  At the Sale Hearing, the Debtors will also request entry of the Sale Order (or Sale Orders) that will approve the Sale Transaction or Sale Transactions.

### SUPPORTING AUTHORITY

39.    Bankruptcy Code section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Courts in this Circuit and others, in applying this section, have required that the sale of a debtor's assets be based upon the sound business judgment of the debtor. *See, e.g., Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147 (Bankr. D. Del. 1999) (holding that an asset sale may be authorized under Bankruptcy Code section 363 if the court finds a "sound business

---

[8]    To the extent that any of the deadlines set forth in this motion do not comply with the Local Rules, the Debtors hereby request a waiver of any such Local Rule.

purpose" for the sale) (citing *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983))*; see also Official Comm. of Unsecured Creditors v. LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141, 143 (2d Cir. 1992) (holding that a judge reviewing a section 363(b) application must find from the evidence presented a good business reason to grant such application).

40.    "Under Delaware law, the business judgment rule operates as a presumption 'that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest.'" *Continuing Creditors' Comm. of Star Telecomms., Inc. v. Edgecomb*, 385 F.Supp.2d 449, 462 (D. Del. 2004) (quoting *Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988) *overruled on other grounds*, *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000)); *see also Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F. Supp.2d 538, 555 n.111 (D. Del. 2008) (same). Thus, this Court should grant the relief requested in this motion if the Debtors demonstrate a sound business justification therefor.  *See In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 179 (D. Del. 1991).

41.    The Debtors have sound business justifications for selling the Subject Assets at this time.  The Debtors' businesses are operating at a negative cash burn and are projected to continue to do so during these Chapter 11 cases.  These cases are the proverbial "melting ice cube" and immediate steps are required to transfer these businesses to a new owner (or owners) who can invest the substantial amounts necessary to invest in the capital expenditures required to allow the businesses to continue to operate outside of bankruptcy and, in time, thrive.  The best manner of preserving these various and distinct industrial businesses for the benefit of numerous stakeholders, including employees, vendors and customers, is to facilitate one or more sales of

these businesses as going concerns swiftly so that employees, customer and vendors will have confidence necessary to allow the operations to emerge both deleveraged and viable.  Cognizant of the need for liquidity, prior to the Petition Date, the Debtors negotiated the basis for obtaining both postpetition liquidity and a process for the preservation of the businesses with the Supporting Noteholders who, through the Purchaser, would be entering into the Stalking Horse APA (subject to market-testing).  The Supporting Noteholders provided necessary credit support for the benefit of the Debtors prior to the Petition Date to allow for an orderly entry into chapter 11 with the goal of quickly and efficiently implementing these sales.

42.    Accordingly, the Debtors submit that the Bidding Procedures are designed to preserve the going concern value of the Subject Assets and that the sale of the Subject Assets to a Successful Bidder (or Successful Bidders), is in the Debtors' best interests and should be approved.

**A.    The Bidding Procedures Are Fair, and Are Consistent with the Debtors' Reasonable Business Judgment.**

43.    The Bidding Procedures are consistent with the Debtors' reasonable business judgment and should be approved.  Courts have made clear that a debtor's business judgment is entitled to substantial deference.  *See, e.g.*, *Stanizale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 234 (3d Cir. 2005)  (indicating the "business judgment rule creates a presumption that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest" (quotations omitted)).  To that end, courts recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales.  *See, e.g.*, *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650,

659 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) (noting that such procedures "encourage bidding and to maximize the value of the debtor's assets"); *see also In re Cal Dive Int'l, Inc.*, No. 15-10458 (CSS) (Bankr. D. Del. June 25, 2015) [D.I. 539].

44.     The Debtors believe that the Bidding Procedures are appropriate under Bankruptcy Code sections 105 and 363 to ensure that the bidding process is fair and reasonable and will preserve value for their estates and creditors.   The currently proposed Bidding Procedures will establish parameters pursuant to which the value of the Subject Assets may be market-tested at the Auction and ensuing Sale Hearing.   Such procedures will increase the likelihood that the Debtors receive the ample consideration for the Subject Assets because they will ensure a competitive bidding process that will encourage participation by financially capable bidders who demonstrate the ability to close such a transaction.   Indeed, the Debtors have put limited (if any) constraints on the ability of prospective purchasers to bid on the Subject Assets, and instead have encouraged bid flexibility by, *inter alia*, allowing the Debtors to consider all competing offers—including offers for all or some Subject Assets — and to select, in their reasonable business judgment, and after consultation with the Consultation Parties (as defined in the Bidding Procedures), the highest or otherwise best offer for the Subject Assets.   The Bidding Procedures also provide potential bidders with sufficient notice and an opportunity to acquire information necessary to submit a timely and informed bid.

