<u>**Exhibit B to the Bidding Procedures Motion**</u>

**Bidding Procedures**

# BIDDING PROCEDURES[1]

By motion (the "**Motion**"), Constellation Enterprises LLC and certain of its direct and indirect subsidiaries (collectively, the "**Debtors**"),[2] which are debtors and debtors in possession in jointly administered chapter 11 cases (the "**Chapter 11 Cases**") pending in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") under Case No. 16-11213 (CSS), sought approval of, among other things, the procedures through which they will, in consultation with an ad hoc group of certain noteholders (the "**Ad Hoc Group**") under that certain Amended and Restated Indenture, dated as of February 1, 2016, among Constellation Enterprises LLC, the guarantors party thereto and Wells Fargo Bank, National Association, as Trustee and Collateral Agent (the "**Trustee**") (as the same may be or has been amended from time to time, the "**Indenture**") and the other Consultation Parties (as defined below), determine the highest or otherwise best offer for the sale of the Subject Assets (as defined below).

As referenced in the Motion, a stalking horse asset purchase agreement (including all exhibits, schedules and ancillary agreements related thereto, and as amended and in effect, the "**Stalking Horse Agreement**") will be entered into by and among the Debtors, as sellers (the "**Sellers**"), and a newly-formed entity to be capitalized by the Supporting Noteholders (the "**Stalking Horse Purchaser**").

On [●], 2016, the Bankruptcy Court entered an order (the "**Bidding Procedures Order**"), which, among other things, authorized the Debtors to determine the highest or otherwise best offer for the Subject Assets through the process and procedures set forth below (the "**Bidding Procedures**").

To the extent the Bidding Procedures require the Debtors to consult with any Consultation Party in connection with making a determination or taking an action, or in connection with any other matter related to the Bidding Procedures or the Auction (as defined below), the Debtors shall do so in a regular and timely manner prior to making such determination or taking such action.

## Assets to Be Sold

A party may participate in the bidding process by submitting a Bid (as defined below) for substantially all of the Debtors' assets as further described in the Stalking Horse Agreement as the "Purchased Assets" and excluding Columbus Holdings Inc. and Columbus Steel Casting (collectively, the "**Subject Assets**"). Except as otherwise provided in the Stalking Horse Agreement or a Modified Asset Purchase Agreement (as defined below) submitted by a Successful Bidder (as defined below) (including any exhibits or schedules thereto), all of the Debtors' right, title and interest in and to the Subject Assets subject thereto shall be sold free and clear of any and all pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon (collectively, the "**Liens**") with such Liens to attach to the proceeds of the sale of the Subject Assets with the same validity and priority as such Liens applied against

---

[1]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the motion for approval of, among other things, the Bidding Procedures (the "**Motion**") or in the Stalking Horse Agreement, as applicable.

[2]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Constellation Enterprises LLC (9571); JFC Holding Corporation (0312); The Jorgensen Forge Corporation (1717); Columbus Holdings Inc. (8155); Columbus Steel Castings Company (8153); Zero Corporation (0538); Zero Manufacturing, Inc. (8362); Metal Technology Solutions, Inc. (7203); Eclipse Manufacturing Co. (1493); and Steel Forming, Inc. (4995).  The debtors' mailing address is located at 50 Tice Boulevard, Woodcliff Lakes, NJ  07677.

the Subject Assets, except as otherwise specifically provided in the Stalking Horse Agreement or a Modified Asset Purchase Agreement (as defined below) submitted by a Successful Bidder (as defined below) (including any exhibits or schedules thereto) and reflected in the Sale Order.

## Bidding Process

The Debtors and their advisors shall, subject to the other provisions of these Bidding Procedures, including the consultation obligations set forth herein, (a) determine whether any person is a Qualified Bidder (as defined below), (b) coordinate the efforts of Preliminary Interested Investors (as defined below) in conducting their due diligence investigations, (c) receive offers from Bidders (as defined below), and (d) negotiate any offers made to purchase the Subject Assets.

## Key Dates For Potential Competing Bidders

The Bidding Procedures provide interested parties with the opportunity to qualify for and participate in the Auction to be conducted by the Debtors in accordance with these Bidding Procedures and the Bidding Procedures Order and to submit competing bids for the Subject Assets. The Debtors shall assist Preliminary Interested Investors in conducting their respective due diligence investigations and shall accept Bids until **July 6, 2016 at 5:00 p.m. (prevailing Eastern Time)** (the "**Bid Deadline**").

The key dates for the sale process are as follows:

| | |
|---|---|
| July 6, 2016 at 5:00 p.m. (prevailing Eastern Time) | Bid Deadline - Due Date for Bids and Deposits |
| July 11, 2016 at 10:00 a.m. (prevailing Eastern Time) | Auction, which will be held at the offices of Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas New York, New York 10036 |
| July 14, 2016 at 10:00 a.m. (prevailing Eastern Time) | Sale Hearing, which will be held at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Wilmington, Delaware 19801 |

Unless otherwise approved by the Bankruptcy Court and notwithstanding anything to the contrary in these Bidding Procedures, no amendment or other modification to these Bidding Procedures (including the extension of any of the deadlines set forth herein) shall be made by the Debtors without the prior written approval of the Ad Hoc Group or its designee.

***Access to Diligence Materials.***

To participate in the bidding process and to receive access to due diligence materials (the "**Diligence Materials**"), a party must submit to the Debtors (i) an executed confidentiality agreement in the form attached hereto as **Exhibit A**, the provisions of which the Debtors shall not waive or fail to use their commercially reasonable efforts to enforce, and (ii) reasonable evidence demonstrating the party's financial capability to consummate a sale transaction for the Subject Assets (an "**Alternate Transaction**"), as determined by the Debtors in consultation with the Consultation Parties.

A party who qualifies for access to Diligence Materials shall be a "**Preliminary Interested Investor**." The Debtors will afford any Preliminary Interested Investor the time and opportunity to conduct reasonable due diligence; provided, however, that the Debtors shall not be obligated to furnish any due diligence information after the Bid Deadline to any party that has not submitted a Qualified Bid (as defined below) and may, in consultation with the Consultation Parties, limit the amount of further due diligence available to Qualified Bidders after the Bid Deadline.

