## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| ) | **Chapter 11** |
| ) | |
| **In re:** ) | **Case No. 16-11213 (CSS)** |
| ) | |
| **Constellation Enterprises LLC, *et al.*,**[1] ) | **Jointly Administered** |
| ) | |
| **Debtors.** ) | Hearing Date: June 15, 2016 |
| ) | Objection Deadline: June 8, 2016 |
| ) | |
| ) | **Re: D.I. 13** |

### PRELIMINARY OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE, (B) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (C) GRANTING ADEQUATE PROTECTION TO THE ADEQUATE PROTECTION PARTIES, (D) SCHEDULING A FINAL HEARING, AND (E) GRANTING RELATED RELIEF

The Official Committee of Unsecured Creditors (the "Committee") appointed in the cases of the above-captioned debtors and debtors-in-possession (the "Debtors"), by and through its proposed undersigned counsel, hereby submits this preliminary objection (the "DIP Objection") to the *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Adequate Protection to the Adequate Protection Parties, (D) Scheduling a Final Hearing, and (E) Granting Related Relief* [D.I. 13] (the "DIP Motion").[2]

In support of the DIP Objection, the Committee respectfully states as follows:

---

[1] The debtors in these cases, along with the last four digits of their federal tax identification number, are: Constellation Enterprises LLC (9571); JFC Holding Corporation (0312); The Jorgensen Forge Corporation (1717); Columbus Holdings Inc. (8155); Columbus Steel Castings Company (8153); Zero Corporation (0538); Zero Manufacturing, Inc. (8362); Metal Technology Solutions, Inc. (7203); Eclipse Manufacturing Co. (1493); and Steel Forming, Inc. (4995). The debtors' mailing address is located at 50 Tice Boulevard, Woodcliff Lakes, NJ 07677.

[2] Capitalized terms used, but not otherwise defined herein, shall have the meanings ascribed to them in the DIP Motion.

## PRELIMINARY STATEMENT

1.      While the Committee acknowledges that debtor-in-possession financing is needed to maintain the Debtors as going concerns during the pendency of these cases, the DIP Facility, as currently structured, provides limited benefit to the Debtors and even less benefit to the Debtors' unsecured creditors.[3]   The DIP Facility is currently only designed to facilitate an expedited sale of substantially all of the Debtors' assets to certain of the New Money DIP Lenders, which include certain holders of the Prepetition First Lien Notes (the "Note Holder Purchaser").

2.      As currently proposed, the DIP Facility would allow the Note Holder Purchaser to use the bankruptcy process, where these cash-strapped Debtors now find themselves, to purchase the majority of the Debtors' assets free and clear of liens through a credit bid and avoid the time-consuming and burdensome state foreclosure process, while providing no value for unsecured creditors.

3.      The DIP Motion seeks approval of a proposed debtor-in-possession financing facility that (a) provides limited "new money;" (b) seeks to roll-up a significant amount of alleged prepetition debt; (c) provides a budget (the "Budget"), which this Court qualified at the first day hearing as "outrageous" as it relates to the funding for the Committee's professionals; (d) imposes a burdensome fee and interest rate structure; (e) provides the DIP Lenders and the

---

[3] Given the unusual current posture of these proceedings—where there is a second hearing with respect to the interim DIP financing before this Court on June 1, 2016 (the "Second Interim Hearing") and where the Committee was appointed a few days prior to the Second Interim Hearing —the Committee is filing the DIP Objection in advance of the Second Interim Hearing so the Court may take into consideration the Committee's preliminary objections while considering interim approval of the DIP Motion.  The Committee appreciates that some of the terms of the proposed DIP Facility will only be considered on an interim, rather than final basis at the Second Interim Hearing.  In addition, counsel for the Debtors have confirmed that the Committee's participation in the Second Interim Hearing will not be deemed to be a waiver of the Committee's rights to raise any objection to the relief sought in the DIP Motion on a final basis by the June 8, 2016 deadline established by this Court.  Accordingly, by filing the DIP Objection, the Committee is not waiving, but rather expressly reserves, all its rights to file an additional objection and to raise the same and/or new arguments prior to any final hearing on the DIP Motion.

- 2 -

Adequate Protection Parties (both as defined below) with liens on virtually all of the Debtors' assets, including the proceeds of avoidance actions, commercial tort claims and other previously unencumbered assets; (f) includes a set of Milestones which could have only been designed to impede a robust marketing and sale process to ensure that the Note Holder Purchaser will acquire the majority of the Debtors' assets via a credit bid; (g) provides for unreasonably broad indemnities and releases; (h) contains waivers of the estate protections found in sections 506(c) and 552(b) of the Bankruptcy Code; and (i) contains a waiver of any argument that might be asserted concerning the equitable doctrine of marshalling.

4.        It is respectfully submitted that this Court should not allow the secured creditors to use these chapter 11 proceedings for their sole benefit.  If the secured creditors wish to utilize the chapter 11 process to liquidate their collateral in order to avoid the lengthy and costly foreclosure process under multiple state laws,[4] they must be required to "pay to play" and fund a process that is fair and equitable to theses Debtors and to all of the parties-in-interest, including the Committee's constituency.

5.        Even if the DIP Lenders come forward with additional funding, the Committee submits that there must be numerous material modifications to the DIP Facility and the Budget in order for the DIP Motion to satisfy the legal and equitable standards for approval of debtor-in-possession financing.  Indeed, as proposed, the DIP Facility contravenes various Bankruptcy Code principles and leaves only one viable option for the Debtors in these cases:  a fire sale of the Debtors' assets through a credit bid by the Note Holder Purchaser, followed by a conversion to chapter 7 cases.

---

[4] The assets proposed to be purchased by the Note Holder Purchaser through a credit bid are located in Ohio, Texas, California, Washington and Utah.

6.     In sum, if the DIP Facility is not modified in a manner that is acceptable to the Committee, the interests of general unsecured creditors (and the estates) will be irrevocably impacted at the very outset of these cases.  As such, the Committee respectfully requests that the Court deny the DIP Motion, or alternatively, approve the DIP Motion provided that all the necessary modifications set forth herein are addressed to the Committee's satisfaction.

## JURISDICTION

7.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

8.     Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

9.     On May 16, 2016 and May 17, 2016 (together, the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their assets and property as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.

10.     On the Petition Date, the Debtors filed the DIP Motion, seeking entry of an order: (a) authorizing the Debtors to obtain post-petition financing in the amount of $32,748,118[5] (the "DIP Facility"), consisting of (i) a superpriority priming multiple draw term loan facility in an aggregate principal amount not to exceed $15,000,000 (the "New Money DIP Loans") and (ii) a term loan facility in the amount of $17,748,118 (the "Roll-Up DIP Loans"),[6] which will be used to repay certain outstanding obligations, including outstanding letters of credit under the

---

[5] This amount was subsequently adjusted to $32,823,369.

[6] This amount was subsequently adjusted to $17,823,369.

Prepetition Facility; (b) authorizing the Debtors' use of Cash Collateral; (c) granting the DIP Lenders liens and claims in post-petition collateral (the "DIP Liens"); (d) granting adequate protection to the Adequate Protection Parties; and (e) scheduling a final hearing on the DIP Motion.

11.     On May 18, 2016, the Court held a hearing (the "May 18 Hearing") to consider various requests for emergency interim relief made by the Debtors, including the DIP Motion. The Court then held a continued telephonic hearing on the DIP Motion on May 20, 2016 (the "May 20 Hearing" and, together with the May 18 Hearing, the "First Day Hearing").  As a result of objections asserted by the Prepetition DDTL Lenders (as defined below) and concerns raised by the Court at the First Day Hearing, the Debtors and the DIP Lenders agreed to make certain modifications to the DIP Facility, as described in greater detail below.

12.     On May 23, 2016, the Court entered an order approving the DIP Motion on an interim basis (the "Interim Order") [D.I. 71].  The Second Interim Hearing on the DIP Motion is scheduled for June 1, 2016 at 1:30 p.m. and a final hearing on the DIP Motion is currently scheduled for June 15, 2016 at 1:30 p.m.

13.     On May 25, 2016, the Office of the United States Trustee for the District of Delaware (the "UST") appointed the Committee pursuant to Section 1102(a)(1) of the Bankruptcy Code.[7]  To date, the Committee has selected Squire Patton Boggs (US) LLP as its lead counsel and CBIZ Corporate Recovery Services as its financial advisor.

14.     On May 25, 2016, the Debtors filed their *Motion for (I) an Order Establishing Bidding Procedures and Granting Related Relief and (II) an Order Approving the Sale of the*

---

[7] The formal notice of appointment of the Committee was filed on May 31, 2016 [D.I. 108].  The members of the Committee are:   U.S. Bank National Association, G.O Carlson, Inc.-Electralloy, PSC Metals, Inc., EAC Corporation, Steel Summit Holdings, Inc., Praxair and United Steelworkers.

Assets (the "Sale Motion") [D.I. 88] pursuant to which the Debtors seek, *inter alia*, approval of procedures for the sale of substantially all of their assets (the "Non-Columbus Assets"), excluding the assets of the Debtors Columbus Holdings, Inc. and Columbus Steel Casting Company (collectively, the "Columbus Debtors").  In addition, on May 25, 2016, the Debtors filed their *Motion for Entry of (I) an Order Authorizing the Sale of CSCs Assets to the Private Sale Purchaser or, in the Alternative, (II) (A) an Order Establishing Bidding Procedures and Granting Related Relief and (B) an Order Approving the Sale of CSCs Assets to the Successful Bidder* [D.I. 87] (the "CSC Sale Motion").  As set forth in the Sale Motion, the Note Holder Purchaser is the proposed stalking horse bidder (the "Stalking Horse Purchaser") for the Non-Columbus Assets and the Stalking Horse Purchaser intends to credit bid a portion or all of its purported prepetition secured debt for the Non-Columbus Assets, with no cash component.[8]

### THE DEBTORS' PREPETITION CAPITAL STRUCTURE

15.    According to the representations made by the Debtors in the DIP Motion, there are three components of the Debtors' prepetition capital structure,[9] as summarized below.

---

[8] In the Sale Motion, the Debtors seek approval of an inherently flawed sale process that is heavily skewed in favor of the Note Holder Purchaser, which is capitalizing the Stalking Horse Purchaser.  The Committee's specific concerns with the proposed sale process will be set forth in detail in a separate objection, but, in summary, the Committee is very concerned that the sale process will not maximize value through a competitive bidding and auction process and will give an unfair advantage to the Stalking Horse Purchaser.  Among other things, (i) the sale milestones are unnecessarily expedited and, coupled with the fact that the Stalking Horse Purchaser's bid is entirely a credit bid, the proposed process will only chill bidding and depress, not maximize, values; (ii) the sale process does not afford the Debtors the necessary flexibility to run it efficiently with the goal of maximizing value, including by not permitting the separate sale of each the Debtors' three businesses included in the Non-Columbus Assets; (iii) it is impossible to discern the actual amount of the Purchase Price, as that term is currently defined in the Term Sheet, such that prospective bidders have no way of determining what they are bidding against; and (iv) the Stalking Horse Purchaser should not be entitled to receive any expense reimbursement under the circumstances.  The Committee will try to resolve its concerns consensually with all relevant parties-in-interest, but as presently proposed, the sale process which the Debtors seek approval of via the Sale Motion is extremely objectionable and clearly not in the best interest of the Debtors' estates and creditors.  The Committee also has concerns with respect to the CSC Sale Motion, which will be raised in a separate objection.

[9] The Committee has not yet had the opportunity to investigate the terms or the validity of any of the debt instruments or alleged security positions of the Facility Lenders, the holders of the Prepetition First Lien Note (the "Prepetition First Lien Note Parties"), or the Prepetition DDTL Lenders (as defined below).  The Committee hereby

16.     The Debtors are borrowers or guarantors under a January 28, 2011 Financing Agreement (the "Financing Agreement") with the lenders thereunder (the "Facility Lenders") and PNC Bank, NA, as agent.  The Financing Agreement provided for a $35 million revolving credit facility (the "Prepetition Facility").  The borrowings under the Prepetition Facility are secured by a first lien on the Debtors' inventory and accounts receivable (the "Revolving Priority Collateral") and a second lien on the Debtors' other assets (the "Fixed Asset Priority Collateral").  As of the Petition Date, there was approximately $17,748,118 outstanding under the Prepetition Facility.

17.     On January 28, 2011, the Debtors issued $130,000,000 of 10.625% First Priority Senior Secured Notes due February 1, 2016 (the "Prepetition First Lien Notes").[10]  The Prepetition First Lien Notes are secured by a first lien on the Fixed Asset Priority Collateral and a second lien on the Revolving Priority Collateral.  As of the Petition Date, there was approximately $129,597,000 outstanding under the Prepetition First Lien Notes, exclusive of interest, fees and costs.

18.     The Debtors are also borrowers or guarantors under an Amended and Restated Term Loan Agreement (the "DDTL Credit Agreement") dated September 17, 2015, with the lenders thereunder (the "Prepetition DDTL Lenders") and Private Equity Opportunities LP, as agent.  The DDTL Credit Agreement provided for a delayed draw term loan facility (the "DDTL Facility") in the initial aggregate amount of $13 million.  The obligations under the DDTL Credit Agreement are secured by a first lien on the Revolving Priority Collateral and a second lien on

---

reserves all its rights to, among other things, challenge any of these prepetition debt obligations or security interests on any available grounds.

[10] By amendment dated February 1, 2016, the interest rate on the Prepetition First Lien Notes was increased from 10.625% to 11.125% and the maturity date under such notes was extended to February 1, 2018.  The Committee reserves all its rights in connection with such transaction, including whether the transaction constituted a fraudulent transfer.

the Fixed Asset Priority Collateral.  The Debtors do not disclose in the DIP Motion the identity of the Prepetition DDTL Lenders; however, it appears that the Prepetition DDTL Lenders are either only comprised of, or include, one or both of the Debtors' equity sponsors.  As of the Petition Date, there was approximately $10.6 million outstanding under the DDTL Facility, exclusive of interest, fees and costs.

19.    The relative priorities of the Prepetition Facility, the Prepetition First Lien Notes and the DDTL Facility are controlled by two intercreditor agreements and the parties thereto are presently litigating before this Court the issue of whether the proposed DIP Facility can prime the Prepetition DDTL Lenders.

## THE PROPOSED DIP FACILITY

20.    As noted *supra*, the proposed DIP Facility is comprised of two parts: (a) $15,000,000 in New Money DIP Loans extended by certain holders of the Prepetition First Lien Notes (collectively, the "New Money DIP Lenders") and (b) the Roll-up DIP Loans from the Facility Lenders under the Roll-up DIP Loans (the "Roll-up DIP Lender"), in the amount of $17,823,369.  Under the DIP Motion as originally filed, the Debtors sought authority to borrow up to $8,500,000 under the New Money DIP Loans on an interim basis and up to $6,500,000 under the New Money DIP Loans upon entry of a final order.  The Debtors also sought authority to borrow the full amount of the Roll-up DIP Loans upon entry of a final order.

21.    The DIP Motion originally contemplated that all of the New Money DIP Lenders would be members of a group of *ad hoc* noteholders (the "Ad Hoc Group") and that the Facility Lenders would not provide any New Money DIP Loans.  At the First Day Hearing, it was disclosed that, after further negotiations, the PNC New Money DIP Lenders (as defined in the Interim Order) would provide $3,000,000 in New Money DIP Loans (the "Interim PNC New

- 8 -

Money DIP Facility"),[11] and that these loans would be made available to the Debtors immediately upon entry of the Interim Order.[12]  Neither the Ad Hoc Group's commitments for New Money DIP Loans or the Roll-Up DIP Loans from the Roll-up DIP Lender are approved under the Interim Order as currently entered.  The Court will consider the Ad Hoc Group's commitments for New Money DIP Loans at the Second Interim Hearing, when it is expected that the Debtors will seek to borrow an additional $5,500,000 on an interim basis from the New Money DIP Lenders pursuant to a supplemental Interim Order.  The additional lending by the New Money DIP Lenders continues to be opposed by the Prepetition DDTL Lenders.

22.     The Debtors also seek authority to use the Cash Collateral as available under the Prepetition Facility, the Prepetition First Lien Notes and the DDTL Facility, and to provide adequate protection to the Facility Lenders, the Prepetition First Lien Notes Parties and the Prepetition DDTL Lenders (collectively, the "Adequate Protection Parties").

23.     Pursuant to the Interim Order, the Debtors were authorized on an interim basis to use $3,000,000 in proceeds from the PNC New Money DIP Facility provided by the PNC New Money DIP Facility Lenders, plus Cash Collateral as specified in the Budget.

## OBJECTION

### I.    Legal Standard for Post-Petition Financing

24.     It is well settled that, in order to obtain post-petition financing, the Debtors must prove, among other things, that the terms of a proposed DIP facility are fair, reasonable and

---

[11] The Committee notes that it does not disagree that the Debtors need DIP financing in these cases and given the intercreditor dispute that arose at the time of the interim hearing on the DIP Motion, that the PNC New Money DIP Facility was necessary and appropriate to maintain the Debtors as going concerns pending resolution of such dispute and formation of the Committee.  Accordingly, the Committee has no objection *per se* to the advances made under the PNC New Money DIP Facility, or the protections afforded to the PNC New Money DIP Lenders under section 363(m) of the Bankruptcy Code in connection therewith.

[12] *In re Constellation Enterprises LLC*, May 18, 2016 Hearing Transcript [D.I. 54] at 45:14-20, attached hereto as Exhibit A.

adequate given the circumstances of the debtor and the proposed lender. *In re L.A. Dodgers, LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011) *citing In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (holding that proposed financing should be beneficial and reasonable); *In re Aqua Assocs.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991); *In re Tenney Village Co.*, 104 B.R. 562, 568 (Bankr. D.N.H. 1989) (debtor-in-possession financing terms must not "pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specifically crafted for the benefit" of the secured creditor).

25.     As discussed in further detail below, the Committee submits that the DIP Facility, as currently proposed, is not fair, reasonable or adequate for, among other things, the following reasons:

- the proposed roll-up is unwarranted, since (a) little new money is being advanced by the Facility Lenders, and (b) there should be no objection to priming given that the Facility Lenders are lenders under both the pre-and post-petition facilities;

- the proposed liens on and superpriority claims in the proceeds of the Debtors' Avoidance Actions and Commercial Tort Claims are unwarranted and prejudicial to unsecured creditors and the estates;

- the interests and fees for the DIP Facility are inappropriate given, among other things, the limited amount of "new money" being provided and the compressed Milestones in these cases;

- the Final Order contemplates waivers of Bankruptcy Code section 506(c), Bankruptcy Code section 552(b) and the equitable doctrine of marshaling, which, given the facts and circumstances of these cases, are wholly inappropriate;

- the DIP Facility inappropriately contains broad indemnity provisions and releases;

- the proposed Budget for the Committee's professionals, the carve-out under the DIP Financing and the budget for investigating lenders' claims and liens are, by any measure, woefully inadequate;

- the Challenge Period is too short given the facts of these cases; and

- the sale Milestones will only lead to a "fire sale" through a credit bid and must be modified.

## II.    The Roll-up is Unwarranted

26.    The proposed Roll-up DIP Loans are not justified under the circumstances of these cases.  The amount of the pre-petition debt that the Facility Lenders are seeking to roll-up is significantly disproportionate to the amount of new money that has been agreed to be lent to the Debtors.  As such, the Committee objects to the Facility Lenders' attempt to roll-up its prepetition outstanding debt.

27.    Courts in this district and others do not favor roll-ups in connection with debtor-in-possession financing unless a substantial showing has been made as to their justification.  *See In re VeraSun Energy Corp.*, 467 B.R. 757 (Bankr. D. Del. 2012), December 3, 2008 Hearing transcript [D.I. 316] at 32:20-25 (noting that the Bankruptcy Court for the District of Delaware and other courts have found that "roll ups are not favored.  They are strongly discouraged on day one, and the bottom line is that for approval a substantial showing has to be made . . . .");[13] 3 COLLIER ON BANKRUPTCY ¶364.04[2][e] n.50 (noting that a roll-up attracts intense scrutiny from the court and the UST, and that Delaware Local Rule 4001-2(a)(i)(E) requires "these provisions to be highlighted in any motion seeking approval of post-petition financing").  Roll-ups are not favored because they provide virtually no benefit to the debtor and act to circumvent the Bankruptcy Code's priority structure for distribution.

28.    Indeed, this Court has expressed skepticism regarding roll-up mechanisms that effectively cross-collateralize various debt obligations, thereby providing the pre-petition lender with additional collateral.  *See In re Orchard Supply Hardware Stores Corp.*, Case No. 13-11565 (CSS), July 15, 2013, Hearing Transcript [D.I. 244] at 170:5-15 (allowing pre-petition lenders to

---

[13] The relevant portions of the hearing transcript are attached hereto as <u>Exhibit B</u>.

obtain additional collateral to secure pre-petition liens is "really at the edge of what the Court is willing to do. And [the Court is] very, very, very reluctant to approve that kind of relief.").[14]

29.    In the present cases, the Debtors have made no substantial showing in support of the proposed roll-up. Instead, the Debtors argue that the roll-up is warranted because it is a "continuation of the prepetition status quo" and that the DIP Facility (including the roll-up) provides comfort to the Debtors' vendors and trade creditors. DIP Motion at ¶¶50-51. However, these arguments ignore the added protection already being given to the Roll-up DIP Lender, since the Prepetition Facility would not just be secured by the value of a first lien on the Revolving Priority Collateral and a second lien on the Fixed Asset Priority Collateral, but would also be afforded additional protections under sections 361 and 364 of the Bankruptcy Code. Moreover, it is disingenuous to suggest that the roll-up, rather than just the new money being provided under the DIP Facility, provides any comfort to vendors and trade creditors. The Debtors should not be permitted to use a $15,000,000 New Money DIP Loan, only $3,000,000 of which was extended by the PNC New Money DIP Facility Lenders, to justify a $17,823,369 roll-up of the Prepetition Facility.

30.    For the foregoing reasons, the Committee objects to the proposed DIP Facility to the extent that it seeks to include a roll-up component.

### III.    The Proposed Liens on and Claims in the Proceeds of Debtors' Avoidance Actions, Commercial Tort Claims and Previously Unencumbered Assets is Inequitable and Unwarranted

31.    Pursuant to the terms of the DIP Facility, the Debtors are granting the New Money DIP Lenders and the Roll-up DIP Lender (collectively, the "DIP Lenders"), as well as the DIP Agent, liens on and superpriority claims in the following assets: (a) the proceeds of the Debtors' chapter 5 causes of action (the "Avoidance Actions"); and (b) commercial tort claims

---

[14] The relevant portions of the hearing transcript are attached hereto as Exhibit C.

- 12 -

(the "<u>Commercial Tort Claims</u>" and together with the Avoidance Actions, the "<u>Claims</u>") and various previously unencumbered assets.  As discussed below, without modification, these proposed liens are inappropriate and contrary to the interests of the Debtors' estates and unsecured creditors.

32.    With respect to the Avoidance Actions, it is well established that causes of action brought under chapter 5 of the Bankruptcy Code should be preserved for the benefit of unsecured creditors. *See Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. Pshp. IV*, 229 F.3d 245, 250 (3d Cir. 2000) ("The purpose of fraudulent conveyance law is to make available to creditors those assets of the debtor that are rightfully part of the bankruptcy estate, even if they have been transferred away.").  Indeed, the intent behind the avoidance power is to allow the debtor to recover certain payments on behalf of all creditors and not, as proposed here, for the exclusive benefit of the DIP Lenders.  *In re Integrated Testing Products Corp.*, 69 B.R. 901, 904 (D.N.J. 1987) (finding that only the trustee, acting on behalf of all of the creditors, has a right to recover payments made as preferences).

33.    Moreover, avoidance actions are not property of a debtor's estate, but rather are rights that may be exercised for the benefit of a debtor's creditors.  *See Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.*), 226 F.3d 237, 243-45 (3d Cir. 2000) (fraudulent transfer claims belong to creditors and a chapter 11 debtor does not acquire its creditors' fraudulent transfer claims as a result of filing for bankruptcy); *In re Sweetwater*, 55 B.R. 724, 731 (D. Utah 1985), *rev'd on other grounds*, 884 F.2d 1323 (10th Cir. 1989) ("The avoiding powers are not 'property' but a statutorily created power to recover property.").  As a result, the Debtors should not be authorized to grant the DIP Lenders and the

- 13 -

DIP Agent liens on the proceeds of Avoidance Actions and the Final Order should preserve those assets accordingly for the benefit of the unsecured creditors.

34.     Similarly, the Final Order should carve out any proposed DIP Liens and adequate protection liens on, and superpriority claims in, the Debtors' Commercial Tort Claims.  First, it is currently unclear whether and to what extent the Commercial Tort Claims were encumbered prepetition.[15]  Second, even if such claims were encumbered and such provisions have been granted in other DIP financing facilities, the facts and circumstances of these cases warrant a different result.  In these cases, for example, it is conceivable that litigation might be brought against the Debtors' present or former directors and officers or other parties-in-interest.  These claims may fall within the definition of Commercial Tort Claim and, therefore, allowing a lien on such claims and the proceeds thereof deprives creditors of a potentially meaningful recovery in cases with an otherwise bleak outlook.

35.     Finally, any assets of the Debtors that may have previously unencumbered should remain so and inure to the benefit of unsecured creditors.

### IV.    The Proposed Fees and Interest Rates Under the DIP Facility are Unreasonable

36.     The DIP Motion seeks approval of an exit fee in an amount equal to 3.00% of the New Money Commitments (as defined in the DIP Credit Agreement), plus a separate $25,000 exit fee payable to the Facility Lenders (collectively, the "Exit Fees").  *See* DIP Motion at ¶14 and DIP Credit Agreement at § 2.06.  Under Section 2.06(a) of the DIP Credit Agreement, both Exit Fees are earned on the date that the DIP Facility is approved and initial New Money Loans (as defined in the DIP Credit Agreement) are made.  The Exit Fees are payable, in cash, on the

---

[15] As noted *supra*, the Committee has not had an opportunity to conduct a review of the Debtors' prepetition loan documents.  Therefore, the Committee cannot currently take a definitive position on whether the Debtors' Commercial Tort Claims are encumbered assets.

earliest of (i) the date that the DIP loan terminates, including an acceleration date, and (ii) the date of the repayment in full of the New Money Loans and the termination of the New Money Commitment (as defined in the DIP Credit Agreement).

37.     Exit Fees are disfavored in debtor-in-possession loans because they can present an artificial barrier to a debtor's conclusion of its Chapter 11 case.  The Debtors do not justify the need for, or the reasonableness of the Exit Fees, offering as support only a single conclusory sentence in Paragraph 11 of the Declaration of Erich Hobelmann [D.I. 14] stating that "the interest rate and fees provided for under the DIP Facility are reasonable under the circumstances."  The Debtors should be required to provide actual evidence to demonstrate that the Exit Fees are necessary in these cases and that comparable exit fees have been approved in other cases under similar circumstances.

38.     In addition to Exit Fees, Section 2.06(c) of the DIP Credit Agreement requires the Debtors to pay fees as "set forth in the Agent Fee Letter."  The Committee has had only a brief opportunity to review the Agent Fee Letter and is concerned that the fees specified therein can be changed or renegotiated by the Debtors and the proposed DIP Lenders without further consultation with the Committee or approval by the Court.  The Court should not approve unknown fees on top of the Exit Fees and interest expenses under the DIP Facility and should require that the Committee be provided an opportunity to review in advance any change to the fees or the Agent Fee Letter.

39.     The Committee is currently examining the interest rate on the DIP Facility, in consultation with its financial advisor.  After cursory review, it appears that the effective rate on the New Money DIP Loans is approximately 10% to 11%.  This appears to be above the current average market rate for these types of loans.

###### V.    The Proposed Waivers of Bankruptcy Code Sections 506(c) and 552(b) Should Not be Permitted in these Cases

40.    The Committee objects to: (a) the proposed waiver of the Debtors' rights to recover the reasonable, necessary costs and expenses of preserving or disposing of property securing any allowed secured claim of the prepetition secured lenders and to any waiver of section 506(c) rights with respect to the DIP collateral, the prepetition collateral or the Cash Collateral; and (b) the proposed waiver of the "equities of the case" exception set forth in Bankruptcy Code section 552(b).  DIP Motion at ¶¶20 & 25.

41.    By waiving their rights under section 506(c) of the Bankruptcy Code, the Debtors are essentially agreeing to pay for any and all expenses associated with the preservation of the secured parties' collateral out of the general unsecured creditor recoveries or administrative and priority recoveries.   Such waivers have been found unenforceable because they provide a windfall to the secured creditor at the expense of unsecured claimants.  *See, e.g., Hartford Fire Ins. Co. v. Norwest Bank Minn, N.A. (In re Lockwood Corp.)*, 223 B.R. 170, 176 (B.A.P. 8th Cir. 1998); *Kivitz v. CIT Group/Sales Fin., Inc.*, 272 B.R. 332, 334 (D. Md. 2000) (section 506(c) of the Bankruptcy Code exists so that unsecured creditors are not required to bear the cost of protecting collateral that is not theirs and to require the secured party to bear the costs of preserving or disposing of its own collateral).

42.    In 2007, Judge Walsh of this District stated the following in response to counsel's representation that section 506(c) waivers are "absolutely standard in the context of DIP financing":

> Well, let me tell you what the law in this Court's been for at least the last five years.  If the Committee doesn't agree with the [section 506(c)] waiver, it doesn't happen.  I've had a couple of cases where the Committee has agreed to it because of exigent circumstances, but absent the Committee's approval, I can't remember the last time I approved such a waiver, if I ever did.

- 16 -

*In re Mortg. Lenders Network USA, Inc.*, No. 07-10146 (PJW) (Bankr. D. Del.), Hearing Transcript [D.I. 346] at 21:7-13;[16] *see also In re Energy Futures Holdings Corp.*, No. 14-10979 (CSS) (Bankr. D. Del.), Hearing Transcript [D.I. 3927] at 212:8-22[17]

43.    The proposed waiver of section 506(c) rights is problematic in these cases because the waiver has been designed solely for the benefit of the Note Holder Purchaser, who is using the chapter 11 process to obtain broad releases and acquire substantially all of the Debtors' assets through a credit-bid.  Therefore, the Committee objects to the 506(c) waiver and submits that this provision must be eliminated.

44.    The Debtors are also seeking a waiver of the "equities of the case" exception contained in section 552(b) of the Bankruptcy Code, which would otherwise allow the Debtors, the Committee, or other parties-in-interest to assert that equitable considerations justify the exclusion of post-petition proceeds from the prepetition collateral.  DIP Motion at ¶25.  In these cases, it is possible that the proposed sale of the Debtors' assets will not generate sufficient proceeds to pay all administrative claims in full, and it is extremely likely that the proposed sales will not provide any recovery to unsecured creditors.  Accordingly, the Committee submits that any finding or order of this Court that prospectively waives the "equities of the case" exception set forth in section 552(b) is inappropriate and should be stricken.  *See In re Metaldyne Corp.*, No. 09-13412 MG, 2009 Bankr. LEXIS 1533, at *20 (Bankr. S.D.N.Y. June 23, 2009) (holding that in the context of a proposed section 552(b) waiver, "the waiver of an equitable rule is not a finding of fact . . . and the Court, in its discretion, declines to waive prospectively an argument that other parties in interest may make.  If, in the event, the Committee or any other party in

---

[16] The relevant portions of the hearing transcript are attached hereto as <u>Exhibit D</u>.

[17] The relevant portions of the hearing transcript are attached hereto as <u>Exhibit E</u>.

interest argues that the equities of the case exception should apply to curtail a particular lenders' (sic) rights, the Court will consider it.").

## VI.    The Release and Indemnity Provisions are Overbroad and Unreasonable

45.    The Interim Order as well as the proposed second interim DIP Order contains release and indemnity provisions that are overbroad, and which threaten to prejudice unsecured creditors.   For instance, paragraph 14 of the proposed second interim DIP Order provides, subject to the Challenge Period, that the Debtors and the Debtors' estates are releasing the New Money DIP Lender, the DIP Agent, the Facility Lenders, the First Lien Notes Parties, as well as each of their former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest (collectively, the "Released Parties"), from a full panoply of claims, including, without limitation, claims relating to their prepetition loans, the DIP Facility, lender liability claims and claims relating to the validity, priority and extent of their liens.   These release provisions are inappropriate for a number of reasons.

46.    *First*, the Debtors seek to *prospectively* release the Released Parties of actions taken pursuant to the "DIP Documents or the transactions contemplated under such documents." By way of example, if any of the Released Parties overreach and attempt to exercise control over the Debtors' affairs, particularly in connection with a plan or sale process, this precludes the Debtors or the Committee from seeking to hold them accountable for such conduct.

47.    *Second*, the proposed releases, as drafted, appear to release parties who are not related to or participating in the DIP Facility.   Specifically, the DIP Facility proposes releasing the Prepetition First Lien Note Parties, regardless of whether those parties are participating in the

- 18 -

DIP Financing.  These releases are not necessary to securing the DIP Financing and to the extent such third-party releases are approved, the Court should only consider doing so in connection with the confirmation of a chapter 11 plan, assuming the requisite standards for releases are satisfied.  Given the circumstances of these cases, granting any release to any DIP party in connection with the DIP Facility will be an injustice to the Committee and the creditors it represents.  Upon information and belief, the Debtors had interlocking boards of directors.  In cases where boards are interlocking and equity sponsors participate as lenders, there is good reason to fully investigate potential causes of action for recharacterization, equitable subordination, and breach of fiduciary duties.

48.    To the extent the Court is inclined to grant releases in connection with the DIP Facility, the Court should first require the Debtors to justify the proposed release and the releases should be narrowly tailored to the extent necessary and limited only to the parties actually funding the DIP Facility.

49.    Furthermore, both the Interim Order as well as the proposed second interim DIP Order provide for expansive indemnification of the DIP Agent and the New Money DIP Lenders, as well as their affiliates and related parties.  While the proposed indemnification of the New Money DIP Lenders and the DIP Agent may be appropriate, "affiliates" and other parties that provide no consideration to the Debtors should not be indemnified, for the reasons set forth above.

50.    The proposed indemnities are also inappropriate inasmuch as they indemnify the DIP Agent, the New Money DIP Lenders and their respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, controlling persons and members of each of the foregoing for expenses incurred regarding any "claim, litigation, investigation or

proceeding related to the [DIP Financing]." This expansive term would likely result in the DIP Agent and the New Money DIP Lenders invoicing the Debtors for all activities related to these cases—and certainly for responding to any Committee investigation. It is inappropriate for the estates, and therefore ultimately the creditors, to bear the burden of indemnifying the DIP Agent and the New Money DIP Lenders for the Committee's customary investigation of the prepetition liens and activities concerning the Debtors. That is a standard cost that the DIP Agent and the New Money DIP Lenders should bear in exchange for receiving the protections afforded to them under sections 364 and 361 of the Bankruptcy Code. Moreover, the DIP Agent and the New Money DIP Lenders have chosen to take an active role in these cases by proposing the DIP Facility and preserving the right of the Note Holder Purchaser to serve as the Stalking Horse Bidder (based on a credit bid) in an auction of the Debtors' assets. These choices, if approved by this Court, would inure to the benefit of the DIP Agent, the New Money DIP Lenders and/or the Note Holder Purchaser in the form of fees and interest related to the DIP Facility and the ability to set the terms of an Asset Purchase Agreement as a Stalking Horse Bidder. The process and procedures in these cases already sufficiently protect the DIP Agent and the New Money DIP Lenders without having the Debtors expend their limited resources on indemnifying them for standard fees and costs attendant to their participation in these cases.

51.     Finally, any indemnification that the Debtors provide in exchange for the DIP Facility must be limited to reasonable costs and expenses that are *not* the result of bad faith, a material breach of the DIP Facility or any similar pre- or postpetition misconduct. Under those circumstances, the costs and expenses could not be considered reasonable and the Debtors should not be obligated to provide an indemnification. As currently proposed, the indemnification is

only limited in the event of gross negligence and willful misconduct.  The Committee therefore submits that the indemnification provisions should be revised, as discussed above.

**VII.    The Proposed Budget Does not Support Funding of the Cases and is Woefully Insufficient as it Relates to Funding for the Committee's Professionals**

52.    The current form of Budget proposed by the Debtors is inadequate and does not even support the compressed sale timeline that the Debtors propose, let alone a process that will lead to the confirmation of a plan of reorganization or liquidation, the reconciliation of and/or objections to claims, and the potential prosecution of avoidance and other actions.  According to the Budget [D.I. 13, Exhibit A], at the end of 13 weeks and just after the proposed closing date of the asset sale, the Debtors will only have approximately $2 million remaining to fully administer these cases.  It is unrealistic under these circumstances for the DIP Lenders to expect that so little funding can possibly carry these cases across the finish line.  As such, the Committee believes that the estates will lack the necessary funding and the Debtors or the Committee (as the case may be) will likely be *unable* to confirm a plan, *unable* to perform any claims reconciliation, *unable* to pursue any avoidance or other causes of action that the Committee may identify, and *unable* to fund even the bare minimum costs necessary to administer these estates.  Moreover, the $2 million will be substantially reduced once the carve-out for the Committee is amended— as it must.

53.    The Debtors have commenced these cases for the benefit of their secured creditors whose goal is to side-step the state law foreclosure process.  It is well settled in this District and others that where creditors and debtors seek to use the chapter 11 process for the sole purpose of liquidating a secured creditor's collateral, that creditor must pay the "freight" by ensuring that the sale does not result in administrative insolvency.  *See, e.g., In re NEC Holdings Corp.*, Case

- 21 -

No. 10-11890 (PJW), July 13, 2010 Hearing Transcript[18] [D.I. 224] at 100 (Bankr. D. Del. July 13, 2010); *see also, In re Townsends, Inc.* Case No. 10-14092 (CSS), January 21, 2011 Hearing Transcript[19] [D.I. 338] at 23-25 (Bankr. D. Del. January 21, 2011) (stating that it is inappropriate to maintain a case that is administratively insolvent).  If the Debtors want these cases to continue under their control in chapter 11, the DIP Facility must be revised to ensure that the estates remain administratively solvent.

54.    Under the Budget, the Committee is subject to a $75,000 monthly fee and expense cap and an overall cap of less than $250,000 for <u>all</u> of the Committee's professionals (at this point comprised of lead bankruptcy counsel, local counsel and a financial advisory firm) over the first thirteen (13) weeks of these cases.  The amount of the proposed carve-out is egregious in cases of this size and will prevent the Committee from discharging its fiduciary duties.  It is well settled that an unsecured creditors' committee has a fiduciary duty to maximize unsecured creditor recoveries from a debtor's estate.  *See Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 466 (2d Cir. 2007).  As such, courts in this district have declined to approve DIP financing orders that inappropriately limit a committee's ability to discharge its fiduciary duties through unreasonable limitations placed on the fees and expenses of its retained professionals.  *See, e.g.*, Final Cash Collateral Order at 6(a), (c), *In re Evergreen Solar, Inc.*, No. 11-12590 (MFW) (Bankr. D. Del. Sept. 8, 2011) [D.I. 171] (upon the committee's objection, combining the debtors' proposed $8.2 million fee cap with the committee's proposed $50,000 fee cap and creating a joint $8.4 million cap for both sets of professionals); *see also In re Channel Master Holdings, Inc.*, 309 B.R. 855, 859-60 (Bankr. D.

---

[18] The relevant portions of the hearing transcript are attached hereto as <u>Exhibit F</u>.

[19] The relevant portions of the hearing transcript are attached hereto as <u>Exhibit G</u>.

Del. 2004) (finding a $75,000 cap on the committee's professional fees under a post-petition financing facility unreasonable).

55.     The Budget attached to the DIP Motion provides for $4,484,000 in professional fees for the initial thirteen weeks of the cases, with only less than $250,000 of this total amount being allocated for the Committee's professionals.  The discrepancy between the fees provided for professionals retained by the Debtors and their various lenders, on the one hand, and the Committee, on the other hand, is self-evident.  In addition, the Post-Carve Out Trigger Notice Cap for all professionals is currently limited to $500,000, which is also as unreasonable as it is inadequate.

56.     Moreover, it bears noting that the Debtors and the prepetition secured parties have spent "months" in prepetition negotiations leading up to the filing of these cases.[20]  In contrast, the Committee was formed on May 25, 2016, and the Committee's professionals will bear the laboring oar in these cases if anything more than turning over the Debtors' assets to the Note Holder Purchaser is to occur.

57.     Even more egregious is the total budget cap of $25,000 for the Committee to conduct its investigation of the lenders' claims.  The budget cap is ridiculously low, given the multiple layers of prepetition debt, security interests and insider relationships which must be investigated during the Challenge Period.  The absurdity of this amount is only exacerbated by the scope of the releases sought by the Debtors and the DIP Lenders (discussed *supra*) and the resulting need for the Committee to conduct a fulsome investigation.  In fact, at the first day hearing in these cases, the Court itself characterized the fees set aside for the Committee as

---

[20] *In re Constellation Enterprises LLC*, May 18, 2016 Hearing Transcript [D.I. 54] at 22:19-25, attached hereto as <u>Exhibit H</u>.

"outrageous."[21]   Indeed, in other complex cases, creditors' committees have not been subject to budgetary restrictions on their investigation of lender claims—a fundamental component of a committee's fiduciary obligations.  *See e.g., In re TOUSA, Inc.* Case No. 08-10928 (Bankr. S.D. Fla. Jan. 9, 2009) (Second Stipulated Final Order Authorizing Use of Cash Collateral) [D.I. 2355] (providing for no cap on the use of cash collateral for committee investigation); *In re Quebecor World (USA) Inc.*, Case No. 08-10152 (Bankr. S.D.N.Y. Apr. 1, 2008) (Final Order Authorizing Postpetition Secured Financing) [D.I. 470] (no limit on DIP loan funds for investigation against prepetition lenders).  For the foregoing reasons, the Committee submits that the Budget is unacceptable and will prevent the Committee from discharging its fiduciary duties in these cases.  Accordingly, it must be revised if the DIP Motion is to be approved.

## VIII.   The Milestones are Too Aggressive and Inappropriate

58.     The DIP Facility provides for aggressive Milestones related to the sale of all of the Non-Columbus Assets which, if not met, will constitute an Event of Default under the DIP Facility.  For instance, (a) an order approving the sale procedures for the Non-Columbus Assets is required to be entered by June 15, 2016, (b) Qualified Bids for the Non-Columbus Assets are required to be submitted by July 5, 2016, (c) the auction for the Non-Columbus Assets is required to commence by July 10, 2016, and (d) an order approving the sale of the Non-Columbus Assets is required to be entered by July 15, 2016.  Making this compressed time period even more troubling is the fact that there was admittedly no prepetition marketing of the Non-Columbus Assets.[22]

59.     Rather than providing the Debtors with the requisite time to conduct a well-marketed sale process designed to maximize value and return to creditors, the DIP Lenders, by

---

[21] *Id*. at 57:3, attached hereto as Exhibit I.

[22] *Id*. at 75:14-17, attached hereto as Exhibit J.

their milestones, are forcing the Debtors to engage in an illusory "process" that is designed to ensure that only the Stalking Horse Purchaser's credit bid is deemed the successful bid for the Non-Columbus Assets.

60.     The Committee has not yet had adequate time to determine if an asset sale is even in the best interest of the Debtors' estates and their creditors.  If this Court approves the DIP Facility as presented, it will require the Debtors to commence a sale process (in fact two sale motions have already been filed) irrespective of whether a sale is actually the best option for these Debtors.  The Committee believes that the Milestones are inappropriate, especially given the lack of a prepetition marketing process for the Non-Columbus Assets.  For this reason, the Committee submits that the Milestones should be extended for at least ninety (90) days so as to permit the Committee to independently evaluate the feasibility of the Milestones, and whether they are in the best interest of the Debtors and general unsecured creditors.

**B.      Miscellaneous Objectionable Provisions of the DIP Facility**

61.     In addition to the objections and necessary modifications discussed above, there are several additional provisions of the DIP Motion that the Committee objects to:

- **Challenge Period**.  The challenge period for the Committee, which is proposed to be sixty (60) days from the Committee's formation, is too short under the circumstances of these cases.  Since the Committee's formation, the Committee's professionals have been focused on the numerous issues implicated by the DIP Facility and the proposed expedited asset sales.  It is clear that many other challenges lie ahead for the Debtors which will require immediate attention. Accordingly, at a minimum, the Final Order should afford the Committee a challenge period of no less than ninety (90) days from the Committee's formation, which period should be subject to an extension, either with the consent of the secured parties or by order of the Court.  In addition, the Interim Order and Final Order do not provide that the Committee can pursue any cause of action belonging to the Debtors' estates.  In light of the highly expedited time frame proposed in these cases and the limited length of the Challenge Period, the Committee should be granted automatic standing to pursue any claims and defenses that may be determined to exist for the benefit of the Debtors' estates. Otherwise, it may be procedurally impossible for the Committee to pursue any

- 25 -

such claims and defenses before the deadline passes. Thus, the Committee should be granted automatic standing to bring any cause of action belonging to the Debtors' estates, including but not limited to, against any of the proposed Released Parties, so that the time and expense of seeking such standing are eliminated.

- **Credit Bids**.    The proposed second interim DIP Order provides that the Prepetition First Lien Notes Parties and the New Money DIP Lenders shall have the right to credit bid at any sale of the Debtors' assets. The proposed second interim DIP Order as well as any final DIP Order should provide that such rights are subject to the Committee's rights to object to any credit bid (whether it is the right to credit bid or the amount of the credit bid), including without limitation, any challenge asserted during the Challenge Period. *See In re Radnor Holdings Corp.*, 353 B.R. 820, 848 (Bankr. D. Del. 2006) (committee rights must be expressly reserved).

- **Columbus Debtors' Assets.**    The proposed second interim DIP Order provides that the Ad Hoc Group can veto any attempt by the Debtors to sell the assets held by the Columbus Debtors. The restriction impermissibly interferes with the Debtors' business judgment and duty to maximize value, and also impermissibly ties the hands of the Committee. This restriction should not be included in the proposed second interim DIP Order or any final DIP Order.

- **Adequate Protection**.    Any grant of adequate protection must be limited to actual diminution in value as a result of the imposition of the automatic stay under section 362 of the Bankruptcy Code, the use, sale or lease of property under section 363 of the Bankruptcy Code, or a grant of a lien under section 364 of the Bankruptcy Code. This diminution in value cannot be presumed, and per the proposed second interim DIP Order, it is not clear whether the diminution is *implied* from the imposition of the automatic stay and the grant of a lien under section 364 or whether it will be calculated on an *actual* basis. It must be *actual* diminution in value.

- **Marshaling Waiver**.    The proposed second interim DIP Order provides in section 22 that upon entry of the Final Order, none of the DIP Collateral, the Prepetition Collateral, the New Money DIP Lenders, the DIP Agent, the Prepetition PNC Credit Facility Secured Parties or the Prepetition First Lien Notes Parties (all as defined therein) shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine. The Committee objects to this provision as inequitable, as it would permit these parties to "cherry pick" the collateral they would liquidate, without regard for the overall value that the estates may realize. A debtor generally has standing to assert the equitable remedy of marshalling as it has the status of a hypothetical lien creditor. Should the debtor waive this right, a committee could seek to do so on a derivative basis. *See Official Comm. Of Unsecured Creditors v. Hudson United Bank (In re America's Hobby Ctr., Inc.)*, 223 B.R. 275, 287 (Bankr. S.D.N.Y. 1998) ("[S]tanding in the shoes of the debtor in possession, the Committee can assert [a marshalling] claim.").

- 26 -

- **Access to Financial Statements, Reports and Other Information**.   The Committee's professionals should receive all of the information reports provided to the secured parties pursuant to the second interim DIP Order, as well as any final DIP Order and at the same time they are provided to such other parties.

## RESERVATION OF RIGHTS

62.    The Committee submits that the DIP Lenders must agree to fund the necessary expenses required for these cases to be completed under chapter 11.   As set forth in the DIP Objection, the Committee does not believe it is appropriate to permit the secured creditors to use the chapter 11 bankruptcy process for their sole benefit, while unsecured creditors stand little, if any chance to benefit from the process.   In addition, the Committee reserves the right to raise further and other objections to the DIP Motion, and any documents related thereto including the DIP Agreement, prior to or at the interim or final hearings in the event the Committee's objections raised herein are not resolved prior to such hearing.

## CONCLUSION

**WHEREFORE**, the Committee respectfully requests that the Court deny the DIP Motion unless the DIP Facility and the Final Order are modified as set forth herein, and grant such other and further relief as the Court may deem just and proper.

Dated:  May 31, 2016
      Wilmington, DE

**SQUIRE PATTON BOGGS (US) LLP**
Norman N. Kinel (*pro hac vice* forthcoming)
Nava Hazan (*pro hac vice* forthcoming)
30 Rockefeller Plaza, 23rd Floor
New York, New York 10112
Tel:  (212) 872-9800
Fax:  (212) 872-9815
Email:    norman.kinel@squirepb.com
            nava.hazan@squirepb.com

-and-

010-8228-0689/15/AMERICAS

**SQUIRE PATTON BOGGS (US) LLP**
Karol K. Denniston (*pro hac vice* forthcoming)
275 Battery Street, Suite 2600
San Francisco, California 94111
Tel:  (415) 954-0200
Fax:  (415) 994-6686
Email:    karol.denniston@squirepb.com

*Proposed Counsel for the Official*
*Committee of Unsecured Creditors*