**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| CONSTELLATION ENTERPRISES LLC, *et al.*,[1] | ) | Case No. 16-11213 (CSS) |
| Debtors. | ) | Jointly Administered<br>**Re: Docket No. 13** |

**SECOND INTERIM ORDER (A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION SECURED FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE, (B) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (C) GRANTING ADEQUATE PROTECTION TO THE ADEQUATE PROTECTION PARTIES, (D) SCHEDULING A FINAL HEARING, AND (E) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), pursuant to sections 105, 361, 362, 363, 364 and 507 of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 2002, 4001 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), seeking entry of an interim order and a final order (a "Final Order"):

(I) authorizing each of the Debtor subsidiaries (the "Borrowers") of Constellation Enterprises LLC ("Constellation"), to obtain, and for Constellation to guarantee unconditionally (the "Guarantor") secured postpetition financing up to an aggregate principal amount of $32,891,210 (the "DIP Facility"), consisting of (a) a superpriority priming multiple draw term

[1] The debtors in these cases, along with the last four digits of the federal tax identification number for each of the debtors, where applicable are: Constellation Enterprises LLC (9571); JFC Holding Corporation (0312); The Jorgensen Forge Corporation (1717); Columbus Holdings Inc. (8155); Columbus Steel Castings Company (8153); Zero Corporation (0538); Zero Manufacturing, Inc. (8362); Metal Technology Solutions, Inc. (7203); Eclipse Manufacturing Co. (1493); and Steel Forming, Inc. (4995). The debtors' mailing address is located at 50 Tice Boulevard, Woodcliff Lakes, NJ 07677

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

loan facility including an aggregate principal amount not to exceed $15,000,000 (the "New Money DIP Loans") (the lenders of such New Money DIP Loans, the "New Money DIP Lenders") and (b) subject to entry of a Final Order, a term loan facility in the amount of $17,891,210 (the "Roll-up DIP Loans," and together with the New Money DIP Loans, the "DIP Loans"), which will be used to repay the outstanding obligations, including outstanding letters of credit, under the Prepetition PNC Credit Facility (as defined below), provided by the Prepetition PNC Credit Facility Lenders (as defined below) (the "Roll-up DIP Lenders" and together with the New Money DIP Lenders, the "DIP Lenders");

(II) authorizing and directing the Debtors to execute and deliver that certain *Senior Secured Super Priority Debtor-in-Possession Amended and Restated Credit Agreement* substantially in the form attached hereto as Exhibit A-1 (the "DIP Credit Agreement" and, together with all agreements, documents and instruments executed and delivered in connection therewith, including the First Interim Order (as defined below), as hereafter amended, supplemented, or otherwise modified from time to time in accordance with this Order (the "Second Interim Order"), including Amendment No. 1 to the DIP Credit Agreement in the form attached hereto as Exhibit A-2, or the Final Order, the "DIP Documents," each term, for the avoidance of doubt, as used with respect to any relief granted herein shall refer solely to the Interim New Money DIP Facility (defined below)), among the Debtors, the DIP Lenders and Cortland Capital Market Services LLC, as administrative and collateral agent (the "DIP Agent"), and to perform such other and further acts as may be necessary or appropriate in connection therewith;

(III) authorizing the Debtors to (a) use Cash Collateral (as such term is defined in section 363(a) of the Bankruptcy Code) to the extent required herein, and (b) provide adequate

protection, solely to the extent provided herein, to the Adequate Protection Parties (as defined herein) under: (i) that certain Financing Agreement, dated as of January 28, 2011 (as amended, amended and restated, supplemented or otherwise modified, the "Prepetition PNC Credit Agreement" and the facility documented thereunder, the "Prepetition PNC Credit Facility"), by and among the Borrowers, the guarantors party thereto, and lenders party thereto (the "Prepetition PNC Credit Facility Lenders") and PNC Bank, National Association, as administrative agent and collateral agent (the "Prepetition PNC Credit Facility Agent" and, together with the Prepetition PNC Credit Facility Lenders, the "Prepetition PNC Credit Facility Secured Parties"); (ii) that certain Amended and Restated Term Loan Agreement, dated as of January 28, 2016 (the "Prepetition DDTL Credit Agreement," and the facility documented thereunder, the "Prepetition DDTL"), by and among the Borrowers, the guarantors party thereto, the lenders party thereto (the "Prepetition DDTL Lenders"), and Private Equity Opportunities LP, as agent (the "Prepetition DDTL Agent" and together with the Prepetition DDTL Lenders, the "Prepetition DDTL Secured Parties", and together with the Prepetition PNC Credit Facility Secured Parties, the "Revolving Priority Adequate Protection Parties"); and (iii) the 11.125% First Priority Senior Secured Notes due February 1, 2018 issued by the Borrower (the "Prepetition First Lien Notes" and together with the Prepetition PNC Credit Facility and the Prepetition DDTL (as defined below), the "Prepetition Debt Facilities") under that certain Amended and Restated Indenture, dated February 1, 2016 (as amended, amended and restated, supplemented or otherwise modified, the "Prepetition First Lien Notes Indenture"), by and among Constellation, as issuer, the guarantors party thereto and Wells Fargo Bank, National Association, as trustee and collateral agent (the "Prepetition First Lien Notes Trustee" and together with the holders of the Prepetition First Lien Notes, the "Prepetition First Lien Notes

Parties" and, together with the Revolving Priority Adequate Protection Parties, the "Adequate Protection Parties"); and (c) subject to entry of the Final Order, effectuating the Roll-up DIP Loans;

(IV) authorizing the DIP Agent to exercise remedies under the DIP Documents upon the occurrence and during the continuance of an Event of Default (as defined in the DIP Credit Agreement);

(V) subject to entry of the Final Order, authorizing the Debtors to grant liens to the DIP Lenders on the proceeds of Avoidance Actions (as defined below);

(VI) subject to entry of the Final Order, waiving the Debtors' right to surcharge against the DIP Collateral (as defined below) or Prepetition Collateral (as defined below) pursuant to section 506(c) the Bankruptcy Code;

(VII) subject to entry of the Final Order, waiving any application of the "equities of the case" exception under section 552(b) of the Bankruptcy Code to with respect to proceeds, products, offspring or profits of any Prepetition Collateral, including Cash Collateral, or the DIP Collateral, as applicable;

(VIII) scheduling a final hearing (the "Final Hearing") on the Motion to consider entry of a Final Order authorizing the balance of the borrowings (including the Roll-up DIP Loans) under, and the Debtors' entry into, the DIP Credit Agreement, on a final basis and approval of notice procedures with respect thereto; and

(IX) modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of this Second Interim Order.

The first interim hearing (the "First Interim Hearing") for this Court to consider granting the relief requested in the Motion having been held by this Court on May 18, 2016; and the

second interim hearing (the "Second Interim Hearing") for this Court to consider granting the relief requested in the Motion having been held by this Court on June 1, 2016; and the Debtors having filed their *Supplement to the Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Secured Financing Pursuant to Section 364 of the Bankruptcy Code, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Adequate Protection to The Adequate Protection Parties, (D) Granting Related Relief* [D.I. 159]; and the third interim hearing (the "Third Interim Hearing") for this Court to consider entry of this Second Interim Order granting the relief requested in the Motion having been held by this Court on June 8, 2016; and upon the record made by the Debtors at the First Interim Hearing, the Second Interim Hearing and the Third Interim Hearing; and following the First Interim Hearing, this Court having entered its *Interim Order (A) Authorizing the Debtors to Obtain Postpetition Secured Financing Pursuant to Section 364 of the Bankruptcy Code, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Adequate Protection to the Adequate Protection Parties, (D) Scheduling a Final Hearing, and (E) Granting Related Relief* [D.I. 71] (the "First Interim Order"), authorizing the Debtors to borrow up to an aggregate principal amount of $3,000,000 in New Money DIP Loans provided by PNC Bank, National Association (the "PNC Interim New Money DIP Loans"); and this Court having heard and resolved or overruled all objections to the relief requested in the Motion; and it appearing that the relief requested on an interim basis in the Motion is in the best interests of the Debtors, their estates and creditors; and after due deliberation and consideration and sufficient cause appearing therefor,

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1. *The Motion.* The Motion is granted on an interim basis as set forth herein. Any objection to entry of this Second Interim Order, other than the Committee DIP Objection (as

defined below) to the extent not withdrawn or resolved is hereby overruled. Notwithstanding anything to the contrary in this Second Interim Order, entry of this Second Interim Order is without prejudice to any and all rights of the Official Committee of Unsecured Creditors appointed in these cases (the "Creditors' Committee") to object to the Motion on any grounds, including but not limited to, the grounds advanced in the *Preliminary Objection of the Official Committee of Unsecured Creditors to Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Adequate Protection to the Adequate Protection Parties, (D) Scheduling a Final Hearing, and (E) Granting Related Relief* [D.I. 117] (the "Committee DIP Objection"). The Creditors' Committee's rights to object to the Motion and the Final Order are hereby fully preserved and nothing in the First Interim Order or this Second Interim Order shall be deemed to be a waiver of any such rights.

2. *Jurisdiction.* This Court has core jurisdiction over the above-captioned chapter 11 cases commenced on May 16, 2016 (the "Petition Date"), the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3. *Notice.* Notice of the First Interim Hearing, the Second Interim Hearing and the proposed entry of this Second Interim Order has been provided to: the parties listed in paragraph 64 of the Motion. Requisite notice of the Motion and the relief requested thereby and this Second Interim Order has been provided in accordance with Bankruptcy Rules 4001(b) and (c), and no other notice need be provided for entry of this Second Interim Order.

4. *Debtors' Stipulations (Prepetition PNC Credit Facility Obligations).* The Debtors admit, stipulate, and agree that:

(a) As of the Petition Date, the Debtors were unconditionally indebted and liable to the Prepetition PNC Credit Facility Secured Parties, without defense, counterclaim or offset of any kind, for all of the obligations under the Prepetition PNC Credit Agreement (and together with all security, pledge and guaranty agreements and all other documentation executed in connection with the Prepetition PNC Credit Agreement, each as supplemented, or otherwise modified, the "Prepetition PNC Credit Facility Documents"), in the aggregate principal amount of $17,891,210 in respect of loans outstanding thereunder, exclusive of accrued and unpaid interest, premium (if any), and certain fees, costs, expenses, charges and all other obligations incurred in connection therewith as provided by the Prepetition PNC Credit Facility Documents (the "Prepetition PNC Credit Facility Obligations");

(b) The Prepetition PNC Credit Facility Obligations are secured by (i) first priority security interests in and liens (the "Prepetition PNC Credit Facility First Priority Liens") in the Revolving Priority Collateral (as defined in the 2011 Intercreditor Agreement (as defined below)); (ii) a super-priority security interest in and liens in the Fixed Asset Collateral ((as defined in the 2011 Intercreditor Agreement) and together with the Revolving Priority Collateral, the "Prepetition Collateral") with respect to all loans made pursuant to the Prepetition PNC Credit Agreement during the period commencing on May 9, 2016 through and including May 16, 2016 (the "Prepetition PNC Credit Facility Super-Priority Liens") and (iii) a second priority security interest in and liens (the "Prepetition PNC Credit Facility Second Priority Liens" and, together with the

Prepetition PNC Credit Facility First Priority Liens and the Prepetition PNC Credit Facility Super-Priority Liens, the "Prepetition PNC Credit Facility Liens") in the Fixed Asset Priority Collateral (as defined in the 2011 Intercreditor Agreement) with respect to all loans made pursuant to the Prepetition PNC Credit Agreement during all times prior to May 9, 2016;

(c) The Prepetition PNC Credit Facility Obligations constitute the legal, valid, binding, non-avoidable obligations of each of the Debtors, and the Prepetition PNC Credit Facility Liens are valid, binding, perfected, non-avoidable liens and security interests in the Prepetition Collateral;

(d) (i) no portion of the Prepetition PNC Credit Facility Obligations, the Prepetition PNC Credit Facility Documents, and the transactions contemplated thereby is subject to contest, attack, objection, recoupment, defense, setoff, counterclaim, avoidance, recharacterization, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined by section 101(5) of the Bankruptcy Code), impairment, or subordination (whether equitable, contractual, or otherwise) or other challenge of any kind pursuant to the Bankruptcy Code or applicable nonbankruptcy law (including without limitation, under sections 502(d) or 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law); and (ii) the Debtors do not have any claims, challenges, counterclaims, causes of action, defenses, recoupment, disgorgement, or setoff rights related to the Prepetition PNC Credit Facility Obligations or the Prepetition PNC Credit Facility Documents, whether arising under the Bankruptcy Code or applicable nonbankruptcy law, on or prior to the date hereof, against

Prepetition PNC Credit Facility Secured Parties, and the Debtors each irrevocably waive, for themselves, and their subsidiaries, any right to challenge or contest in any way the validity, perfection, priority, extent and enforceability of the Prepetition PNC Credit Facility Liens or the validity, priority, extent or enforceability of the Prepetition PNC Credit Facility Obligations and the Prepetition PNC Credit Facility Documents. The Prepetition PNC Credit Facility Obligations constitute allowed claims for all purposes between and against the Debtors' estates, and none of the Prepetition PNC Credit Facility Secured Parties are required to file a proof of claim with regard to the Prepetition PNC Credit Facility Obligations or the Prepetition PNC Credit Facility Liens. Any order entered by the Court in relation to the establishment of a bar date for any claims (including administrative expense claims) in any of these chapter 11 cases or subsequent chapter 7 or chapter 11 cases (each, a "Successor Case") shall not apply to the Prepetition PNC Credit Facility Secured Parties with respect to the Prepetition PNC Credit Facility Obligations (including the Prepetition PNC Credit Facility Liens);

5. *Debtors' Stipulations (Prepetition First Lien Notes Obligations).* The Debtors admit, stipulate, and agree that:

(a) As of the Petition Date, the Debtors were unconditionally indebted and liable to the Prepetition First Lien Notes Parties, without defense, counterclaim or offset of any kind, for all of the obligations under the Prepetition First Lien Notes Indenture (and together with all security, pledge and guaranty agreements and all other documentation executed in connection with the Prepetition First Lien Notes Indenture, each as supplemented, or otherwise modified, the "Prepetition First Lien Notes Documents" and, together with the Prepetition PNC Credit Facility Documents and the

Prepetition DDTL Credit Agreement (together with all security, pledge and guaranty agreements and all other documentation executed in connection with the Prepetition DDTL Credit Agreement, each as supplemented, or otherwise modified), the "Prepetition Debt Facilities Documents"), in the aggregate principal amount of $129,597,000, in respect of loans outstanding thereunder, exclusive of accrued and unpaid interest, premium (if any), and certain fees, costs, expenses, charges and all other obligations incurred in connection therewith as provided by the Prepetition PNC Credit Facility Documents (the "Prepetition First Lien Notes Obligations");

(b) The Prepetition First Lien Notes Obligations are secured by (i) first priority security interests in and liens (the "Prepetition First Lien Notes First Priority Liens") in the Fixed Asset Priority Collateral, but which security interests and liens are junior and subordinate to the Prepetition PNC Credit Facility Super-Priority Liens and (ii) second priority security interests in and liens (the "Prepetition First Lien Notes Second Priority Liens" and together with the Prepetition First Lien Notes First Priority Liens, the "Prepetition First Lien Notes Liens") in the Revolving Priority Collateral;

(c) The Prepetition First Lien Notes Obligations constitute the legal, valid, binding, non-avoidable obligations of each of the Debtors, and the Prepetition First Lien Notes Liens are valid, binding, perfected, non-avoidable liens and security interests in the Prepetition Collateral;

(d) (i) no portion of the Prepetition First Lien Notes Obligations, the Prepetition First Lien Notes Documents, and the transactions contemplated thereby is subject to contest, attack, objection, recoupment, defense, setoff, counterclaim, avoidance, recharacterization, reclassification, reduction, disallowance, recovery,

disgorgement, attachment, "claim" (as defined by section 101(5) of the Bankruptcy Code), impairment, or subordination (whether equitable, contractual, or otherwise) or other challenge of any kind pursuant to the Bankruptcy Code or applicable nonbankruptcy law (including without limitation, under sections 502(d) or 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law); and (ii) the Debtors do not have any claims, challenges, counterclaims, causes of action, defenses, recoupment, disgorgement, or setoff rights related to the Prepetition First Lien Notes Obligations or the Prepetition First Lien Notes Documents, whether arising under the Bankruptcy Code or applicable nonbankruptcy law, on or prior to the date hereof, against Prepetition First Lien Notes Parties, and the Debtors each irrevocably waive, for themselves, and their subsidiaries, any right to challenge or contest in any way the validity, perfection, priority, extent and enforceability of the Prepetition First Lien Notes Liens or the validity, priority, extent or enforceability of the Prepetition First Lien Notes Obligations and the Prepetition First Lien Notes Documents. The Prepetition First Lien Notes Obligations constitute allowed claims for all purposes between and against the Debtors' estates, and none of the Prepetition First Lien Notes Parties is required to file a proof of claim with regard to the Prepetition First Lien Notes Obligations or the Prepetition First Lien Notes Liens. Any order entered by the Court in relation to the establishment of a bar date for any claims (including administrative expense claims) in any of these chapter 11 cases or any Successor Case shall not apply to the Prepetition First Lien Notes Parties with respect to the Prepetition First Lien Notes Obligations (including the Prepetition First Lien Notes Liens);

6. *Findings Regarding the Interim New Money DIP Facility and the Use of Prepetition Collateral.*

(a) The Debtors require the DIP Facility, solely with respect to the Interim New Money DIP Loans (as defined below) (the "Interim New Money DIP Facility"), *inter alia*, for (i) the payment of certain prepetition amounts (including prepetition payments to "critical vendors") pursuant to orders of the Court authorizing such payments, (ii) general corporate purposes, (iii) to pay administrative expenses for goods and services received in the ordinary course of business following the Petition Date, and (iv) to pay costs and expenses of administering the chapter 11 cases, in each of the foregoing cases solely to the extent as permitted by the DIP Documents and the Budget (as defined below), and (v) to pay fees and expenses and other obligations arising from the Interim New Money DIP Facility and as set forth in the DIP Documents.

(b) The Debtors are unable to obtain financing on more favorable terms and conditions, both with regard to the Interim New Money DIP Facility itself as well as with regard to support for the Debtors' overall restructuring efforts, from sources other than the New Money DIP Lenders pursuant to, and for the purposes set forth in, the DIP Documents. The Debtors are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors are also not able to obtain credit secured by a lien allowable only under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without granting the New Money DIP Lenders the DIP Liens (as defined below) on the terms and conditions set forth in this Second Interim Order and the DIP Documents. In addition, the Debtors are unable to obtain credit for borrowed money without the Debtors granting to the New Money DIP Lenders claims entitled to the benefits of sections 364(c)(1) and 503(b), having a super-priority over any

and all administrative expenses ("Superpriority Claims") related to all obligations under the Interim New Money DIP Facility, subject only to the Carve-Out (as defined below), on the terms and conditions set forth in this Second Interim Order and the DIP Documents.

(c)     The New Money DIP Lenders have indicated a willingness to provide financing to the Debtors subject to entry of this Second Interim Order, and conditioned upon the entry of the Final Order, including findings that such financing is essential to the Debtors' estates, the New Money DIP Lenders are extending credit to the Debtors as set forth in the DIP Documents in good faith, and that the Superpriority Claims, security interests, liens, rights and other protections granted to the New Money DIP Lenders and the DIP Agent will have the protections provided in section 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument or reconsideration of this Second Interim Order, the Final Order or any other order.

(d)     All of the Debtors have received and will receive fair and reasonable consideration in exchange for access to the Interim New Money DIP Facility and all other financial accommodations provided under the DIP Documents and this Second Interim Order, each with respect to the Interim New Money DIP Facility. The terms of the DIP Documents, with respect to the Interim New Money DIP Facility, are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

(e)     The terms of the DIP Documents, with respect to the Interim New Money DIP Facility, and the use of the Prepetition Collateral, including the Cash Collateral,

including, without limitation, the interest rates and fees applicable, and intangible factors relevant thereto, are more favorable to the Debtors than those available from alternative sources. Based upon the record before the Court, the DIP Documents, with respect to the Interim New Money DIP Facility, have been negotiated in good faith and at arm's-length among the Debtors, the New Money DIP Lenders, and the DIP Agent. The Interim New Money DIP Facility and other financial accommodations made to the Debtors by the DIP Agent and the New Money DIP Lenders pursuant to the DIP Documents, the First Interim Order and this Second Interim Order (solely as it relates to the Interim New Money DIP Facility, the "DIP Obligations") shall be deemed to have been extended by the DIP Agent and the New Money DIP Lenders in good faith, as that term is used in sections 363(m) and 364(e) of the Bankruptcy Code, and in express reliance upon the protections set forth therein, and the DIP Agent and the New Money DIP Lenders shall be entitled to all protections afforded thereby.

(f) Good cause has been shown for immediate entry of this Second Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2). The authorization granted herein to enter into the DIP Documents, to continue using Cash Collateral and to obtain funds under the Interim New Money DIP Facility, including on a priming basis as set forth herein, is necessary to avoid immediate and irreparable harm to the Debtors and their estates. Entry of this Second Interim Order is in the best interests of the Debtors, their estates and creditors because it will, among other things, allow for access to the financing necessary for the Debtors to, among other things, maintain business relationships with vendors, suppliers, customers and other parties, permit the orderly

continuation of their businesses and pay for certain costs and expenses related to the Debtors' chapter 11 cases.

7. *Authorization of the Interim New Money DIP Facility and the DIP Documents.*

(a) The Debtors were by the First Interim Order and are hereby expressly authorized and empowered to execute and deliver and, upon such execution and delivery, to perform under the DIP Documents with respect to the Interim New Money DIP Facility, including the DIP Credit Agreement, subject to and in accordance with the terms of this Second Interim Order.

(b) Upon entry of this Second Interim Order, the Borrowers are hereby authorized to borrow, and the Guarantor is hereby authorized to Guarantee, additional borrowings (in addition to the amounts borrowed pursuant to the First Interim Order) up to an aggregate principal amount of $5,500,000 in New Money DIP Loans (the "Additional Interim New Money DIP Loans" and, together with the PNC Interim New Money DIP Loans, the "Interim New Money DIP Loans") (plus interest, fees and other expenses and amounts provided for in the DIP Credit Agreement), which shall be provided by certain New Money DIP Lenders (the "Additional Interim New Money DIP Lenders"), subject to and in accordance with the terms of this Second Interim Order and the DIP Documents.

(c) In accordance with the terms of this Second Interim Order and the DIP Credit Agreement, proceeds of the Interim New Money DIP Loans shall be used solely for the purposes permitted under the DIP Credit Agreement, this Second Interim Order and the Budget, plus permitted variances as set forth in the DIP Documents.

(d) In furtherance of the foregoing and without further approval of this Court, each Debtor was by the First Interim Order and is hereby authorized to perform all acts (and to the extent such acts have already occurred, such acts are hereby ratified) and to execute and deliver all instruments and documents that the DIP Agent determines to be reasonably required or necessary for the Debtors' performance of their obligations under the DIP Documents with respect to the Interim New Money DIP Facility including, without limitation:

(i) the execution, delivery and performance of the DIP Documents with respect to the Interim New Money DIP Facility;

(ii) the non-refundable payment to the DIP Agent, or the New Money DIP Lenders, as the case may be, of the fees, expenses, indemnification obligations and other amounts set forth in the DIP Documents;

(iii) the performance of all other acts required under or in connection with the DIP Documents with respect to the Interim New Money DIP Facility.

(e) The DIP Documents, with respect to the Interim New Money DIP Facility, constitute valid and binding obligations of the Debtors, enforceable against the Debtors in accordance with the terms of this Second Interim Order and the DIP Documents. No obligation, payment, transfer or grant of security by the Debtors under the DIP Documents, this Second Interim Order, each with respect to the Interim New Money DIP Facility, shall be subject to contest, attack, objection, recoupment, defense, setoff, counterclaim, avoidance, recharacterization, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined by section 101(5) of the Bankruptcy Code), impairment, or subordination (whether equitable, contractual, or

otherwise) or other challenge of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law (including without limitation, under sections 502(d) or 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law).

8. *Budget*. Attached as Exhibit B hereto and incorporated by reference herein is the 13-week budget setting forth the Debtors' projected receipts, disbursements and accrued Professional Fees (as defined below) (the "Budget"). Subject to the permitted variances as set forth in the DIP Documents, the use of proceeds of the Interim New Money DIP Facility and Cash Collateral shall in all cases be used solely in accordance with this Second Interim Order, the Budget and any permitted variances. The consent of the DIP Agent and the Required New Money Lenders (as defined in the DIP Credit Agreement) to the Budget shall not be construed as consent to the use of any Cash Collateral or New Money DIP Loans after the occurrence of an Event of Default (as defined in the DIP Documents), regardless of whether the aggregate funds shown on the Budget have been expended. The Debtors shall have an obligation to deliver, on or prior to the third business day after (i) the end of every week, a Variance Report (as defined in the DIP Credit Agreement), and (ii) the end of every other week, an updated Budget for the rolling 13-week period commencing with the first day of the week in which such delivery occurs, which updated Budget must be approved by the Required New Money Lenders pursuant to the terms of the DIP Documents in their sole discretion. Notwithstanding anything herein to the contrary, but subject to the entry of the Final Order, with respect to the updated Budget to be delivered on or prior to the third business day after the tenth week covered by the initial Budget, delivery of an updated Budget that is not satisfactory to the Required New Money Lenders, each

in their sole discretion, at such time shall constitute an Event of Default under the Interim New Money DIP Facility.

9. *DIP Superpriority Claims.* Subject only to the payment of the Carve-Out (as defined below), as security for and on account of the DIP Obligations, the New Money DIP Lenders are hereby granted an allowed superpriority administrative expense claim pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code (the "<u>DIP Superpriority Claim</u>"). The DIP Superpriority Claim shall be an allowed claim against each of the Debtors (jointly and severally) with priority over any and all administrative expenses and all other claims asserted against the Debtors now existing or hereafter arising of any kind whatsoever, including all other administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all other administrative expenses or other claims arising under any other provision of the Bankruptcy Code, including sections 105, 326, 327, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment; <u>provided</u> that the DIP Superpriority Claim will have recourse to proceeds of Avoidance Actions (as defined below) only upon entry of the Final Order.

10. *DIP Liens.* As security for the DIP Obligations, effective and perfected (i) upon the date of the First Interim Order with respect to the PNC Interim New Money DIP Loans and (ii) upon the date this Second Interim Order with respect to the Additional Interim New Money DIP Loans, and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Agent or the New Money DIP Lenders of, or over, any DIP Collateral (as defined below), the following security interests and

liens are hereby granted by the Debtors to the DIP Agent, for the benefit of the DIP Agent and the New Money DIP Lenders (all property identified in clauses (a), (b) and (c) below being collectively referred to as the "DIP Collateral"), in all cases subject to the payment of the Carve-Out (all such liens and security interests granted to the DIP Agent, for the benefit of the New Money DIP Lenders, pursuant to this Second Interim Order, and the DIP Documents, the "DIP Liens").

(a) *First Priority Lien on Unencumbered Collateral.* Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected, first priority senior security interest, and security interest in, all previously unencumbered property, whether now owned or hereafter acquired or existing and wherever located, of each Debtor and each Debtor's "estate" (as created pursuant to section 541(a) of the Bankruptcy Code), of any kind or nature whatsoever, real or personal, tangible or intangible, and now existing or hereafter acquired or created, including, without limitation, all cash, accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor, other equity or ownership interests, money, investment property, causes of action arising under chapter 5 of the Bankruptcy Code ("Avoidance Actions"), including the proceeds or

property recovered in connection with the pursuit of such claims (upon entry of the Final Order), Cash Collateral, and all cash and non-cash proceeds, rents, products, substitutions, accessions, and profits of any of the collateral described above, documents, vehicles, intellectual property, securities, partnership or membership interests in limited liability companies and capital stock, including, without limitation, the products, proceeds and supporting obligations thereof, whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever located, which in each case is not subject to (x) valid, perfected, unavoidable, and enforceable liens in existence on or as of the Petition Date or (y) valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date solely to the extent permitted by section 546(b) of the Bankruptcy Code; provided, however, the DIP Liens provided by this paragraph 10(a) on account of the PNC Interim New Money DIP Loans shall be senior to the DIP Liens provided by this paragraph 10(a) on account of the Additional Interim New Money DIP Loans.

(b) *DIP Liens on Encumbered Collateral (PNC Interim New Money DIP Loans).* Pursuant to section 364(d)(1) of the Bankruptcy Code, solely with respect to the PNC Interim New Money DIP Loans, a valid, binding, continuing, enforceable, fully-perfected, first priority senior priming security interest in and lien upon all property (including the Revolving Priority Collateral and Fixed Asset Priority Collateral), except as otherwise set forth herein, whether now owned or hereafter acquired or existing and wherever located, of each Debtor and each Debtor's "estate" (as created pursuant to section 541(a) of the Bankruptcy Code), of any kind or nature whatsoever, real or personal, tangible or intangible, and now existing or hereafter acquired or created,

including, without limitation, all cash, accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor, other equity or ownership interests, money and investment property.

(c) *DIP Liens on Encumbered Collateral (Additional Interim New Money DIP Loans).* Pursuant to section 364(d)(1) of the Bankruptcy Code, solely with respect to the Additional Interim New Money DIP Loans, a valid, binding, continuing, enforceable, fully-perfected, first priority senior priming security interest in and lien upon all property other than Revolving Priority Collateral (including Fixed Asset Priority Collateral), except as otherwise set forth herein, whether now owned or hereafter acquired or existing and wherever located, of each Debtor and each Debtor's "estate" (as created pursuant to section 541(a) of the Bankruptcy Code), of any kind or nature whatsoever, real or personal, tangible or intangible, and now existing or hereafter acquired or created, including, without limitation, all cash, accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims,

securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor, other equity or ownership interests, money and investment property; provided, however, and notwithstanding anything herein to the contrary, the DIP Liens securing Additional Interim New Money DIP Loans provided by this paragraph 10(c) shall be junior to (x) the Prepetition PNC Credit Facility Super-Priority Liens and (y) the DIP Liens securing the PNC Interim New Money DIP Loans. For the avoidance of doubt and purposes of clarity, there shall be no DIP Liens granted on the Revolving Priority Collateral pursuant to this paragraph 10(c).

(d) *DIP Liens Junior to Certain Other Liens (Additional Interim New Money DIP Loans).* Pursuant to section 364(c)(3) of the Bankruptcy Code, solely with respect to the Additional Interim New Money DIP Loans, a valid, binding, continuing, enforceable fully-perfected junior security interest in and lien upon the Revolving Priority Collateral, that is junior to (i) the DIP Liens securing the PNC Interim New Money DIP Loans, (ii) the Prepetition PNC Credit Facility First Priority Liens, (iii) any valid, perfected and unavoidable security interests and liens which secure the Prepetition DDTL (the "Prepetition DDTL First Priority Liens") and (iv) any Revolving Party Adequate Protection Liens (as defined below).

(e) *DIP Liens Junior to Certain Other Liens (All Interim New Money DIP Loans).* Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable fully-perfected security interest in and lien upon all property, whether now owned or hereafter acquired or existing and wherever located, of each

Debtor and each Debtor's "estate" (as created pursuant to section 541(a) of the Bankruptcy Code), that is subject to valid, perfected and unavoidable liens in existence immediately prior to the Petition Date that are senior to the liens securing the Prepetition Debt Facilities or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by Bankruptcy Code section 546(b) that are senior to the liens securing the Prepetition Debt Facilities, which security interests and liens in favor of the DIP Agent are junior to such valid, perfected unavoidable liens.

(f) For purposes hereof, the "Carve-Out" shall mean the sum of (i) all fees required to be paid to the clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate, or such other amount as agreed to with the U.S. Trustee or ordered by the Court; (ii) fees and expenses of up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) to the extent allowed at any time, whether by interim order or otherwise, all unpaid fees and expenses (excluding any transaction fees or success fees) (the "Professional Fees") incurred prior to the delivery of a Carve-Out Trigger Notice (as defined below) by persons or firms ("Debtors' Professionals") retained by the Debtors pursuant to section 327, 328 or 363 of the Bankruptcy Code and the Creditors' Committee (together with the Debtors' Professionals, the "Professional Persons") appointed in the Bankruptcy Cases pursuant to section 1103 of the Bankruptcy Code, subject to a monthly cap of $175,000 on fees incurred by Professional Persons retained by the Creditors' Committee; and (iv) Professional Fees of Professional Persons in an aggregate amount not to exceed $500,000 (the "Post-Carve Out Trigger Notice Cap") incurred after the first business day following

delivery by the DIP Agent of the Carve-Out Trigger Notice (as defined below), to the extent allowed at any time, whether by interim order or otherwise; provided, however, that nothing herein shall be construed to impair the ability of any party to object to the reasonableness of any fees, expenses, reimbursement or compensation described in clauses (iii) or (iv) above, on any grounds. "Carve-Out Trigger Notice" means written notice delivered by the DIP Agent to the Debtors and their lead counsel, the United States Trustee, and lead counsel to the Creditors' Committee, which notice may be delivered following the occurrence of a Default or Event of Default (in each case, as defined in the DIP Credit Agreement) under the DIP Documents, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

11. *Allocation of Net Cash Proceeds.* Prior to payment in full, in cash of all Prepetition PNC Credit Facility Obligations and all obligations owed to PNC Bank, National Association under the DIP Facility (the "PNC Obligations"), the allocation of the amount of Net Cash Proceeds (as defined in the DIP Credit Agreement) received by the DIP Agent in connection with any Disposition (as defined in the DIP Credit Agreement) of assets of the Debtors as between the Revolving Priority Collateral and the Fixed Asset Priority Collateral (the "Proceeds Allocation"), shall be determined by the Required Lenders in a commercially reasonable manner; provided that (a) the DIP Agent shall file the notice on the docket disclosing the Proceeds Allocation within two (2) business days of such determination (the "Allocation Notice"), (b) the Prepetition DDTL Secured Parties shall have the right to seek an appropriate remedy, including disgorgement, with respect to any dispute regarding the Proceeds Allocation within ten (10) business days of filing of the Allocation Notice (which deadline may be extended by agreement of the parties) and (c) in any dispute regarding the Proceeds Allocation, the

Prepetition DDTL Secured Parties shall have the burden of establishing that the Proceeds Allocation was not determined in a commercially reasonable manner. Following payment in full, in cash of all PNC Obligations, any subsequent allocation of Net Cash Proceeds (the "Subsequent Proceeds Allocation") shall be determined in a commercially reasonable manner by the Prepetition DDTL Secured Parties and the Additional Interim New Money DIP Lenders; provided that in the event of any dispute between the Prepetition DDTL Secured Parties, the Additional Interim New Money DIP Lenders and, as applicable, the Prepetition First Lien Notes Parties regarding such Subsequent Proceeds Allocation, such allocation shall be subject to further order of the Court.

12. *Remedies upon Event of Default.* The Debtors shall promptly provide notice to the DIP Agent (with a copy to counsel for the Creditors' Committee and the U.S. Trustee) of the occurrence of any Event of Default. Upon the occurrence of an Event of Default and following the giving of seven (7) business days' written notice (the "DIP Enforcement Notice") to the Debtors, counsel for the Creditors' Committee and the U.S. Trustee (the "DIP Notice Period"), the New Money DIP Lenders and the DIP Agent may exercise any remedies, subject to the Carve-Out, available to them under this Second Interim Order, the DIP Documents, and applicable non-bankruptcy law, including but not limited to foreclosing upon the DIP Collateral or otherwise enforcing the DIP Obligations and the DIP Liens on any or all of the DIP Collateral and/or exercising any other default-related remedies under the DIP Credit Agreement, this Second Interim Order, or applicable law in seeking to recover payment of the DIP Obligations. Unless the Court orders otherwise during the DIP Notice Period (unless such period may be extended by the Court), the automatic stay pursuant to section 362 of the Bankruptcy Code shall be automatically terminated at the end of the DIP Notice Period, without further notice or order

of the Court, and the New Money DIP Lenders and the DIP Agent shall be permitted to exercise all rights and remedies set forth in Second Interim Order, the DIP Documents, and as otherwise available at law without further order or application or motion to the Court, and without restriction or restraint by any stay under section 362 or 105 of the Bankruptcy Code.

13. *Use of Cash Collateral.* The Debtors were, by the First Interim Order, and are hereby authorized to use all Cash Collateral, but solely for the purposes set forth in this Second Interim Order and in accordance with the Budget, from the date of this Second Interim Order through and including the date of the Final Hearing; provided that the Adequate Protection Parties are granted adequate protection as hereinafter set forth and, except on the terms and conditions of this Second Interim Order, the Debtors shall be enjoined and prohibited from at any time using the Cash Collateral. Notwithstanding anything to the contrary in the Prepetition PNC Credit Facility Documents, including, without limitation, Section 4.02 of the Prepetition PNC Credit Agreement, (a) PNC Bank, National Association ("PNC") shall not debit, or sweep from, any account of the Debtors held at PNC to apply any Cash Collateral to satisfy any Prepetition PNC Credit Facility Obligations, or any other prepetition or postpetition obligations to the Prepetition PNC Credit Facility Secured Parties, without further order of this Court and (b) all Cash Collateral held at PNC at any time shall be deposited into the operating account(s) of the Debtors held at PNC to be used by the Debtors only for the purposes expressly permitted by, and in accordance with, this Second Interim Order, the DIP Documents and the Budget.

14. *Entitlement to Adequate Protection.* The Adequate Protection Parties are entitled to adequate protection of their interests in the Revolving Priority Collateral and Fixed Asset Priority Collateral, as applicable, as of the Petition Date in an amount equal to the postpetition diminution in the aggregate value of such interests from and after the Petition Date (each such

diminution, a "Diminution in Value") resulting from the (a) imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, (b) the use, sale or lease of property under section 363 of the Bankruptcy Code, or (c) a grant of a lien under section 364 of the Bankruptcy Code. All distributions made on account of, and liens and security interests granted in connection with, the Adequate Protection Obligations (as defined below) shall be made and applied in accordance with (i) the Prepetition Debt Facilities Documents, (ii) that certain Intercreditor Agreement dated as of January 28, 2011, by and among, the Prepetition PNC Credit Facility Agent, the Prepetition DDTL Agent and the Prepetition First Lien Notes Trustee (as amended, amended and restated, supplemented or otherwise modified, the "2011 Intercreditor Agreement") and (iii) that certain Intercreditor Agreement, dated as of September 17, 2015, by and among the Prepetition PNC Credit Facility Agent, the Prepetition DDTL Agent, the Company and the other loan parties thereto (as amended, amended and restated, supplemented or otherwise modified, the "2015 Intercreditor Agreement" and together with the 2011 Intercreditor Agreement, the "Intercreditor Agreements"). The Adequate Protection Parties shall be granted the following forms of adequate protection (the "Adequate Protection Obligations"):

(a) Superpriority Adequate Protection Claim. An allowed superpriority administrative expense claim pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code as provided for by section 507(b) of the Bankruptcy Code on account of any Diminution in Value (the "Adequate Protection Claim"). Subject and junior in priority in all respects only to the Carve-Out and the DIP Superpriority Claim, the Adequate Protection Claim shall be an allowed claim against each of the Debtors (jointly and severally) with priority over any and all administrative expenses and all other claims asserted against the Debtors now existing or hereafter arising of any kind whatsoever,

including all other administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all other administrative expenses or other claims arising under any other provision of the Bankruptcy Code, including sections 105, 326, 327, 328, 330, 331, 503(b), 507(a), 507(b), or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment. Except to the extent expressly set forth in this Second Interim Order, the Adequate Protection Parties shall not receive or retain any payments, property, or other amounts in respect of any 507(b) claims unless and until all DIP Obligations shall have indefeasibly been paid in full in cash or otherwise satisfied in a manner acceptable to the New Money DIP Lenders.

(b) Adequate Protection Liens (Revolving Priority Adequate Protection Parties). As security for the Adequate Protection Claim, the Revolving Priority Adequate Protection Parties are hereby granted, effective and perfected upon the date of the First Interim Order and without the necessity of the execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements or other agreements, additional and replacement security interests in and liens (collectively, the "Revolving Priority Adequate Protection Liens") upon all of the DIP Collateral subject and subordinate only to (i) the Carve-Out, (ii) with respect to DIP Collateral that is Revolving Priority Collateral, the DIP Liens securing the PNC Interim New Money DIP Loans, (iii) with respect to DIP Collateral that is Fixed Asset Collateral, (w) the DIP Liens securing the PNC Interim New Money DIP Loans, (x) the Prepetition PNC-Super Priority Liens, (y) the DIP Liens securing the Additional New Money DIP Loans and (z) the Prepetition First Lien Notes Adequate Protection Liens and (iv) with respect to DIP Collateral that is

neither Revolving Priority Collateral nor Fixed Asset Priority Collateral, the DIP Liens securing both the PNC Interim New Money DIP Loans and the Additional Interim New Money DIP Loans.

(c) Adequate Protection Liens (Prepetition First Lien Notes Parties). As security for the Adequate Protection Claim, the Prepetition First Lien Notes Parties are hereby granted, effective and perfected upon the date of the First Interim Order and without the necessity of the execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements or other agreements, additional and replacement security interests in and liens (collectively, the "Prepetition First Lien Notes Adequate Protection Liens" and, together with Revolving Priority Adequate Protection Liens, the "Adequate Protection Liens") upon all of the DIP Collateral subject and subordinate only to (i) the Carve-Out, (ii) with respect to DIP Collateral that is Revolving Priority Collateral, (v) the DIP Liens securing the PNC Interim New Money DIP Loans, (w) the Prepetition PNC Credit Facility First Priority Liens, (x) the Prepetition DDTL First Priority Liens (y) the Revolving Priority Adequate Protection Liens and (z) the DIP Liens securing the Additional New Money DIP Loans, (iii) with respect to DIP Collateral that is Fixed Asset Collateral, (x) the DIP Liens securing the PNC Interim New Money DIP Loans, (y) the Prepetition PNC-Super Priority Liens and (z) the DIP Liens Securing the Additional New Money DIP Loans and (iv) with respect to DIP Collateral that is neither Revolving Priority Collateral nor Fixed Asset Priority Collateral, the DIP Liens securing both the PNC Interim New Money DIP Loans and the Additional Interim New Money DIP Loans.

(d) Fees and Expenses. As additional adequate protection, the Debtors are authorized to pay, within ten (10) calendar days after the delivery of invoices (which invoices may be in redacted form to protect privileged and other confidential information) to the Debtors, the Office of the United States Trustee and the Creditors' Committee, but without the necessity of filing motions or fee applications, all reasonable and documented fees and expenses payable to the Prepetition PNC Credit Facility Secured Parties and the Prepetition First Lien Notes Parties, including, but not limited to, the fees and expenses of one lead counsel and one local counsel for each of: (i) the Prepetition PNC Credit Facility Agent, (ii) the Prepetition First Lien Notes Trustee and (iii) the ad hoc group of unaffiliated holders of the Prepetition First Lien Notes (the "Ad Hoc Group"), including with respect to any such amounts arising before and after the Petition Date; provided that the Ad Hoc Group reserves the right to retain the services of a financial advisor in its sole discretion and the reasonable and documented fees and expenses of any such financial advisor shall also be paid as additional adequate protection. The obligations of the Debtors under the preceding sentence shall have equal priority to the Adequate Protection Claim and shall be secured by the Adequate Protection Liens.

(e) Consent for Sale of Fixed Asset Collateral if the Columbus Debtors. Subject to entry of the Final Order, as additional adequate protection, there shall be no sale of any Fixed Asset Collateral of Columbus Holdings Inc. and Columbus Steel Castings Company without the consent of the Ad Hoc Group.

(f) Credit Bidding. Subject to the entry of the Final Order, the Prepetition First Lien Notes Trustee (on behalf of the Prepetition First Lien Notes Parties) shall have

the right to credit bid up to the full amount of the Prepetition First Lien Notes Obligations in the sale of any Fixed Asset Priority Collateral, including, without limitation, pursuant to (i) section 363 of the Bankruptcy Code, (ii) a plan of reorganization or a plan of liquidation under section 1129 of the Bankruptcy Code, or (iii) a sale or disposition by a chapter 7 trustee for any Debtor under section 725 of the Bankruptcy Code; provided, however, that prior to effectuating the Roll-up DIP Loans, the foregoing shall be subject to the payment in full in cash of any amounts then outstanding that are secured by any Prepetition PNC Credit Facility Super-Priority Liens and the PNC Interim New Money DIP Loans.

(g) Right to Seek Additional Adequate Protection. This Second Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Adequate Protection Parties to request additional forms of adequate protection in the event the DIP Credit Agreement is terminated, or the rights of all parties to oppose such relief.

15. *Release*. Subject to entry of the Final Order and to paragraph 19 hereof, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of each of their predecessors, their successors, and assigns (collectively, the "Releasors") shall to the maximum extent permitted by applicable law, unconditionally, irrevocably and fully forever release, remise, acquit, relinquish, irrevocably waive and discharge each of the New Money DIP Lenders, the DIP Agent, the Prepetition PNC Credit Facility Secured Parties, the Prepetition First Lien Notes Parties, and each of their respective former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in

interest (collectively, the "Releases"), each in their capacity as such, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description that exist on the date hereof relating to any of the (a) Prepetition Debt Facilities, or the transactions contemplated under Prepetition Debt Facilities Documents and (b) the DIP Documents or the transactions contemplated under such documents, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under title 11 of the United States Code, and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection or avoidability of the liens or claims of the Prepetition PNC Credit Facility Secured Parties and the Prepetition First Lien Notes Parties.

16. *Termination.* The Debtors' right to use the Prepetition Collateral, including Cash Collateral, and proceeds of the New Money DIP Loans pursuant to this Second Interim Order shall automatically terminate (the date of any such termination, the "Termination Date") (unless such period is extended by the New Money DIP Lenders) on the occurrence of any of the events set forth below (unless waived by the New Money DIP Lenders) (the events set forth below are collectively referred to herein as the "Termination Events"):

(a) the Debtors' failure to comply with, timely pay, or timely perform, as the case may be, the adequate protection provisions or the covenants and other Adequate Protection Obligations of the Debtors contained in this Second Interim Order; and

(b) any Event of Default under the DIP Documents, as it relates to the Interim New Money DIP Facility, that is not waived by the Required DIP Lenders (as defined in the DIP Credit Agreement). Notwithstanding anything to the contrary in the DIP Documents, the failure by the Debtors to timely achieve the Milestones shall be an Event of Default only upon entry of the Final Order.

17. *Perfection of DIP Liens and Adequate Protection Liens.*

(a) Without regard to the terms of section 362 of the Bankruptcy Code regarding the automatic stay, the DIP Agent was by the Interim Order and is hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments in any jurisdiction in order to validate and perfect the liens and security interests granted on account of the DIP Liens and the Adequate Protection Obligations hereunder. Whether or not the DIP Agent shall, in its respective sole discretion, file such financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute, subordination, contest, attack, objection, recoupment, defense, setoff, counterclaim, avoidance, recharacterization, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined by section 101(5) of the Bankruptcy Code), impairment, subordination (whether equitable, contractual or otherwise) or other challenge of any kind pursuant to the Bankruptcy Code or applicable

non-bankruptcy law as of the date of entry of the First Interim Order or this Second Interim Order, as applicable. If the DIP Agent determines to file any financing statements, notice of liens or similar instruments, the Debtors will cooperate and assist in any such filings as reasonably requested by the DIP Agent and the automatic stay shall be modified to allow such filings.

(b) The DIP Agent may, in its discretion, cause a certified copy of this Second Interim Order to be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Second Interim Order for filing and recording.

(c) The Debtors shall execute and deliver to the DIP Agent all such agreements, financing statements, instruments and other documents as the DIP Agent may reasonably request to evidence, confirm, validate, or perfect the DIP Liens and the Adequate Protection Liens, as applicable.

18. *Preservation of Rights Granted Under this Second Interim Order.*

(a) Notwithstanding any order dismissing any of these chapter 11 cases under section 1112 of the Bankruptcy Code or otherwise entered at any time, but subject to the Carve-Out in all respects, (x) the DIP Liens, the DIP Superpriority Claim, the Adequate Protection Liens, and the other administrative claims granted pursuant to this Second Interim Order shall continue in full force and effect and shall maintain their priorities as provided in this Second Interim Order until all DIP Obligations and the Adequate Protection Obligations shall have been indefeasibly paid and satisfied in full in cash, as applicable, and (y) this Court shall retain jurisdiction, notwithstanding such dismissal, for

the purposes of enforcing the claims, liens, and security interests referred to in clause (x) above.

(b) If any or all of the provisions of this Second Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacatur shall not affect: (i) the validity, perfection, priority, extent or enforceability of the DIP Liens or DIP Obligations or any Adequate Protection Obligations incurred or granted prior to the actual receipt of written notice by counsel to the DIP Agent (with respect to the DIP Obligations) and counsel to the Adequate Protection Parties, of the effective date of such reversal, stay, modification or vacatur; or (ii) the validity, perfection, priority, extent or enforceability of the DIP Liens and the Adequate Protection Liens, as applicable. Notwithstanding any such reversal, stay, modification or vacatur, any use of the Prepetition Collateral (including the Cash Collateral), the DIP Liens, or the Adequate Protection Obligations incurred or granted by the Debtors hereunder, as the case may be, prior to the actual receipt of written notice by counsel to the DIP Agent (with respect to the DIP Obligations) and counsel to the Adequate Protection Parties (with respect to the Adequate Protection Obligations) of the effective date of such reversal, stay, modification or vacatur shall be governed in all respects by the original provisions of this Second Interim Order, and the New Money DIP Lenders, the DIP Agent, and the Adequate Protection Parties shall be entitled to all of the rights, remedies, privileges and benefits granted in section 363(m) of the Bankruptcy Code with respect to all uses of the Prepetition Collateral (including the Cash Collateral), all Adequate Protection Obligations, and the DIP Obligations.

(c) Except as expressly provided in the First Interim Order or this Second Interim Order, and subject to the Carve-Out, the DIP Liens and the Adequate Protection Liens and all other rights and remedies of the New Money DIP Lenders and the Adequate Protection Parties granted by the provisions of the First Interim Order and this Second Interim Order shall survive, and shall not be modified, impaired, or discharged by the entry of an order converting any of these chapter 11 cases to a case under chapter 7 of the Bankruptcy Code or dismissing any of these chapter 11 cases. The terms and provisions of the First Interim Order and this Second Interim Order shall continue in these chapter 11 cases and in any Successor Cases, and the DIP Liens and the Adequate Protection Liens, the DIP Superpriority Claim, and the other administrative claims granted pursuant to this Second Interim Order, and all other rights and remedies of the DIP Agent, the New Money DIP Lenders, and the Adequate Protection Parties granted by the provisions of this Second Interim Order shall continue in full force and effect.

19. *Effect of Stipulations*. The Debtors' acknowledgments, stipulations, waivers and releases set forth in the First Interim and this Second Interim Order shall be binding on the Debtors and their respective representatives, successors, and assigns and, subject to any action timely commenced before the expiration of the Challenge Period (as defined below) by: (x) the Creditors' Committee; or (y) a party in interest with requisite standing other than the Creditors' Committee, on each of the Debtors' estates, all creditors thereof and each of their respective representatives, successors, and assigns, including any trustee appointed or elected for any of the Debtors, whether such trustee or representative is appointed in chapter 11 or chapter 7 (a "Trustee"). The stipulations and admissions contained in this Second Interim Order shall be binding upon all other parties in interest, including any Trustee, unless (a) the Creditors'

Committee or any other party in interest (including any Trustee), in each case, with requisite standing, has (1) duly filed an adversary proceeding or (2) initiated a contested matter in compliance with the Bankruptcy Code and Bankruptcy Rules challenging the validity, perfection, priority, extent or enforceability of the Prepetition Debt Facilities or otherwise asserting or prosecuting any Avoidance Actions or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "Claims and Defenses") against the Prepetition PNC Credit Facility Secured Parties or the Prepetition First Lien Notes Parties in connection with any matter related to the Prepetition Debt Facilities by no later than (i) 75 days following the date of entry of the First Interim Order for any party other than the Creditors' Committee, and (ii) 60 days following the date of formation of the Creditors' Committee for the Creditors' Committee (the time period established by the foregoing clauses (i) and (ii), the "Challenge Period"); provided, however, that in the event that, prior to the expiration of the Challenge Period, (x) these chapter 11 cases are converted to chapter 7 or (y) a chapter 11 trustee is appointed in these chapter 11 cases, then, in each such case, the Challenge Period shall be extended for a period of 60 days solely with respect to any Trustee, commencing on the occurrence of either of the events described in the foregoing (x) and (y); and (b) an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the plaintiff sustaining any such challenge or claim in any such duly filed adversary proceeding. If no such adversary proceeding is timely filed or no contested matter is initiated in compliance with the Bankruptcy Code and Bankruptcy Rules prior to the expiration of the Challenge Period, without further order of this Court (x) the obligations under the Prepetition PNC Credit Facility Documents and the Prepetition First Lien Notes Documents shall constitute allowed claims, not subject to any Claims and Defenses (whether characterized as a counterclaim, setoff,

subordination, recharacterization, defense, avoidance, contest, attack, objection, recoupment, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined by section 101(5) of the Bankruptcy Code), impairment, subordination (whether equitable, contractual or otherwise), or other challenge of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law), for all purposes in these chapter 11 cases and any subsequent chapter 7 case, if any; and (y) the Prepetition PNC Credit Facility Secured Parties and the Prepetition First Lien Notes Parties shall not be subject to any other or further challenge and any party in interest shall be enjoined from seeking to exercise the rights of the Debtors' estates, including any successor thereto (including any estate representative or a Trustee, whether such Trustee is appointed or elected prior to or following the expiration of the Challenge Period). If any such adversary proceeding is timely filed prior to the expiration of the Challenge Period, the stipulations and admissions contained in the First Interim Order and this Second Interim Order shall nonetheless remain binding and preclusive on the Creditors' Committee and any other party in these cases, including any Trustee, except as to any such findings and admissions that were expressly and successfully challenged in such adversary proceeding. Nothing in this Second Interim Order vests or confers on any party, including a Creditors' Committee or Trustee, standing or authority to pursue any cause of action belonging to the Debtors or their estates. Upon a successful challenge, the Court may fashion an appropriate remedy.

20. *Limitation on Charging Expenses Against Collateral.* Subject to entry of the Final Order, (a) no costs or expenses of administration of these chapter 11 cases, any Successor Cases or any other future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral, the Prepetition Collateral or the Cash Collateral pursuant to

section 506(c) of the Bankruptcy Code or any similar principle of law or equity without the prior written consent of the DIP Agent, the New Money DIP Lenders, the Prepetition PNC Credit Facility Secured Parties or the Prepetition First Lien Notes Parties, as applicable and (b) no such consent or waiver shall be implied from any further action, inaction, or acquiescence by the DIP Agent, the New Money DIP Lenders, the Prepetition PNC Credit Facility Secured Parties or the Prepetition First Lien Notes Parties.

21. *Limitations under Section 552(b) of the Bankruptcy Code*. Subject to entry of the Final Order, the DIP Agent, the New Money DIP Lenders, the Prepetition PNC Credit Facility Secured Parties and the Prepetition First Lien Notes Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Agent, the New Money DIP Lenders, the Prepetition PNC Credit Facility Secured Parties or the Prepetition First Lien Notes Parties with respect to proceeds, products, offspring or profits of any of the Prepetition Collateral, including the Cash Collateral, or the DIP Collateral, as applicable.

22. *Credit Bidding*. Subject to and upon entry of this Second Interim Order: (i) the New Money DIP Lenders shall have the right to credit bid as part of any asset sale process or plan sponsorship process and shall have the right to credit bid the full amount of their claims arising under the Interim New Money DIP Facility during any sale of the Debtors' assets (in whole or in part), including without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code; and (ii) the Debtors acknowledge that the New Money DIP Lenders shall have the right to credit bid as part of any asset sale process or plan sponsorship process and shall have the right to credit bid the full amount of their claims

arising under the Interim New Money DIP Facility during any sale of the Debtors' assets (in whole or in part), including without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code; provided that such relief will be binding on the Debtors' estates and all parties in interest upon entry of the Final Order.

23. *Marshaling*. Subject to entry of the Final Order, none of the DIP Collateral, the Prepetition Collateral, the New Money DIP Lenders, the DIP Agent, the Prepetition PNC Credit Facility Secured Parties or the Prepetition First Lien Notes Parties shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine.

24. *Information and Other Covenants*. The Debtors shall comply with all affirmative and negative covenants, and reporting requirements as set forth in the DIP Credit Agreement, as it relates to the Interim New Money DIP Facility, together with such additional information requests as the DIP Agent may reasonably make from time to time. The Creditors' Committee shall be considered a notice party and receive all notices and communications provided for under the DIP Credit Agreement, the First Interim Order, this Second Interim Order and the Final Order to the following addresses: Squire Patton Boggs (US) LLP, 30 Rockefeller Center, New York, New York 10112 Attn: Norman N. Kinel (norman.kinel@squirepb.com) and 275 Battery Street, Suite 2600 San Francisco, California 94111, Attn: Karol K. Denniston (karol.denniston@squirepb.com).

25. *Expenses and Indemnification*.

(a) All (i) reasonable and documented out-of-pocket expenses (including but not limited to reasonable legal fees and expenses of outside counsel, local counsel and financial advisors (collectively the "DIP Professionals") of the DIP Agent and the New

Money DIP Lenders in connection with the preparation, execution and delivery, administration, amendment, waiver or modification (including proposed amendments, waivers or modifications) of the Interim New Money DIP Facility and the transactions contemplated thereby and (ii) reasonable and documented out-of-pocket expenses (including, without limitation, fees, disbursements and other charges of DIP Professionals) of the DIP Agent and the New Money DIP Lenders, for enforcement costs and documentary taxes associated with the Interim New Money DIP Facility and the transactions contemplated thereby are to be paid by the Debtors. All fees and expenses described above shall be payable by the Debtors (whether accrued or incurred prior to, on, or after the Petition Date) within ten (10) calendar days after the delivery of invoices (which invoices may be in redacted form to protect privileged and confidential information) to the Debtors, the Office of the United States Trustee and the Creditors' Committee, but without the necessity of filing motions or fee applications.

(b) In addition, the Debtors will indemnify the New Money DIP Lenders, the DIP Agent and their respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, controlling persons and members of each of the foregoing (each an "Indemnified Person") and hold them harmless from and against all reasonable and documented out-of-pocket costs, expenses (including but not limited to reasonable and documented legal fees and expenses) and liabilities arising out of or relating to the transactions contemplated hereby and any actual or proposed use of the proceeds of any loans made under the Interim New Money DIP Facility; provided, however, that no such person will be indemnified for costs, expenses or liabilities to the extent determined by a final, non-appealable judgment of a court of competent

jurisdiction to have been incurred by reason of the gross negligence or willful misconduct of such person (or their related persons). No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the Debtors or any shareholders or creditors of the Debtors for or in connection with the transactions contemplated hereby, except to the extent such liability is found in an final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Person's gross negligence or willful misconduct, and in no event shall any Indemnified Person be liable on any theory of liability for any special, indirect, consequential or punitive damages.

26.    *Limitation on Use of the Interim New Money DIP Facility, the DIP Collateral, and the Prepetition Collateral (Including the Cash Collateral).*  The Debtors shall use the Interim New Money DIP Facility and the Prepetition Collateral, including the Cash Collateral, solely as provided in the First Interim Order, this Second Interim Order, the Budget, and the DIP Documents. Notwithstanding anything herein or in any other order of this Court to the contrary, neither the Interim New Money DIP Facility, the DIP Collateral, the Cash Collateral, nor the Carve-Out may be used to (a) object, contest, or raise any defense to, the validity, perfection, priority, extent or enforceability of any amount due under the DIP Documents, the Prepetition PNC Credit Facility Documents, the Prepetition First Lien Notes Documents or the liens or claims granted under the First Interim Order or this Second Interim Order, (b) assert any Claims and Defenses or any other causes of action against the DIP Agent, the New Money DIP Lenders, the Prepetition PNC Credit Facility Secured Parties, the Prepetition First Lien Notes Parties or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors, (c) prevent, hinder or otherwise delay the DIP Agent's, the  New Money DIP Lenders',

the Prepetition PNC Credit Facility Secured Parties' or the Prepetition First Lien Notes Parties' assertion, enforcement, or realization on the Prepetition Collateral or DIP Collateral in accordance with the DIP Documents, the PNC Credit Facility Documents, the Prepetition First Lien Notes Documents, the First Interim Order or this Second Interim Order, (d) seek to modify any of the rights granted to the DIP Agent, the New Money DIP Lenders or the Adequate Protection Parties hereunder or under the DIP Documents, the PNC Credit Facility Documents or the Prepetition First Lien Notes Documents, in the case of each of the foregoing clauses (a) through (d), without such party's prior written consent or (e) pay any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an order of this Court and (ii) permitted under the DIP Documents and the Budget; provided, however, that notwithstanding anything to the contrary herein, the Debtors shall not be authorized to use the Interim New Money DIP Facility, DIP Collateral or the Cash Collateral to pay fees or expenses in excess of $50,000 in the aggregate (the "Investigation Budget") for the Creditors' Committee to investigate (but not prepare, initiate or prosecute) Claims and Defenses against the Prepetition PNC Credit Facility Secured Parties or the Prepetition First Lien Notes Parties before the termination of the Challenge Period.

27. *No Standing Granted.* Nothing in the First Interim Order or this Second Interim Order vests or confers on any person (as defined in the Bankruptcy Code), including the Creditors' Committee or any other statutory committee appointed in these chapter 11 cases, standing or authority to pursue any Claims and Defenses or other causes of action belonging to the Debtors or their estates with respect to Prepetition PNC Credit Facility or the Prepetition First Lien Notes or any obligations arising thereof.

28. *Binding Effect; Successors and Assigns.* The provisions of this Second Interim Order, the DIP Credit Agreement, and the DIP Documents shall be binding upon all parties in interest in the Debtors' chapter 11 cases and any Successor Cases, including the New Money DIP Lenders, the Adequate Protection Parties, the Creditors' Committee, the Debtors and their respective successors and assigns (including any Trustee hereinafter appointed or elected for the estates of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agent, the New Money DIP Lenders and the Adequate Protection Parties; provided, however, that except to the extent expressly set forth in this Second Interim Order, the Adequate Protection Parties shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors. In determining to make any loan (whether under the DIP Credit Agreement or otherwise), to permit the use of Cash Collateral or in exercising any rights or remedies as when permitted pursuant to this Second Interim Order or the DIP Documents, the DIP Agent, the New Money DIP Lenders and the Adequate Protection Parties shall not (i) be deemed to be in control of the operations of the Debtors or (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates.

29. *Modifications of New Money DIP Facility.* The Debtors and the New Money DIP Lenders are hereby authorized to implement, in accordance with the terms of the DIP Documents, any non-material modifications (including without limitation, any change in the number or composition of the New Money DIP Lenders or the DIP Agent) of the DIP Documents (other than this Second Interim Order and the Final Order) upon notice to the

Creditors' Committee and the U.S. Trustee, but without motion or application to, order of or hearing before, this Court. Any material modification or amendment to the DIP Documents shall only be permitted pursuant to an order of this Court, after being submitted to this Court upon notice to counsel for the Creditors' Committee, the U.S. Trustee, the Adequate Protection Parties and any other party required by the Bankruptcy Rules; provided, however, that any forbearance from, or waiver of, (a) a breach by the Debtors of a covenant representation or any other agreement or (b) a Default or an Event of Default, in each case under the DIP Documents shall not require an order of this Court.

30. *Limitation of Liability*. In determining to make any loan under the DIP Credit Agreement or in exercising any rights or remedies as and when permitted pursuant to this Second Interim Order, the New Money DIP Loans or the Prepetition Debt Facilities, the DIP Agent, the New Money DIP Lenders, the Prepetition PNC Credit Facility Secured Parties and the Prepetition First Lien Notes Parties shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute). Furthermore, nothing in this Second Interim Order, the New Money DIP Loans, or the Prepetition Debt Facilities shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the New Money DIP Lenders, the Prepetition PNC Credit Facility Secured Parties or the Prepetition First Lien Notes Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors.

31. *Rights Reserved.* Notwithstanding anything herein to the contrary, no term or provision of this Second Interim Order or the Budget shall prejudice the rights or interests of any party in interest with respect to the Intercreditor Agreements or the rights of offset or recoupment of any party.

32. *Choice of Law; Jurisdiction.* The Interim New Money DIP Facility and DIP Documents (and the rights and obligations of the parties thereto) shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York, including, without limitation, Sections 5-1401 and 5-1402 of the New York General Obligations Law, and, to the extent applicable, the Bankruptcy Code. The Court shall have exclusive jurisdiction with respect to any and all disputes or matters under, or arising out of or in connection with, either the Interim New Money DIP Facility or New Money DIP Loans.

33. *Controlling Effect of Second Interim Order.* To the extent any provision of this Second Interim Order conflicts or is inconsistent with any provision of the Motion, the First Interim Order, the DIP Documents or the New Money DIP Facility, the provisions of this Second Interim Order shall control.

34. *Jurisdiction.* This Court shall retain jurisdiction to enforce the terms of this Second Interim Order and to adjudicate any and all matters arising from or related to the interpretation or implementation of this Second Interim Order.

35. *Final Hearing.* The Final Hearing shall be heard before The Honorable Christopher S. Sontchi on June 15, 2016 at 10:00 a.m. in Courtroom 5 on the 6th Floor of the United States Bankruptcy Court, 824 North Market Street, Wilmington, DE 19801.

36.    *Objections.*  Any objections or responses to entry of the Final Order shall be filed

on or before 4:00 p.m., prevailing Eastern Time, on June 8, 2016, and shall be served on:  (a) the

Debtors, 50 Tice Boulevard, Suite 340, Woodcliff Lakes, NJ 07677, Attn:  Donald MacKenzie

(dmackenzie@conwaymackenzie.com); (b) counsel to the Debtors, Kramer Levin Naftalis &

Frankel LLP, 1777 Avenue of the Americas, New York, New York, 10036, Attn:  Adam Rogoff

and Joseph A. Shifer (arogoff@kramerlevin.com; jshifer@kramerlevin.com); (c) co-counsel to

the Debtors, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street,

Wilmington, Delaware 19801, Attn: Daniel J. DeFranceschi (defranceschi@rlf.com); (d) counsel

to PNC, Hahn & Hessen LLP, 488 Madison Avenue, New York, New York 10022 Attn:  Joshua

I. Divack (jdivack@hahnhessen.com); (e) counsel to the Prepetition DDTL Lenders, Fried,

Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, New York 10004

Attn:    Gary    C.    Kaplan    (gary.kaplan@friedfrank.com)    and    Matthew    M.    Roose

(matthew.roose@friedfrank.com); (g) counsel to the DIP Agent, New Money DIP Lenders and

Ad Hoc Group, Akin Gump Strauss Hauer & Feld, 1333 New Hampshire Avenue NW,

Washington, DC 20036 Attn: Scott L. Alberino (salberino@akingump.com) and One Bryant

Park, New York, New York Attn: Jason P. Rubin (jrubin@akingump.com); (h) co-counsel to the

DIP Agent, New Money DIP Lenders and Ad Hoc Group, Young Conaway Stargatt & Taylor,

LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn: M. Blake

Cleary; (i) counsel to the Creditors' Committee, Squire Patton Boggs (US) LLP, 30 Rockefeller

Center, New York, New York 10112 Attn: Norman N. Kinel (norman.kinel@squirepb.com) and

275 Battery Street, Suite 2600 San Francisco, California 94111, Attn: Karol K. Denniston

(karol.denniston@squirepb.com); and (j) Office of The United States Trustee, 844 King Street,

Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Linda Casey (linda.casey@usdoj.gov). In the event no objections to entry of the Final Order are timely received, this Court may enter such Final Order without need for the Final Hearing.

Dated: June 9, 2016
Wilmington, Delaware

THE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY JUDGE

112022324 v2