## Exhibit 1

## Bidding Procedures

## Constellation Enterprises LLC
### Bidding Procedures[1]

## INTRODUCTION

Constellation Enterprises LLC and certain of its subsidiaries (collectively, the "Debtors")[2] are debtors-in-possession in chapter 11 cases (jointly administered under Case No. 16-11213 (CSS)) pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

By the Sale Motion, the Debtors sought approval of, among other things, the procedures (the "Bidding Procedures") by which they may solicit and select the highest or otherwise best offer for the sale of substantially all or a portion of CSC's assets (the "Assets")[3] either through one sale to a Successful Bidder (as defined below) or multiple sales to multiple Successful Bidders.

On June 15, 2016, the Bankruptcy Court entered an order (the "Bidding Procedures Order"), which, among other things, approved the Bidding Procedures set forth below pursuant to which the Debtors will solicit bids for the purchase of substantially all or a portion of their Assets.

## KEY DATES

These Bidding Procedures provide interested parties with the opportunity to complete diligence, to submit competing bids for all or a portion of the Assets, and to participate in an auction to be conducted by the Debtors (the "Auction").

The key dates for the sale process are as follows:

| | |
|---|---|
| July 1, 2016 | Date by which Debtor May Designate Stalking Horse Bidder and Enter into Stalking Horse Agreement |
| July 11, 2016 at 5:00 p.m. (prevailing Eastern Time) | Deadline to submit bids |

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Debtors' Motion for Entry of (I) an Order Authorizing the Sale of CSC's Assets to the Private Sale Purchaser or, in the Alternative, (II) (A) an Order Establishing Bidding Procedures and Granting Related Relief and (B) an Order Approving the Sale of CSC's Assets* [D.I. 87] (the "Sale Motion").

[2] The debtors in these cases, along with the last four digits of the federal tax identification number for each of the debtors, where applicable are:  Constellation Enterprises LLC (9571); JFC Holding Corporation (0312); The Jorgensen Forge Corporation (1717); Columbus Holdings Inc. (8155); Columbus Steel Castings Company (8153); Zero Corporation (0538); Zero Manufacturing, Inc. (8362); Metal Technology Solutions, Inc. (7203); Eclipse Manufacturing Co. (1493); and Steel Forming, Inc. (4995).  The debtors' mailing address is located at 50 Tice Boulevard, Suite 340, Woodcliff Lakes, NJ  07677.

[3] For the avoidance of doubt, the "Assets" subject to the Sale Motion and the Bidding Procedures do not include any of the assets being sold pursuant to the *Debtors' Motion for (I) an Order Establishing Bidding Procedures and Granting Related Relief and (II) an Order Approving the Sale of the Assets* [D.I. 88].

| July 14, 2016 at 10:00 a.m. (prevailing Eastern Time) | Auction (if necessary) |

| July 18, 2016 at 4:00 p.m. (prevailing Eastern Time) | Deadline to object to the Sale to the Successful Bidder, including adequate assurance of future performance |
| July 22, 2016 at 11:00 a.m. (prevailing Eastern Time) | Hearing on approval of the Sale to the Successful Bidder |
| August 22, 2016 at 5:00 p.m. (prevailing Eastern Time) | Outside Closing Date[4] |

## PURCHASE AGREEMENT

Pursuant to a purchase agreement, in substantially the form attached hereto as Exhibit 1 (with any ancillary agreements thereto or contemplated thereby, the "Purchase Agreement"), and to the maximum extent permitted by section 363 of the Bankruptcy Code, the Successful Bidder shall acquire all or a portion of the Assets, free and clear of any and all claims, liens, encumbrances and other interests, subject to certain other conditions.

## ACCESS TO DEBTORS' DILIGENCE MATERIALS

To receive access to due diligence materials and to participate in the bidding process, an interested party must submit to the Debtors or already be bound by (i) an executed confidentiality agreement in form and substance satisfactory to the Debtors, and (ii) a statement that such party has a bona fide interest in purchasing and the financial ability to purchase all or some of the Assets.

A party who, in the Debtors' reasonable discretion, satisfies the requirements set forth in the immediately preceding sentence for receiving access to diligence materials shall be a "Diligence Party." As promptly as practicable after the Debtors determine that a party is a Diligence Party, the Debtors will deliver to the Diligence Party access to the Debtors' confidential electronic data room. The Debtors will afford any Diligence Party the time and opportunity to conduct reasonable due diligence before the Bid Deadline (as defined below). Notwithstanding the foregoing, the Debtors reserve the right to withhold any diligence materials that the Debtors determine are sensitive or otherwise not appropriate for disclosure to a Diligence Party who the Debtors determine is a competitor of the Debtors or is affiliated with any competitor of the Debtors. Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be a Diligence Party. The Debtors shall not exclude a party from diligence who has complied with subsections (i) and (ii) of the preceding paragraph, unless they have first consulted with the Consultation Parties (as defined below) regarding such determination.

All due diligence requests must be directed to:

---

[4] Consistent with the Bid Assessment Criteria (as defined below), the Debtors, when determining whether a Bid is the highest and best Bid, will ascribe value to a proposed closing date that is earlier than August 22, 2016.

RLF1 14646374v.1

Erich Hobelmann
Senior Vice President
Tel: 212.351.9764
ehobelmann@imperialcapital.com
Imperial Capital, LLC
277 Park Avenue, 48th Floor
New York, NY 10172

Each Diligence Party and Qualified Bidder (as defined below) shall comply with all reasonable requests for additional information and due diligence access by the Debtors or their advisors regarding such Bidder and its contemplated transaction. Failure by a Diligence Party to comply with requests for additional information and due diligence access may be a basis for the Debtors to determine, in consultation with the Consultation Parties, that such bidder is not a Qualified Bidder. Failure by a Qualified Bidder to comply with requests for additional information and due diligence access may be a basis for the Debtors to determine, in consultation with the Consultation Parties, that a bid made by such Qualified Bidder is not a Qualified Bid. The Debtors reserve the right, in their discretion and in consultation with the Consultation Parties, to permit a Diligence Party or Qualified Bidder to remedy any such failure to comply.

## INDICATIONS OF INTEREST

The Debtors reserve the right, in consultation with the Consultation Parties, to require Diligence Parties to submit written indications of interest specifying, among other things, the Assets proposed to be acquired, the amount and type of consideration to be offered, and any other material terms to be included in a bid by such party. A Diligence Party that fails to comply with any such request by the Debtors, in the Debtors' discretion and in consultation with the Consultation Parties, may not be provided further diligence access or be permitted to participate further in the auction process. The Debtors also reserve the right to exclude any Diligence Party (prior to its submission of a Qualified Bid) from continuing in the auction process if the Debtors determine, in consultation with the Consultation Parties, that the consideration proposed to be paid by such Diligence Party is insufficient.

## AUCTION QUALIFICATION PROCESS

To be eligible to participate in the Auction, each offer, solicitation, or proposal (each, a "Bid"), and each party submitting such a Bid (each, a "Bidder") must satisfy each of the conditions set forth below, as determined by the Debtors. A Bid will not be considered qualified for the Auction if such Bid does not satisfy each of the following conditions:

(a) Good Faith Deposit: Each Bid for all or a portion of the Assets must be accompanied by a deposit (a "Good Faith Deposit") submitted by wire transfer of immediately available funds to an account identified by the Debtors. Each Good Faith Deposit must equal the amount of five percent (5%) of the "Purchase Price" contained in the Modified Purchase Agreement (as defined below). For purposes of calculating the amount of the Good Faith Deposit, the Purchase Price shall include the value of any liabilities being assumed pursuant to such Bid, with such

amount being determined by the Debtors in consultation with the Consultation Parties.

(b)  Bids for Portions of the Assets:  A Bid may offer to purchase all or substantially all of the Debtors' Assets or only a portion of the Assets.  The Debtors may, in consultation with the Consultation Parties, waive or modify the application of the Qualified Bid conditions in respect of Bids for a portion of the Assets, including, *inter alia*, the amount of the Good Faith Deposit.

(c)  Same or Better Terms:  To the extent a Stalking Horse Bidder is selected, each subsequent Bid for any Assets subject to the Stalking Horse Agreement (alone or combined with Bids for other Assets subject to the Stalking Horse Agreement) must be on terms that, in the Debtors' business judgment, in consultation with the Consultation Parties, are the same or better than the terms of the Stalking Horse Agreement.

(d)  Executed Agreement:  Each Bid must be based on the Purchase Agreement and must include executed transaction documents, signed by an authorized representative of such Bidder, pursuant to which the Bidder proposes to effectuate a sale transaction for the Assets (a "Sale Transaction").  A Bid shall also include a copy of the modified Purchase Agreement (the "Modified Purchase Agreement") marked against the Purchase Agreement attached hereto to show all changes requested by the Bidder (including those related to purchase price).

(e)  Designation of Assigned Contracts and Leases, Payment of Cure Amounts:  A Bid must identify any and all executory contracts and unexpired leases of CSC that the Bidder wishes to have assumed and assigned to it at closing and provide for the payment of all cure amounts payable with respect to such contracts and leases under the Bankruptcy Code.

(f)  Corporate Authority:  A Bid must include written evidence reasonably acceptable to the Debtors demonstrating appropriate corporate authorization to consummate the proposed Sale Transaction, *provided* that, if the Bidder is an entity specially formed for the purpose of effectuating the Sale Transaction, then the Bidder must furnish written evidence reasonably acceptable to the Debtors of the approval of the Sale Transaction by the equity holder(s) of such Bidder.

(g)  Disclosure of Identity of Bidder:  A Bid must fully disclose the identity of each entity that will be bidding for or purchasing the Assets or otherwise participating in connection with such Bid (including any equity holder or other financial backer if the Bidder is an entity specifically formed for the purpose of effectuating the Sale Transaction), and the complete terms of any such participation, including any binding agreements, arrangements, or understandings concerning a collaborative or joint bid or any other combination concerning the proposed Bid.

(h)  Proof of Financial Ability to Perform:  A Bid must include written evidence that the Debtors reasonably conclude, in consultation with their advisors and the

4

Consultation Parties (as defined below), demonstrates that the Bidder has the necessary financial ability to (i) close the Sale Transaction and (ii) provide adequate assurance of future performance under all contracts to be assumed and assigned in such Sale Transaction. Such information must include, *inter alia*, the following:

(1)    contact names and numbers for verification of financing sources;

(2)    evidence of the Bidder's internal resources and proof of unconditional debt funding commitments from a recognized financial institution and, if applicable, equity commitments in an aggregate amount equal to the cash portion of such Bid (including, if applicable, the Bidder's payment of cure amounts) or the posting of an irrevocable letter of credit from a recognized banking institution issued in favor of the Debtors in such amount, in each case, as are needed to close the Sale Transaction;

(3)    the Bidder's current financial statements (audited if they exist) or other similar financial information reasonably acceptable to the Debtors; and

(4)    any such other form of financial disclosure or credit-quality support information or enhancement reasonably requested by the Debtors, in consultation with the Consultation Parties, demonstrating that such Bidder has the ability to close the Sale Transaction.

(i)    Regulatory and Third Party Approvals:  A Bid must set forth each regulatory and third-party approval required for the Bidder to consummate the Sale Transaction, if any, and the time period within which the Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the Modified Purchase Agreement, those actions the Bidder will take to ensure receipt of such approval(s) as promptly as possible).

(j)    Contingencies:  Unless otherwise agreed by the Debtors, in consultation with the Consultation Parties, each Bid may not be conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence.

(k)    Irrevocable:  Each Bid must expressly provide that (1) the Bidder is prepared to consummate the transaction set forth in the Modified Purchase Agreement promptly following entry of the Sale Order and satisfaction of the closing conditions (if any) set forth in the Modified Purchase Agreement, and (2) the offer reflected in such Bid shall remain open and irrevocable until the conclusion of the Auction, provided that if such Bid is accepted as the Successful Bid or the Backup Bid (each as defined herein), such Bid shall continue to remain open and irrevocable as provided under "Closing the Auction; Successful Bidder" and "Backup Bidder" below.

(l)    Bid Deadline:  Each Bid must be received by each of the following parties, in writing, on or before July 11, 2016 at 5:00 p.m. (prevailing Eastern Time) (the

5

"Bid Deadline"): (a) the Debtors, 50 Tice Boulevard, Suite 340, Woodcliff Lakes, NJ 07677, Attn.: Donald S. MacKenzie (dmackenzie@conwaymackenzie.com); (b) counsel to the Debtors, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York, 10036, Attn:    Adam Rogoff (arogoff@kramerlevin.com); (c) co-counsel to the Debtors, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington Delaware 19801, Attn:    Daniel J. DeFranceschi (defranceschi@rlf.com); (d) financial advisors to the Debtors, Imperial Capital, LLC, 277 Park Avenue, 48th Floor, New    York,    NY    10172,    Attn:    Erich    Hobelmann (ehobelmann@imperialcapital.com); (e) counsel to the Roll-up DIP Lenders, Hahn & Hessen LLP, 488 Madison Avenue, New York, New York 10002 Attn: William C. Robertson (wrobertson@hahnhessen.com); (f) counsel to the DIP Lenders, Akin Gump Strauss Hauer & Feld, 1333 New Hampshire Avenue NW, Washington, DC 20036 Attn: Scott L. Alberino (salberino@akingump.com) and One    Bryant    Park,    New    York,    Attn:    Jason    P.    Rubin (jrubin@akingump.com); and (g) proposed counsel to the Committee, Squire Patton Boggs, 30 Rockefeller Plaza, New York, New York 10112, Attn: Norman N. Kinel (norman.kinel@squirepb.com).

A Bid received from a Bidder on or before the Bid Deadline that meets the requirements set forth above for the applicable Assets shall constitute a "Qualified Bid" for such Assets, and such Bidder shall constitute a "Qualified Bidder" for such Assets.

## STALKING HORSE BIDS

Subject to the provisions set forth herein and in consultation with the Consultation Parties, the Debtors reserve the right, at any time before July 1, 2016, to enter into a purchase agreement, in substantially the form of the Purchase Agreement (the "Stalking Horse Agreement"), subject to higher or otherwise better offers at the Auction, with any of the potential bidders (the "Stalking Horse Bidder"), to establish a minimum Qualified Bid at the Auction. The Stalking Horse Agreement may contain certain customary terms and conditions, including expense reimbursement and a break-up fee in favor of the Stalking Horse Bidder (the "Bid Protections") in amounts to be determined by the Debtors, in each case, in consultation with the Consultation Parties, but not to exceed, in the aggregate, three percent (3%) of the proposed purchase price for the Assets.    In the event that the Debtors enter into a Stalking Horse Agreement, the Debtors may, provided that they obtain the consent of the Consultation Parties and the U.S. Trustee (which consent may be withheld), submit an order to the Bankruptcy Court under certification of counsel that approves such Bid Protections (the "Stalking Horse Order"). In the event that the Consultation Parties and the U.S. Trustee do not each consent to the Debtors' entry into the Stalking Horse Agreement, the proposed Bid Protections and the form of Stalking Horse Order, the Debtors may file a notice seeking an expedited hearing on not less than seven calendar days' (7-days') notice (the "Stalking Horse Hearing") on approval of entry into the Stalking Horse Agreement and any Bid Protections included therein, and all parties in interest shall have the right at the Stalking Horse Hearing to object to the designation of the Stalking Horse Bidder, the provision of Bid Protections to such Stalking Horse Bidder and the terms and conditions under which such Bid Protections would be payable to the Stalking Horse Bidder. Within one calendar day of the selection by the Debtors of a Stalking Horse Bidder, the Debtors

shall serve notice of the Stalking Horse Agreement on all parties on the Debtors' Rule 2002 Notice List, including the Consultation Parties, all parties reasonably known to have expressed an interest in a transaction with respect to all or a portion of the Assets within the past two (2) years, and all parties holding liens on the Assets (each, a "Stalking Horse Notice"). Each Stalking Horse Notice shall include (i) the identity of the proposed Stalking Horse Bidder, (ii) a summary of the key terms of the Stalking Horse Agreement, (iii) a summary of the type and amount of Bid Protections, if any, proposed to be afforded to the Stalking Horse Bidder, and (iv) a correct and complete copy of the Stalking Horse Agreement. At the Auction, the Debtors shall distribute complete and correct copies of the Stalking Horse Agreement(s), if any, to each of the other Qualified Bidders.

Any Stalking Horse Agreement executed by the Debtors and the transactions contemplated thereby will be deemed a Qualified Bid for all purposes, and any Stalking Horse Bidder party to a Stalking Horse Agreement executed by the Debtors will be deemed to be a Qualified Bidder.

Other than as provided by order of the Bankruptcy Court, no party submitting a Bid shall be entitled to a break-up fee or expense reimbursement except for the Bid Protections for any Stalking Horse Bidder that are ultimately approved by the Bankruptcy Court. Any substantial contribution claims by any Bidder are deemed waived.

## HIGHEST OR OTHERWISE BEST BID

Whenever these Bidding Procedures refer to the highest or otherwise best Qualified Bid, such determination shall take into account any factors the Debtors, in consultation with the Consultation Parties, reasonably deem relevant to the value of the Qualified Bid to the estates and may include, but are not limited to, the following (i) the amount and nature of the consideration, including any Assumed Liabilities (as defined in the Purchase Agreement); (ii) the number, type, and nature of any changes to the Purchase Agreement requested by each Qualified Bidder; (iii) the extent to which such modifications are likely to delay closing of the sale of the Assets and the cost to the Debtors of such modifications or delay; (iv) the likelihood of the Qualified Bidder being able to close the proposed transaction (including obtaining any required regulatory approvals) and the timing thereof; and (v) the net benefit to the Debtors' estates (collectively, the "Bid Assessment Criteria").

## AUCTION

If two or more Qualified Bids for the same Assets are received by the Bid Deadline, the Debtors will conduct the Auction to determine the highest or otherwise best Qualified Bid. If less than two Qualified Bids are received by the Bid Deadline with respect to any portion of the Assets, the Debtors shall not conduct the Auction with respect to such Assets. If only one Qualified Bid is received with respect to all or a portion of the Assets, the Debtors may, after consultation with the Consultation Parties, designate such Qualified Bid as a Successful Bid. Only Qualified Bidders may participate in the Auction. For the avoidance of doubt, the Debtors may conduct the Auction whether or not a Stalking Horse Bidder has been designated by the Debtors by July 1, 2016 or any time thereafter.

## PROCEDURES FOR AUCTION

The Auction shall take place on July 14, 2016 at 10:00 a.m. (prevailing Eastern Time) at the offices of co-counsel for the Debtors, Richards, Layton & Finger, P.A., One Rodney Square, 920 N. King Street, Wilmington, Delaware 19801, or such other place and time as the Debtors shall notify all Qualified Bidders and the Consultation Parties. The Auction shall be conducted according to the following procedures:

The Auction will be conducted openly and all creditors may be permitted to attend. However, only Qualified Bidders will be entitled to make any Overbids (as defined below) at the Auction.

**Auction to be Conducted by the Debtors.**

The Debtors and their advisors shall direct and preside over the Auction, which shall be transcribed. Other than as expressly set forth herein, the Debtors (in consultation with the Consultation Parties) may conduct the Auction in the manner they determine will result in the highest or otherwise best offer for any of the Assets. Prior to the commencement of the Auction, the Debtors shall use their best efforts to provide the Consultation Parties and each Qualified Bidder participating in the Auction with a copy of the Modified Purchase Agreement associated with the highest or otherwise best Qualified Bid with respect to the Assets for which such Qualified Bidder is bidding, as determined by the Debtors in consultation with the Consultation Parties (such highest or otherwise best Qualified Bid, the "Auction Baseline Bid"). In the event that the Debtors enter into a Stalking Horse Agreement at any time prior to the Auction with respect to any Assets, such Stalking Horse Agreement shall be the Auction Baseline Bid with respect to such Assets (in addition to being afforded the treatment, to the extent applicable, described above under "Stalking Horse Bids"). At the start of the Auction, the Debtors shall describe the material terms of the Auction Baseline Bid and each Qualified Bidder participating in the Auction must confirm that (a) it has not engaged in any collusion with respect to the bidding or sale of any of the Assets described herein, (b) it has reviewed, understands, and accepts the Bidding Procedures, (c) it has consented to the core jurisdiction of the Bankruptcy Court (as described more fully below), and (d) its Qualified Bid is a good faith *bona fide* offer that it intends to consummate if selected as the Successful Bidder.

**Terms of Overbids.**

An "Overbid" is any bid made at the Auction, in accordance with the requirements set forth herein, subsequent to the Debtors' announcement of the respective Auction Baseline Bid. To submit an Overbid for purposes of this Auction, a Bidder must comply with the following conditions:

(a)  Minimum Overbid Increments: The initial Overbid, if any, shall provide for total consideration to the Debtors with a value that exceeds the value of the consideration under the Auction Baseline Bid by an incremental amount that is not less than the sum of (x) $100,000 (the "Minimum Overbid Increment") plus (y) in the event that the Debtors have entered into a Stalking Horse Agreement prior to the Auction with respect to the Assets to which the Overbid relates, cash equal to the aggregate amount of any Bid Protections under such Stalking Horse

Agreement, and each successive Overbid shall exceed the then-existing Overbid by an incremental amount that is not less than the Minimum Overbid Increment. The Debtors reserve the right, in consultation with the Consultation Parties, to announce reductions or increases in the Minimum Overbid Increment at any time during the Auction. Additional consideration in excess of the amount set forth in the respective Auction Baseline Bid may include cash and/or noncash consideration, *provided, however,* that the value for such non-cash consideration shall be determined by the Debtors in their reasonable business judgment in consultation with the Consultation Parties.

(b)    <u>Remaining Terms are the Same as for Qualified Bids</u>: Except as modified herein, an Overbid at the Auction must comply with the conditions for a Qualified Bid set forth above, provided, however, that the Bid Deadline shall not apply. Any Overbid must include, in addition to the amount and the form of consideration of the Overbid, a description of all changes requested by the Bidder to the Purchase Agreement, Modified Purchase Agreement, as the case may be, in connection therewith. For the avoidance of doubt, any Overbid shall be irrevocable and shall remain open and binding on the Bidder in accordance with these Bidding Procedures and the conditions for a Qualified Bid.

At the Debtors' discretion, to the extent not previously provided (which shall be determined by the Debtors in consultation with the Consultation Parties), a Bidder submitting an Overbid at the Auction must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors), as the Debtors, in their reasonable business judgment in consultation with the Consultation Parties, may request, demonstrating such Bidder's ability to consummate the Sale Transaction proposed by such Overbid.

**Announcement and Consideration of Overbids.**

(a)    <u>Announcement of Overbids</u>: A Bidder submitting an Overbid at the Auction shall announce at the Auction the material terms of such Overbid, including the total amount and type of consideration offered in such Overbid.

(b)    <u>Consideration of Overbids</u>: The Debtors reserve the right, in their reasonable business judgment in consultation with the Consultation Parties, to make one or more continuances of the Auction to, among other things: facilitate discussions between the Debtors and individual Qualified Bidders; allow individual Qualified Bidders to consider how they wish to proceed; and give Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment in consultation with the Consultation Parties, may require, that the Qualified Bidder has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed Sale Transaction at the prevailing Overbid amount.

**Additional Procedures.**

The Debtors (in consultation with the Consultation Parties), in the exercise of their fiduciary duties for the purpose of maximizing value for their estates from the sale process, may modify the Bidding Procedures and implement additional procedural rules for conducting the Auction. Specifically, among other things, the Debtors, in consultation with the Consultation Parties, may determine to select more than one Successful Bid and more than one Successful Bidder (and/or more than one Backup Bid and more than one Backup Bidder, in which event such Backup Bids may provide for groupings of Assets that are different from the groupings of Assets reflected in the Successful Bid(s)) for separate portions of the Assets.

**Consent to Jurisdiction as Condition to Bidding.**

All Qualified Bidders shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court to enter an order or orders, which shall be binding in all respects, in any way related to the Debtors, their chapter 11 cases, the Bidding Procedures, the Purchase Agreement, the Auction, or the construction and enforcement of documents relating to any Sale Transaction and waived any right to a jury trial in connection with any disputes relating to the Debtors, their chapter 11 cases, the Bidding Procedures, the Purchase Agreement, the Auction, or the construction and enforcement of documents relating to any Sale Transaction.

**Sale Is As Is/Where Is.**

Any of the Assets sold pursuant to the Bidding Procedures shall be sold free and clear of all liens claims and encumbrances as permitted by Bankruptcy Code section 363(f) other than any Assumed Liabilities and conveyed at Closing in their then-present condition, "**AS IS, WHERE IS, WITH ALL FAULTS, AND WITHOUT ANY WARRANTY WHATSOEVER, EXPRESS OR IMPLIED**", except to the extent set forth in the definitive agreement for the Successful Bid, if applicable.

**Closing the Auction; Successful Bidder.**

The Auction shall continue until there is only one Qualified Bid for the Assets that the Debtors determine in their reasonable business judgment, in consultation with the Consultation Parties, is the highest or otherwise best Qualified Bid at the Auction. Thereafter, the Debtors shall select such Qualified Bid, in consultation with the Consultation Parties, as the overall highest or otherwise best Qualified Bid (such Bid, the "Successful Bid," and the Bidder submitting such Successful Bid, the "Successful Bidder"). In making this decision, the Debtors shall consider the Bid Assessment Criteria.

The Auction shall close when the Successful Bidder(s) submits fully executed sale and transaction documents memorializing the terms of the Successful Bid(s).

Promptly following the Debtors' selection of the Successful Bid(s) and the conclusion of the Auction, the Debtors shall announce the Successful Bid(s) and Successful Bidder(s) and shall file with the Bankruptcy Court notice of the Successful Bid(s) and Successful Bidder(s).

The Debtors shall not consider any Bids submitted after the conclusion of the Auction. The Successful Bidder(s) shall be required to keep the Successful Bid(s) open and irrevocable until the closing of the transactions contemplated thereby.

**Backup Bidder.**

Notwithstanding anything in the Bidding Procedures to the contrary, the Qualified Bid for the Assets that the Debtors determine in their reasonable business judgment, in consultation with the Consultation Parties, is the next highest or otherwise best Qualified Bid at the Auction after the Successful Bid, will be designated as the "Backup Bid" and the Bidder submitting such Backup Bid, the "Backup Bidder." The Backup Bidder shall be required to keep the Backup Bid open and irrevocable until the earlier of 5:00 p.m. (prevailing Eastern Time) on the date that is forty-five (45) days after the date of entry of the Sale Order (the "Outside Backup Date") or the closing of the transaction with the Successful Bidder (defined herein).

Following entry of the Sale Order, if the Successful Bidder fails to consummate the Successful Bid, the Debtors may, in consultation with the Consultation Parties, designate the Backup Bid to be the new Successful Bid and the Backup Bidder to be the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the transaction with the Backup Bidder without further order of the Bankruptcy Court. In such case of a breach or failure to perform on the part of the Successful Bidder, the defaulting Successful Bidder's deposit shall be forfeited to the Debtors. The Debtors specifically reserve the right to seek all available damages, including specific performance, from any defaulting Successful Bidder (including any Backup Bidder designated as a Successful Bidder) in accordance with the terms of the Bidding Procedures.

## RETURN OF GOOD FAITH DEPOSITS

The Good Faith Deposits of all Qualified Bidders shall be held in one or more accounts by the Debtors, but shall not become property of the Debtors' estates; *provided, however*, that the Good Faith Deposit of any Successful Bidder (including any Backup Bidder that becomes a Successful Bidder) may be forfeited to the Debtors or credited towards the purchase price set forth in the Successful Bid, in either case as provided in these Bidding Procedures. The Good Faith Deposit of any Qualified Bidder that is neither the Successful Bidder nor the Backup Bidder shall be returned to such Qualified Bidder not later than seven (7) days after the Sale Hearing. The Good Faith Deposit of the Backup Bidder, if any, shall be returned to the Backup Bidder not later than three (3) business days after (i) the closing of the transaction with the Successful Bidder (defined herein) for the Assets bid upon by the Backup Bidder and (ii) the Outside Backup Date; *provided, however*, that if the Back-up Bid becomes the Successful Bid as provided herein, any subsequent breach or failure to perform by the Back-up Bidder may result in the forfeit of the Good Faith Deposit of the Back-up Bidder to the Debtors. Upon the return of the Good Faith Deposits, their respective owners shall receive any and all interest that may have accrued thereon. If the Successful Bidder consummates the Successful Bid, its Good Faith Deposit shall be credited towards the purchase price set forth in the Successful Bid.

RLF1 14646374v.1

## THE CONSULTATION PARTIES

The Debtors shall consult with the Committee, the Ad Hoc Group of Secured Notes, the DIP Lenders, Private Equity Opportunities LP and PNC Bank (collectively, the "Consultation Parties" and each, a "Consultation Party") as explicitly provided for in these Bidding Procedures.[5]  For the avoidance of doubt, the Debtors' obligation to consult with the Consultation Parties may, in the Debtors' discretion, be met by (i) consultation solely with the respective advisors to each of the Consultation Parties, as set forth in "Auction Qualification Process" above (collectively, the "Consultation Party Advisors"); or (ii) consultation with each of the Consultation Parties and the Consultation Party Advisors at the same time or in separate communications.

## RESERVATION OF RIGHTS OF THE DEBTORS

The Debtors further reserve the right, in their reasonable business judgment, in consultation with the Consultation Parties to:  (i) determine which bidders are Qualified Bidders; (ii) determine which Bids are Qualified Bids; (iii) determine which Qualified Bid is the highest or otherwise best proposal and which is the next highest or otherwise best proposal; (iv) reject, at any time prior to the closing of the Auction or, if no Auction is held, at any time prior to entry of the Sale Order, any Bid that is (a) inadequate or insufficient, (b) not in conformity with the requirements of these Bidding Procedures, the requirements of the Bankruptcy Code, or (c) contrary to the best interests of the Debtors and their estates; (v) waive terms and conditions set forth herein with respect to all potential bidders; (vi) impose additional terms and conditions; (vii) extend any of the dates established by these Bidding Procedures; (viii) continue or cancel the Auction and/or Sale Hearing in open court, or by filing a notice on the docket of the Debtors' chapter 11 cases, without further notice; (ix) include any other party as a Consultation Party and attendee at the Auction; and (x) modify the Bidding Procedures and implement additional procedural rules for conducting the Auction so long as such rules are not inconsistent in any material respect with the Bankruptcy Code, the Bidding Procedures Order, or any other order of the Court.

---

[5] In each instance in the Bidding Procedures where the Consultation Parties are provided with consultation rights, such rights are subject to the consent rights, as applicable, provided for under the DIP Facility and any order approving the *Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Secured Financing Pursuant to Section 364 of the Bankruptcy Code, (B) Authorizing the Debtors to use Cash Collateral, (C) Granting Adequate Protection to the Adequate Protection Parties, (D) Scheduling a Final Hearing, and (E) Granting Related Relief* [D.I. 13], subject to entry of a final order approving such motion.

## Exhibit 1

**The Purchase Agreement**

ASSET PURCHASE AGREEMENT

BY AND BETWEEN

[_____]

as Purchaser,

and

COLUMBUS STEEL CASTINGS COMPANY

as Seller

Dated as of [___], 2016

## TABLE OF CONTENTS

<u>Page</u>

### ARTICLE 1

**PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES**                    1

| | | |
|---|---|---|
| 1.1. | Purchase and Sale of Assets | 1 |
| 1.2. | Assumption of Liabilities | 2 |
| 1.3. | Excluded Liabilities | 2 |
| 1.4. | "As Is" Transaction | 2 |
| 1.5. | Additional Assumed Contracts and Excluded Agreements; Cure Costs | 3 |
| 1.6. | Other Debtors | 3 |

### ARTICLE 2

**CONSIDERATION**                    4

| | | |
|---|---|---|
| 2.1. | Consideration | 4 |
| 2.2. | Deposit | 4 |
| 2.3. | Condition of Conveyance | 4 |
| 2.4. | Procedures for Assumption of Agreements; Delayed Transfer of Assets | 5 |

### ARTICLE 3

**CLOSING AND TERMINATION**                    5

| | | |
|---|---|---|
| 3.1. | Closing | 5 |
| 3.2. | Closing Deliveries by Seller | 5 |
| 3.3. | Closing Deliveries by Purchaser | 6 |
| 3.4. | Termination of Agreement | 6 |
| 3.5. | Procedure Upon Termination | 8 |
| 3.6. | Effect of Termination | 8 |
| 3.7. | Break-Up Fee and Expense Reimbursement | 8 |

### ARTICLE 4

**REPRESENTATIONS AND WARRANTIES OF SELLER**                    9

| | | |
|---|---|---|
| 4.1. | Corporate Organization | 9 |
| 4.2. | Authority Relative to This Agreement | 9 |
| 4.3. | Conflicts; Consents of Third Parties | 9 |
| 4.4. | Litigation | 10 |
| 4.5. | Intellectual Property | 10 |
| 4.6. | Permits | 10 |
| 4.7. | Brokers and Finders | 11 |

i

4.8.  Title to Assets; Condition of Assets.................................................................11
4.9.  Contracts .........................................................................................................11
4.10. Real Property ...................................................................................................11
4.11. Compliance with Law ......................................................................................12
4.12. Employees; Employee Benefits .......................................................................12
4.13. Insurance Policies ...........................................................................................13
4.14. Tax Matters.....................................................................................................13
4.15. Customers and Vendors ..................................................................................14
4.16. Transactions with Directors, Officers, Members and Affiliates .......................14
4.17. No Other Representations or Warranties .........................................................14

## ARTICLE 5

## REPRESENTATIONS AND WARRANTIES OF PURCHASER                  15

5.1.  Corporate Organization....................................................................................15
5.2.  Authority Relative to This Agreement...............................................................15
5.3.  Consents and Approvals; No Violation .............................................................15
5.4.  Brokers and Finders ........................................................................................15
5.5.  Sufficiency of Funds ........................................................................................16
5.6.  Independent Investigation................................................................................16

## ARTICLE 6

## EMPLOYEES                                                       16

6.1.  Employees........................................................................................................16

## ARTICLE 7

## BANKRUPTCY COURT MATTERS                                       17

7.1.  Competing Transaction.....................................................................................17
7.2.  Bankruptcy Court Filings..................................................................................18

## ARTICLE 8

## COVENANTS AND AGREEMENTS                                       19

8.1.  Conduct of Business ........................................................................................19
8.2.  Pre-Closing Access to Information....................................................................20
8.3.  Further Agreements .........................................................................................20
8.4.  Consent and Approvals....................................................................................20
8.5.  Preservation of Records; Post-Closing Access to Information...........................21
8.6.  Publicity ..........................................................................................................22
8.7.  Prohibition on Use of Purchased Names .........................................................22
8.8.  Further Assurances..........................................................................................22

## ARTICLE 9

**CONDITIONS TO CLOSING**      **23**

9.1.   Conditions Precedent to the Obligations of Purchaser and Seller ....................................23
9.2.   Conditions Precedent to the Obligations of Seller.............................................................23
9.3.   Conditions Precedent to the Obligations of Purchaser ......................................................24

## ARTICLE 10

**DEFINITIONS**      **24**

10.1.   Certain Definitions...............................................................................................................24
10.2.   Additional Defined Terms ...................................................................................................31

## ARTICLE 11

**TAXES**      **32**

11.1.   Additional Tax Matters.......................................................................................................32

## ARTICLE 12

**MISCELLANEOUS**      **33**

12.1.   Payment of Expenses ..........................................................................................................33
12.2.   Survival of Representations and Warranties; Survival of Post-Closing Covenants ..........33
12.3.   Ultimate Limit of Liability..................................................................................................33
12.4.   Entire Agreement; Amendments and Waivers ...................................................................33
12.5.   Counterparts........................................................................................................................33
12.6.   Governing Law ...................................................................................................................34
12.7.   Jurisdiction, Waiver of Jury Trial ......................................................................................34
12.8.   Notices ................................................................................................................................34
12.9.   Binding Effect; Assignment................................................................................................35
12.10. Severability .........................................................................................................................35
12.11. Injunctive Relief..................................................................................................................35
12.12. Third Party Beneficiaries ...................................................................................................36
12.13. Certain Interpretations .......................................................................................................36
12.14. Non-Recourse .....................................................................................................................37

KL2 2956610.10

## ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT (as amended, supplemented or otherwise modified from time to time, this "Agreement"), dated as of [__], 2016 (the "Execution Date"), by and between Columbus Steel Castings Company, a Delaware corporation ("Seller"), and [__], a [___] ("Purchaser"). Article 10 contains definitions of certain capitalized terms used herein and also provides cross-references to certain capitalized terms defined elsewhere in this Agreement.

## RECITALS

WHEREAS, Seller is engaged in the business of manufacturing and providing steel castings for use in the freight rail, mass transit and industrial markets (the "Business") and owns certain assets related thereto and Purchaser desires to purchase certain assets used in the operation of the Business and assume certain liabilities related thereto;

WHEREAS, Seller is a debtor in that certain bankruptcy case under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (as amended, the "Bankruptcy Code"), filed on May 16, 2016 in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") under Case No. 16-11215 (such bankruptcy case, the "Chapter 11 Case"); and

WHEREAS, Purchaser desires to purchase and assume from Seller, and Seller desires to sell, transfer and assign to Purchaser, the Purchased Assets and the Assumed Liabilities in accordance with this Agreement and in accordance with and subject to the Sale Order, pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Purchaser and Seller hereby agree as follows:

## ARTICLE 1

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

1.1.    Purchase and Sale of Assets.

(a)    *Purchased Assets.* Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code and on the terms and subject to the conditions set forth in this Agreement and the Sale Order, at the Closing, Purchaser shall purchase, acquire and accept from Seller, and Seller shall sell, transfer, assign, convey and deliver to Purchaser, on the Closing Date, all of Seller's right, title and interest in, to and under, free and clear of all Encumbrances (other than Permitted Encumbrances) to all of Seller's assets, properties, rights and interests of any nature

1

whatsoever[1], excluding those assets identified as "Excluded Assets" in Section 1.1(b), but including those assets set forth on Schedule 1.1(a) hereto (collectively, but in all cases expressly excluding those assets identified as "Excluded Assets" in Section 1.1(b), the "Purchased Assets").

(b)    *Excluded Assets*.  Notwithstanding anything to the contrary in this Agreement or any of the Ancillary Agreements, in no event shall Seller be deemed to sell, transfer, assign or convey, and Seller shall retain all of its right, title and interest to, in and under, all of its assets, properties, rights and interests, other than the Purchased Assets, including as set forth on Schedule 1.1(b) hereto (collectively, the "Excluded Assets").[2]

1.2.    Assumption of Liabilities.  On the terms and subject to the conditions set forth in this Agreement and the Sale Order, effective as of the Closing, Purchaser shall assume and discharge when due all Liabilities arising out of the conduct and the operations of the Business by Purchaser or its Affiliates after the Closing and such other Liabilities as set forth on Schedule 1.2 hereto (collectively, but in all cases excluding the Excluded Liabilities, the "Assumed Liabilities").[3]

1.3.    Excluded Liabilities.  Except for the Assumed Liabilities set forth in Section 1.2 (which shall, in no event, be Excluded Liabilities), Purchaser shall not assume, or become liable for the payment or performance of, any Liabilities of Seller of any nature whatsoever, whether accrued or unaccrued (collectively, the "Excluded Liabilities"), including, without limitation, the Liabilities set forth on Schedule 1.3, all of which shall remain Liabilities of Seller.

1.4.    "As Is" Transaction.  PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ARTICLE 4 OF THIS AGREEMENT, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, EITHER WRITTEN OR ORAL, WITH RESPECT TO SELLER, THE BUSINESS, THE PURCHASED ASSETS, THE ASSUMED LIABILITIES OR ANY OTHER MATTER.  WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLER HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS.  ACCORDINGLY, PURCHASER WILL

---

[1] Note to Draft: Purchased Assets to include the Owned Real Property.  Seller would consider a transaction whereby the Owned Real Property is purchased separately as long as the purchase of the Owned Real Property is part of the same bid and closes simultaneously with the purchase of the other Purchased Assets.

[2] Note to Draft: Excluded Assets to include, among other items, preference, fraudulent transfer and avoidance actions, intercompany obligations, certain books and records (e.g., books and records relating to Excluded Assets, books are records that are subject to attorney-client, work product or similar privilege and books and records the transfer of which would violate privacy rights of any person), and assets owned by the other Debtors or relating to the businesses of the other Debtors.

[3] Note to Draft: Assumed Liabilities to include, among other items, any allowed claims relating to current or former employees as and to the extent that such claims are allowed under section 507(a) and/or section 503 of the Bankruptcy Code.

2

ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

    1.5.    Additional Assumed Contracts and Excluded Agreements; Cure Costs.

    (a)    Prior to the Execution Date, Seller shall have delivered to Purchaser a schedule setting forth with respect to each Contract, as of the Execution Date, Seller's good faith estimate of the Cure Costs in respect of each such Contract (such schedule, the "Execution Date Contract Schedule"). Upon Purchaser's request, Seller shall use commercially reasonable efforts to provide additional information available to it as to the Liabilities under the Contracts reasonably requested by Purchaser in connection with Purchaser's assessment whether to designate any such Contract as an Assumed Contract and accept an assignment of such Contract pursuant to the terms of this Agreement. No later than eight (8) Business Days prior to the Hearing, Purchaser shall provide Seller with Schedule 1.5(a), which is the list of Assumed Contracts, if any, to be assigned by Seller to Purchaser. No later than three (3) Business Days prior to the Hearing, Purchaser may identify in writing to Seller any additional Contracts that Purchaser wants added to Schedule 1.5(a) (the "Additional Assumed Contracts"). Any Additional Assumed Contract added to Schedule 1.5(a) shall become an Assumed Contract, and shall be deemed a Purchased Asset for purposes of this Agreement, and all Cure Costs relating to such Assumed Contract and all Liabilities arising on or after the Closing Date under such Assumed Contract shall be an Assumed Liability for all purposes of this Agreement pursuant to the provisions of Sections 1.2 and 2.3 hereof. Notwithstanding the foregoing, at any time prior to one (1) Business Day prior to the Closing Date, Purchaser may identify in writing to Seller any Assumed Contract as one that Purchaser no longer desires to have assigned to it and such Contract shall for purposes of this Agreement be deemed to be an Excluded Agreement.

    (b)    Seller shall (i) use commercially reasonable efforts to provide draft copies of any motions, applications or other court documents to be filed with, and the proposed orders to submitted to, the Bankruptcy Court seeking authorization to assume and assign any Contracts, within a reasonable period of time under the circumstances prior to the date Seller intends to file any of the foregoing and (ii) consult in good faith with Purchaser regarding the substance of the foregoing.

    (c)    Purchaser shall use commercially reasonable efforts to provide Seller with sufficient information to establish Purchaser's adequate assurance of Purchaser's future performance of the Assumed Contracts under Section 365 of the Bankruptcy Code.

    (d)    The Cure Costs in respect of all of the Assumed Contracts shall be paid by Purchaser on or before Closing or as soon as practicable after the Cure Cost for an Assumed Contract has been determined by the Bankruptcy Court.

    1.6.    Other Debtors. (a) The Purchased Assets do not include any assets, properties, rights or interests that are not owned by Seller and in no event include any assets, properties, rights or interests owned by any of the other Debtors and (b) nothing in this Agreement shall modify or effect any Liabilities of any of the other Debtors or result in any of the other Debtors having or incurring any Liabilities and the parties acknowledge and agree that in no event shall this Agreement be deemed to cause any of the other Debtors to assume any Excluded Liability.

3

## ARTICLE 2

## CONSIDERATION

2.1.    <u>Consideration</u>.  The aggregate purchase price for the purchase of the Purchased Assets and the assumption of the Assumed Liabilities is an amount equal to $[___] (the "<u>Purchase Price</u>").  The Purchase Price shall be paid on the Closing Date in accordance with Section 3.3(a).

2.2.    <u>Deposit</u>.

(a)    Upon the execution of this Agreement, pursuant to the terms of the Escrow Agreement, Purchaser shall, within two (2) Business Days following the date hereof, deposit with the Escrow Agent the sum of $[___][4] by wire transfer of immediately available funds (the "<u>Escrow Amount</u>"), to be released by the Escrow Agent in accordance with the provisions of the Escrow Agreement and this Agreement.  The Escrow Amount shall be applied against the Purchase Price at Closing and released to Seller at Closing in accordance with the provisions of the Escrow Agreement and this Agreement.

(b)    Pursuant to and in accordance with the Escrow Agreement: (i) if this Agreement is terminated pursuant to <u>Section 3.4(g)</u>, (A) the Escrow Amount (together with all accrued interest thereon, if any) shall be paid to Seller, and (B) Seller and Purchaser shall deliver Joint Written Instructions to the Escrow Agent directing the Escrow Agent to deliver the Escrow Amount (together with all accrued interest thereon, if any) to Seller; or (ii) if this Agreement is terminated pursuant to <u>Sections 3.4(a)</u>, <u>3.4(b)</u>, <u>3.4(c)</u>, <u>3.4(d)</u>, <u>3.4(e)</u>, <u>3.4(f)</u>, <u>3.4(h)</u> or <u>3.4(i)</u>, (x) the Escrow Amount (together with all accrued interest thereon, if any) shall be paid to Purchaser, and (y) Seller and Purchaser shall deliver Joint Written Instructions to the Escrow Agent directing the Escrow Agent to deliver the Escrow Amount (together with all accrued interest thereon, if any) to Purchaser.

2.3.    <u>Condition of Conveyance</u>.  Without limiting the provisions of this Agreement relating to the Ancillary Agreements or any other provisions of this Agreement relating to sale, transfer, assignment, conveyance or delivery, the Purchased Assets and the Assumed Liabilities shall be sold, transferred, assigned, conveyed and delivered by Seller to Purchaser by appropriate instruments of transfer, bills of sale, endorsements, assignments and deeds, in recordable form as appropriate, and otherwise all in form and substance satisfactory to Purchaser, and free and clear of any and all Encumbrances (other than Permitted Encumbrances) of any and every kind, nature and description pursuant to the Sale Order.

---

[4] Note to Draft: To be 5% of Purchase Price.

2.4.    Procedures for Assumption of Agreements; Delayed Transfer of Assets.

(a)    At the Closing, Seller shall assume and assign to Purchaser the Assumed Contracts, in each case pursuant to Section 365 of the Bankruptcy Code and the Sale Order, subject to provision of adequate assurance as may be required under Section 365 of the Bankruptcy Code.  In connection with such assumption and assignment, Purchaser shall, on or before Closing or as soon as practicable after the Cure Cost for an Assumed Contract has been determined by the Bankruptcy Court, pay the Cure Costs of each Assumed Contract.

(b)    If following the Closing, Seller receives or becomes aware that it holds any asset, property or right which constitutes a Purchased Asset, then Seller shall transfer such asset, property or right to Purchaser as promptly as practicable for no additional consideration.

(c)    If following the Closing, Purchaser receives or becomes aware that it holds any asset, property or right which constitutes an Excluded Asset, then Purchaser shall transfer such asset, property or right to Seller as promptly as practicable for no additional consideration.

## ARTICLE 3

## CLOSING AND TERMINATION

3.1.    Closing.  Subject to the satisfaction of the conditions set forth in Section 9.1, Section 9.2 and Section 9.3, or the waiver thereof by the party entitled to waive the applicable condition, the closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Kramer Levin Naftalis & Frankel LLP at 1177 Avenue of the Americas, New York, New York 10036 (or at such other place as the parties may mutually designate in writing) on the date that is no later than the second (2nd) Business Day following the date on which all of the conditions set forth in Section 9.1, Section 9.2 and Section 9.3 are satisfied or waived by the party entitled to waive the applicable condition (other than conditions that by their nature are to be satisfied at the Closing).  The date on which the Closing is held is referred to in this Agreement as the "Closing Date".

3.2.    Closing Deliveries by Seller.  At the Closing, Seller shall deliver:

(a)    to the Escrow Agent, Joint Written Instructions, duly executed by Seller, directing the Escrow Agent to deliver the Escrow Amount (together with all accrued interest thereon, if any) to Seller;

(b)    to Purchaser, a duly executed bill of sale and assignment and assumption agreement, substantially in the form attached as Exhibit A hereto, with respect to (i) conveyances by Seller of the Purchased Assets to Purchaser and (ii) the assignment by Seller and the assumption by Purchaser of the Assumed Liabilities by Purchaser;

(c)    to Purchaser, a true and correct copy of the Sale Order and case docket reflecting that the Sale Order is in effect;

5

(d) to Purchaser, the officer's certificates required to be delivered pursuant to Sections 9.3(a) and 9.3(b);

(e) to Purchaser, a certificate executed by Seller in accordance with Treasury Regulation Section 1.1445-2(b)(ii) to the effect that Seller is not a "foreign person" within the meaning of the Code section 1445 or successor statute;

(f) to Purchaser, one or more deeds of transfer, each in a customary form as mutually reasonably agreed between Seller and Purchaser, to be executed by Seller and, if required by applicable Law, Purchaser in respect of the Owned Real Property, each of which shall be a quitclaim deed, or the equivalent in the applicable jurisdiction; and

(g) to Purchaser, all other previously undelivered Seller Ancillary Agreements required by this Agreement to be delivered by Seller at or prior to the Closing in connection with the transactions contemplated by this Agreement.

3.3.   Closing Deliveries by Purchaser.  At the Closing, Purchaser shall deliver:

(a) to the Escrow Agent, Joint Written Instructions, duly executed by Purchaser, directing the Escrow Agent to deliver the Escrow Amount (together with all accrued interest thereon, if any) to Seller;

(b) to Seller, an amount equal to the Purchase Price (less the Escrow Amount), by wire transfer of immediately available funds to the account of Seller in accordance with written wire instructions delivered by Seller to Purchaser on or prior to the Closing Date;

(c) to Seller, a duly executed bill of sale and assignment and assumption agreement, substantially in the form attached as Exhibit A hereto, with respect to (i) conveyances by Seller of the Purchased Assets to Purchaser and (ii) the assignment by Seller and the assumption by Purchaser of the Assumed Liabilities by Purchaser; and

(d) to Seller, the officer's certificates required to be delivered pursuant to Sections 9.2(a) and 9.2(b).

3.4.   Termination of Agreement.  This Agreement may be terminated prior to Closing as follows:

(a) by the mutual written consent of Seller and Purchaser at any time prior to the Closing;

(b) by Purchaser or Seller, if the Closing shall not have been consummated on or prior to [___], 2016 (the "Outside Date"); provided, however, that the right to terminate this Agreement under this Section 3.4(b) shall not be available to Purchaser or Seller, as applicable, if Purchaser is or Seller is, as applicable, in material breach or violation of any of their respective representations, warranties, covenants or agreements under this Agreement;

6

(c)     by Purchaser or Seller, if there shall be any Law that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited, or there shall be in effect a final non-appealable order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; it being agreed that the parties hereto shall promptly appeal any adverse determination which is appealable (and pursue such appeal with reasonable diligence);

(d)     by Purchaser, if the Chapter 11 Case as it relates to Seller and its assets, as a result of Seller's acts or failures to act, is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs, the business or the reorganization of Seller is appointed in any Chapter 11 Case;

(e)     by Purchaser, if (i) the Sale Order shall not have been entered by the Bankruptcy Court by 11:59 p.m. (New York City time) on [___], 2016 or (ii) following entry of the Sale Order, the Sale Order shall (A) have been reversed or (B) have been modified or amended in any manner materially adverse to Purchaser without the prior written consent of Purchaser; provided, that the right of Purchaser to terminate this Agreement under this Section 3.4(e) shall not be available if Purchaser is then in material breach of its representations, warranties, covenants or other agreements contained in this Agreement;

(f)     by Purchaser, (i) if Seller shall have breached or failed to perform any of its representations, warranties, covenants or other agreements contained in this Agreement, or if any representation or warranty of Seller in this Agreement shall have become untrue, and (ii) any such breach, failure to perform or occurrence referred to in clause (i) (A) would result in a failure of any condition set forth in Section 9.3(a) or Section 9.3(b) and (B) is not curable or able to be performed, or, if curable or able to be performed, is not cured or performed prior to the earlier of (x) the Outside Date and (y) twenty (20) days after written notice of such breach, failure or occurrence is given to Seller by Purchaser; provided, that the right of Purchaser to terminate this Agreement under this Section 3.4(f) shall not be available if Purchaser is then in material breach of its representations, warranties, covenants or other agreements contained in this Agreement;

(g)     by Seller, (i) if Purchaser shall have breached or failed to perform any of its representations, warranties, covenants or other agreements contained in this Agreement, or if any representation or warranty of Purchaser in this Agreement shall have become untrue, and (ii) any such breach, failure to perform or occurrence referred to in clause (i) (A) would result in a failure of a condition set forth in Section 9.2(a) or Section 9.2(b) and (B) is not curable or able to be performed, or, if curable or able to be performed, is not cured or performed prior to the earlier of (x) the Outside Date and (y) twenty (20) days after written notice of such breach, failure or occurrence is given to Purchaser by Seller; provided, that the right of Seller to terminate this Agreement under this Section 3.4(g) shall not be available if Seller is then in material breach of its representations, warranties, covenants or other agreements contained in this Agreement;

(h)     by Seller or Purchaser, if (i) Seller enters into a definitive agreement with respect to a Competing Bid, (ii) the Bankruptcy Court enters an order approving a Competing Bid and (iii) the Person making the Competing Bid consummates the Competing Bid; or

KL2 2956610.10

(i)     by Purchaser, if the Back-up Termination Date has occurred.

3.5.    Procedure Upon Termination.  In the event of a termination of this Agreement by Purchaser or Seller, or both, pursuant to Section 3.4, (a) written notice of such termination shall be given promptly by the terminating party to the other parties hereto, specifying the provision hereof pursuant to which such termination is made, and (b) except as set forth in Section 3.6, this Agreement shall thereupon terminate and become void and of no further force or effect, and the consummation of the transactions contemplated by this Agreement shall be abandoned without further action of the parties hereto; provided, however, notwithstanding anything contained in this Agreement to the contrary but subject to Section 12.3, such termination shall not relieve any party from Liability for its breach of this Agreement prior to such termination.  Any termination of this Agreement by Purchaser or Seller, or both, pursuant to Section 3.4 shall be effective on the date that written notice of such termination is given by the terminating party to the other parties hereto.

3.6.    Effect of Termination.  In the event of any termination of this Agreement pursuant to Section 3.4, this Agreement (other than the provisions set forth in Section 2.2(b), Section 3.4, Section 3.5, this Section 3.6, Section 3.7 (unless the Agreement is terminated by Seller under Section 3.4(g)), and Article 12) shall become null and void ab initio and be of no further force and effect, it being agreed that, subject to Section 12.3, such termination shall not relieve any party hereto from liability of any breach of this Agreement prior to such termination.

3.7.    Break-Up Fee and Expense Reimbursement.  In the event that a Competing Bid is consummated, in consideration for Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of assets of Seller, Seller shall pay Purchaser, in accordance with the terms hereof, a break-up fee in an amount equal to $[___] (the "Break-Up Fee"), plus (ii) up to $[___] of the reasonable and documented third-party out-of-pocket costs, fees and expenses incurred by Purchaser (including reasonable fees and expenses of legal, accounting and financial advisors) in connection with this Agreement and the transactions contemplated hereby (such expense reimbursement, together with the Break-Up Fee, the "Termination Payment").  The Termination Payment shall be paid on the first Business Day following the date of consummation of a Competing Bid and shall be paid solely from the proceeds of a Competing Bid.  Upon payment of the Termination Payment to Purchaser in accordance with this Section 3.7, Seller and Purchaser will be deemed to have fully released and discharged each other from any Liability resulting from the termination of this Agreement and neither Seller nor Purchaser or any other Person will have any other remedy or cause of action under or relating to this Agreement or any applicable Law, including for reimbursement of expenses.  Notwithstanding anything to the contrary in this Section 3.7, Purchaser shall not be entitled to receive, and Seller shall not be required to pay, the Termination Payment if any material breach by Purchaser of this Agreement has occurred, including if this Agreement is terminated by Seller under Section 3.4(g).

8

# ARTICLE 4

## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the Seller Disclosure Schedules, Seller hereby makes the representations and warranties in this Article 4 to Purchaser as of the Execution Date.

4.1.   Corporate Organization.  Seller is a corporation, duly organized, validly existing and in good standing under the Laws of the State of Delaware.  Seller has all requisite power and authority to own, lease, develop and operate the Purchased Assets and to conduct the Business as it is now being operated.  Seller is duly licensed or qualified and in good standing to do business in each jurisdiction in which the properties owned or leased by it or the operation of its business makes such licensing or qualification necessary, except where the failure to be so qualified, licensed or in good standing would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

4.2.   Authority Relative to This Agreement.  Subject to entry of the Sale Order, Seller has all requisite corporate power, authority and legal capacity to (a) execute and deliver this Agreement, (b) execute and deliver such Seller Ancillary Agreements to be executed by such Seller, and (c) perform its obligations hereunder and under each of the Seller Ancillary Agreements to be executed by such Seller, and to consummate the transactions contemplated hereby and thereby.  The execution and delivery of this Agreement and each of the Seller Ancillary Agreements, and the consummation of the transactions contemplated hereby and thereby, have been duly authorized by all requisite action on the part of Seller.  This Agreement has been, and at or prior to the Closing, each of Seller Ancillary Agreements will be, duly and validly executed and delivered by Seller and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, and the entry of the Sale Order) this Agreement constitutes, and each of Seller Ancillary Agreements, when so executed and delivered, will constitute, legal, valid and binding obligations of Seller, enforceable against Seller in accordance with its respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at Law or in equity) (the "Bankruptcy Exceptions").

4.3.   Conflicts; Consents of Third Parties.

(a)   Subject to entry of the Sale Order, neither the execution and delivery of this Agreement or any of the Ancillary Agreements by Seller, nor the consummation of the transactions contemplated hereby or thereby, nor compliance by Seller with any of the terms or provisions hereof or thereof, will (i) conflict with or result in a breach of any provision of the charter documents, bylaws or other governing documents of Seller, (ii) conflict with or result in a breach of any Law applicable to Seller or (iii) conflict with, violate, result in the breach or termination of or the loss of a benefit under, or constitute (with or without notice or lapse of time or both) a default (or give rise to any right of termination, cancellation, payment or acceleration) or adverse modification of any terms or rights under, any Contract or Permit or (iv) result in any

9

Encumbrance (other than Permitted Encumbrances) on any of the Purchased Assets, except in each case <u>clauses (i)</u> through <u>(iv)</u> above, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)     Subject to entry of the Sale Order, as of the date hereof, no consent, approval, license, permit, order, qualification or authorization of, or registration, declaration, notice or filing with, any Governmental Body or any other Person is required for or in connection with the execution and delivery by Seller of this Agreement and each Ancillary Agreement to which it is a party, and the consummation by Seller of the transactions contemplated hereby and thereby.

4.4.    <u>Litigation</u>.  There is no litigation, action, claim, suit, proceeding, investigation, examination, hearing, arbitration, inquiry, subpoena or audit, whether in law or equity, or whether civil, criminal, regulatory, arbitral or administrative (except as filed as part of the Bankruptcy Cases) related to the Purchased Assets (collectively, "<u>Actions</u>"), pending or, to the Knowledge of Seller, threatened.  Except as filed as part of the Bankruptcy Cases, Seller is not subject to any judgment, decree, injunction, subpoena, order, ruling, writ, assessment or award of any court, arbitration panel or other Governmental Body that relates to the Purchased Assets or the Assumed Liabilities and for which Seller has continuing obligations or Liabilities.

4.5.    <u>Intellectual Property</u>.  <u>Section 4.5</u> of the Seller Disclosure Schedule sets forth a true, complete and correct list of (i) all of the patents, registered trademarks, registered copyrights, Internet domain names, and applications for any of the foregoing, in each case that constitute the Seller Intellectual Property ("<u>Registered IP</u>") and (ii) all software included in the Seller Intellectual Property.  To the Knowledge of Seller, (x) no Registered IP has been adjudged invalid or unenforceable in whole or in part and (y) all Registered IP is valid and enforceable.

4.6.    <u>Permits</u>.

(a)     All of the Permits that are (i) required for the ownership or use of the Purchased Assets and (ii) for the operation of the Business (collectively, the "<u>Permits</u>") are held by Seller in full force and effect, except in each case of <u>clauses (i)</u> and <u>(ii)</u> above, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Each such Permit is listed in <u>Section 4.6(a)</u> of the Seller Disclosure Schedule.

(b)     (i) Seller is in compliance with its obligations under each of the Permits and the rules and regulations of the Governmental Body issuing such Permits, and (ii) no condition exists that with notice or lapse of time or both would constitute a default under, or a violation of, any Permit, except in each case of <u>clauses (i)</u> and <u>(ii)</u> above, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(c)     There is no pending, or to the Knowledge of Seller threatened, action, investigation or proceeding with respect to revocation, cancellation, suspension or nonrenewal of any such Permit.  Seller has not received any written notice from any Governmental Body (x) asserting the violation of the terms of any such Permit, (y) threatening to revoke, cancel, suspend or not renew the terms of any such Permit, or (z) seeking to impose fines, penalties or other sanctions for violation of the terms of any such Permit, except in each case of <u>clauses (x)</u>

10

through (y) above, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

4.7.     Brokers and Finders.  Seller has not employed, and no other Person has made any arrangement by or on behalf of Seller with, any investment banker, broker, finder, consultant or intermediary in connection with the transactions contemplated by this Agreement which could give rise to any claim against Purchaser for any investment banking, brokerage, finder's or similar fee or commission in connection with this Agreement or the transactions contemplated hereby.

4.8.     Title to Assets; Condition of Assets.  Seller has good and marketable title, a valid leasehold interest, or with respect to the Owned Real Property, fee simple title, as applicable, in and to each of the Purchased Assets and has the right to use all of the Purchased Assets necessary for the conduct of the Business as currently conducted.  Subject to entry of the Sale Order, Seller has, and at the Closing Purchaser shall receive, good, valid and marketable title, valid leasehold interest in, or with respect to the Owned Real Property, fee simple title, as applicable, to the material Purchased Assets, free and clear of all Encumbrances (except Permitted Encumbrances).

4.9.     Contracts.  Except in each case as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, each Contract listed on the Execution Date Contract Schedule is valid, binding and enforceable against Seller and, to the Knowledge of Seller, the other parties thereto, in accordance with its terms, in each case subject to the Bankruptcy Exceptions.  To the Knowledge of Seller, (i) there is no material default by Seller under any Contract listed on the Execution Date Contract Schedule and (ii) no event has occurred which, with due notice or lapse of time or both, would constitute such a default, in each case of clauses (i) and (ii) above, that will not be cured by compliance with the Sale Order at Closing, including payment of any Cure Costs that the Purchaser is required to pay pursuant to this Agreement.  To the knowledge of Seller, (x) no other party to any Contract listed on the Execution Date Contract Schedule is in material default in respect thereof and (y) no event has occurred which, with due notice or lapse of time or both, would constitute such a default, except in each case clauses (x) and (y) above, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

4.10.   Real Property.

(a)      Section 4.10(a) of the Seller Disclosure Schedule sets forth a complete and correct list of all Owned Real Property specifying the address or other information sufficient to identify all such Owned Real Property.  Seller has good, marketable fee simple title to the Owned Real Property, free and clear of any Encumbrances, except for Permitted Encumbrances.

(b)      As of the Execution Date there is no Leased Real Property.  Seller has not assigned, mortgaged, pledged or otherwise encumbered its interest under any Owned Real Property and Seller not has entered into any written lease, sublease or otherwise entered into any written agreement which granted to any Person the right to access, enter upon, use, occupy, lease, manage or operate any portion of Seller's interest in the Owned Real Property that is not otherwise a Permitted Encumbrance or that will not otherwise be terminated on or prior to the Closing Date.

11

4.11. <u>Compliance with Law</u>. Seller: (i) is in compliance with all applicable Laws relating to the Purchased Assets, (ii) as of the Execution Date, has not received notice of any alleged violation of any Law applicable to the Purchased Assets, and (iii) is not subject to, or in default in any respect with, any order of any Governmental Body applicable to the Purchased Assets or the transactions contemplated under this Agreement, except in each case of <u>clauses (i)</u> through <u>(iii)</u> above, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. To the Knowledge of Seller, no investigations, inquiries or reviews by any Governmental Body with respect to the Purchased Assets have been commenced.

4.12. <u>Employees; Employee Benefits</u>.

(a)     <u>Section 4.12(a)</u> of the Seller Disclosure Schedule sets forth a true and complete list of individuals that are currently employed by Seller in the Business and all individuals that are on temporary or permanent lay-off or furlough status ("<u>Business Employees</u>"), including name, title, date of hire, former or current base salary or wage rate, position, title, bonus opportunity, and whether such employee is out on disability or other permitted leaves of absence and/or is on temporary or permanent lay-off or furlough status.

(b)     Seller is not a party to any labor or collective bargaining agreement that covers any Business Employees. To the Knowledge of Seller, there are no union organizing activities pending or overtly threatened with respect to the Business Employees. There are no strikes, lockouts or other material labor disputes pending or, to the Knowledge of Seller, overtly threatened by or with respect to any Business Employees. Seller has complied in all respects with applicable Laws regarding the employment of employees, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(c)     <u>Section 4.12(c)</u> of the Seller Disclosure Schedule sets forth a list of all of the material pension, retirement, profit-sharing, deferred compensation, equity compensation, severance, change in control, vacation, medical, dental, disability, life insurance, bonus or other plans, programs, arrangements or agreements (including all "employee benefit plans" as that term is defined in Section 3(3) of ERISA) maintained, sponsored or contributed to by Seller or any of its Affiliates for the benefit of the Business Employees or any beneficiary or dependent thereof (collectively, the "<u>Benefit Plans</u>").

(d)     Seller does not (i) maintain, contribute to or participate in, and has not incurred any liability with respect to, any employee benefit plan that is subject to Title IV of ERISA, Code Section 412, or ERISA Section 302, or (ii) participate in or contribute to, and has not incurred any liability with respect to, a multiemployer plan within the meaning of Section 3(37) of ERISA. No Benefit Plan is (i) a voluntary employees' beneficiary association within the meaning of Code Section 501(c)(9), or (ii) a self-insured group health or other group welfare plan.

(e)     Each of the Benefit Plans intended to be "qualified" within the meaning of Code Sections 401(a) or 501 has received a favorable determination letter or may rely on a favorable opinion letter as to such plan's qualified status, and, to the Knowledge of Seller, no circumstances exist that would reasonably be expected to result in the revocation of any such letter. Each of the Benefit Plans has been (i) administered in compliance with its terms in all

12

respects and (ii) maintained in accordance with ERISA, the Code and any other applicable Laws in all material respects, in each case of <u>clauses (i)</u> and <u>(ii)</u> above, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(f) With respect to each Benefit Plan: (i) no actions, suits, claims or disputes are pending, or, to the Knowledge of Seller, threatened; (ii) no audits, inquiries, reviews, proceedings, claims, or demands are pending with any Governmental Body; (iii) all material premiums, contributions, or other payments required to have been made under the terms of any Benefit Plan or any contract or agreement relating thereto as of the Closing Date have been made; and (iv) all material reports, returns and similar documents required to be distributed to any plan participant have been duly and timely distributed.

(g) No Benefit Plan provides for medical or death benefits with respect to any employee or former employee of Seller or its predecessors after termination of employment, except as required under Section 4980B of the Code or Part 4 of Title I of ERISA or other applicable Laws.

(h) Except as otherwise expressly contemplated by the terms of this Agreement, to the Knowledge of Seller, the consummation of the transactions contemplated by this Agreement shall not give rise to any material liability under any Benefit Plan, or accelerate the time of payment or vesting or increase the amount of compensation or benefits due to any employee, director or independent contractor of Seller (whether current, former or retired) or their beneficiaries solely by reason of such transactions.

4.13. <u>Insurance Policies</u>. <u>Section 4.13</u> of the Seller Disclosure Schedule sets forth a complete list of all insurance policies with respect to which Seller is a party, a named insured or otherwise the beneficiary of coverage with respect to any of the Purchased Assets or the Assumed Liabilities.

4.14. <u>Tax Matters</u>. Except in each case as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect:

(a) Seller has (or will have by the Closing Date) filed all Tax Returns that are required to be filed before the Closing Date and such Tax Returns have been (or will be by the Closing Date) properly prepared and timely filed and were (or will be by the Closing Date) true, complete and accurate in all material respects;

(b) Seller has fully and timely paid all Taxes due and payable (whether or not shown on any Return), and Seller has withheld and timely paid over to the appropriate Taxing authority all Taxes that they are required to withhold from amounts paid or owing to any employee, creditor, independent contractor or other third party in compliance with all Tax withholding and remitting provisions of applicable Laws and has complied in all respects with all material Tax information reporting provisions of all applicable Laws;

(c) Seller has not waived any statute of limitations with respect to any Taxes or agreed to any extension of time with respect to the collection or assessment or reassessment of

13

Taxes due from Seller for any Taxable period and no request for any such waiver or extension is currently pending;

(d)     No audits or administrative or judicial or other proceedings are pending or being conducted or, to the Knowledge of Seller, being threatened in writing with respect to the Taxes due from Seller, no Governmental Body has given notice in writing of any intention to assert any deficiency or claim for additional Taxes against Seller, no claim has been made by any Governmental Body in a jurisdiction where Seller does not file a Return that Seller is or may be subject to Taxation by that jurisdiction, and all deficiencies for Taxes asserted or assessed against Seller have been fully and timely paid or have otherwise been resolved;

(e)     None of the Purchased Assets are subject to any Encumbrance for Taxes (other than Permitted Encumbrances);

(f)     None of the Purchased Assets are "tax-exempt use property" within the meaning of Section 168(h) of the Code; and

(g)     Seller has not had a permanent establishment in any foreign country, as defined in any applicable Tax treaty or convention between the United States and such foreign country, and is not engaged in a trade or business in any foreign country with which the United States does not have a Tax treaty or convention.

4.15.    Customers and Vendors.    Section 4.15 of the Seller Disclosure Schedule sets forth a true, complete and correct list of the twenty (20) largest customers and twenty (20) largest vendors for the Business, in each case for the fiscal year ended December 31, 2015.

4.16.    Transactions with Directors, Officers, Members and Affiliates.    Seller is not a party to any agreement or arrangement with any of the directors, officers, managers or members of Seller or any Affiliate of Seller with respect to the Business under which it (i) leases any real or personal property (either to or from such directors, officers, managers, members or Affiliates of Seller); (ii) licenses technology (either to or from such directors, officers, managers, members or Affiliates of Seller); (iii) is obligated to purchase any tangible or intangible asset from or sell such asset to such directors, officers, managers, members or Affiliates of Seller; (iv) purchases products or services from such directors, officers, managers, members or Affiliates of Seller; or (v) pays or receives commissions, rebates or other payments. No Affiliate of Seller owns or has any rights in or to any of the assets, properties or rights used by Seller with respect to the Business in the ordinary course of its business.

4.17.    No Other Representations or Warranties.    Except for the representations and warranties contained in this Article 4, none of Seller nor or any other Person on behalf of Seller makes any express or implied representation or warranty with respect to any of the Purchased Assets or with respect to any other information provided to Purchaser in connection with the transactions contemplated hereby, including, without limitation, as to the probable success or profitability of the ownership, use or operation of the Business, and the Purchased Assets following the Closing. None of Seller shall have or be subject to any liability to Purchaser resulting from the distribution to Purchaser, or Purchaser's use of, any such information, including any information, documents, projections, forecasts or other materials made available to

14

Purchaser in expectation of the transactions contemplated by this Agreement, unless any such information is expressly included in a representation or warranty contained in this Article 4.

## ARTICLE 5

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby makes the representations and warranties in this Article 5 to Seller as of the Execution Date.

5.1.    Corporate Organization.  Purchaser is a [limited liability company/corporation], duly organized, validly existing and in good standing under the Laws of its jurisdiction of formation.

5.2.    Authority Relative to This Agreement.  Purchaser has all requisite [limited liability company/corporate] power, authority and legal capacity to (a) execute and deliver this Agreement, (b) execute and deliver the Ancillary Agreements to be executed by Purchaser, and (c) perform its obligations hereunder and under each of the Ancillary Agreements to be executed by Purchaser, and to consummate the transactions contemplated hereby and thereby.  The execution and delivery of this Agreement and each of such Ancillary Agreements, and the consummation of the transactions contemplated hereby and thereby, have been duly authorized by all requisite action on the part of Purchaser.  This Agreement has been, and at or prior to the Closing each of such Ancillary Agreements will be, duly and validly executed and delivered by Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, and the entry of the Sale Order) this Agreement constitutes, and each of such Ancillary Agreements when so executed and delivered will constitute, legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with its respective terms, subject to the Bankruptcy Exceptions.

5.3.    Consents and Approvals; No Violation.  Neither the execution and delivery of this Agreement or any of the Ancillary Agreements by Purchaser, nor the consummation of the transactions contemplated hereby or thereby, nor compliance by Purchaser with any of the terms or provisions hereof or thereof, will (i) conflict with or result in a breach of any provision of the [certificate of formation, limited liability company agreement/certificate of incorporation, bylaws] or other governing documents of Purchaser, (ii) conflict with or result in a breach of any Law applicable to Purchaser or (iii) conflict with, violate, result in the breach or default under any Contract to which Purchaser is a Party.  The execution, delivery and performance by Purchaser of this Agreement does not require Purchaser to make any filing with or give notice to, or obtain any consent or Permit from, any Governmental Body, other than the Sale Order.

5.4.    Brokers and Finders.  Purchaser has not employed, and to the knowledge of Purchaser, no other Person has made any arrangement by or on behalf of Purchaser with, any investment banker, broker, finder, consultant or intermediary in connection with the transactions contemplated by this Agreement which could give rise to and claim against Seller and its Affiliates for investment banking, brokerage, finder's or similar fee or commission in connection with this Agreement or the transactions contemplated hereby.

15

5.5.    Sufficiency of Funds. Purchaser has as of the Execution Date, and shall have at the Closing, funds that are sufficient to pay the Purchase Price, assume the Assumed Liabilities and otherwise consummate all of the transactions contemplated hereunder.

5.6.    Independent Investigation.    Purchaser has conducted its own independent investigation, review and analysis of the Business, the Purchased Assets and the Assumed Liabilities, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records, and other documents and data of the Seller for such purpose. Purchaser acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Purchaser has relied solely upon its own investigation and the express representations and warranties of the Seller set forth in Article 4 of this Agreement; and (b) neither the Seller nor any other Person has made any representation or warranty as to the Seller, the Business, the Purchased Assets, the Assumed Liabilities or this Agreement, except as expressly set forth in Article 4 of this Agreement (as qualified by the Seller Disclosure Schedule).    SUCH REPRESENTATIONS AND WARRANTIES MADE BY THE SELLER IN ARTICLE 4 CONSTITUTE THE SOLE AND EXCLUSIVE REPRESENTATIONS AND WARRANTIES OF THE SELLER TO PURCHASER IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREBY, AND PURCHASED UNDERSTANDS, ACKNOWLEDGES AND AGREES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN ARTICLE 4 OF THIS AGREEMENT, ALL OTHER REPRESENTATIONS AND WARRANTIES OF ANY KIND OR NATURE EXPRESS OR IMPLIED, WRITTEN OR ORAL (INCLUDING ANY REPRESENTATION OR WARRANTY AS TO THE ACCURACY OR COMPLETENESS OF ANY INFORMATION REGARDING THE SELLER, ANY AFFILIATES OF THE SELLER, THE BUSINESS, THE PURCHASED ASSETS OR THE ASSUMED LIABILITIES FURNISHED OR MADE AVAILABLE TO PURCHASER AND ITS REPRESENTATIVES AND ANY INFORMATION, DOCUMENTS OR MATERIAL MADE AVAILABLE TO PURCHASER, MANAGEMENT PRESENTATIONS OR IN ANY OTHER FORM IN EXPECTATION OF THE TRANSACTIONS CONTEMPLATED HEREBY OR AS TO THE FUTURE REVENUE, PROFITABILITY OR SUCCESS OF THE BUSINESS, OR ANY REPRESENTATION OR WARRANTY ARISING FROM STATUTE OR OTHERWISE IN LAW OR RELATING TO MERCHANTABILITY OR FITNESS FOR USE) ARE SPECIFICALLY DISCLAIMED BY THE SELLER.

## ARTICLE 6

## EMPLOYEES

6.1.    Employees.

(a)    From and after the date hereof until the Closing Date, Seller shall not terminate the employment of any Business Employees (other than for cause), without the prior written consent of Purchaser.

(b)    Purchaser (or its Affiliates) may, in its sole discretion, make written offers of employment to any or all of the Business Employees (the "Offer Employees"), with such

16

employment by Purchaser or its Affiliate (as applicable) to commence as of the Closing Date, conditional on Closing; provided that Purchaser shall make offers of employment to not less than 90% of the Business Employees for compensation and other terms and conditions substantially similar to those provided to such Business Employees by Seller immediately prior to the Closing Date (or with respect to those Business Employees on lay-off or furlough status, immediately prior to their lay-off or furlough). Each such Offer Employee who executes and delivers an offer letter on or before the Closing Date and commences employment with Purchaser (or its Affiliates) on the Closing Date is hereinafter referred to as a "Transferred Employee". Prior to the Closing, Seller shall cooperate with Purchaser in its efforts to obtain an executed offer letter from each such Business Employee to whom Purchaser desires (or is required) to extend an offer of employment. Subject to the foregoing provisions of this Section 6.1(b), all such offers of employment shall be (i) subject to such compensation, benefit and other terms and conditions of employment as Purchaser shall determine in its sole discretion and (ii) contingent on such Business Employee's waiver of any claims to termination payments against Seller's bankruptcy estate. On the Closing Date, Seller shall terminate the employment of each Transferred Employee and Purchaser shall commence its employment of such Transferred Employee.

(c)    Nothing in this Article 6 expressed or implied shall confer any third party rights or remedies hereunder in any Person, including any Business Employees or Transferred Employees and nothing herein amends any Benefit Plan or any employee benefit plan of Purchaser.

(d)    Subject to applicable Law, Seller shall cooperate with Purchaser and shall permit Purchaser a reasonable period during normal business hours prior to the Closing Date, to communicate with Business Employees on temporary or permanent lay-off or furlough status and meet with current Business Employees at such times as Purchaser shall reasonably request in connection with Purchaser determining which Business Employees shall be extended an offer of employment.

(e)    Following the Closing, Seller and Purchaser shall cooperate reasonably with each other to provide an orderly administrative transition to Purchaser of the Transferred Employees, including the provision by Seller to Purchaser of all necessary or appropriate documents, records, materials, accounting files and Tax information with respect to each Transferred Employee.

## ARTICLE 7

## BANKRUPTCY COURT MATTERS

7.1.    Competing Transaction.    This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids in respect of all or any part of the Purchased Assets (whether in combination with other assets of the Seller or its Affiliates or otherwise) (each a "Competing Bid"). Seller is permitted to and to cause its Representatives and Affiliates to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Affiliates and Representatives) in connection with any sale or other disposition of the Purchased Assets. In

addition, Seller and its Representatives and Affiliates shall have the authority to respond to any inquiries or offers to purchase all or any part of the Purchased Assets (whether in combination with other assets of the Seller or its Affiliates or otherwise) and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable Law, including supplying information relating to the Business and the assets of Seller to prospective purchasers.

7.2.    Bankruptcy Court Filings.

(a)    As soon as reasonably practicable following the execution of this Agreement, Seller shall file with the Bankruptcy Court a supplement to its pending motion seeking approval of this Agreement and the sale of the Purchased Assets subject to the terms and conditions of this Agreement. Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to obtain the Bankruptcy Court's entry of the Sale Order, including a finding of adequate assurance of future performance by Purchaser, including by furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code. Purchaser shall not, without the prior written consent of Seller, file, join in, or otherwise support in any manner whatsoever any motion or other pleading relating to the sale of the Purchased Assets hereunder, except to the extent necessary to further the terms of this Agreement.

(b)    Seller shall file such motions or pleadings as may be appropriate or necessary to assume and assign the Assumed Contracts and to determine the amount of the Cure Costs; provided, that nothing herein shall preclude Seller from filing such motions, including upon commencement of the Bankruptcy Cases, to reject any Contracts that are not Assumed Contracts.

(c)    Seller and Purchaser agree that, in the event that Purchaser is not the winning bidder at the auction undertaken pursuant to the Sale Procedures (the "Auction"), if and only if (i) Purchaser submits the second highest or second best bid at the Auction or the terms of this Agreement constitute the second highest or best bid, and (ii) Seller gives written notice to Purchaser on or before the Back-up Termination Date, stating that Seller (A) failed to consummate the sale of the Purchased Assets with the winning bidder, and (B) terminated the purchase agreement with the winning bidder, Purchaser shall, subject to the fulfillment or waiver of the conditions set forth in Section 9.1 and Section 9.3, promptly consummate the transactions contemplated hereby upon the terms and conditions as set forth herein, including the Purchase Price, as the same may be increased by Purchaser at the Auction.

(d)    Provided Purchaser is selected as the winning bidder in respect of the Purchased Assets at the Auction, Seller shall seek entry of the Sale Order and any other necessary orders to close the sale by the Bankruptcy Court as soon as reasonably practicable following the closing of the Auction in accordance with the terms and conditions hereof. Purchaser and Seller understand and agree that the transaction is subject to approval by the Bankruptcy Court. Purchaser and Seller agree to use their respective commercially reasonable efforts to, and promptly take all actions as are reasonably necessary to, obtain the entry of the

18

Sale Order. In the event the entry of the Sale Order shall be appealed, Seller shall use commercially reasonable efforts to defend such appeal.

## ARTICLE 8

## COVENANTS AND AGREEMENTS

8.1.    Conduct of Business.

(a)    During the period from the Execution Date and continuing until the earlier of the termination of this Agreement in accordance with Section 3.4 and the Closing Date, except (1) for any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, (2) as required by applicable Law, the Bankruptcy Court or the Bankruptcy Code, (3) as occurring as a result of Seller being in bankruptcy under the Bankruptcy Code, (4) as and to the extent permitted by the lenders under the DIP Financing, (5) as otherwise expressly contemplated by this Agreement or as set forth in Schedule 8.1(a) or (6) with the prior written consent of Purchaser not to be unreasonable withheld, delayed or conditioned, Seller shall:

(i)    maintain the Purchased Assets in their existing condition and repair, subject to ordinary wear and tear;

(ii)    use commercially reasonable efforts to maintain the Permits;

(iii)    comply with all applicable Laws in all material respects;

(iv)    maintain the Books and Records;

(v)    not sell, pledge, assign, lease, license, or cause, permit or suffer the imposition of any Encumbrance on, or otherwise dispose of, any of the Purchased Assets, except in each case in connection with (A) the sale or disposition of Inventory to customers, (B) the sale or disposition of obsolete assets or (C) the DIP Financing;

(vi)    other than as required by Law or existing plans or agreements, not agree to any increase in the rate of compensation, commission, bonus or other direct or indirect remuneration payable to any Business Employee;

(vii)    not authorize, declare or pay any dividends on or make any distribution with respect to its outstanding shares of capital stock of Seller (whether in cash, assets, stock or other securities);

(viii)    not agree to any limitations on engaging or competing in any line of business or in any geographic area or location or otherwise covering the Business;

(ix)    not enter in any settlement, consent decree or other agreement or arrangement with a third party or Governmental Body that would require the payment by Purchaser or any Affiliate thereof of any material funds after the Closing;

(x)    not expend any insurance proceeds, condemnation awards or other

19

compensation in respect of loss or damage to any Purchased Asset to the extent occurring after the date hereof but prior to the Closing Date; and

(xi)    not enter into any agreement (whether written or oral) to do any of the foregoing, or authorize or publicly announce an intention to do any of the foregoing.

8.2.    Pre-Closing Access to Information.

(a)    Seller agrees that, between the Execution Date and the earlier of the Closing Date and the date on which this Agreement is terminated in accordance with Section 3.4, Purchaser and the directors, officers, employees, counsel, professionals, advisors, accountants, agents, contractors and other representatives (the "Representatives") of Purchaser, shall be entitled to have, and Seller shall afford, such access to, and make such investigation and examination of the Books and Records, and the Purchased Assets and Assumed Liabilities as Purchaser or any of Purchaser's Representatives may reasonably request.    Any such investigations and examinations shall be conducted during regular business hours and upon reasonable advance notice to Seller.

(b)    Notwithstanding anything to the contrary contained in Section 8.2(a), no such access, examination, investigation, assessment, evaluation or testing shall unreasonably interfere with the operations of Seller.

(c)    All information provided or obtained pursuant to this Section 8.2 shall be governed by that certain confidentiality agreement, dated as of [__], 2016, executed by an Affiliate of Purchaser in connection with a possible transaction involving Seller (the "Confidentiality Agreement").

8.3.    Further Agreements.    After the Closing, Seller shall (i) promptly deliver to Purchaser any mail or other communication received by Seller and relating to the Business, the Purchased Assets or the Assumed Liabilities, (ii) promptly transfer in immediately available funds to Purchaser any cash, electronic credits or deposits received by Seller to the extent that such cash, electronic credits or deposits are Purchased Assets, and (iii) promptly forward to Purchaser any checks or other instruments of payment that it receives to the extent that such checks or other instruments are Purchased Assets.    After the Closing, Purchaser shall (x) promptly deliver to Seller any mail or other communication received by Purchaser and relating to the Excluded Assets or the Excluded Liabilities, (y) promptly wire transfer in immediately available funds to Seller, any cash, electronic credits or deposits received by Purchaser to the extent that such cash, electronic credits or deposits are Excluded Assets, and (z) promptly forward to Seller any checks or other instruments of payment that it receives to the extent that such checks or other instruments are Excluded Assets.    From and after the Closing Date, Seller shall refer all inquiries with respect to the Business, the Purchased Assets and the Assumed Liabilities to Purchaser, and Purchaser shall refer all inquiries with respect to the Excluded Assets and the Excluded Liabilities to Seller.

8.4.    Consent and Approvals.    Prior to Closing, each of the parties hereto shall, at Purchaser's expense: (i) use its commercially reasonable efforts, as promptly as practicable, to obtain all approvals, authorizations, clearances, consents and waivers of, and to file all notices

20

and other filings with, regulatory and other Governmental Bodies and all other Persons that are necessary or required of it to consummate the transactions set forth herein; and (ii) provide such other information and communications to regulatory and other Governmental Bodies and other Persons as Purchaser or Seller, as applicable, or such Governmental Bodies or other Persons may reasonably request.

8.5.    Preservation of Records; Post-Closing Access to Information.

(a)     Seller and Purchaser agree that each of them shall preserve and keep the records held by them or their Affiliates relating to the Business, the Purchased Assets and the Assumed Liabilities until the later of the liquidation and winding up of Seller's estates (including, without limitation, through liquidation under Chapter 7 of the Bankruptcy Code) (the "Wind Down") (but in no event later than three (3) years after the Closing Date except, in the case of Tax matters, until thirty (30) days following the expiration of the period of any applicable statute of limitations) and shall make such records available during such time period to the other party as may be reasonably required by such other party in connection with, among other things, any insurance claims by, actions or tax audits against or governmental investigations of Seller or Purchaser or any of their respective Affiliates, administration of Seller's bankruptcy, or in order to enable Seller or Purchaser to comply with their respective obligations under this Agreement or any of the Ancillary Agreements and each other agreement, document or instrument contemplated hereby or thereby.

(b)     Until the completion of the Wind Down, Purchaser shall give Seller and Seller's Representatives reasonable access, during normal business hours, upon reasonable advance written notice (which notice shall specify the intended use or purpose of such access) and in a manner as would not be unreasonably disruptive to the business or operations of Purchaser or any of its subsidiaries, to Purchaser's offices, facilities, plants, properties, assets, employees and Documents that were included in the Purchased Assets pertaining to (A) the conduct of the Business or ownership of the Purchased Assets prior to the Closing Date or (B) the Excluded Assets and the Excluded Liabilities, to the extent necessary for, and solely in order for, Seller to effect the Wind Down, including, without limitation, reconciling and objecting to claims in the Bankruptcy Cases and compiling and filing tax returns. Purchaser shall, at Purchaser's expense, use commercially reasonable efforts to cause its Representatives to furnish to Seller such financial, technical, operating and other information pertaining to (i) the conduct of the Business or ownership of the Purchased Assets prior to the Closing Date or (ii) the Excluded Assets and the Excluded Liabilities, in each case, as Seller's Representatives shall from time to time reasonably request in a written notice (which notice shall specify the intended use or purpose of any such information) and to discuss such information with such Representatives to the extent necessary for, and solely in order for, Seller to effect the Wind Down.  Notwithstanding the foregoing, Purchaser shall not be required to provide any such access, or cause its Representatives to furnish any such information, to the extent that doing so, in the reasonable judgment of Purchaser, would constitute a waiver of the attorney-client privilege. Seller acknowledge and agree that any and all information received from or on behalf of, or made available by or on behalf of, Purchaser pursuant to this Section 8.5(b) shall be used solely in respect of the Wind Down.  In addition, Seller agrees that, with respect to confidential information, only those Representatives who require the receipt of such information for the

21

purposes allowed hereunder and who have been informed by Seller of the confidential nature of such information shall be provided access to such information.

8.6.    <u>Publicity</u>.  Except as required by applicable Law or for any filings by Seller or Purchaser with the Bankruptcy Court, Seller and Purchaser shall not (and shall cause their respective Affiliates not to) issue any press release or make any public statement concerning this Agreement or the transactions contemplated hereby without the other party's consent, in each case not to be unreasonably withheld, conditioned or delayed.

8.7.    <u>Prohibition on Use of Purchased Names</u>.  Seller hereby agrees that, on and at all times following the Closing Date, it shall not use and shall cease using, and shall cause its respective Affiliates not to use and to cease using, directly or indirectly, the Purchased Names; <u>provided, however</u>, that Seller may use the Purchased Names solely for purposes of completing the Wind Down.

8.8.    <u>Further Assurances</u>.

(a)    Subject to the terms and conditions of this Agreement and applicable Law, Seller and Purchaser shall use their respective commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable to ensure that the conditions precedent to the other party's obligations hereunder set forth in this Agreement are satisfied and to consummate and make effective the transactions contemplated by this Agreement as soon as practicable.

(b)    Subject to the terms and conditions of this Agreement, neither Seller nor Purchaser shall take any action or refrain from taking any action the effect of which would be to materially delay or impede the ability of Seller or Purchaser to consummate the transactions contemplated by this Agreement unless taking such action or refraining from taking such action is required by applicable Law.

(c)    Subject to the terms and conditions of this Agreement, at and following the Closing, each of the parties shall execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquaintances and such other instruments, and cooperate and take such further actions, as may be reasonably necessary or appropriate to transfer and assign fully to Purchaser and its successors and assigns, all of the Purchased Assets, and for Purchaser and its successors and assigns to assume the Assumed Liabilities, and to otherwise make effective the transactions contemplated hereby.  Nothing in this <u>Section 8.8</u> shall obligate any party hereto to waive any right or condition under this Agreement.

(d)    The obligations of Seller pursuant to this <u>Section 8.8</u> shall be subject to any orders, approvals or authorizations granted or required by the Bankruptcy Court or under the Bankruptcy Code (including in connection with the Chapter 11 Case), and Seller's obligations as a debtor in possession to comply with any order of the Bankruptcy Court, and Seller's duty to the estate and its creditors including the duty to seek and obtain the highest or otherwise best price for the Purchased Assets in compliance with, and not in a manner inconsistent with, the Sale Procedures, as approved by the Sale Procedures Order.

22

(e)    For the avoidance of doubt, nothing in this <u>Section 8.8</u> shall be deemed to obligate Seller to take any action or execute or deliver any document which would (i) cause Seller to incur any monetary cost or expense not provided for under the DIP Financing, (ii) impose on Seller burdens not expressly imposed on Seller pursuant to the other provisions of this Agreement, or (iii) cause Seller to become involved in any litigation or proceeding.

## ARTICLE 9

## CONDITIONS TO CLOSING

9.1.    <u>Conditions Precedent to the Obligations of Purchaser and Seller</u>.  The respective obligations of each party to this Agreement to consummate the transactions contemplated by this Agreement are subject to the satisfaction or written waiver, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by Seller and Purchaser, in whole or in part, to the extent permitted by applicable Law):

(a)    no temporary restraining order, preliminary or permanent injunction or other order issued by any court of competent jurisdiction or other legal restraint or prohibition preventing the consummation of the transactions contemplated hereby shall have been issued, nor shall there be any statute, rule, regulation, order or other Law promulgated, enacted, entered, enforced which makes the consummation of the transactions contemplated by this Agreement illegal, void or rescinded;

(b)    all authorizations, consents, orders or approvals of, or declarations or filings with, or expirations of waiting periods imposed by, any Governmental Body, and set forth on <u>Schedule 9.1(b)</u>, shall have been filed, occurred or been obtained; and

(c)    the Bankruptcy Court shall have entered the Sale Order, and such order shall be a Final Order; <u>provided, however</u>, if the Sale Order as entered contains a waiver of the requirements under the Federal Rules of Bankruptcy Procedure 6004(h) and 6006(d), then the requirement that such order be a Final Order shall not apply as long as such order is in full force and effect and has not been stayed.

9.2.    <u>Conditions Precedent to the Obligations of Seller</u>.  The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by Seller, in whole or in part, to the extent permitted by applicable Law):

(a)    each of (i) the representations and warranties of Purchaser in this Agreement shall have been true and correct on the Execution Date and as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date), except where the failure of such representations and warranties to be so true and correct (without giving effect to any limitation as to "material" or "material adverse effect") has not resulted in a material adverse effect on the ability of Purchaser to consummate the transactions contemplated hereby at the Closing, and Seller shall have received a certificate signed by an authorized person of Purchaser, dated the Closing Date, to the foregoing effect;

23

(b)     Purchaser shall have performed and complied in all respects with all obligations and agreements required in this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date, except where the failure to so comply has not resulted in material adverse effect on the ability of Purchaser to consummate the transactions contemplated hereby as the Closing, and Seller shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect;  and

(c)     Purchaser shall have delivered, or caused to be delivered, to Seller (or at the direction of Seller) all of the items set forth in <u>Section 3.3</u>; and

(d)     The lenders under the DIP Financing shall have consented to the closing of the transactions contemplated hereby.

9.3.    <u>Conditions Precedent to the Obligations of Purchaser</u>.    The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by Purchaser, in whole or in part, to the extent permitted by applicable Law):

(a)     each of (i) the representations and warranties of Seller in this Agreement shall have been true and correct on the Execution Date and as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date), except where the failure of such representations and warranties to be so true and correct (without giving effect to any limitation as to "material" or "Material Adverse Effect") has not resulted in a Material Adverse Effect, and Purchaser shall have received a certificate signed by an authorized person of Seller, dated the Closing Date, to the foregoing effect;

(b)     Seller shall have performed and complied in all respects with all obligations and agreements required in this Agreement to be performed or complied with by Seller on or prior to the Closing Date, except where the failure to so comply has not resulted in a Material Adverse Effect, and Purchaser shall have received a certificate signed by an authorized officer of Seller, dated the Closing Date, to the foregoing effect; and

(c)     Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in <u>Section 3.2</u>.

## ARTICLE 10

## DEFINITIONS

10.1.    <u>Certain Definitions</u>. As used herein:

(a)     "<u>Accounts Receivable</u>" means all trade accounts receivable and other rights to payment from customers of Seller, and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in

24

respect of goods shipped or products sold or services rendered to customers of Seller prior to Closing, and any claim, remedy or other right of Seller related to any of the foregoing.

(b)     "Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(c)     "Ancillary Agreements" means, collectively, the Seller Ancillary Agreements and each agreement required pursuant to Sections 3.2 and 3.3 hereto.

(d)     "Assumed Contracts" means, collectively, the Contracts identified by Purchaser in accordance with Section 1.5 hereto and listed on Schedule 1.5(a), which Contracts shall be assumed by Seller and assigned to Purchaser pursuant to Section 365 of the Bankruptcy Code, the Sale Order or other order of the Bankruptcy Court and the bill of sale/assignment and assumption agreement.

(e)     "Back-up Termination Date" means the first to occur of (i) forty-five (45) days after the entry of the sale order approving a Competing Bid and (ii) consummation of the transaction with the winning bidder at the Auction.

(f)     "Bankruptcy Cases" means, collectively, the Chapter 11 Case and the bankruptcy cases of certain Affiliates of Seller filed in the Bankruptcy Court under the Bankruptcy Code on May 16, 2016 or May 17, 2016 under Case Nos. 16-11213, 16-11214, 16-11216, 16-11217, 16-11218, 16-11219, 16-11220, 16-11221 and 16-11222, respectively.

(g)     "Books and Records" means all documents used by Seller in connection with, or relating to, the Purchased Assets, the Assumed Liabilities, or the Business, including all files, data, reports, plans, mailing lists, supplier lists, customer lists, price lists, marketing information and procedures, advertising and promotional materials, equipment records, warranty information, records of operations, standard forms of documents, manuals of operations or business procedures and other similar procedures (including all discs, tapes and other media-storage data containing such information) with respect to the Business.

(h)     "Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in Wilmington, Delaware or New York, New York are authorized or required by Law to be closed.

(i)     "Code" means the Internal Revenue Code of 1986, as amended.

(j)     "Contract" means any written or oral contract, indenture, note, bond, lease, license, commitment or instrument or other agreement or arrangement primarily related to the operation of the Business or affecting or related to any of the Purchased Assets or the Assumed Liabilities or by which Seller is bound or by which any property of Seller is Encumbered.

25

(k)    "Cure Costs" means, with respect to any Contract, the costs and expenses payable under Section 365 of the Bankruptcy Code in connection with the assumption and assignment of such contract.

(l)    "Debtors" means, collectively, Seller and its Affiliates that also filed for relief under the Bankruptcy Cases.

(m)    "DIP Financing" means the secured postpetition financing obtained by Seller and the other Debtors.

(n)    "Documents" means all of Seller's written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, correspondence, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies and documents, Tax Returns, ledgers, journals, title policies, customer lists, supplier lists, vendor lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.) and other similar materials, in each case whether or not in electronic form primarily related to or primarily used, or held for use, in connection with the Purchased Assets or operation of the Business.

(o)    "Encumbrance" means any lien, encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interest, hypothecation, easement, right of way, encroachment, right of first refusal, preemptive right, judgment, conditional sale or other title retention agreement.

(p)    "Equipment" means all equipment, machinery, storage tanks, furniture, fixtures and other tangible personal property of every kind and description and improvements and tooling owned by or primarily used, or held for use, in connection with the operation of the Business by Seller, wherever located.

(q)    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

(r)    "Escrow Agent" means [    ].

(s)    "Escrow Agreement" means that certain Escrow Agreement, dated as of the date hereof, by and among Seller, Purchaser and the Escrow Agent.

(t)    "Excluded Agreements" shall mean, collectively, the Contracts other than the Assumed Contracts.

(u)    "Final Order" means an order, ruling or judgment of the Bankruptcy Court (or other court of competent jurisdiction) entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Case (or by the clerk of such other court of competent jurisdiction on

26

the docket of such court) that: (i) is in full force and effect and (ii) has not been stayed; and (iii) is no longer subject to review, reversal, modification or amendment, by appeal or writ of certiorari.

(v)    "Governmental Body" means any government, quasi-governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature or any self-regulatory agency, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private).

(w)    "Hearing" means the hearing to be held by the Bankruptcy Court to consider the Sale Order and the approval of the transactions contemplated hereby.

(x)    "Intellectual Property" means all intellectual property of any kind used, or held for use, in connection with the operation of the Business, including the following: (i) trademarks, service marks, trade names, slogans, logos, trade dress, internet domain names, brand names, and other similar designations of source or origin, together with all goodwill, registrations and applications related to the foregoing; (ii) patents, utility models and industrial design registrations (and all continuations, divisionals, continuations in part, provisionals, renewals, reissues, re-examinations and applications for any of the foregoing); (iii) copyrights and copyrightable subject matter (including, without limitation, any registrations and applications for any of the foregoing); (iv) trade secrets, proprietary processes, formulae, algorithms, models, and methodologies; and (v) computer software, computer programs, and databases (whether in source code, object code or other form); provided, however, Intellectual Property shall exclude the items listed on Schedule 10.1(x).[5]

(y)    "Inventory" means all of Seller's inventories (including, without limitation, raw materials, processed scrap, packaging materials, supplies, work in process, finished goods, spare parts and replacement and component parts and fuel) that are used, or held for use, in connection with the operation of the Business.

(z)    "Joint Written Instructions" means written instructions from Seller and Purchaser, a form of which is attached to the Escrow Agreement as an exhibit thereto, directing the Escrow Agent to deliver the amounts to the released from escrow as provided for under this Agreement.

(aa)    "Knowledge of Seller" or "Seller's Knowledge" means the actual knowledge, as of the Effective Date, of [____].

(bb)    "Laws" means all federal, state, local or foreign laws, statutes, common law, rules, codes, regulations or ordinances issued, promulgated, enforced or entered by, any and all Governmental Bodies, or other requirement or rule of law.

---

[5] Note to Draft: Constellation names to be excluded.

27

(cc)    "<u>Leased Real Property</u>" means any of the real property leased or subleased by Seller.

(dd)    "<u>Liability</u>" means, as to any Person, any debt, adverse claim, liability, obligation, commitment, assessment, cost, expense, loss, charge, fee, penalty, fine, contribution or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, including all costs and expenses relating thereto.

(ee)    "<u>Material Adverse Effect</u>" means any effect, change, condition, circumstance, development or event that, individually or in the aggregate with all other effects, changes, conditions, circumstances, developments or events has had, or would reasonably be expected to have, a material adverse effect on the business, assets, operation, condition (financial or otherwise) or results of operation of the Business or the Purchased Assets (excluding the Excluded Assets and the Excluded Liabilities), taken as a whole, other than any effect, change, condition, circumstance, development or event arising from or related to: (i) general business or economic conditions in any of the geographical areas in which the Business operates; (ii) any condition or occurrence affecting the industry in which Seller operates generally; (iii) national or international political or social conditions, including the engagement by any country in hostilities, whether commenced before or after the date hereof and whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack; (iv) financial, banking, or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index); (v) the occurrence of any act of God or natural disaster, including any fire, flood, hurricane, tornado, or other weather event; (vi) changes in Law or accounting rules; (vii) the taking of any action expressly contemplated by this Agreement or any Ancillary Agreement or taken with the prior written consent of Purchaser; (viii) any filing or motion made under sections 1113 or 1114 of the Bankruptcy Code with respect to any unions, employees, retirees, retiree benefits or collective bargaining agreements; (ix) the sale of any other assets (other than the Purchased Assets) to any third parties by any Seller or any of its Affiliates; (x) any effects or changes arising from or related to the breach of the Agreement by Purchaser; (xi) the initiation of the Bankruptcy Cases or any actions taken in the Bankruptcy Cases in furtherance of the transactions contemplated herein; or (xii) any strike or labor dispute; provided, however, that in the case of the foregoing <u>clauses (i)</u> through <u>(vi)</u>, such effects, changes, conditions, circumstances, developments or events shall be taken into account in determining whether any material adverse effect has occurred to the extent that any such effects, changes, conditions, circumstances, developments or events have, or would reasonably be expected to have, a disproportionate effect on the Business (excluding the Excluded Assets and the Excluded Liabilities) or the Purchased Assets relative to other participants operating in the industry in which Seller operates.

(ff)    "<u>Ordinary Course of Business</u>" means the ordinary and usual course of normal day to day operations of the Business consistent with past practice during the period immediately preceding the date of this Agreement.

28

(gg)    "Owned Real Property" means the real property that is owned by Seller, and that, subject to the terms and conditions hereof, will be sold, conveyed and transferred to Purchaser pursuant to this Agreement.

(hh)    "Permits" means all notifications, licenses, permits (including environmental, construction and operation permits), franchises, certificates, approvals, consents, waivers, clearances, exemptions, classifications, registrations, variances, orders, tariffs, rate schedules and other similar documents and authorizations issued by any Governmental Body to Seller primarily used, or held for use, in connection with the operation of the Business or applicable to ownership of the Purchased Assets or assumption of the Assumed Liabilities.

(ii)    "Permitted Encumbrances" means (i) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Purchased Assets which do not, individually or in the aggregate, materially adversely affect the operation of the Business; (ii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law (but not restrictions arising from a violation of any such Law); (iii) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course of Business for sums not yet due and payable or that are due but may not be paid as a result of the commencement of the Bankruptcy Cases and that do not result from a breach, default or violation by a Seller of any Contract or Law; (iv) statutory liens for current Taxes, assessments or other governmental charges not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings or the making of appropriate demands, notices or filings; (v) easements, covenants, conditions, restrictions and other similar matters affecting title to real property and other encroachments and title and survey defects with respect to any real property that do not or would not reasonably be expected to adversely affect the current occupancy or use of such real property in any material respect; (vi) matters that would be disclosed on an accurate survey of the real property that do not or would not reasonably be expected to adversely affect the current occupancy or use of such real property in any material respect; (vii) any liens shown in any title commitment, report or policy, or otherwise of record that do not or would not reasonably be expected to adversely affect the current occupancy or use of the real property in any material respect; (viii) Encumbrances on equipment registered under the Uniform Commercial Code as adopted in any applicable state or similar legislation in other jurisdictions by any lessor or licensor of assets to Seller (in respect of the Business) or in respect of the purchase price therefor (it being understood that all such Encumbrances shall be discharged or released at the Closing); (ix) rights granted to any licensee of any Seller Intellectual Property in the Ordinary Course of Business; (x) Encumbrances that will be and are discharged or released either prior to, or simultaneously with the Closing; (xi) such other Encumbrances, title exceptions or imperfections of title as Purchaser may approve in writing in its sole discretion; and (xii) any Liabilities created by this Agreement or any of the Ancillary Agreements.

(jj)    "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, estate, Governmental Body or other entity or group.

(kk)    "Purchased Names" means the trade name[s] set forth on Schedule 1.1(a);

(ll)    "Sale Order" means the order of the Bankruptcy Court, in form and substance reasonably satisfactory to Purchaser, which shall, among other things, (i) authorize the sale of the Purchased Assets to Purchaser pursuant to this Agreement free and clear of all liens, claims and Encumbrances (other than Permitted Encumbrances) pursuant to Section 363(f) of the Bankruptcy Code; (ii) authorize and finalize the assumption of the Contracts by Seller and the assignment of the Contracts to Purchaser subject to payment of the Cure Costs; (iii) authorize the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements and all other transactions and agreements contemplated hereby or thereby; (iv) find that Purchaser is a good-faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code; (v) confirm that Purchaser is acquiring the Purchased Assets free and clear of the Excluded Assets and Excluded Liabilities; and (vi) retain jurisdiction of the Bankruptcy Court to interpret and enforce the terms and provisions of this Agreement.

(mm)    "Sale Procedures" means the bidding an auction procedures that are approved pursuant to the Sale Procedures Order.

(nn)    "Sale Procedures Order" means an order of the Bankruptcy Court that, among other things, approves the Sale Procedures and is in substantially the form attached to the pending motion (Docket No. [___]).

(oo)    "Seller Ancillary Agreements" means, collectively, each certificate, agreement or document (other than this Agreement) that Seller is required to execute and/or deliver in connection with this Agreement.

(pp)    "Seller Disclosure Schedule" means the disclosure schedules which are attached hereto and delivered by Seller. The disclosures in the Seller Disclosure Schedules shall modify and relate to the representations and warranties in the corresponding section or subsection of Article 4 to which they refer and are intended to qualify such representations and warranties. The information set forth in one section or subsection of the Seller Disclosure Schedules that is specifically referred to in another section or subsection of the Seller Disclosure Schedules by appropriate cross-reference shall also be deemed to qualify such other section or subsection of Article 4, and the information set forth in one section or subsection of the Seller Disclosure Schedules shall also be deemed to qualify each other section or subsection of Article 4 to the extent that the relevance of a disclosure in one section or subsection of the Seller Disclosure Schedules to another section or subsection of Article 4 is reasonably apparent on its face.

(qq)    "Seller Intellectual Property" means any Intellectual Property that is owned by, licensed to, or primarily used, or held for use by, Seller relating to or in connection with the operation of the Business.

(rr)    "Tax" and "Taxes" mean (i) any and all federal, state, local or foreign taxes, charges, fees, imposts, levies or other assessments, including all income, gross income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, production, premium, disability, worker's compensation, utility, windfall

30

profit, environmental, registration, alternative, add-on minimum, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes, customs duties, fees, assessments and charges of any kind whatsoever, in each case imposed by any Governmental Body; (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any Governmental Body in connection with any item described in clause (i); and (iii) any Liability in respect of any items described in clauses (i) and/or (ii) payable by reason of Contract, assumption, transferee liability, operation of Law, Treasury Regulation Section 1.1502-6(a) (or any predecessor or successor thereof or any analogous or similar provision under Law) or otherwise.

(ss)    "Tax Return" means any return, report, information return, declaration, claim for refund or other document (including any schedule or related or supporting information) supplied or required to be supplied to any Governmental Body with respect to Taxes, including amendments thereto.

10.2.    Additional Defined Terms.  The following terms have the meanings set forth in the Sections set forth below:

| Defined Term | Location |
| --- | --- |
| Actions | Section 4.4 |
| Additional Assumed Contract | Section 1.5 |
| Agreement | Preamble |
| Allocation | Section 11.1(b) |
| Assumed Liabilities | Section 1.2 |
| Auction | Section 7.2(c) |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bankruptcy Exceptions | Section 4.2 |
| Benefit Plans | Section 4.12(c) |
| Break-Up Fee | Section 3.7 |
| Business | Recitals |
| Business Employees | Section 4.12(a) |
| Chapter 11 Case | Recitals |
| Closing | Section 3.1 |
| Closing Date | Section 3.1 |
| Competing Bid | Section 7.1 |
| Confidentiality Agreement | Section 8.2(c) |
| Escrow Amount | Section 2.2 |
| Excluded Assets | Section 1.1(a) |
| Excluded Liabilities | Section 1.3 |
| Execution Date | Preamble |
| Execution Date Contract Schedule | Section 1.5(a) |
| Offer Employee | Section 6.1(b) |
| Outside Date | Section 3.4(b) |
| Permits | Section 4.6(a) |
| Purchase Price | Section 2.1 |

31

| **Defined Term** | **Location** |
|---|---|
| Purchased Assets | Section 1.1(a) |
| Purchaser | Preamble |
| Registered IP | Section 4.5 |
| Representatives | Section 8.2 |
| Seller | Preamble |
| Termination Payment | Section 3.7 |
| Transfer Taxes | Section 11.1(a) |
| Wind Down | Section 8.5(a) |

## ARTICLE 11

## TAXES

11.1.    <u>Additional Tax Matters</u>.

(a)    Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes and recording charges which may be payable by reason of the sale of the Purchased Assets or the assumption of the Assumed Liabilities under this Agreement or the transactions contemplated herein, including any real property transfer taxes (all of the foregoing, "<u>Transfer Taxes</u>") shall be borne and paid by Purchaser.

(b)    Purchaser shall, not later than one hundred twenty (120) days after the Closing Date, prepare and deliver to Seller for its consent (which consent shall not be unreasonably withheld, delayed or conditioned) a schedule allocating the Purchase Price (and any other items that are required for federal income tax purposes to be treated as purchase price, including Assumed Liabilities and including, as appropriate, Cure Costs) among the Purchased Assets (such schedule, the "<u>Allocation</u>").  If Seller raises any reasonable objection to the Allocation in writing within ten (10) business days of the receipt thereof, Purchaser and Seller shall negotiate in good faith to resolve such objection(s).  If Seller does not raise any objection to the Allocation within ten (10) business days of the receipt thereof, Seller shall be deemed to have conclusively accepted the Allocation.  Purchaser and Seller shall report and file all Tax Returns (including amended Tax Returns and claims for refund) consistent with the Allocation as finally agreed upon, and shall take no position contrary thereto or inconsistent therewith (including, without limitation, in any audits or examinations by any Governmental Body or any other proceeding); <u>provided</u>, <u>however</u>, that nothing contained herein shall prevent Purchaser or Seller from settling any proposed deficiency or adjustment by any Governmental Body based upon or arising out of the Allocation, and neither Purchaser or Seller shall be required to litigate before any court any proposed deficiency or adjustment by any Governmental Body challenging such Allocation.  Purchaser and Seller shall cooperate in the filing of any forms (including Form 8594 under Section 1060 of the Code) with respect to the Allocation, including any amendments to such forms required pursuant to this Agreement with respect to any adjustment to the Purchase Price.  Notwithstanding any other provision of this Agreement, the terms and provisions of this Section 11.1(b) shall survive the Closing without limitation.

32

# ARTICLE 12

## MISCELLANEOUS

12.1.   <u>Payment of Expenses</u>.   Except as otherwise provided in this Agreement and whether or not the transactions contemplated hereby are consummated, each party hereto shall bear its own costs and expenses (including investment advisory and legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby; <u>provided, however</u>, that all Transfer Taxes (as well as the costs and expenses incurred in connection with the preparation and filing of all Tax Returns with respect thereto) shall be borne by Purchaser.

12.2.   <u>Survival of Representations and Warranties; Survival of Post-Closing Covenants</u>. All covenants and agreements contained herein which by their terms are to be performed in whole or in part, or which prohibit actions, subsequent to the Closing shall, solely to the extent such covenants and agreements are to be performed, or prohibit actions, subsequent to the Closing, survive the Closing in accordance with their terms. All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificated deliveries hereunder, shall not survive the Closing and shall thereupon terminate, including any Actions for damages in respect of any breach thereof.

12.3.   <u>Ultimate Limit of Liability</u>.   Notwithstanding anything to the contrary contained herein, under no circumstance will the aggregate Liability of Seller to Purchaser under this Agreement and the Ancillary Agreements be anything other than payment of the Termination Payment if and to the extent payable hereunder, and the Seller shall no other liability hereunder.

12.4.   <u>Entire Agreement; Amendments and Waivers</u>.   This Agreement (including the Schedules hereto), the Ancillary Agreements and the Confidentiality Agreement represent the entire understanding and agreement between the parties hereto with respect to the subject matter hereof.   Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed, in the case of an amendment, by each party hereto, or in the case of a waiver, by the party against whom the waiver is to be effective.   No action taken pursuant to this Agreement, including, without limitation, any investigation by or on behalf of any party shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.   The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.   No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

12.5.   <u>Counterparts</u>.   For the convenience of the parties hereto, this Agreement may be executed and delivered (by facsimile or PDF signature) in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

KL2 2956610.10

12.6.   Governing Law.   THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF (EXCEPT SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

12.7.   Jurisdiction, Waiver of Jury Trial.

(a)   THE BANKRUPTCY COURT WILL HAVE EXCLUSIVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY; PROVIDED, HOWEVER, THAT IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE, THE COURTS OF THE STATE OF NEW YORK LOCATED IN NEW YORK, NEW YORK AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN THE SOUTHERN DISTRICT OF THE STATE OF NEW YORK WILL HAVE SOLE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY.

(b)   EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

12.8.   Notices.   Unless otherwise set forth herein, any notice, request, instruction or other document to be given, provided or furnished hereunder by any party to the other parties shall be in writing and shall be deemed duly given, provided or furnished (i) upon delivery, when delivered personally, (ii) one (1) Business Day after being sent by overnight courier or when sent by facsimile or e-mail transmission (with confirmation of transmission), and (iii) three (3) Business Days after being sent by registered or certified mail, postage prepaid, as follows:

If to Seller:

> Columbus Steel Castings Company
> c/o Constellation Enterprises LLC
> 50 Tice Boulevard, Suite 340
> Woodcliff Lakes, New Jersey 07677
> Attn.: Dana LaForge
> Email: laforge@brera.com

with a copy (which shall not constitute effective notice) to:

> Kramer Levin Naftalis &Frankel LLP
> 1177 Avenue of the Americas

34

New York, NY 10036
Attention: Adam C. Rogoff
Email: arogoff@kramerlevin.com
Attention: Steven M. Goldman
Email: sgoldman@kramerlevin.com

If to Purchaser:

[_____]
[_____]
[_____]
Attn.: [_____]

with copies (which shall not constitute effective notice) to:

[_____]
[_____]
[_____]
Attn.: [_____]

or to such other Persons, addresses or facsimile numbers as may be designated in writing by the party to receive such notice.

12.9.  **Binding Effect; Assignment**.  This Agreement shall be binding upon Purchaser and, subject to entry of the Sale Order, Seller, and inure to the benefit of the parties and its respective successors and permitted assigns, including, without limitation, any trustee or estate representative appointed in the Chapter 11 Case or any successor Chapter 7 case.  No assignment of this Agreement or of any rights or obligations hereunder may be made by Seller or Purchaser (by operation of Law or otherwise) without the prior written consent of the other parties hereto and any attempted assignment without the required consents shall be void.

12.10.  **Severability**.  If any term, condition or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in a manner adverse to any party.  Upon such determination that any term, condition or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the fullest extent possible.

12.11.  **Injunctive Relief**.  The parties agree that damages at Law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement by the parties, and, accordingly, each of Seller and Purchaser shall be entitled to injunctive relief with respect to any such breach, including, without limitation, specific

35

performance of such covenants, promises or agreements or an order enjoining the other party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement by such party, all without the necessity of proving the inadequacy of money damages as a remedy and without the necessity of posting bond. The rights set forth in this <u>Section 12.11</u> shall be in addition to any other rights which Seller or Purchaser may have at Law or in equity pursuant to this Agreement.

12.12. <u>Third Party Beneficiaries</u>. This Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the parties hereto and such permitted assigns, any legal or equitable rights hereunder.

12.13. <u>Certain Interpretations</u>.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)    All references in this Agreement to Articles, Sections, clauses, parts and Schedules shall be deemed to refer to Articles, Sections, clauses, parts and Schedules to this Agreement unless otherwise specified.

(ii)    All Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule but not otherwise defined therein shall be defined as set forth in this Agreement.

(iii)    The Article, Section and paragraph captions herein are for convenience of reference only, do not constitute part of this Agreement and shall not be deemed to limit or otherwise affect any of the provisions hereof.

(iv)    The words "include," includes" and "including," when used herein shall be deemed in each case to be followed by the words "without limitation" (regardless or whether such words or similar words actually appear).

(v)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day.

(vi)    Any reference in this Agreement to "$" or "dollars" shall mean U.S. dollars.

(vii)    Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

36

(viii)    The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(b)    The parties hereto agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any Law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

12.14.  Non-Recourse.    No past, present or future director, officer, employee, incorporator, member, partner or equity holder of the parties to this Agreement, nor any Debtor (other than Seller, and with respect to Seller, only as specifically provided for herein), will have any liability for any obligations or liabilities of Seller or Purchaser, as applicable, under this Agreement, or any agreement entered into in connection herewith of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby. Any claim or cause of action based upon, arising out of, or related to this Agreement or any agreement, document or instrument contemplated hereby may only be brought against Persons that are expressly named as parties hereto or thereto, and then only with respect to the specific obligations set forth herein or therein. Other than the parties hereto, no party shall have any liability or obligation for any of the representations, warranties, covenants, agreements, obligations or liabilities of any party under this Agreement or the agreements, documents or instruments contemplated hereby or of or for any action or proceeding based on, in respect of, or by reason of, the transactions contemplated hereby or thereby (including breach, termination or failure to consummate such transactions), in each case whether based on contract, tort, fraud, strict liability, other Laws or otherwise and whether by piercing the corporate veil, by a claim by or on behalf of a party hereto or another Person or otherwise. In no event shall any Person be liable to another Person for any punitive damages with respect to the transactions contemplated hereby.

*[Remainder of Page Intentionally Left Blank]*

37

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

<u>**SELLER:**</u>

**COLUMBUS STEEL CASTINGS COMPANY**

By: _____
Name:
Title:

KL2 2956610.10

**PURCHASER:**

[＿＿＿]

By:_____
Name:
Title: