# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| )<br>) | **Chapter 11** |
| **In re:** ) | **Case No. 16-11213 (CSS)** |
| ) | |
| **Constellation Enterprises LLC, *et al.*,**[1] ) | **Jointly Administered** |
| **Debtors.** ) | Hearing Date: June 24, 2016<br>Objection Deadline: June 21, 2016[2] |
| ) | |
| ) | **Re: D.I. 88** |

## OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' MOTION FOR (I) ORDER ESTABLISHING BIDDING PROCEDURES AND GRANTING RELATED RELIEF AND (II) ORDER APPROVING THE SALE OF THE ASSETS

The Official Committee of Unsecured Creditors (the "Committee") appointed in the cases of the above-captioned debtors and debtors-in-possession (the "Debtors"), by and through its proposed undersigned counsel, hereby submits this objection (the "Objection") to the *Debtors' Motion for (I) an Order Establishing Bidding Procedures and Granting Related Relief and (II) an Order Approving the Sale of the Assets* (the "Motion")[3] [D.I. 88].

In support of the Objection, the Committee respectfully states as follows:

---

[1] The debtors in these cases, along with the last four digits of their federal tax identification number, are: Constellation Enterprises LLC (9571); JFC Holding Corporation (0312); The Jorgensen Forge Corporation (1717); Columbus Holdings Inc. (8155); Columbus Steel Castings Company (8153); Zero Corporation (0538); Zero Manufacturing, Inc. (8362); Metal Technology Solutions, Inc. (7203); Eclipse Manufacturing Co. (1493); and Steel Forming, Inc. (4995). The debtors' mailing address is located at 50 Tice Boulevard, Woodcliff Lakes, NJ 07677.

[2] The Debtors agreed to extend the Committee's objection deadline to 5:00 p.m. Eastern Time on June 21, 2016.

[3] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion, the Bidding Procedures, as defined below, or the Term Sheet, as defined below, as applicable.

## PRELIMINARY STATEMENT

1.      The Debtors are asking this Court to approve an inherently flawed sale process (the "Sale Process") for the majority of their assets (the "Assets").[4]  The Sale Process is skewed in favor of a sale of the Assets to certain of the so-called "New Money DIP Lenders," which include certain holders of the Prepetition First Lien Notes (the "Note Holder Purchaser").  The Debtors must maximize value and encourage competitive bidding, flexibility and market-testing – goals that are critical to the success of a well-run sale process and the Debtors' ability to discharge their fiduciary duties to maximize value for the benefit of all stakeholders.  Instead, the Sale Process, as currently proposed, accomplishes none of those goals.

2.      These are not cases where the Debtors conducted significant marketing efforts prepetition with respect to the Assets.  By the Debtors' own admission, no marketing occurred prior to the commencement of these cases with respect to the Assets and the Debtors began the marketing and sale process with Imperial Capital, LLC ("Imperial"), their financial advisor and investment banker, after the Petition Date.  At the first day hearing in these cases, while describing their intention to file the Motion as "the start of a process," counsel for the Debtors had the following exchange with the Court:

> THE COURT:  Wasn't there a prepetition marketing process for anything other than Columbus?
>
> MR. ROGOFF:  **There was not a prepetition marketing process to sell the businesses**.  Columbus went through a fulsome marketing process by Lincoln.  With respect to the other businesses, there was a process that was started to look at fund – and refinancing and alternatives to strategic transactions, **but not a full marketing and sale of the company.  That is something that we are working with Imperial to, to move expeditiously forward on**.

*Transcript of May 18 First Day Hearing* ("Hearing Tr."), p. 75, lines 14-24 (emphasis added).

---

[4] The Motion relates to the majority of the Debtors' assets other than the assets of Debtor Columbus Steel Castings Company, which are the subject of a separate sale motion [D.I. 87].

3.      Without any marketing efforts or discussions with other potential bidders, the Debtors selected the Note Holder Purchaser to serve as the stalking horse bidder for the Assets on the terms and conditions set forth in the term sheet (the "Term Sheet") attached as Exhibit C to the Motion; a document that is not binding and remains subject to the negotiation of an Asset Purchase Agreement and a form of sale order, neither of which has been filed as of the date of this Objection.[5]  The Debtors further agreed to conduct the Sale Process in accordance with the terms of a debtor-in-possession financing facility (the "DIP Facility")[6] that provides for aggressive sale milestones that would have bids due by July 5, 2016 and require the entry of a sale order by July 15, 2016 – *a sixty (60) day sale process from start to finish*.  A violation of the sale milestones triggers a breach under the DIP Facility.

4.      As currently proposed, the Sale Process (with the proposed sale milestones and the other relief requested in connection with the final approval of the DIP Facility) would allow the Note Holder Purchaser to use the bankruptcy process to purchase the majority of the Debtors' Assets free and clear of liens through a credit bid and avoid a time-consuming, burdensome and costly state foreclosure process across multiple jurisdictions,[7] while providing no value for unsecured creditors.

5.      Specifically, the following summarizes the Committee's main concerns regarding the proposed Sale Process, each of which is discussed in greater detail below, but subject in all

---

[5] The Term Sheet states in relevant part that it "does not constitute an offer or a legally binding obligation of the Company, Supporting Holders, Purchaser, or any other party in interest, and no legally binding obligation will exist unless and until definitive documents are executed by and among the appropriate parties."

[6] On May 23, 2016, the Court entered an order (the "First Interim DIP Order") [D.I. 71] approving the DIP Facility on an interim basis.  On June 9, 2016, the Court entered a second order (the "Second Interim DIP Order" [D.I. 192] and, with the First Interim DIP Order, the "Interim DIP Order") approving the DIP Facility on an interim basis.

[7] The Assets proposed to be purchased by the Note Holder Purchaser through a credit bid are located in Ohio, Texas, California, Washington and Utah.

respects to the Committee's right to assert further objections as and when additional facts and

information become known:

- Timeline. The sale milestones are unnecessarily expedited and, coupled with the fact that the Note Holder Purchaser's bid is a credit bid in its entirety, the proposed sale process will likely chill bidding and depress, not maximize, value;

- Flexibility. The Sale Process does not afford the Debtors the necessary flexibility they need to run an efficient process with the goal of maximizing value, including by requiring bids to be bulk bids for the entirety of the Assets and not permitting the separate sale of each of the Debtors' three businesses comprising the Assets, regardless of the economic reality that the three businesses are entirely separate business units;

- Purchase Price. It is not possible to determine the actual amount of the Purchase Price, as that term is currently defined in the Term Sheet, such that prospective bidders cannot determine what they are bidding against. One of the requirements for a bid to be a "Qualified Bid" under the Bid Procedures is for the bid to be in an amount equal to or greater than the Purchase Price, which can only occur if the amount of the Purchase Price is fixed and known to all potentially interested parties. Moreover, the Purchase Price as proposed by the Note Holder Purchaser must be allocated among the three business units to allow for potential bidders to bid on each business unit. Without allocation, a blanket credit bid by the Note Holder Purchaser on the three businesses will impede the Sale Process;

- Access to Diligence Materials. Prospective bidders are required to demonstrate financial capability to consummate a sale transaction as a prerequisite to being given access to diligence materials. While evidence of financial wherewithal and the absence of financing contingencies are appropriate considerations to determine whether a particular bid should be deemed qualified (and those factors are indeed included in the Qualified Bid requirements portion of the Bid Procedures), it is not appropriate to condition access to diligence materials on providing such evidence;

- Credit Bid. The Bid Procedures purport to allow the Note Holder Purchaser to credit bid the entirety of the Indenture Obligations. The Motion is silent as to the authority of the Note Holder Purchaser to exercise such right under the terms of the Indenture. The Note Holder Purchaser should be limited to credit bidding only its share of the Indenture Obligations, which specific amount should be disclosed. Moreover, any right to credit bid should be subject to the Committee's Challenge Rights (as defined in the Interim DIP Order) and the Note Holder Purchaser should be required to post a letter of credit or deposit cash into an escrow to backstop the amount that is credit bid. In the event a portion of the credit bid is invalidated as a result of a successful challenge by the Committee of

the Note Holder Purchaser's underlying liens and security interests, the Note Holder Purchaser must pay the difference with the bid in cash;

- <u>Cross-Default</u>.  The DIP Facility should not contain cross-default provisions with the Stalking Horse APA;

- <u>Expense Reimbursement</u>.  The Note Holder Purchaser should not be entitled to receive any expense reimbursement under the circumstances of these cases;

- <u>Consultation Rights</u>.  The Committee should be a Consultation Party under the Bidding Procedures for all purposes.  In addition, the Debtors should not be required to consult with or provide copies of bids to the Note Holder Purchaser with respect to any Assets that the Note Holder Purchaser bids on, so as to avoid giving the Note Holder Purchaser an unfair advantage; and

- <u>Cure Cap</u>.  Pursuant to the Term Sheet, the Note Holder Purchaser has imposed a cap of $3 million (the "<u>Cure Cap</u>") on the amount of cure costs to be included as Assumed Liabilities.  There is no explanation, however, for the basis of the Cure Cap or why it is necessary since if the Note Holder Purchaser elects in its sole discretion to designate a contract or lease that has a cure cost in excess of what was estimated by the Debtors, the Note Holder Purchaser will pay the required cost even if it exceeds the Cure Cap.  This provision should be modified to state that (i) the Note Holder Purchaser will pay all necessary cure costs for any contract or lease it designates for assumption and assignment as an Assumed Liability, regardless of whether the cure costs exceed the Cure Cap, and (ii) the Debtors shall not be required to pay any cure cost for a contract or lease designated for assumption and assignment by the Note Holder Purchaser.

6.     The Note Holder Purchaser is in control of these cases by virtue of the Debtors' lack of cash and dependence on the DIP Facility.  If the Note Holder Purchaser wants to buy the Debtors' Assets through the bankruptcy process, it must adequately fund these cases and allow for a fair, equitable and open sale process.

7.     In the event that this Objection is not resolved prior to the hearing on the Motion, the Committee intends to file a proposed revised version of the bid procedures (the "<u>Bid Procedures</u>") and the form of order approving the Bid Procedures (the "<u>Bid Procedures Order</u>") to show the Committee's proposed changes.

8.      In addition, the Debtors currently anticipate filing the Stalking Horse APA on June 22, 2016.  Since the hearing on the Motion is currently scheduled for June 24, 2016 and the objection deadline with respect to the Motion is today, June 21, 2016, the Committee did not have the opportunity to review the Stalking Horse APA before filing the Objection.  Therefore, the Committee fully reserves its rights to object to the form of the Stalking Horse APA and the Sale Order when they are filed and reserves all its rights to supplement this Objection as appropriate.

9.      The Committee intends to continue its discussions and negotiations with the Debtors and other parties-in-interest to resolve the Committee's concerns with respect to the Sale Process on a consensual basis.  However, in the absence of material modifications to the Bidding Procedures, the Committee submits that the Sale Process, as currently proposed, does not allow for a fair, equitable and open sale process and that the Motion should be denied.

## JURISDICTION

10.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

11.      Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

12.      On May 16, 2016 and May 17, 2016 (together, the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their assets and property as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.

13.     On May 25, 2016, the Office of the United States Trustee for the District of Delaware (the "UST") appointed the Committee pursuant to Section 1102(a)(1) of the Bankruptcy Code.[8]  To date, the Committee has selected Squire Patton Boggs (US) LLP as its proposed lead counsel, Whiteford Taylor Preston LLP as its proposed Delaware local counsel, and CBIZ Corporate Recovery Services as its proposed financial advisor.

## The DIP Facility and Sale Milestones

14.     On May 23, 2016 and June 9, 2016, the Court entered the Interim DIP Order approving the DIP Facility on an interim basis.   On June 1, 2016, the Committee filed an objection (as supplemented, the "DIP Objection") [D.I. 117 and 269] objecting to various aspects of the DIP Facility, including the Sale Milestones.

15.     Among other things, the DIP Facility is linked with the Sale Process in that it appears to provide for only sufficient financing from the New Money DIP Lenders to allow for an expedited 60-day sale process in accordance with the following sale milestones (the "Sale Milestones"):[9]

- May 21, 2016 – Deadline to file the Motion;
- June 10, 2016 – Deadline to file the Stalking Horse APA;
- June 15, 2016 – Deadline for entry of a bid procedures order;
- July 5, 2016 – Bid Deadline;
- July 10, 2016 – Auction Deadline;
- July 15, 2016 – Deadline for entry of Sale Order; and
- July 30, 2016 – Closing Deadline.

16.     In addition, the Interim DIP Order contains broad stipulations by the Debtors with respect to the validity, extent, priority, and amount of the claims asserted by the Debtors'

---

[8] The formal notice of appointment of the Committee was filed on May 31, 2016 [D.I. 108].  The members of the Committee are:   U.S. Bank National Association, G.O Carlson, Inc.-Electralloy, PSC Metals, Inc., EAC Corporation, Steel Summit Holdings, Inc., Praxair and United Steelworkers.

[9] The Sale Milestones are set forth in detail on page 7 of the Term Sheet, which is an exhibit to both the motion to approve the DIP Facility [D.I. 13] and to the Motion.

prepetition secured lenders and broad releases in favor of those lenders.  Subject to the entry of a final order, the Committee has been provided with only a very limited investigation budget and a truncated Challenge Period to investigate the basis for the Debtors' stipulations and whether any claims against the lenders may exist.  Such rights necessarily impact the extent to which the Assets are encumbered and the ability of the Note Holder Purchaser to exercise any credit bid rights it may have under section 363(k) of the Bankruptcy Code.

### The Sale Motion

17.     On May 25, 2016, the Debtors filed the Motion, pursuant to which the Debtors seek, *inter alia*, approval of the Bid Procedures for the sale of the Assets and the final approval of the sale to the purchaser selected as successful bidder following the completion of the Sale Process.  As set forth in the Motion, the Note Holder Purchaser is the proposed stalking horse bidder for the Assets and intends to credit bid a portion or all of the Indenture Obligations, with a limited (and unknown) cash component to satisfy wind-down and professional fee expenses.  No cash proceeds will be available for unsecured creditors in the event the Note Holder Purchaser is selected as the successful bidder.

### The Debtors' Marketing Efforts

18.     As discussed above, the Debtors acknowledged during the first day hearing that no prepetition marketing process occurred with respect to the Assets.  The Debtors and Imperial only commenced the Sale Process on or about the Petition Date, which is currently limited to sixty (60) days.  The Committee believes that the marketing period is far too short and that the overall Sale Process would materially benefit from additional time.

## OBJECTION

19.     The Committee submits that, unless material changes are made to the Bid Procedures, the Motion must be denied for the reasons set forth below, including because the Sale Milestones are too aggressive and the Sale Process weighs too heavily in favor of the Note Holder Purchaser's credit bid.  As currently structured, the Bid Procedures and the Sale Process are not designed to maximize value or facilitate competitive bidding for the Assets and are therefore not in the best interest of the Debtors' estates and creditors.

### A.      Applicable Legal Standards.

20.     The principal goal in any proposed sale of property under section 363 of the Bankruptcy Code is to maximize the proceeds received by the estate, thereby providing the greatest value for creditors.  *See In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) (bid procedures must not favor one purchaser over another by increasing the cost of acquisition); *In re Mushroom Transp. Co. Inc.*, 382 F.3d 325, 339 (3d Cir. 2004) (noting the trustee's duty to maximize benefit to the estate); *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998).  To protect this outcome and ensure that the estate yields the maximum benefit from a sale, courts must safeguard the bidding and sale process and approve only those procedures that will not chill bidders' participation in the process.  Courts will not approve bidding procedures that undermine the principles of fair play because, unless the sale process remains open and fair, competing bidders will refrain from participating.  *See In re Jon J. Peterson, Inc.*, 411 B.R. 131, 137 (Bankr. W.D.N.Y. 2009).

21.     It is indisputable that a debtor-in-possession owes a fiduciary duty to its creditors and other stakeholders in its estate.  *Commodity Futures Trading Com v. Weintraub*, 471 U.S. 343, 355 (1985) ("[T]he fiduciary duty of the trustee runs to shareholders as well as to creditors."); *Myers v. Martin (In re Martin)*, 91 F.3d 389, 394 (3d Cir. 1996) ("[A] trustee has a

010-8228-9857/8/AMERICAS

fiduciary relationship with *all* creditors of the estate.").  Not only should bid protections for stalking horse bidders operate to maximize the value to the estate, so should the actual bidding procedures—by providing a controlled, fair and open process that will encourage participation in the auction.  To that end, courts should examine proposed procedures to ensure that they do not hamper the competitive bidding process.  *See generally Calpine Corp. v. O'Brien Envtl. Energy Inc. (In re O'Brien Envtl. Energy Inc.)*, 181 F.3d 527, 535-37 (3d Cir. 1999) (noting the importance of competitive bidding in bringing value to the estate).  Ensuring that the sale process remains fair and open necessarily requires the court to reject procedures that favor one party over another, such as those that provide unique rights to the stalking horse bidder.

> **B.     The Sale Milestones and Overall Timing of the Sale Process are Too Aggressive, Given the Lack of Any Prepetition Marketing Process, and Must be Revised Accordingly.**

22.     As indicated above, the Sale Milestones contemplate a 60-day sale process, which is overly aggressive under the circumstances of these cases and cannot be expected to sufficiently expose the Assets to the market and maximize value.  In contrast to many other chapter 11 cases, there was no prepetition marketing process with respect to the Assets.  The Debtors and Imperial started the postpetition sale process at the time of the filing of these cases and must, under the terms of the DIP Facility (including the limited amount of funds being made available under the DIP Facility and the Sale Milestones required by the DIP Facility), complete the entire sale process in a mere 60 days.

23.     A sale process must last enough time, however, to adequately expose the assets to the market because the best test for ensuring that value is being maximized is a full and fair market test.  *See, e.g., Official Comm. Of Unsecured Creditors of Champion Enters. V. Credit Suisse (In re Champion Enters.)*, 2012 Bankr. LEXIS 4009, *93-94 (Bankr. Del. 2012) ("A market test is the best evidence of a company's value at a given point in time").  In the

*Champion Enters.* case, this Court found that the sale process undertaken provided a true market test because it was thorough, conducted at arm's length, and "took place over many months pre- and post-petition." *Id.* Shorter postpetition marketing periods might be warranted in circumstances where there were significant prepetition marketing efforts. *See, e.g., In re Ashley River Consulting, LLC*, 2015 Bankr. LEXIS 2268, at *21-22 (Bankr. S.D.N.Y. 2015) (trustee believed a 75-day marketing period was appropriate given the past and present marketing work that was performed).

24.     The timeline proposed here is simply too short to properly expose the Assets to the market.  Among other things, prospective bidders will not have sufficient time to conduct the necessary due diligence and resolve all financing and other contingencies in time to submit a bid by the July 5, 2016 deadline which is two weeks away.  The proposed timeline must be modified to encourage competitive bidding and cannot tip the scales in favor of the Note Holder Purchaser's bid.  The United States Trustee has expressed the same concerns with respect to the timeline:

> The other issue that the U.S. Trustee has that has been addressed by subjecting it to final order is the time frames and the milestones in this case are not only tight, but there does not appear to be a record of a robust prepetition marketing process for the three lines of business that are being subject to a credit bid, and also a truncated challenge period.

*Hearing Tr.* at p. 53, lines 1-7.

25.     A 60-day sale process cannot be considered a robust marketing process.  While the Debtors cite to a number of cases in the Motion in support of their argument that the proposed Bid Procedures are consistent with precedents in this District (*Motion* at ¶ 45), the Motion is silent as to which, if any, cases actually approved a 60-day sale period where there was

11

no prepetition marketing process and the stalking horse purchaser intended to purchase the assets through a credit bid.

26.     The Committee respectfully submits that the condensed timeline, coupled with the lack of any prepetition marketing process and the ability of the Note Holder Purchaser to credit bid the entirety of the Indenture Obligations, will chill bidding.  In order to fully expose the Assets to the market, the Committee respectfully submits that no less than a 3 month marketing process is necessary.  "The need for expedition … is not a justification for abandoning proper standards."  *In re Lionel*, 722 F.2d 1063, 1071 (2d Cir. 1983) (citations omitted).

27.     Given that the "Final Maturity Date" of the DIP Facility is 120 days from the Petition Date, the Sale Milestones should be extended as follows, working backwards from a sale closing:

- Closing – 110 days from the Petition Date;

- Sale Hearing – 105 days from the Petition Date;

- Auction – 103 days from the Petition Date; and

- Bid Deadline – 100 days from the Petition Date.

28.     Absent an extension of the Sale Milestones and the overall marketing period for the Assets, the Committee submits that the Sale Process will not maximize value and, as such, is not in the best interest of the Debtors' estates.

**C.      The Debtors Must Have Greater Flexibility To Consider Bids and Conduct the Auction.**

29.     Numerous provisions in the proposed Bid Procedures restrict the Debtors' flexibility in considering bids and conducting an auction for the Assets.  For instance, in the Motion, the Debtors state that they "have put limited (if any) constraints on the ability of

prospective purchasers to bid on the Subject Assets, and instead have encouraged bid flexibility by, *inter alia*, allowing the Debtors to consider all competing offers – including offers for all or some Subject Assets – and to select, in their reasonable business judgment, and after consultation with the Consultation Parties (as defined in the Bid Procedures), the highest or otherwise best offer for the Subject Assets." *Motion* at ¶ 44. However, this description is in contradiction with the Bid Procedures which require bids to be for "the purchase of all, and not less than all, of the Subject Assets and the assumption of all, and not less than all, of the Assumed Liabilities" unless the bidder can obtain a waiver of this requirement and the Debtors and the "Ad Hoc Group" consent in their sole and absolute discretion. Bid Procedures at p. 5.

30.    This requirement unreasonably restricts the Debtors' ability to consider a bid that is not a bulk bid and that is not on terms equal to or better than the Note Holder Purchaser's bid. The Debtors must have adequate flexibility to consider bids to maximize value, and to conduct an auction for the Assets, or any portion thereof, as they see fit, in each case in consultation with the Consultation Parties.  Imposing that only bulk bids be submitted as Qualified Bids is also arbitrary since, from a business standpoint, the three businesses comprising the Assets are separate businesses with very few, if any, synergies.

**D.      The Proposed Expense Reimbursement is Unjustified and Unwarranted.**

31.    The Note Holder Purchaser should not be entitled to the Expense Reimbursement. *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d at 535 (holding that expense reimbursement protection must be necessary to preserve value and should not be approved for impermissible purposes such as to increase the acquisition cost for other prospective bidders or if such protection is not needed to induce a bid).   Indeed, the Note Holder Purchaser's request for such reimbursement, if approved by this Court, will likely negatively impact the Debtors' estates

and creditors by potentially chilling the bidding process and thereby ensuring that the Note Holder Purchaser's credit bid will be the Successful Bid — with no return for unsecured creditors.

32.    Pursuant to the Term Sheet, the Debtors are obligated to reimburse the Note Holder Purchaser for documented, reasonable, third-party out-of-pocket costs, fees and expenses incurred in connection with the formation and operation of the Note Holder Purchaser, the Term Sheet, the Stalking Horse APA, or the proposed sale.  In the event of a termination of the Term Sheet, the amount for the expense reimbursement for the Note Holder Purchaser is capped at $250,000.00.  In the event the sale with the Stalking Horse Purchaser is consummated, the expense reimbursement amount will be un-capped.

33.    As an initial matter, expense reimbursements are generally authorized as a stalking horse protection to induce a prospective bidder to agree to serve as a stalking horse. However, the Debtors did not conduct a prepetition sale process and selected a stalking horse from a wide group of bidders, nor did the Debtors have to induce the Note Holder Purchaser to serve as the stalking horse.  Here, there was no need for such inducement, since the Note Holder Purchaser has required stalking horse status by making such a designation a requirement under the Term Sheet and the DIP Facility.

34.    In addition, the Note Holder Purchaser has been involved in the Debtors' affairs for a long time and do not need to incur any material expense in credit-bidding for the Assets. The request for expense reimbursement is even more inappropriate because, under the Term Sheet, the Debtors have already agreed to pay the fees and costs incurred by the Note Holder Purchaser.  Moreover, the Note Holder Purchaser already exercises significant control over these

cases by virtue of the term of the DIP Financing.  Therefore, there is no need for or reason to provide the Note Holder Purchaser with any Expenses Reimbursement.

35.    The Expense Reimbursement provides no value to these estates and discourages competing bidders by artificially driving up the value of any topping bid.  Indeed, the Bid Procedures require that any Qualified Bid must, among other requirements, be high enough to cover the Purchase Price plus the amount of the Expense Reimbursement.  Accordingly, this Court should deny the Motion, or, if it is to be approved, strike the Expense Reimbursement provision from the Term Sheet and the Bid Procedures.

**E.    The Bidding Procedures and the Term Sheet Chill Bidding Because a Competing Bidder Cannot Determine the Necessary Bid Amount.**

36.    The Bid Procedures provide for numerous requirements for a bid to be considered a Qualified Bid, including (i) that the bid be on terms that are the same or better for the Debtors than the terms of the Note Holder Purchaser Bid and (ii) that the bid has a value greater than the sum of the Purchase Price, plus the Expense Reimbursement, plus a $500,000 overbid.  Thus, it is imperative for a potential bidder to know what the exact Purchase Price is.  Otherwise, the potential bidder will not be able to submit a qualifying bid.

37.    However, the definition of "Purchase Price" in the Term Sheet does not contain any information on the amount of the Purchase Price, such that it is impossible to determine what the Purchase Price actually is, which will chill the bidding process and discourage interested parties from investing time and money to conduct due diligence on the Debtors' Assets.

38.    Specifically, the term "Purchase Price" is defined as follows in the Term Sheet:

> The aggregate consideration for the Purchased Assets shall consist of the following (collectively, the "Purchase Price"): (i) cash in an amount sufficient to satisfy any outstanding claims as of the "Closing Date under the DIP Facility and, to the extent outstanding and not included in the DIP Facility, the Prepetition PNC Facility; (ii) cash to be paid into a separate escrow account (the "Wind-

<u>Down and Professional Escrow Account</u>") in an amount sufficient to satisfy the amounts to be paid following the Closing Date pursuant to the terms of the to be agree-upon budget for Wind-Down Expenses and unpaid retained professional fees; provided, however, that such expenses and fees and the corresponding amounts for such expenses and fees set forth in or contemplated by the wind-down budget, and the cash to be paid pursuant to this clause (ii), shall be reduced to the extent any such fees and expenses are assumed or included as Assumed Liabilities, (iii) pursuant to section 363(k) of the Bankruptcy Code, a credit bid of the Obligations owed by the Company arising under the Indenture in an amount to be set forth in the Asset Purchase Agreement by Purchaser, in its sole and absolute discretion; and (iv) assumption of the Assumed Liabilities (including all Cure Costs related to Assumed Contracts).

*Term Sheet* at p. 2.

39.    None of the specific amounts referenced in this definition has been disclosed, including the amount of the Wind-Down and Professional Escrow Account.  The amount of the credit bid is also unknown because the Note Holder Purchaser has not disclosed the amount of its holdings under the relevant indenture.  Finally, the amount of the credit bid is subject to change without any control or disclosure in the event the Note Holder Purchaser is trading on the notes under the relevant indenture, such that the Purchase Price could actually become a moving target under the control of the Note Holder Purchaser.  Prospective bidders must know how much their bid should amount to in order to be a Qualified Bid under the Bid Procedures.  The amount of the Purchase Price must be fixed to allow for a sale process to occur.

40.    Moreover, the Purchase Price, as proposed by the Note Holder Purchaser, must be allocated among the three business units to allow for potential bidders to bid on each of the business units.  Without allocation, a blanket credit bid by the Note Holder Purchaser on the three businesses will impede the Sale Process.

41.     Such information is crucial to potentially interested parties who are conducting due diligence on the Assets to be able to bid.  First, such parties were informed that the specific amount the Note Holder Purchaser will credit bid would be disclosed by June 10, 2016.  Subsequently, they were informed that the amount will be disclosed by June 20, 2016.  Finally, they were informed by the Debtors that the amount of the credit bid will not be disclosed until June 24, 2016.  Clearly, the moving target for disclosure of the amount of the credit bid has been detrimental, and has had a chilling effect, on the Sale Process.

42.     Finally, the overbid requirement of $500,000 is excessive.  Competitive bidding must be encouraged and facilitated.  To require each bid in increments of $500,000 will chill bidding and must be reduced to no more than $100,000.

F.     **This Court Can and Should Limit the Amount of the Note Holder Purchaser's Credit Bid.**

43.     Section 363(k) of the Bankruptcy Code permits the holder of an allowed claim to credit bid the full amount of that claim when the collateral securing such claim is sold outside of the ordinary course of business.  *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank,* 132 S.Ct. 2065 (2012)*; In re Phila. Newspapers, LLC*, 599 F.3d 298 (3d Cir. 2010). A secured creditor's ability to credit bid, however, is subject to the discretion of the bankruptcy court. Section 363(k) states that the amount of a credit bid may be abrogated for "cause."  11 U.S.C. § 363(k).   Cause is not defined in the Bankruptcy Code but has been the subject of recent jurisprudence.

44.     Last year, the Bankruptcy Court for the District of Delaware limited the right of a secured creditor to credit bid "for cause" on the basis that the bidding would be chilled if the credit bid was not capped.  *In re Fisker Auto. Holdings, Inc.*, 510 B.R. 55 (Bankr. D. Del 2014). *Fisker* was primarily focused on reducing the amount of the proposed credit bid to prevent a

chilling effect on other potential bidders and to ensure that the secured creditor was only permitted to bid the undisputed value of its secured claim. *Id*. at 60 (relying primarily on *In re Phila. Newspapers, LLC*, 599 F.3d at 315-16, n.14). Recent opinions analyzing the term "cause" under section 363(k) have focused on other factors, such as disputes over the validity of the secured claim. *See In re Free Lance-Star Pub'g Co.*, 512 B.R. 798 (Bankr. E.D. Va. 2014) (limiting a secured creditor's credit bid based on, among other things, improperly perfected liens and interference with the competitive bidding process); *In re RML Dev., Inc.*, 528 B.R. 150 (Bankr. W.D. Tenn. 2014) (limiting a credit bid to the undisputed amount of the creditor's secured claim).

45.    Indeed, this Court has previously denied noteholders the right to credit bid even their own portion of the obligations owed under an indenture where the indenture and related agreements did not allow the noteholders to act as a majority or minority as to credit bidding. *In re Electroglas, Inc*., 2009 Bankr. LEXIS 5527, *2-8 (Bankr. Del. 2009). The court in that case also found that cause existed to deny the noteholders the right to credit bid under section 363(k) of the Bankruptcy Code because allowing them to credit bid "would create confusion as to rights, some of which was already evidenced by the competing bids currently before me. In short, if there is going to be a credit bid, it needs to come from the Trustee." *Id*. at *8-9.

46.    As a threshold matter, a secured creditor can only credit bid the amount of its own secured claim. Here, the Bid Procedures allow the Note Holder Purchaser to credit bid the entirety of the Indenture Obligations, without specifying whether the Note Holder Purchaser owns the entirety of the Indenture Obligations or is authorized to trade on the notes. In addition, there is no discussion in the Motion of what requirements or limitations exist under the terms of the Indenture or related agreements with respect to allowing a subset of the Noteholders to

18

exercise credit bid rights with respect to the entirety of obligations owing under the Indenture. As such, blanket authority to credit bid the entirety of the Indenture Obligations is not appropriate.

47.    Furthermore, cause may exist in the instant cases to limit the amount of any credit bid by the Note Holder Purchaser.  The Committee has begun its investigating whether the Note Holder Purchaser's liens are valid, but until the Committee has completed its investigation, this Court should not permit the Note Holder Purchaser to credit bid.  The Committee is also investigating the recapitalization transaction which took place on January 2016.  After the expiration of the investigation period, the Court should limit the Note Holder Purchaser's credit bid to only the allowed and undisputed amount of its secured claim.  Thus, any right to credit bid of the Note Holder Purchaser should be subject to the Committee's Challenge Rights (as defined in the Interim DIP Order).  Alternatively, the Note Holder Purchaser should be required to post collateral or deposit cash into escrow to backstop its credit bid, which cash can be used to true-up any portion of the credit bid that is subsequently deemed not to be part of the credit bid as a result of a successful challenge by the Committee to the underlying liens and security interests of the Note Holder Purchaser.

48.    Therefore, this Court should prohibit the Note Holder Purchaser from credit bidding during the Committee's investigation period (or require cash to be escrowed on account of such credit bid), and limit any credit bid thereafter to the allowed amount of the Note Holder Purchaser's secured claim.  Moreover, to the extent that the Committee's investigation of the Note Holder Purchaser reveals "cause" that would preclude credit bidding or support a reduction in the amount of its credit bid, the Committee reserves all of its rights in that regard.

G.     **The Note Holder Purchaser Must Be Required to Pay the Full Cure Cost for Any Contract or Lease Designated for Assumption and Assignment.**

49.     Pursuant to the Term Sheet, the Note Holder Purchaser has imposed the Cure Cap of $3 million on the amount of cure costs to be included as Assumed Liabilities.  There is no explanation, however, for the basis of the Cure Cap or why it is necessary, especially when the Term Sheet states that, if the Note Holder Purchaser elects in its sole discretion to designate a contract or lease that has a cure cost in excess of what was estimated by the Debtors, the Note Holder Purchaser will pay the required cost even if it exceeded the Cure Cap.

50.     This provision should unequivocally state that the Note Holder Purchaser will pay all necessary cure costs for any contract or lease it designates for assumption and assignment as an Assumed Liability, regardless of whether the cure costs exceed the Cure Cap.  In addition, the Debtors' estates should not be required to pay any cure cost for a contract or lease designated for assumption and assignment by the Note Holder Purchaser.  Absent this modification, the Note Holder Purchaser's obligation with respect to payment of cure costs is ambiguous.

H.     **Several Other Aspects of the Bidding Procedures Provide an Unfair Advantage to the Note Holder Purchaser and/or Fail to Create a Competitive and Open Auction Process.**

51.     Other aspects of the Bid Procedures and the Term Sheet appear designed to ensure that the Note Holder Purchaser will receive the benefits of the bankruptcy sale process, while discouraging other prospective bidders from participating in such process, including the following:

- Access to Diligence Materials.  Prospective bidders are required to demonstrate financial capability to consummate a sale transaction as a prerequisite to being given access to diligence materials.  While evidence of financial wherewithal and the absence of financing contingencies are appropriate considerations for determining whether a particular bid should be deemed qualified (and those factors are indeed included in the Qualified Bid requirements portion of the Bid Procedures), it is inappropriate to condition access to diligence materials on providing such evidence;

20

- Cross-Default.  The DIP Facility should not contain cross-default provisions with the Stalking Horse APA; and

- Consultation Rights.  The Committee should be a required Consultation Party under the Bidding Procedures for all purposes.  The Debtors should not be required to consult with or provide copies of bids to the Note Holder Purchaser with respect to any Assets that the Note Holder Purchaser bids on, so as to avoid giving the Note Holder Purchaser an unfair advantage.

## RESERVATION OF RIGHTS

52.    The Committee reserves the right to supplement this Objection at any time prior to the hearing on the Motion.  The Committee expressly reserves its rights to raise additional or further objections to the Motion, any subsequent sale motion, the Term Sheet, the Stalking Horse APA and/or the proposed Sale Order when filed, at or prior to the hearing on the Motion.

**WHEREFORE**, the Committee respectfully requests that, unless all of the modifications set for herein are made to the Bid Procedures, this Court deny the Motion and grant the Committee such other and further relief as the Court deems just and proper.

Dated:  June 21, 2016
      Wilmington, DE

*/s/ Christopher M. Samis*
**WHITEFORD, TAYLOR & PRESTON LLC**
Christopher M. Samis
The Renaissance Centre, Suite 500
405 North King Street
Wilmington, DE 19801-3700
Tel:  (302) 357-3266
Fax:  (302) 357-3288
Email:  csamis@wtplaw.com

*Proposed Local Counsel for the Official Committee of Unsecured Creditors*

-and-

**SQUIRE PATTON BOGGS (US) LLP**
Norman N. Kinel (admitted *pro hac vice*)
Nava Hazan (admitted *pro hac vice*)
30 Rockefeller Plaza, 23rd Floor
New York, New York 10112

Tel:  (212) 872-9800
Fax:  (212) 872-9815
Email:    norman.kinel@squirepb.com
               nava.hazan@squirepb.com

-and-

**SQUIRE PATTON BOGGS (US) LLP**
Karol K. Denniston (admitted *pro hac vice*)
275 Battery Street, Suite 2600
San Francisco, California 94111
Tel:  (415) 954-0200
Fax:  (415) 994-6686
Email:    karol.denniston@squirepb.com

*Proposed Counsel for the Official*
*Committee of Unsecured Creditors*

010-8228-9857/8/AMERICAS