45.     The Bidding Procedures are also consistent with the precedent in this District.  *See, e.g.*, *In re Endeavour Operating Corp.*, No. 14-12308 (KJC) (Bankr. D. Del. May 20, 2015) [D.I. 668]; *In re Old FOH Inc. (f/k/a/ Frederick's of Hollywood, Inc.*), No. 15-10836 (KG) (May 6, 2015) [D.I. 120]; *In re Caché Inc.,* No. 15-10172 (MFW) (Bankr. D. Del. Feb. 25, 2015) [D.I. 196]; *In re RS Legacy Corp. (f/k/a RadioShack Corp.*), No. 15-10197 (BLS) (Bankr.

D. Del. Feb. 20, 2015) [D.I. 457]; *In re Dendreon Corp.,* No. 14-12515 (PJW) (Bankr. D. Del.

Dec. 17, 2014) [D.I. 195]; *In re PSL – N. Am. LLC*, No. 14-11477 (PJW) (Bankr. D. Del. July

14, 2014) [D.I. 97]; *In re Phoenix Payment Sys., Inc.,* No. 14-11848 (MFW) (Bankr. D. Del.

Aug. 26, 2014) [D.I. 95].

46. Accordingly, for all of the foregoing reasons, the Debtors believe that the

Bidding Procedures (i) will encourage robust bidding for the Subject Assets, (ii) are consistent

with other procedures previously approved by courts in this District and (iii) are appropriate

under the relevant standards governing auction proceedings and bidding incentives in bankruptcy

proceedings and should be approved.

**B.    The Expense Reimbursement Necessary to Preserve the Value of the Debtors' Estates.**

47. By this motion, the Debtors seek to provide the Purchaser with the following

Bid Protections: (i) the  Expense Reimbursement; and (ii) an minimum overbid increment.

48. Approval of these forms of bid protections in connection with the sale of

significant assets pursuant to Bankruptcy Code section 363 has become established practice in

chapter 11 cases. *See, e.g., Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl.*

*Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999); *Integrated Res., Inc.*, 147 B.R. at 656-57 (noting that

overbid procedures and break-up fee arrangements that have been negotiated by a debtor are to

be reviewed according to the deferential "business judgment" standard, under which such

procedures and arrangements are "presumptively valid"); *In re 995 Fifth Ave. Assocs., L.P.*,

96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (holding that the business judgment standard protects

break-up fees and other contractual provisions negotiated in good faith).  The United States

Court of Appeals for the Third Circuit has approved bidding incentives in the bankruptcy

context.  *In re O'Brien*, 181 F.3d 527; *see also Reliant Energy Channelview LP v. Kelson*

*Channelview LLC (In re Reliant Energy Channelview LP)*, 594 F.3d 200, 206–08 (3d Cir. 2010). The court in *O'Brien* held that even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context. Accordingly, to be approved, bidding incentives must provide some post-petition benefit to the debtor's estate. *See In re O'Brien*, 188 F.3d at 533.

49.    The Debtors believe that the bid protections increase the likelihood of a sale to a contractually committed bidder at a price the Debtors believe is fair, while providing the Debtors with an opportunity to enhance the value to their estate through an auction process. Without the bid protections, the Purchase would not be willing to enter into the Stalking Horse APA, and they have been negotiated in good faith. Further, the bid protections will be reasonable and appropriate in light of the size and nature of the Sale Transaction and the efforts that likely will be expended by the Purchaser.

50.    This Court has approved protections similar to the proposed Bid Protections as reasonable and consistent with the type and range of Bid Protections typically approved. *See, e.g.*, *In re Cal Dive Int'l, Inc.*, No. 15-10458 (CSS) (Bankr. D. Del. July 7, 2015) [D.I. 572] (authorizing expense reimbursement); *In re Old FOH Inc. (f/k/a/ Frederick's of Hollywood, Inc.)*, No. 15-10836 (KG) (May 6, 2015) [D.I. 120] (authorizing a termination fee and expense reimbursement); *In re Caché Inc.,* No. 15-10172 (MFW) (Bankr. D. Del. Feb. 25, 2015) [D.I. 196] (authorizing expense reimbursement and break-up fee); *In re Deb Stores Holding LLC*, No. 14-12676 (KG) (Bankr. D. Del. Dec. 18, 2014) [D.I. 159] (same); *In re Source Home Entm't, LLC,* No. 14-11553 (KG) (Bankr. D. Del. July 1, 2014) [D.I. 160] (authorizing expense reimbursement); *In re Coldwater Creek, Inc.,* No. 14-10867 (BLS) (Bankr. D. Del. Apr. 29,

2014) [D.I. 266] (approving expense reimbursement and break-up fee); *In re Brookstone Holdings Corp.*, No. 14-10752 (BLS) (Bankr. D. Del. Apr. 25, 2014) [D.I. 241] (same); *In re LMI Legacy Holdings* Inc. *fdba Landauer Healthcare Holdings,* No. 13-12098 (CSS) (Bankr. D. Del. Sept. 12, 2013) [D.I. 143] (same).

**C.      Approval of the Sale Is Warranted under Bankruptcy Code Section 363(b).**

51.    As set forth above, a debtor may be authorized to sell assets out of the ordinary course of business pursuant to Bankruptcy Code section 363 and before obtaining a confirmed plan of reorganization when it demonstrates a sound business purpose for doing so. *See In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147-49 (3d Cir. 1986) (implicitly adopting the "sound business judgment test" of *Lionel*); *In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC), 2007 WL 7728109, at *5 (Bankr. D. Del. Aug. 15, 2007) (finding that "[t]he Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the Sale prior to, and outside of, a plan of reorganization"); *Dai-Ichi Kangyo Bank Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate under [section 363(b)], courts require the debtor to show that a sound business purpose justifies such actions . . . ."); *Delaware & Hudson Ry. Co.*, 124 B.R. at 176 (sale of substantially all of debtor's assets outside of reorganization plan is appropriate when a sound business reason justifies such a sale); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983) (concluding that "there must be some articulated business justification, other than appeasement of major creditors, for using, selling or leasing property out of the ordinary course of business before the bankruptcy judge may order such disposition under section 363(b)"); *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991) (stating that the "sound business

purpose test" is appropriate).  Once a court has determined there is a sound business justification for a sale outside of a plan, the court must also determine that (i) the trustee has provided the interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable and (iii) the purchaser is proceeding in good faith.  *Delaware & Hudson*, 124 B.R. at 176.

52.     The Debtors submit that the sale of the Subject Assets is based upon their sound business judgment.  For the reasons noted above, the Debtors have determined that a sale, conducted in accordance with the Bidding Procedures, is in the best interest of their estates.

53.     The Debtors also meet the additional requirements necessary to approve a sale under Bankruptcy Code section 363.  As stated herein, the Debtors will provide adequate notice of the Sale to interested parties, and the Debtors believe that the notice procedures described herein are reasonable and adequate under the circumstances.  Additionally, the Debtors will enter into a Purchase Agreement only after a market-test of the Subject Assets and if the sale price is fair and reasonable.  Accordingly, the Debtors submit that it is a valid exercise of their business judgment to seek the relief requested by this motion.

**D.     The Proposed Sale Transaction Satisfies the Requirements of Bankruptcy Code Section 363(f) for a Sale Free and Clear of Interests.**

54.     Bankruptcy Code section 363(f) provides that a sale of encumbered property "free and clear of any interest" is permissible, only if "applicable non-bankruptcy law permits sale of such property free and clear of such interest," entities holding interests in the property consent to the sale, "such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property, such interest is in bona fide dispute, *or* such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest."  11 U.S.C. § 363(f) (emphasis supplied).

55.     Bankruptcy Code section 363(f) is drafted in the disjunctive and, as such, it is necessary to meet only one of these five conditions.  To the extent an entity with liens on the Subject Assets does not consent to the proposed Sale Transaction, the Debtors believe that they will be able to demonstrate at the Sale Hearing satisfaction of the requirements of Bankruptcy Code section 363(f).  Alternatively, the Debtors may sell the Subject Assets free and clear of any other interests under section 363(f)(5), because the liens on any Subject Assets sold will attach to the proceeds of such a sale and entities holding such interests could be compelled to accept money satisfaction in legal or equitable proceedings.  Accordingly, pursuant to Bankruptcy Code section 363, the Debtors may sell the Subject Assets free and clear of all liens, claims, and encumbrances.

56.     The Debtors also submit that it is appropriate to sell the Subject Assets free and clear of successor liability relating to the Debtors' business.  Such a provision ensures that the Successful Bidder is protected from any claims or lawsuits premised on the theory that the Successful Bidder is a successor in interest to one or more of the Debtors.  Courts have consistently held that a buyer of a debtor's assets pursuant to a Bankruptcy Code section 363 sale takes free and clear from successor liability relating to the debtor's business.  *See, e.g., United States v. Knox-Schillinger (In re Trans World Airlines, Inc.)*, 322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program); *United Mine Workers of Am. 1992 Benefit Plan v. Leckie Smokeless Coal. Co.* (*In re Leckie Smokeless Coal Co.*), 99 F.3d 573, 585-86 (4th Cir. 1996) (affirming the sale of debtors' assets free and clear of certain taxes); *Amphenol Corp. v. Shandler* (*In re Insilco Techs., Inc.*), 351 B.R. 313, 321-22 (Bankr. D. Del. 2006) (stating that a 363 sale permits a buyer to take ownership of property without concern that

a creditor will file suit based on a successor liability theory); *In re General Motors Corp*., 407 B.R. 463, 505-06 (Bankr. S.D.N.Y. 2009), *aff'd sub nom., In re Motors Liquidation Corp.,* 428 B.R. 43 (S.D.N.Y. 2010) & 430 B.R. 65 (S.D.N.Y. 2010) (holding that "[T]he law in this Circuit and District is clear; the Court will permit GM's assets to pass to the purchaser free and clear of successor liability claims, and in that connection, will issue the requested findings and associated injunction."); *In re Chrysler LLC*, 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009) ("[*I*]*n personam* claims, including any potential state successor or transferee liability claims against New Chrysler, as well as *in rem* interests, are encompassed by section 363(f) and are therefore extinguished by the Sale Transaction.").

57.    The purpose of an order purporting to authorize the transfer of assets free and clear of all liens, claims, encumbrances, and all other interests would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against a purchaser arising from a seller's pre-sale conduct.  Moreover, without such assurances, the Debtors would run the risk that potential bidders may not enter the auction or, if they did, would do so with reduced bid amounts.  To that end, the Successful Bidder should not be liable under any theory of successor liability relating to the Debtors' businesses, but should hold the Subject Assets free and clear.

**E.    The Supporting Creditors Should Be Permitted to Credit Bid the Full Face Amount of their Notes.**

58.    The Stalking Horse APA and the Bidding Procedures contemplate that the Supporting Creditors will be permitted to credit bid the face amount of their debt, consistent with section 363(k) of the Bankruptcy Code.  That statute provides as follows:

> At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

11 U.S.C. § 363(k).

59.     Under section 363(k), a secured creditor is entitled to bid an amount up to its entire claim; the "offset" (i.e., credit) is not limited to the value of the collateral. See, e.g., In re Submicron Systems Corp., 432 F.3d 448, 459 (3d Cir. 2006) ("It is well settled among district and bankruptcy courts that creditors can bid the full face value of their secured claims under § 363(k)"); *In re Suncruz Casinos, LLC*, 298 B.R. 833, 839 (Bankr. S.D. Fla. 2003) ("The plain language of [section 363(k)] makes clear that the secured creditor may credit bid its entire claim, including any unsecured deficiency portion thereof.") (emphasis in original); *In re Morgan House Gen. P'Ship*, 1997 U.S. Dist. LEXIS 1306 at *1 (E.D. Pa. 1997); *In re Realty Invs., Ltd. V*, 72 B.R. 143, 146 (Bankr. C.D. Cal. 1987); *Criimi Mae Servs. Ltd. P'ship v. WDH Howell, LLC (In re WDH Howell, LLC)*, 298 B.R. 527, 532 n.8 (D.N.J. 2003).

60.     Thus, the right to credit bid is not affected by any prior valuation of an allowed claim under section 506(a) of the Bankruptcy Code. See In re Submicron Systems Corp., 432 F.3d at 461 ("§ 363 speaks to the full face value of a secured creditor's claim, not to the portion of that  claim that is actually collateralized as described in § 506."); *In re Morgan House Gen. P'ship*, 1997 U.S. Dist. LEXIS 1306 at *5 (holding that creditors may bid "to the extent of their claim" under § 363(k)); *In re Midway Invs.*, Ltd., 187 B.R. 382, 391 n.12 (Bankr. S.D. Fla. 1995) ("[A] secured creditor may bid in the full amount of the creditor's allowed claim, including the secured portion and any unsecured portion thereof") (citing legislative history).

**F.     A Successful Bidder Should Be Entitled to the Protections of Bankruptcy Code Section 363(m).**

61.     Pursuant to Bankruptcy Code section 363(m), a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims. *Mark Bell Furniture Warehouse, Inc., v. D. M. Reid Assocs., Ltd. (In re Mark Bell Furniture Warehouse,*

*Inc.*), 992 F.2d 7, 8 (1st Cir. 1993); *In re Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985); *In re Congoleum Corp.*, No. 03-51524, 2007 WL 1428477, *2 (Bankr. D. N.J. May 11, 2007); *Abbotts Dairies of Pa.*, 788 F.2d 143, 147 (3d Cir. 1986).

62.     Any agreement consummating a Sale or Sales will be negotiated at arm's-length by sophisticated parties, each represented by their own advisors.  Accordingly, the Debtors request that the Sale Order (or Sale Orders) include a provision that the Successful Bidder (or Successful Bidders) for the Subject Assets, is a "good faith" purchaser within the meaning of Bankruptcy Code section 363(m).  The Debtors believe that providing any Successful Bidder with such protection will ensure that the maximum price will be received by the Debtors for the Subject Assets and closing of the same will occur promptly.

**G.     Notice of the Auction and Sale Hearing Is Reasonable and Appropriate.**

63.     The Debtors submit that the Sale Notice as set forth above, along with publication of the Sale Notice as described herein above on one occasion on the Mailing Date or as soon as reasonably practicable thereafter (and in local publications of general circulation as the Debtors deem appropriate) is reasonable and appropriate and will be adequate to ensure that all interested parties have the opportunity to bid for the Subject Assets, and/or object to the proposed sale of the Subject Assets.  Accordingly, the Debtors submit that the foregoing method of notice is reasonable under the circumstances.

**H.     Assumption and Assignment of Executory Contracts and Unexpired Leases Should Be Authorized.**

64.     Bankruptcy Code section 365(a) provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  The standard governing a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable

business judgment supports assumption or rejection.  *See, e.g.*, *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (debtor's decision to assume or reject executory contract is governed by business judgment standard and can only be overturned if decision was product of bad faith, whim, or caprice); *In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court" (citation omitted)); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39-40 (3d Cir. 1989) (same).  If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract. *See Grp. of Inst. Investors v. Chicago M. St. P. & P.R.R. Co.*, 318 U.S. 523 (1943); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d at 39-40.  The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the contract will benefit the estate."  *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting *In re Stable Mews Assocs.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y 1984)).  Any more exacting scrutiny would slow the administration of a debtor's estate, increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially.  *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985) (citation omitted).  In addition, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1)(A).

65.     Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract.  *See L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel*

*Home Ctr., Inc.*), 209 F.3d 291, 299 (3d Cir. 2000) (indicating that "[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); *Leonard v. General Motors Corp. (In re Headquarters Dodge, Inc.*), 13 F.3d 674, 682 (3d Cir. 1994) (noting that purpose of Bankruptcy Code section 365(f) is to assist trustee in realizing the full value of the debtor's assets).

66.      Bankruptcy Code section 365(f) provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided."  11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction."  *In re DBSI, Inc.*, 405 B.R. 698, 708 (Bankr. D. Del. 2009); *EBG Midtown S. Corp. v. McLaren/Hart Env. Eng'g Corp. (In re Sanshoe Worldwide Corp.*), 139 B.R. 585, 592 (S.D.N.Y. 1992); *In re Decora Indus.*, 2002 U.S. Dist. LEXIS 27031, at * 23 (D. Del. 2002) ("adequate assurance falls short of an absolute guaranty of payment" (citation omitted)); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.*), 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

67.      Adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding).

68.      To facilitate and effect the proposed Sale Transaction, the Debtors request approval of the assumption and assignment of any Acquired Contracts to any Successful Bidder under Bankruptcy Code section 365.  The Debtors further request that the Sale Order(s) provide

that the Acquired Contracts will be transferred to, and remain in full force and effect for the benefit of, the Successful Bidder(s) notwithstanding any provisions in the Acquired Contracts, including those described in Bankruptcy Code sections 365(b)(2) and (f)(1) and (3) that prohibit such assignment.

69.    Any Successful Bidder must (i) submit evidence sufficient to demonstrate its financial wherewithal and ability to consummate the Sale Transaction, including the assumption of the Acquired Contracts at the closing of the Asset Purchase Agreement and (ii) provide adequate assurance of future performance in connection with any assigned executory contracts and leases.  Furthermore, to the extent that any defaults exist under any executory contract or unexpired lease that is to be assumed and assigned in connection with the sale of the Subject Assets, the Successful Bidder will cure any such default prior to such assumption and assignment.

70.    The Debtors will present facts at the Sale Hearing to demonstrate the financial credibility, willingness, and ability of the Successful Bidder to perform under the Acquired Contracts.  The Sale Hearing thus will afford the Court and other interested parties the opportunity to evaluate the ability of the Successful Bidder to provide adequate assurance of future performance under the Acquired Contracts, as required under Bankruptcy Code section 365(b)(1)(C).  Further, as set forth above, the Debtors will give notice to all parties to the Acquired Contracts or the Previously Omitted Contracts of their intention to assume the Acquired Contracts or the Previously Omitted Contracts, as the case may be, and what the Debtors believe are the Cure Amounts.

71.    Accordingly, the Debtors submit that implementation of the proposed Assumption and Assignment Procedures is appropriate in these cases.  The Court therefore

should have a sufficient basis to authorize the Debtors to reject or assume and assign contracts as will be set forth in the Stalking Horse APA or the Successful Bidder's purchase agreement.

## I.    Request for Relief Pursuant to Bankruptcy Rules 6004(h) and 6006(d)

72.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  Bankruptcy Rule 6006(d) further provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

73.    The Debtors believe that any Sale Transaction should be consummated as soon as practicable to preserve and maximize value.  Accordingly, the Debtors request that any Sale Order approving the sale of the Subject Assets and the assumption and assignment of the Designated Contracts be effective immediately upon entry of such order and that the fourteen-day stay under Bankruptcy Rules 6004(h) and 6006(d) be waived.

## NOTICE

74.    No trustee or examiner has been appointed in the Debtors' chapter 11 cases. The Debtors have provided notice of this motion to (i) the U.S. Trustee, Attn: Linda Casey, Esq.; (ii) counsel to the Committee; (iii) counsel to the agents under the Debtors' pre-petition credit facilities; (iv) counsel to the Ad Hoc Group of Noteholders; (v) counsel to the indenture trustee under the Debtors' pre-petition indenture; (vi) the Internal Revenue Service; and (vii) any parties entitled to notice pursuant to Local Rule 2002-1(b).  In light of the nature of the relief requested in this motion, the Debtors respectfully submit that no further notice is necessary.

**WHEREFORE**, the Debtors respectfully request that the Court (i) enter the Bidding Procedures Order, (ii) following the Sale Hearing, enter the Sale Order, and (iii) grant such other and further relief as is just and proper.

Wilmington, Delaware
Date: May 25, 2016

*/s/ Rachel L. Biblo*
Daniel J. DeFranceschi (No. 2732)
Zachary I. Shapiro (No. 5103)
Rachel L. Biblo (No. 6012)
Joseph C. Barsalona II (No. 6102)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

-and-

Adam C. Rogoff
Joseph A. Shifer
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 715-9100
Facsimile:  (212) 715-8000

*Proposed Attorneys for the Debtors and*
*Debtors-in-Possession*