The Debtors reserve the right to withhold any Diligence Materials that the Debtors, in consultation with the Consultation Parties, determine are business-sensitive or otherwise not appropriate for disclosure to a Preliminary Interested Investor who is a competitor of the Debtors or is affiliated with any competitor of the Debtors. Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be a Preliminary Interested Investor.

All due diligence requests must be directed to Imperial Capital LLC, 277 Park Avenue, 48th Floor, New York, New York 10172, Attention: Erich Hobelmann (ehobelmann@imperialcapital.com).

***Due Diligence from Bidders.***

Each Preliminary Interested Investor and each Bidder shall comply with all reasonable requests for additional information and due diligence access by the Debtors or their advisors regarding such Preliminary Interested Investor or Bidder, as applicable, and its contemplated transaction. Failure by a Preliminary Interested Investor or a Bidder (other than the Stalking Horse Purchaser) to comply with requests for additional information and due diligence access may be a basis for the Debtors to determine that such Bidder is not a Qualified Bidder.

## Auction Qualification Process

To be eligible to participate in the Auction, each offer, solicitation or proposal (each, a "**Bid**"), and each party submitting such a Bid (other than the Stalking Horse Purchaser) (each, a "**Bidder**"), must be reasonably determined by the Debtors, in consultation with the Consultation Parties, to satisfy each of the following conditions:

(a)    **Good Faith Deposit**: Each Bid must be accompanied by a cash deposit in the amount of ten percent (10%) of the purchase price contained in the Modified Asset Purchase Agreement, which deposit shall be held in an interest-bearing escrow account to be identified and established by the Debtors (the "**Good Faith Deposit**").

(b)    **Same or Better Terms**: Each Bid must be on terms that the Debtors, in their business judgment and after consulting with the Consultation Parties, determine are the same or better for the Debtors than the terms of the Stalking Horse Agreement.

(c)     **Executed Agreement**: Each Bid must be based on the Stalking Horse Agreement and must include binding, executed transaction documents, signed by an authorized representative of such Bidder, pursuant to which the Bidder proposes to effectuate an Alternate Transaction (a "**Modified Asset Purchase Agreement**"). Each Bid must also include a copy of the Modified Asset Purchase Agreement (including all exhibits thereto, including the form of Sale Order) marked against the Stalking Horse Agreement to show all changes requested by the Bidder (including those related to purchase price and to remove any provisions that apply only to the Stalking Horse Purchaser, such as the expense reimbursement provision contained in the Stalking Horse Agreement, which shall not be in any Modified Asset Purchase Agreement). Each Modified Asset Purchase Agreement must provide a representation that the Qualified Bidder will (a) make all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "**HSR Act**"), if applicable, (b) submit and pay the fees associated with all necessary filings under the HSR Act as soon as reasonably practicable; provided, however, that the timing and likelihood of receiving HSR Act approval will be a consideration in determining the highest and best Bid, and (c) pay the expense reimbursement of the Stalking Horse Purchaser as contemplated by the Stalking Horse Agreement.

(d)     **Scope of Bid**: Each Bid must be for the purchase of all, and not less than all, of the Subject Assets and the assumption of all, and not less than all, of the Assumed Liabilities; provided, however, that, notwithstanding anything to the contrary contained in these Bid Procedures, at the written request of a Bidder, the Debtors and the Ad Hoc Group may consent, in their sole and absolute discretion, to waive this requirement and permit the modification or limitation of this requirement in order to permit Bids for portions of the Subject Assets and to permit for an assumption of only certain Assumed Liabilities.

(e)     **Minimum Bid**: Each Bid must, individually or in conjunction with one or more other Bids, have a purchase price, including any assumption of liabilities, that in the Debtors' reasonable business judgment (after consultation with the Consultation Parties) has a value greater than the sum of (i) the Purchase Price (as defined in the Stalking Horse Agreement)[3], *plus* (ii) the amount of the Expense Reimbursement (as defined in the Stalking Horse Agreement), *plus* (iii) $500,000 (the "**Minimum Bid**") and, in any event, provide for sufficient cash at the closing of such Bid to repay, in full and in immediately available funds, the full amount of the Obligations owed by the Debtors arising under the DIP Facility.  In addition, each Bid must expressly provide for the payment of the expense reimbursement of the Stalking Horse Purchaser as contemplated by the Stalking Horse Agreement in cash upon selection as, and to the extent selected as, the Successful Bid.

(f)     **Designation of Assigned Contracts and Leases**: Each Bid must identify with particularity each and every executory contract and unexpired lease with respect to which the Bidder seeks assignment from the Sellers.

---

[3]     The amount of the Wind-down Expenses will be shared with potential bidders as part of the due diligence process.

(g) **Designation of Assumed Liabilities**: Each Bid must identify all liabilities which the Bidder proposes to assume.

(h) **Corporate Authority**: Each Bid must include written evidence reasonably acceptable to the Debtors demonstrating appropriate corporate authorization to consummate the proposed Alternate Transaction; provided, however, that, if the Bidder is an entity specially formed for the purpose of effectuating the Alternate Transaction, then the Bidder must furnish written evidence reasonably acceptable to the Debtors of the approval of the Alternate Transaction by the equity holder(s) of such Bidder.

(i) **Disclosure of Identity of Bidder**: Each Bid must fully disclose the identity of each entity that will be bidding for or purchasing the Subject Assets, including any equity holders, in the case of a Bidder which is an entity specially formed for the purpose of effectuating the contemplated transaction, or otherwise participating in connection with such Bid, and the complete terms of any such participation, including any agreements, arrangements or understandings concerning a collaborative or joint bid or any other combination concerning the proposed Bid. Each Bid must also fully disclose any connections or agreements with the Debtors, the Stalking Horse Purchaser or any other known, potential, prospective Bidder or Qualified Bidder, and/or any officer, director or equity security holder of the Debtors. All information disclosed pursuant to this paragraph shall be made available by the Debtors to the Ad Hoc Group promptly upon Debtors' receipt thereof but in any event no later than one (1) business day following the Bid Deadline.

(j) **Proof of Financial Ability to Perform**: Each Bid must include written evidence that the Debtors may conclude, in consultation with the Consultation Parties, demonstrates that the Bidder has the necessary financial ability to close the Alternate Transaction and comply with section 365 of the Bankruptcy Code, including providing adequate assurance of future performance under all contracts to be assumed and assigned in such Alternate Transaction. Such information must include, *inter alia*, the following:

  (1) contact names and numbers for verification of financing sources;

  (2) evidence of the Bidder's internal resources and proof of unconditional debt funding commitments from a recognized banking institution and, if applicable, equity commitments in an aggregate amount equal to the cash portion of such Bid or the posting of an irrevocable letter of credit from a recognized banking institution issued in favor of the Debtors in the amount of the cash portion of such Bid, in each case, as are needed to close the Alternate Transaction;

  (3) the Bidder's current financial statements (audited if they exist) or other similar financial information reasonably acceptable to the Debtors;

  (4) a description of the Bidder's pro forma capital structure; and

  (5) any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors, in consultation with the Consultation Parties, demonstrating that such Bidder has the ability to close the Alternate Transaction.

(k) **Regulatory and Third Party Approvals**: Each Bid must set forth each regulatory and third-party approval required for the Bidder to consummate the Alternate Transaction,

and the time period within which the Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the Modified Asset Purchase Agreement, those actions the Bidder will take to ensure receipt of such approval(s) as promptly as possible).

(l)   **Contact Information and Affiliates**: Each Bid must provide the identity and contact information for the Bidder and full disclosure of any affiliates of the Bidder.

(m)   **Contingencies**: Each Bid (i) may not contain representations and warranties, covenants, or termination rights materially more onerous in the aggregate to the Debtors than those set forth in the Stalking Horse Agreement, as determined by the Debtors in good faith, and (ii) may not be conditioned on obtaining financing, any internal approvals or credit committee approvals, or on the outcome or review of due diligence, including with respect to any environmental, health or safety Laws or employee, labor, health or safety matters.

(n)   **Irrevocable**: Each Bid must be irrevocable until five (5) business days after the Sale Hearing; provided, however, that if such Bid is accepted as the Successful Bid or the Backup Bid (each as defined herein), such Bid shall continue to remain irrevocable until the closing of the sale of the Subject Assets.

(o)   **Compliance with Diligence Requests**: Each Bidder submitting a Bid must have complied with reasonable requests for additional information and due diligence access from the Debtors to the reasonable satisfaction of the Debtors, in consultation with the Consultation Parties.

(p)   **Confidentiality Agreement**: To the extent not already executed, each Bid must include an executed confidentiality agreement in the form attached as **Exhibit A**.

(q)   **Termination Fees**: Each Bid (other than the Stalking Horse Purchaser's Bid pursuant to the Stalking Horse Agreement which provides for certain expense reimbursements) must not entitle the Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment or reimbursement and, by submitting the Bid, the Bidder waives the right to pursue a substantial contribution claim under 11 U.S.C. § 503 related in any way to the submission of its Bid or participation in any Auction.

(r)   **Closing Date**: Each Bid must include a commitment to close the transactions contemplated by the Modified Asset Purchase Agreement by no later than September 11, 2016.

(s)   **Bid Deadline**: The following parties must receive a Bid in writing (in both PDF and Word format), on or before the Bid Deadline: (i) the Debtors, Constellation Enterprises LLC, c/o Conway MacKenzie Management Services, LLC, 600 Fifth Avenue, 25th Floor, New York, New York 10020, Attn: Donald MacKenzie (dmackenzie@conwaymackenzie.com); (ii) counsel to the Debtors, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas New York, New York 10036, Attention: Adam C. Rogoff (arogoff@kramerlevin.com ) and Joseph A. Shifer (jshifer@kramerlevin.com); (iii) co-counsel to the Debtors, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801, Attn: Daniel J. DeFranceschi (defranceschi@rlf.com); and (v) counsel to the Ad Hoc Group,

Akin Gump Strauss Hauer & Feld LLP, 1333 New Hampshire Ave NW, Washington, DC 20036, Attention: Scott L. Alberino (salberino@akingump.com).

A Bid received from a Bidder before the Bid Deadline that meets the above requirements for the Subject Assets, as determined by the Debtors in consultation with the Consultation Parties, shall constitute a "**Qualified Bid**" for such assets, and such Bidder shall constitute a "**Qualified Bidder**" with respect to the Subject Assets; provided, however, that, if the Debtors receive a Bid prior to the Bid Deadline that is not a Qualified Bid, the Debtors may, in consultation with the Consultation Parties, provide the Bidder with the opportunity to remedy any deficiencies prior to the Auction; provided, further, that, for the avoidance of doubt, if any Qualified Bidder fails to comply with reasonable requests for additional information and due diligence access from the Debtors to the satisfaction of the Debtors, in consultation with the Consultation Parties, the Debtors may, after consulting with the Consultation Parties, disqualify any Qualified Bidder and Qualified Bid, in the Debtors discretion and such Bidder shall not be entitled to attend or participate in the Auction. Any amendments, supplements or other modifications to any Bids (including pursuant to this paragraph) shall be delivered to the parties listed in paragraph (s) above as provided therein. All Qualified Bids will be considered, but the Debtors reserve their right to reject any or all bids. However, bids that are unconditional and contemplate sales that may be consummated on or soon after the Sale Hearing are preferred. Additionally, notwithstanding anything herein to the contrary, the Stalking Horse Agreement submitted by the Stalking Horse Purchaser shall be deemed a Qualified Bid, and the Stalking Horse Purchaser a Qualified Bidder. The Debtors shall inform counsel to the Stalking Horse Purchaser, the Consultation Parties and any Qualified Bidders whether the Debtors consider any Bid to be a Qualified Bid as soon as practicable but no event later than one (1) business day before the Auction.

Each Qualified Bidder, by submitting a Bid, shall be deemed to acknowledge and agree that it is not relying upon any written or oral statements, representations, promises, warranties or guarantees of any kind whether expressed or implied, by operation of law or otherwise, made by any person or party, including the Sellers and their agents and representatives (other than as may be set forth in a definitive agreement executed by the Debtors), regarding the Debtors, the Subject Assets, the Auction, these Bidding Procedures or any information provided in connection therewith.

## **Auction**

If one or more Qualified Bids (other than the Stalking Horse Agreement submitted by the Stalking Horse Purchaser) are received by the Bid Deadline, the Debtors will conduct an auction (the "**Auction**") to determine the highest or otherwise best Qualified Bid. This determination shall take into account any factors the Debtors, in consultation with the Consultation Parties, reasonably deem relevant to the value of the Qualified Bid to the estates and may include, but are not limited to, the following: (a) the amount and nature of the consideration, including any assumed liabilities; (b) the number, type and nature of any modifications to the Stalking Horse Agreement requested by each Bidder in such Bidder's Modified Asset Purchase Agreement; (c) the extent to which such modifications are likely to delay closing of the sale of the Debtors' assets and the cost to the Debtors of such modifications or delay; (d) the total consideration to be received by the Debtors; (e) the likelihood of the Bidder's ability to close a transaction and the timing thereof; (f) the timing and likelihood of any regulatory approvals, including HSR Act approval; and (g) the net benefit to the Debtors' estates (collectively, the "**Bid Assessment Criteria**").

If no timely, conforming Qualified Bids (other than the Qualified Bid submitted by the Stalking Horse Purchaser) are received by the Bid Deadline, the Auction shall be canceled and the Stalking Horse Agreement shall be the Successful Bid and the Stalking Horse Purchaser shall be the Successful Bidder.

**Procedures for Auction**

   If one or more Qualified Bids, other than the Stalking Horse Agreement, for all, or substantially all, of the Subject Assets are submitted (or, if Qualified Bids are submitted for all, or substantially all, of the Subject Assets, in the aggregate with the other Qualified Bids to the extent permitted and not mutually exclusive or for the same respective assets and liabilities) by the Bid Deadline, the Debtors shall conduct the Auction on July 11, 2016 at 10:00 a.m. (prevailing Eastern Time) at the offices of Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas New York, New York 10036 or such other place and time as the Debtors shall notify all Qualified Bidders, the Stalking Horse Purchaser, the Ad Hoc Group, the Official Committee of Unsecured Creditors (the "Creditors' Committee"), the Trustee and each of their respective counsel and advisors. The Auction shall be conducted according to the following procedures:

*Participation.*

   Only the Debtors, the Consultation Parties, the Creditors' Committee, the Stalking Horse Purchaser, and any other Qualified Bidder, in each case, along with their representatives and counsel, may attend the Auction (such attendance to be in person) and only the Stalking Horse Purchaser and such other Qualified Bidders will be entitled to make any Bids at the Auction; provided, however, that any other creditor may attend (but not participate in) the Auction if it provides the Debtors written notice of its intention to attend the Auction on or before the Bid Deadline. Such written notice must be sent to counsel for the Debtors via electronic mail, to Adam C. Rogoff (arogoff@kramerlevin.com) and Joseph A. Shifer (jshifer@kramerlevin.com).

*The Debtors Shall Conduct the Auction.*

   The Debtors and their professionals shall direct and preside over the Auction and the Auction shall be transcribed. Other than as expressly set forth herein, the Debtors (in consultation with the Consultation Parties) may conduct the Auction in the manner they reasonably determine will result in the highest or otherwise best Qualified Bid.

   One (1) day prior to the Auction, the Debtors will:

  (a) notify each Qualified Bidder that has timely submitted a Qualified Bid that its Bid is a Qualified Bid;

  (b) provide each Qualified Bidder participating in the Auction with a copy of the Modified Asset Purchase Agreements associated with all Qualified Bids received before the Bid Deadline and, with respect to such Qualified Bids, an indication as to which Qualified Bid (or aggregate of Qualified Bids) is highest or best, as determined by the Debtors in consultation with the Consultation Parties (such highest or otherwise best Qualified Bid or Qualified Bids, the "**Auction Baseline Bid**").

   In addition, at the start of the Auction, the Debtors shall describe the terms of the Auction Baseline Bid. Each Qualified Bidder participating in the Auction must confirm that it (a) has not engaged in any collusion with respect to the bidding or sale of any of the assets described herein, (b) has reviewed, understands and accepts the Bidding Procedures and (c) has consented to the core jurisdiction of the Bankruptcy Court.

   The Debtors shall consult in good faith with the Consultation Parties throughout the Auction process to the extent reasonably practicable. Any rules developed by the Debtors (after consulting with the Consultation Parties) will provide that all bids will be made and received in one room, on an open basis, and all other Bidders will be entitled to be present for all bidding with the understanding that the

true identity of each Bidder will be fully disclosed to all other Bidders and that all material terms of each Qualified Bid submitted in response to the Auction Baseline Bid, or to any successive bids made at the Auction, will be fully disclosed to all other Bidders throughout the entire Auction, and each Qualified Bidder will be permitted what the Debtors determine to be an appropriate amount of time to respond to the previous bid at the Auction.

*Terms of Overbids.*

An "**Overbid**" is any bid made at the Auction subsequent to the Debtors' announcement of the respective Auction Baseline Bid. To submit an Overbid for purposes of this Auction, a Bidder must comply with the following conditions:

(a)     **Minimum Overbid Increments**: Any Overbid for all of the Subject Assets after and above its respective Auction Baseline Bid shall be made in increments in cash or in cash equivalents, or other forms of consideration acceptable to the Debtors, after consulting with the Consultation Parties and with the consent of the Ad Hoc Group, or in such other higher amounts as the Debtors will announce from time to time during the Auction. The Stalking Horse Purchaser shall be entitled to submit Overbids in cash, cash equivalents or other forms of consideration, as described above, or additional credit bid amounts up to the full amount of the Obligations owed by the Debtors arising under the Indenture (the "**Indenture Obligations**"), in each case, as determined by the Stalking Horse Purchaser in its sole and absolute discretion.

(b)     **Stalking Horse Purchaser May Credit Bid the Indenture Obligations**: The Stalking Horse Purchaser shall be permitted to credit bid the full amount, or any portion, of the Indenture Obligations pursuant to any Overbid in connection with each round of bidding in the Auction.

(c)     **Remaining Terms Are the Same as for Qualified Bids**: Except as modified herein, an Overbid at the Auction must comply with the conditions for a Qualified Bid set forth above; provided, however, that the Bid Deadline shall not apply to such Overbids. Any Overbid must include, in addition to the amount and the form of consideration of the Overbid, a description of all changes requested by the Bidder to the Stalking Horse Agreement or Modified Asset Purchase Agreement, as the case may be, in connection therewith. Any Overbid must remain open and binding on the Bidder.

At the Debtors' discretion, to the extent not previously provided (which shall be determined by the Debtors in consultation with the Consultation Parties), a Bidder submitting an Overbid at the Auction must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors, in consultation with the Consultation Parties) reasonably demonstrating such Bidder's ability to close the Alternate Transaction proposed by such Overbid.

*Announcement and Consideration of Overbids.*

(a)     **Announcement of Overbids**: The Debtors shall announce at the Auction the material terms of each Overbid, the total amount of consideration offered in each such Overbid, and the basis for calculating such total consideration.

(b)     **Consideration of Overbids**: Subject to the deadlines set forth herein, the Debtors reserve the right, in their reasonable business judgment in consultation with the Consultation

Parties, to make one or more continuances of the Auction to, among other things: facilitate discussions between the Debtors and individual Qualified Bidders; allow individual Qualified Bidders to consider how they wish to proceed; aggregate Qualified Bids for only certain assets with other such bids (to the extent permitted and not mutually exclusive or for the same respective assets and liabilities); or give Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors in their reasonable business judgment (after consulting with the Consultation Parties) may require, that the Qualified Bidder has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed Alternate Transaction at the prevailing Overbid amount. When comparing Overbids to the Qualified Bid made by the Stalking Horse Purchaser, the Debtors shall treat the credit bid (including any Overbid) made by the Stalking Horse Purchaser as being made in cash or in cash equivalents.

*Other Procedures.*

(a)  **Jurisdiction of Bankruptcy Court**: All Qualified Bidders (including the Stalking Horse Purchaser) at the Auction shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and waive any right to a jury trial in connection with any disputes relating to the marketing process, the Auction, and the construction and enforcement of the Qualified Bidder's fully executed sale and transaction documents, as applicable.

(b)  **Additional Bids; Modifications**: All Qualified Bidders, including the Stalking Horse Purchaser, shall have the right to submit additional bids and make additional modifications to the Stalking Horse Agreement or Modified Asset Purchase Agreement at the Auction; provided, however, that any such modifications to the Stalking Horse Agreement or Modified Asset Purchase Agreement on an aggregate basis and viewed in whole, shall not, in the Debtors' business judgment, be less favorable to the Debtors than the terms of the Stalking Horse Agreement.

*Additional Procedures.*

The Debtors (after consulting with the Consultation Parties) may announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction; provided, however, that (a) any such additional procedural rules are not inconsistent in any respect with the Bidding Procedures or the Stalking Horse Agreement and (b) any such additional procedural rules will not amend, modify, or waive (or permit such an amendment, modification, or waiver of) any of the terms of these Bidding Procedures, in each case, without the prior written consent of the Ad Hoc Group.

*Sale Is As Is/Where Is.*

Except as otherwise provided in the Stalking Horse Agreement, any Modified Asset Purchase Agreement or the Sale Order, the Subject Assets or any other assets of the Sellers sold pursuant to the Bidding Procedures shall be conveyed at the closing of the purchase and sale of the Subject Assets in their then-present condition, "**AS IS, WITH ALL FAULTS, AND WITHOUT ANY WARRANTY WHATSOEVER, EXPRESS OR IMPLIED.**"

***Closing the Auction.***

The Auction shall continue in additional rounds of bidding until the Debtors select, after consultation with the Consultation Parties, the Bid that is the highest or otherwise best offer, or collection of offers, which produces the highest or best recovery to the estates (the "**Successful Bid**," and the Bidder submitting such Successful Bid, the "**Successful Bidder**"). The Successful Bidder(s) shall have the rights and responsibilities of the purchaser(s) as set forth in the applicable Stalking Horse Agreement or Modified Asset Purchase Agreement. In selecting the Successful Bid, the Debtors and the Consultation Parties shall consider the Bid Assessment Criteria.

The Auction shall close when the Successful Bidder submits fully executed sale and transaction documents memorializing the terms of the Successful Bid.

Promptly following the Debtors' selection, after consulting with the Consultation Parties, of the Successful Bid and the conclusion of the Auction, the Debtors shall announce the Successful Bid and Successful Bidder and shall file with the Bankruptcy Court notice of the Successful Bid and Successful Bidder.

The Debtors shall not consider any Bids submitted after the conclusion of the Auction.

***Backup Bidder.***

Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next highest or otherwise best Bid at the Auction, as determined by the Debtors, in the exercise of their business judgment and after consulting with the Consultation Parties, will be designated as the backup bidder (the "**Backup Bidder**"). The Backup Bidder shall be required to keep its initial Bid (or if the Backup Bidder submitted one or more Overbids at the Auction, the Backup Bidder's final Overbid) (the "**Backup Bid**") open and irrevocable until the closing of the transaction with the Successful Bidder.

Following the Sale Hearing, if the Successful Bidder fails to consummate the purchase of the Subject Assets, the Debtors may, after consultation with the Consultation Parties, deem the Backup Bidder to have the new Successful Bid, and the Debtors will be authorized, without further order of the Bankruptcy Court, to consummate the transaction with the Backup Bidder. All Qualified Bids (other than the Successful Bid and Backup Bid) shall be deemed rejected by the Debtors on and as of the date of approval of the Successful Bid and Backup Bid by the Bankruptcy Court. The Debtors, on their behalf and on behalf of each of their respective estates, specifically reserve the right to seek all available damages, including specific performance, from any defaulting Successful Bidder (including any Backup Bidder designated as a Successful Bidder) in accordance with the terms of the Bidding Procedures.

## Bid Protections

Pursuant to the Bidding Procedures Order, the Stalking Horse Purchaser is entitled to the Bid Protections in the amounts set forth in, and in accordance with the terms of, the Stalking Horse Agreement and the Bidding Procedures Order.

Pursuant to the Bidding Procedures Order, except for the Stalking Horse Purchaser, no other party submitting an offer or Bid or a Qualified Bid shall be entitled to any expense reimbursement, break-up fee, termination fee or similar fee or payment.

## Sale Hearing

The Successful Bid and the Backup Bid (or, if no Qualified Bid other than that of the Stalking Horse Purchaser is received, then the Stalking Horse Agreement) will be subject to approval by the Bankruptcy Court. The sale hearing to approve the Successful Bid and any Backup Bid (or the Stalking Horse Agreement, if no Qualified Bid other than that of the Stalking Horse Purchaser is received) shall take place on July 14, 2016 at 10:00 a.m. (prevailing Eastern Time) before the Bankruptcy Court (the "**Sale Hearing**"). The Sale Hearing may be adjourned by the Debtors, in consultation with the Consultation Parties, from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing, or by filing a notice on the docket of the Debtors' Chapter 11 Cases.

## Return of Good Faith Deposits

The Good Faith Deposits of all Qualified Bidders shall be held in one or more interest-bearing escrow accounts by the Debtors, but shall not become property of the Debtors' estates absent further order of the Bankruptcy Court or as expressly provided below. The Good Faith Deposit of any Qualified Bidder that is neither the Successful Bidder nor the Backup Bidder shall be returned to such Qualified Bidder not later than five (5) business days after the Sale Hearing. The Good Faith Deposit of the Backup Bidder, if any, shall be returned to the Backup Bidder no later than seventy-two (72) hours after the closing of the transaction with the Successful Bidder for the assets bid upon by the Backup Bidder. Upon the return of the Good Faith Deposits, their respective owners shall receive any and all interest that will have accrued thereon. If the Successful Bidder timely closes the winning transaction, its Good Faith Deposit shall be credited towards the purchase prices. If a Successful Bidder (or Backup Bidder, if applicable) fails to consummate an Alternate Transaction because of a breach or failure to perform on the part of such Successful Bidder (or Backup Bidder, if applicable), the Debtors will not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder (or Backup Bidder, if applicable), and such Good Faith Deposit shall irrevocably become property of the Debtors.

## The Consultation Parties

The Debtors shall consult with the members of the Ad Hoc Group, the Creditors' Committee, and each of their respective counsel and advisors (each, a "**Consultation Party**" and collectively, the "**Consultation Parties**") as explicitly provided for in the Bidding Procedures; provided, however, that the Debtors shall not be required to consult with any Consultation Party (or its counsel and advisors) during the Auction process to the extent such Consultation Party has submitted a Bid or has had a Bid submitted on its behalf, for so long as such Bid remains open, if the Debtors determine, in their reasonable business judgment, that consulting with such Consultation Party regarding any issue, selection or determination would be likely to have a chilling effect on potential bidding or otherwise be contrary to goal of maximizing value for the Debtors' estates from the sale process.

## Reservation of Rights of the Debtors

Except as otherwise provided in the Stalking Horse Agreement, the Bidding Procedures or the Bidding Procedures Order, the Debtors further reserve the right as they may reasonably determine to be in the best interest of their estates, after consultation with the Consultation Parties, to: (a) determine which Bidders are Qualified Bidders; (b) determine which Bids are Qualified Bids; (c) determine which Qualified Bid is the highest or best proposal and which is the next highest or best proposal; (d) reject any Bid that is (1) inadequate or insufficient, (2) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code or (3) contrary to the best interests of the Debtors and their estates; (e) waive terms and conditions set forth herein with respect to all potential Bidders;

(f) impose additional terms and conditions with respect to all potential Bidders; (g) extend the deadlines set forth herein; (h) continue or cancel the Auction and/or Sale Hearing in open court, or by filing a notice on the docket of the Debtors' Chapter 11 Cases, without further notice to creditors or other parties in interest; and (i) modify the Bidding Procedures and implement additional procedural rules that the Debtors determine, in their business judgment, after consultation with the Consultation Parties, will better promote the goals of the bidding process and discharge the Debtors' fiduciary duties; provided, however, that any modification or additions to the Bidding Procedures shall not be inconsistent with the Stalking Horse Agreement, the Bidding Procedures Order or any other Order of the Bankruptcy Court, unless otherwise ordered by the Bankruptcy Court.

## Exhibit A

**Form Confidentiality Agreement**

## CONFIDENTIALITY AND NONDISCLOSURE AGREEMENT

This Confidentiality and Non-Disclosure Agreement (this "**Agreement**"), dated as of _____, 2016 (the "**Effective Date**"), is made and entered into by and between Constellation Enterprises LLC, a Delaware limited liability company ("**Constellation**") and each of the Debtors (defined below), on the one hand, and _____, a _____ (the "**Recipient**"), on the other hand.

WHEREAS, on May 16, 2016 and May 17, 2016, Constellation and certain of its affiliates (collectively, the "**Debtors**," and together with the Recipient, the "**Parties**," and each a "**Party**") filed voluntary petitions for relief under Chapter 11 of title 11 U.S.C. §§ 101, et seq., (as amended, the "**Bankruptcy Code**') in the United States Bankruptcy Court for the District of the Delaware (the "**Bankruptcy Court**"), which cases are being jointly administered under Case No. 16-11213 (CSS);

WHEREAS, in connection with a potential transaction involving one or more of the Debtors (a "**Potential Transaction**"), the Debtors and their Representatives (as defined below) may from time to time provide Recipient with Confidential Information (as defined below) for the purpose of discussions and/or the exchange of information relating to an evaluation of any such Potential Transaction; and

WHEREAS, the Parties wish to enter into this Agreement for the purpose of establishing the agreements of the Parties (i) governing such disclosure, receipt, custody and use of the Confidential Information (as defined below), (ii) providing for restrictions on the solicitation for employment and hiring by Recipient of employees of the Debtors and (iii) restricting Recipient and its Representatives (defined below) from contacting customers, suppliers and vendors of any of the Debtors in connection with a Potential Transaction.

NOW, THEREFORE, in consideration of the premises and the mutual agreements contained herein, the Debtors and Recipient agree as follows:

1.    **Confidential Information Defined.**  "Confidential Information" means any (i) non-public, confidential and/or proprietary information of or relating to the Debtors (including their non-Debtor affiliates) that is disclosed or made available, directly or indirectly, to the Recipient by or on behalf of the Debtors, whether furnished in oral, written, graphic, electronic or other form and (ii) any notes, reports, analyses, compilations, studies or other documents or records prepared by the Recipient, to the extent that such notes, reports, analyses, compilations, studies, documents or records contain any such confidential, non-public and/or proprietary information.  The term "Confidential Information" for purposes of this Agreement does not include any information that (i) was or becomes generally available to the public, other than as a result of a disclosure by the Recipient or its Representatives in breach of this Agreement, (ii) was or becomes available to the Recipient from a source other than the Debtors or their Representatives; provided, however, that such source was not known by the Recipient to be bound by any agreement with or duty to the Debtors to keep such information confidential, or (iii) was or is independently developed or lawfully acquired by the Recipient without use of or reference to the Confidential Information.  The term "**Representatives**" means, with respect to

any person, such person's affiliates and the respective shareholders, members, managers, partners, directors, officers, employees, advisors, agents, accountants, auditors and attorneys of such person and such person's affiliates, each acting in their capacity as such. The term "person" as used in this Agreement will be interpreted broadly to include any corporation, limited liability company, governmental agency or body, stock exchange, entity, partnership, association, group or individual.

2.    **Use and Nondisclosure Obligation.** The Recipient shall use the Confidential Information solely for the purpose of discussing, evaluating, negotiating and implementing the terms of a Potential Transaction, and shall not disclose any Confidential Information to any person (other than to its Representatives), except to the extent that any use or disclosure of any Confidential Information (a) has been consented to by the Debtors in writing, or (b) is required by applicable law, rule, subpoena, civil investigative demand or similar process, or is otherwise required by any governmental agency, regulatory authority or other compulsory legal process (including by deposition, interrogatory, request for documents, subpoena, civil investigative demand or similar process); provided, however, that if the Recipient is required to disclose any Confidential Information to a person pursuant to this subparagraph (b), then the Recipient will inform such person of the confidential nature of such information and, to the extent not prohibited by any law, rule and regulation, notify the Debtors of such disclosure as promptly as practicable so that the Debtors may seek (at the Debtors' expense) to obtain confidential treatment of such Confidential Information by the persons to whom it is disclosed; provided, further, however, that the Recipient shall not be required to inform such person or give such notification to the Debtors if (i) the disclosure was made to a bank examiner, regulatory examiner or self-regulatory examiner in the course of such examiner's routine examination or inspection of the Recipient or its affiliates and not an examination or investigation aimed at learning information regarding any of the Debtors or the Potential Transaction or (ii) the information is disclosed for evidentiary purposes solely to assert any defenses available under the various state and federal securities laws, including, without limitation, "due diligence" defenses, in any action, proceeding or arbitration related to the Confidential Information to which the Recipient or any of its Representatives is a party. The Recipient hereby acknowledges and agrees that it shall be responsible for any breach of this Agreement by any of its Representatives, other than any Representative that has signed a separate confidentiality agreement with the Debtors.

The Debtors may provide certain Confidential Information to the Recipient's Advisors on a "professionals' eyes only" basis (such Confidential Information, "**PEO Information**") if (x) it reasonably believes such Confidential Information is sensitive commercial information regarding the Debtors, or (y) it otherwise reasonably believes such Confidential Information should be treated on a "professionals' eyes only" basis, and in each case only if such Confidential Information is clearly marked in writing as "professionals' eyes only."

3.    **Securities Laws**.    Recipient acknowledges that in its examination of the Confidential Information, it and its Representatives may have access to material non-public information ("**MNPI**") concerning the Debtors and/or their securities or debt and that it is familiar with the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"), and the rules and regulations promulgated thereunder. However, nothing herein is intended to constitute an advance determination that the Confidential Information, or any particular item thereof,

constitutes or does not constitute MNPI subject to such potential securities law restrictions, and, for the avoidance of doubt, the Debtors acknowledge that Recipient is not making any agreement or commitment herein that would prohibit Recipient or its affiliates from engaging in transactions with respect to any securities or debt of the Debtors.

4.    **Standard Protection.**  For the purposes of complying with the obligations set forth herein, the Recipient shall use at least the same degree of care to avoid disclosure and unauthorized use of the Confidential Information as the Recipient employs to protect its own confidential information.

5.    **Ownership**; **Return or Destruction of Confidential Information.**    All Confidential Information disclosed or made available by the Debtors shall be and remain the property of the applicable Debtor. Promptly following receipt by the Recipient of a written request from the Debtors, the Recipient shall, at the Recipient's election, either return or destroy (to the extent practicable with respect to electronically stored media) all Confidential Information that is within the Recipient's possession or control; provided, however, that one or more copies of the Confidential Information (including any memoranda, notes, analyses, studies or any other documents prepared by the Recipient or any of its Representatives based on, containing or reflecting any Confidential Information) may be retained by the Recipient in the ordinary course of Recipient's business  as may be required by law, rule or regulation or by any judicial, governmental, supervisory or regulatory body or stock exchange or in accordance with the Recipient's bona fide legal, compliance obligations and/or security, disaster recovery and/or document retention policies and procedures. Notwithstanding the return or destruction of Confidential Information, the Recipient shall continue to be bound by their respective obligations of confidentiality hereunder until such time as set forth in Section 11 below.

6.    **No Solicit/No Hire of Employees**.  Recipient agrees that, except with the prior written consent of Constellation, it will not, and it will not permit any of its affiliates to, directly or indirectly, solicit for employment, or hire, any employees of any of the Debtors for a period of one (1) year after the date of this Agreement; provided, however, this Section 6 shall not restrict Recipient or any of its affiliates from (i) making any general solicitation for employment that is not specifically directed at any such person, (ii) soliciting any such person who has left the employment of the Debtors at least three (3) months prior to such solicitation or (iii) hiring any such person who responds to any solicitation permitted by clauses (i) or (ii) above provided such person has not been an employee of any of the Debtors for a period of three (3) months prior to being hired.

7.    **No Contact**.  Recipient and its Representatives shall not initiate, contact, or engage in, discussions with any customer, supplier or vendor of any of the Debtors in connection with a Potential Transaction without the prior written consent of Constellation.

8.    **Remedies for Breach**.  It is understood and agreed that money damages may not be a sufficient remedy for any breach of this Agreement and that the non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy for any such breach without the need to post any bond.  Such remedy shall not be deemed to be the exclusive remedy for breach of this Agreement, but shall be in addition to all other remedies available at law or equity to the non-breaching Party.

9.      **No Fiduciary Relationship**.    Neither this Agreement, nor any exchange of Confidential Information under it, will be construed as creating any fiduciary, advisory or other relationship or obligation of any kind between the Parties or between Recipient and any other person who receives Confidential Information, directly or indirectly, from the Debtors or Recipient.

10.     **No Obligation**.  The Debtors acknowledge and agree that neither the execution of this Agreement by the Recipient nor the receipt and evaluation of the Confidential Information by the Recipient shall be deemed to be, construed as, or constitute an obligation or commitment to enter into or to consent to or otherwise approve a Potential Transaction (or any other transaction that the Debtors may pursue).  The Debtors further acknowledge and agree that any such entry, consent or approval may be provided or withheld by the Recipient in its sole and absolute discretion and the Recipient has given the Debtors no assurances, representations, commitments or promises that it will enter into or provide any such consent or approval of a Potential Transaction.

11.     **Term**. This Agreement and the Recipient's obligations hereunder shall terminate upon the date that is one year following the Effective Date (the "**Termination Date**"); provided, however, such termination shall not relieve Recipient from liability of any breach of this Agreement prior to such termination.

12.     **No Waiver**.  No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder.

13.     **No Representations or Warranties**.    Neither the Debtors nor any of their Representatives has made or hereby makes any representations and warranties as to the accuracy or completeness of the Confidential Information, and neither the Debtors nor any of their Representatives shall have any liability to the Recipient resulting from the use or contents of the Confidential Information or from any action taken or any inaction occurring in reliance on the Confidential Information.

14.     **Entire Agreement**.  This Agreement constitutes the entire understanding and agreement between the Parties relating to the subject matter hereof; provided, however, this Agreement shall not, by implication or otherwise, alter, modify, amend or in any way affect any of the terms, provisions, obligations, covenants, liens, security interests or rights contained in any other agreement, including any loan, indenture, note, instrument, or certificate, or any related document.

15.     **Amendment**.  This Agreement may not be modified, supplemented, or amended orally, but only in writing signed by both Parties.  No course of dealing between the Parties shall be deemed to modify or amend any provision of this Agreement.

16.     **Governing Law; Venue**.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to the conflict of law provisions thereof that would result in the application of the laws of any other jurisdiction.  Each

Party hereby irrevocably and unconditionally consents to submit to the exclusive jurisdiction of the Bankruptcy Court, or if the Bankruptcy Court does not have jurisdiction, any State or Federal court sitting in the State of New York, County of New York in the Borough of Manhattan for any actions, suits or proceedings arising out of or relating to this Agreement and the transactions contemplated hereby (and agrees not to commence any action, suit or proceeding relating thereto except in such courts).  Each Party hereby consents and submits to personal jurisdiction and service, and irrevocably and unconditionally waives any objection which it may now or hereafter have to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby, in any of the aforementioned courts, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.  TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEBTORS AND THE RECIPIENT HEREBY AGREE TO WAIVE TRIAL BY JURY IN ANY ACTION PROCEEDING OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF EITHER PARTY WITH RESPECT TO ANY MATTER WHATSOEVER RELATING TO THIS AGREEMENT.

17. **Miscellaneous**.  This Agreement shall not be assigned by the Recipient without the prior written consent of Constellation and any attempted assignment in violation of this section 17 shall be null and void *ab initio*.  This Agreement shall bind and inure to the benefit of the Parties and their successors and permitted assigns.  If any of the provisions of this Agreement are determined to be invalid under applicable law, they are, to that extent, deemed omitted.  The invalidity of any portion of this Agreement shall not render any other portion invalid.  This Agreement may be executed in any number of counterparts with the same effect as if all signatories had signed the same document.  Fax and PDF signatures on this Agreement shall be fully binding and effective for all purposes.

18. **Notices**.  Any notice required or permitted to be given hereunder shall be properly given only if in writing and if sent by overnight courier, delivered by hand or sent by facsimile (receipt of which facsimile shall be confirmed) and with a copy also delivered by email to the following addresses to all of the identified notice parties (if more than one person is listed), or such other addresses as shall subsequently be provided to a party:

If to the Debtors:

Constellation Enterprises, LLC
50 Tice Boulevard, Suite 340
Woodcliff Lakes, New Jersey 07677
Attention: Dana LaForge
Email: laforge@brera.com

with a copy to (which shall not constitute notice):

Kramer Levin Naftalis &Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
Attention:  Adam C. Rogoff

Email:  arogoff@kramerlevin.com
Attention: James A. Grayer
Email:  jgrayer@kramerlevin.com

If to the Recipient:

[ADDRESS]
Attention:  [    ]
Email:  [    ]

with a copy to (which shall not constitute notice):

[ADDRESS]
Attention:  [    ]
Email:  [    ]


[Signature Page Follows]

IN WITNESS WHEREOF, the Debtors and the Recipient have executed this Agreement as of the Effective Date.


CONSTELLATION ENTERPRISES LLC, and each of the other Debtors


By:_____
Name:
Title:



[RECEPIENT]

By:_____
Name:
Title: