**<u>Exhibit A</u>**

**Asset Purchase Agreement**

**ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**[_____]**

**as Purchaser,**

**and**

**CONSTELLATION ENTERPRISES LLC**

**and**

**THE ADDITIONAL SELLERS**

**as Sellers**


**Dated as of [____], 2016**

# TABLE OF CONTENTS

**Page**

## ARTICLE 1

### PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES                2

| | | |
|---|---|---|
| 1.1. | Purchase and Sale of Assets | 2 |
| 1.2. | Assumption of Liabilities | 2 |
| 1.3. | Excluded Liabilities | 3 |
| 1.4. | "As Is" Transaction | 3 |
| 1.5. | Additional Assumed Contracts and Excluded Agreements; Cure Costs | 3 |
| 1.6. | Other Debtors | 4 |

## ARTICLE 2

### CONSIDERATION                4

| | | |
|---|---|---|
| 2.1. | Consideration | 4 |
| 2.2. | Deposit | 5 |
| 2.3. | Condition of Conveyance | 5 |
| 2.4. | Procedures for Assumption of Agreements; Delayed Transfer of Assets | 5 |

## ARTICLE 3

### CLOSING AND TERMINATION                6

| | | |
|---|---|---|
| 3.1. | Closing | 6 |
| 3.2. | Closing Deliveries by Sellers | 6 |
| 3.3. | Closing Deliveries by Purchaser | 7 |
| 3.4. | Termination of Agreement | 7 |
| 3.5. | Procedure Upon Termination | 9 |
| 3.6. | Effect of Termination | 9 |

## ARTICLE 4

### REPRESENTATIONS AND WARRANTIES OF SELLER                9

| | | |
|---|---|---|
| 4.1. | Corporate Organization | 9 |
| 4.2. | Authority Relative to This Agreement | 9 |
| 4.3. | Conflicts; Consents of Third Parties | 10 |
| 4.4. | Litigation | 10 |
| 4.5. | Intellectual Property | 10 |
| 4.6. | Permits | 11 |
| 4.7. | Brokers and Finders | 11 |
| 4.8. | Title to Assets; Condition of Assets | 11 |

i

4.9.    Contracts ...............................................................................................11
4.10.   Real Property ........................................................................................12
4.11.   Compliance with Law ............................................................................12
4.12.   Employees; Employee Benefits ..............................................................12
4.13.   Insurance Policies .................................................................................14
4.14.   Tax Matters ..........................................................................................14
4.15.   Customers and Suppliers.......................................................................15
4.16.   No Other Representations or Warranties ................................................15

## ARTICLE 5

**REPRESENTATIONS AND WARRANTIES OF PURCHASER**        **15**

5.1.    Corporate Organization..........................................................................15
5.2.    Authority Relative to This Agreement.....................................................15
5.3.    Consents and Approvals; No Violation ...................................................15
5.4.    Brokers and Finders ..............................................................................16
5.5.    Sufficiency of Funds .............................................................................16

## ARTICLE 6

**EMPLOYEES**        **16**

6.1.    Employees.............................................................................................16

## ARTICLE 7

**BANKRUPTCY COURT MATTERS**        **17**

7.1.    Competing Transaction...........................................................................17
7.2.    Bankruptcy Court Filings.......................................................................17

## ARTICLE 8

**COVENANTS AND AGREEMENTS**        **18**

8.1.    Conduct of Business ..............................................................................18
8.2.    Pre-Closing Access to Information ..........................................................19
8.3.    Further Agreements ...............................................................................20
8.4.    Consent and Approvals ..........................................................................20
8.5.    Preservation of Records; Post-Closing Access to Information...................20
8.6.    Publicity ...............................................................................................21
8.7.    Prohibition on Use of Purchased Names ................................................21
8.8.    Further Assurances................................................................................22

KL2 2963598.4

## ARTICLE 9

**CONDITIONS TO CLOSING**                                                                    **22**

9.1.    Conditions Precedent to the Obligations of Purchaser and Sellers....................................22
9.2.    Conditions Precedent to the Obligations of Sellers .........................................................23
9.3.    Conditions Precedent to the Obligations of Purchaser ....................................................23

## ARTICLE 10

**DEFINITIONS**                                                                              **24**

10.1.    Certain Definitions.........................................................................................................24
10.2.    Additional Defined Terms ..............................................................................................31

## ARTICLE 11

**TAXES**                                                                                    **32**

11.1.    Additional Tax Matters ..................................................................................................32

## ARTICLE 12

**MISCELLANEOUS**                                                                            **33**

12.1.    Payment of Expenses ......................................................................................................33
12.2.    Survival of Representations and Warranties; Survival of Post-Closing Covenants ..........33
12.3.    Ultimate Limit of Liability..............................................................................................33
12.4.    Entire Agreement; Amendments and Waivers .................................................................33
12.5.    Counterparts ...................................................................................................................33
12.6.    Governing Law ...............................................................................................................34
12.7.    Jurisdiction, Waiver of Jury Trial ...................................................................................34
12.8.    Notices ...........................................................................................................................34
12.9.    Binding Effect; Assignment ............................................................................................35
12.10.  Severability ....................................................................................................................35
12.11.  Injunctive Relief.............................................................................................................36
12.12.  Third Party Beneficiaries ...............................................................................................36
12.13.  Certain Interpretations ...................................................................................................36
12.14.  Non-Recourse .................................................................................................................37
12.15.  Sellers' Representative....................................................................................................37

KL2 2963598.4

# ASSET PURCHASE AGREEMENT[1]

ASSET PURCHASE AGREEMENT (as amended, supplemented or otherwise modified from time to time, this "Agreement"), dated as of [__], 2016 (the "Execution Date"), by and among Constellation Enterprises LLC, a Delaware limited liability company (the "Company"), the Additional Sellers (together with the Company, the "Sellers" and each individually a "Seller"), and [___], a [___] ("Purchaser").  Article 10 contains definitions of certain capitalized terms used herein and also provides cross-references to certain capitalized terms defined elsewhere in this Agreement.

## RECITALS

WHEREAS, Sellers are engaged in (i) the production of large, custom-forged industrial steel, aluminum, and titanium open-die forgings (the "JFC Business"), (ii) the manufacturing of tank heads and other cold metal stamped products (the "CMF Business"), and (iii) the manufacturing of deep drawn aluminum and molded plastic cases (the "ZMI Business" and, together with the JFC Business and the CMF Business, the "Business"), and Sellers own certain assets related to the Business and Purchaser desires to purchase certain assets used in the operation of the Business and assume certain liabilities related thereto;

WHEREAS, Sellers are debtors in those certain bankruptcy cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (as amended, the "Bankruptcy Code"), filed on May 16, 2016 and May 17, 2016 in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") under Case Nos. 16-11213, 16-11216, 16-11217, 16-11218, 16-11219, 16-11220, 16-11221 and 16-11222, respectively, (such bankruptcy cases, the "Chapter 11 Cases"); and

WHEREAS, Purchaser desires to purchase and assume from Sellers, and Sellers desires to sell, transfer and assign to Purchaser, the Purchased Assets and the Assumed Liabilities in accordance with this Agreement and in accordance with and subject to the Sale Order, pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Purchaser and Sellers hereby agree as follows:

---

[1] Note to Draft: Form of Asset Purchase Agreement to be conformed to specific transaction proposed by purchaser whether for all or some of the debtors' assets.

KL2 2963598.4

# ARTICLE 1

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

1.1.  Purchase and Sale of Assets.

(a)  *Purchased Assets*. Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code and on the terms and subject to the conditions set forth in this Agreement and the Sale Order, at the Closing, Purchaser shall purchase, acquire and accept from Sellers, and each Seller shall sell, transfer, assign, convey and deliver to Purchaser, on the Closing Date, all of such Seller's right, title and interest in, to and under, free and clear of all Encumbrances (other than Permitted Encumbrances) to all of such Seller's assets, properties, rights and interests of any nature whatsoever[2], excluding those assets identified as "Excluded Assets" in Section 1.1(b), but including those assets set forth on Schedule 1.1(a) hereto (collectively, but in all cases expressly excluding those assets identified as "Excluded Assets" in Section 1.1(b), the "Purchased Assets").

(b)  *Excluded Assets*. Notwithstanding anything to the contrary in this Agreement or any of the Ancillary Agreements, in no event shall any Seller be deemed to sell, transfer, assign or convey, and each Seller shall retain all of its right, title and interest to, in and under, all of its assets, properties, rights and interests, other than the Purchased Assets, including as set forth on Schedule 1.1(b) hereto (collectively, the "Excluded Assets").[3]

1.2.  Assumption of Liabilities.  On the terms and subject to the conditions set forth in this Agreement and the Sale Order, effective as of the Closing, Purchaser shall assume and discharge when due all Liabilities arising out of the conduct and the operations of the Business by Purchaser or its Affiliates after the Closing and such other Liabilities as set forth on Schedule 1.2 hereto (collectively, but in all cases excluding the Excluded Liabilities, the "Assumed Liabilities").[4]

---

[2] Note to Draft: Purchased Assets to include all shares of capital stock or other equity interests in Zero Cases (UK) Limited and Zero Cases Europe Ltd. and all of the Owned Real Property.

[3] Note to Draft: Excluded Assets to include, among other items, preference, fraudulent transfer and avoidance actions, intercompany obligations, certain books and records (e.g., books and records relating to Excluded Assets, books are records that are subject to attorney-client, work product or similar privilege and books and records the transfer of which would violate privacy rights of any person).

[4] Note to Draft: Assumed Liabilities to include, among other items, any allowed claims relating to current or former employees as and to the extent that such claims are allowed under section 507(a) and/or section 503 of the Bankruptcy Code.  Additionally, note that under the Bid Procedures Order each bid must include a statement indicating whether the bidder intends to assume the sponsorship of all or any part of, or any of the potential liabilities associated with the Pension Plan for Bargaining Unit Employees of Eclipse Manufacturing Co., Eclipse Manufacturing Co. Administrative and Technical Group Pension, Pension Plan for Hourly Paid Employees Of Metal Technology Solutions, and Pension Plan for Salaried Employees of Metal Technology Solutions.

2

1.3.    Excluded Liabilities.  Except for the Assumed Liabilities set forth in Section 1.2 (which shall, in no event, be Excluded Liabilities), Purchaser shall not assume, or become liable for the payment or performance of, any Liabilities of any Seller of any nature whatsoever, whether accrued or unaccrued (collectively, the "Excluded Liabilities"), including, without limitation, the Liabilities set forth on Schedule 1.3, all of which shall remain Liabilities of the applicable Seller.

1.4.    "As Is" Transaction.  Purchaser acknowledges and agrees that it has conducted its own independent investigation, review and analysis of the Business, the Purchased Assets and the Assumed Liabilities, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records, and other documents and data of the Sellers for such purpose.  Purchaser acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Purchaser has relied solely upon its own investigation and the express representations and warranties of the Sellers set forth in Article 4 of this Agreement; and (b) no Seller, nor any other Person, has made any representation or warranty as to any Seller, the Business, the Purchased Assets, the Assumed Liabilities or this Agreement, except as expressly set forth in Article 4 of this Agreement (as qualified by the Seller Disclosure Schedule).    SUCH REPRESENTATIONS AND WARRANTIES MADE BY THE SELLERS IN ARTICLE 4 CONSTITUTE THE SOLE AND EXCLUSIVE REPRESENTATIONS AND WARRANTIES OF THE SELLERS TO PURCHASER IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREBY, AND PURCHASER UNDERSTANDS, ACKNOWLEDGES AND AGREES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN ARTICLE 4 OF THIS AGREEMENT, ALL OTHER REPRESENTATIONS AND WARRANTIES OF ANY KIND OR NATURE EXPRESS OR IMPLIED, WRITTEN OR ORAL (INCLUDING ANY REPRESENTATION OR WARRANTY AS TO THE ACCURACY OR COMPLETENESS OF ANY INFORMATION REGARDING ANY SELLER, ANY AFFILIATES OF ANY SELLER, THE BUSINESS, THE PURCHASED ASSETS OR THE ASSUMED LIABILITIES FURNISHED OR MADE AVAILABLE TO PURCHASER AND ITS REPRESENTATIVES AND ANY INFORMATION, DOCUMENTS OR MATERIAL MADE AVAILABLE TO PURCHASER, MANAGEMENT PRESENTATIONS OR IN ANY OTHER FORM IN EXPECTATION OF THE TRANSACTIONS CONTEMPLATED HEREBY OR AS TO THE FUTURE REVENUE, PROFITABILITY OR SUCCESS OF THE BUSINESS, OR ANY REPRESENTATION OR WARRANTY ARISING FROM STATUTE OR OTHERWISE IN LAW OR RELATING TO MERCHANTABILITY OR FITNESS FOR USE) ARE SPECIFICALLY DISCLAIMED BY THE SELLERS.    PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT PURCHASER IS PURCHASING THE PURCHASED ASSETS ON AN "AS IS, WHERE IS", "WHERE IS," AND "WITH ALL FAULTS" BASIS AFTER GIVING EFFECT TO THE TERMS CONTAINED HEREIN.

1.5.    Additional Assumed Contracts and Excluded Agreements; Cure Costs.

(a)    Prior to the Execution Date, Sellers shall have delivered to Purchaser a schedule setting forth with respect to each Contract, as of the Execution Date, Seller's good faith estimate of the Cure Costs in respect of each such Contract (such schedule, the "Execution Date Contract Schedule").  Upon Purchaser's request, Sellers shall use commercially reasonable

3

efforts to provide additional information available to them as to the Liabilities under the Contracts reasonably requested by Purchaser in connection with Purchaser's assessment whether to designate any such Contract as an Assumed Contract and accept an assignment of such Contract pursuant to the terms of this Agreement.  No later than eight (8) Business Days prior to the Hearing, Purchaser shall provide Sellers with Schedule 1.5(a), which is the list of Assumed Contracts, if any, to be assigned by Sellers to Purchaser.  No later than three (3) Business Days prior to the Hearing, Purchaser may identify in writing to Sellers any additional Contracts that Purchaser wants added to Schedule 1.5(a) (the "Additional Assumed Contracts").  Any Additional Assumed Contract added to Schedule 1.5(a) shall become an Assumed Contract, and shall be deemed a Purchased Asset for purposes of this Agreement, and all Cure Costs relating to such Assumed Contract and all Liabilities arising on or after the Closing Date under such Assumed Contract shall be an Assumed Liability for all purposes of this Agreement pursuant to the provisions of Sections 1.2 and 2.3 hereof.  Notwithstanding the foregoing, at any time prior to one (1) Business Day prior to the Closing Date, Purchaser may identify in writing to Sellers any Assumed Contract as one that Purchaser no longer desires to have assigned to it and such Contract shall for purposes of this Agreement be deemed to be an Excluded Agreement.

(b)     Sellers shall (i) use commercially reasonable efforts to provide draft copies of any motions, applications or other court documents to be filed with, and the proposed orders to submitted to, the Bankruptcy Court seeking authorization to assume and assign any Contracts, within a reasonable period of time under the circumstances prior to the date any Seller intends to file any of the foregoing and (ii) consult in good faith with Purchaser regarding the substance of the foregoing.

(c)     Purchaser shall use commercially reasonable efforts to provide Sellers with sufficient information to establish Purchaser's adequate assurance of Purchaser's future performance of the Assumed Contracts under Section 365 of the Bankruptcy Code.

(d)     The Cure Costs in respect of all of the Assumed Contracts shall be paid by Purchaser on or before Closing or as soon as practicable after the Cure Cost for an Assumed Contract has been determined by the Bankruptcy Court.

1.6.   Other Debtors.  (a) The Purchased Assets do not include any assets, properties, rights or interests that are not owned by Sellers and in no event include any assets, properties, rights or interests owned by any of the Other Debtors and (b) nothing in this Agreement shall modify or effect any Liabilities of any of the Other Debtors or result in any of the Other Debtors having or incurring any Liabilities and the parties acknowledge and agree that in no event shall this Agreement be deemed to cause any of the Other Debtors to assume any Excluded Liability.

## ARTICLE 2

## CONSIDERATION

2.1.   Consideration.  The aggregate purchase price for the purchase of the Purchased Assets and the assumption of the Assumed Liabilities is an amount in cash equal to $[____] *plus*

4

the Estimated Wind Down Expenses[5] (collectively, the "Purchase Price").  The Purchase Price shall be paid on the Closing Date in accordance with Section 3.3(a).

    2.2.   Deposit.

    (a)   Upon the execution of this Agreement, pursuant to the terms of the Escrow Agreement, Purchaser shall, within two (2) Business Days following the date hereof, deposit with the Escrow Agent the sum of $[__][6] by wire transfer of immediately available funds (the "Escrow Amount"), to be released by the Escrow Agent in accordance with the provisions of the Escrow Agreement and this Agreement.  The Escrow Amount shall be applied against the Purchase Price at Closing and released to Sellers at Closing in accordance with the provisions of the Escrow Agreement and this Agreement.

    (b)   Pursuant to and in accordance with the Escrow Agreement: (i) if this Agreement is terminated pursuant to Section 3.4(g), (A) the Escrow Amount (together with all accrued interest thereon, if any) shall be paid to Sellers, and (B) Sellers and Purchaser shall deliver Joint Written Instructions to the Escrow Agent directing the Escrow Agent to deliver the Escrow Amount (together with all accrued interest thereon, if any) to Sellers; or (ii) if this Agreement is terminated pursuant to Sections 3.4(a), 3.4(b), 3.4(c), 3.4(d), 3.4(e), 3.4(f), 3.4(h), 3.4(i) or 3.4(j), (x) the Escrow Amount (together with all accrued interest thereon, if any) shall be paid to Purchaser, and (y) Sellers and Purchaser shall deliver Joint Written Instructions to the Escrow Agent directing the Escrow Agent to deliver the Escrow Amount (together with all accrued interest thereon, if any) to Purchaser.

    2.3.   Condition of Conveyance.  Without limiting the provisions of this Agreement relating to the Ancillary Agreements or any other provisions of this Agreement relating to sale, transfer, assignment, conveyance or delivery, the Purchased Assets and the Assumed Liabilities shall be sold, transferred, assigned, conveyed and delivered by Sellers to Purchaser by appropriate instruments of transfer, bills of sale, endorsements, assignments and deeds, in recordable form as appropriate, and otherwise all in form and substance reasonably satisfactory to Purchaser, and free and clear of any and all Encumbrances (other than Permitted Encumbrances) of any and every kind, nature and description, all as pursuant to the Sale Order.

    2.4.   Procedures for Assumption of Agreements; Delayed Transfer of Assets.

    (a)   At the Closing, Sellers shall assume and assign to Purchaser the Assumed Contracts, in each case pursuant to Section 365 of the Bankruptcy Code and the Sale Order, subject to provision of adequate assurance as may be required under Section 365 of the Bankruptcy Code.  In connection with such assumption and assignment, Purchaser shall, on or before Closing or as soon as practicable after the Cure Cost for an Assumed Contract has been determined by the Bankruptcy Court, pay the Cure Costs of each Assumed Contract.

---

[5] Note to Draft: To include, among other things, Seller's retained professional fees and an amount sufficient to satisfy 503(b)(9) claims and "burial" costs.

[6] Note to Draft: To be 10% of Purchase Price.

(b)     If following the Closing, any Seller receives or becomes aware that it holds any asset, property or right which constitutes a Purchased Asset, then such Seller shall transfer such asset, property or right to Purchaser as promptly as practicable for no additional consideration.

(c)     If following the Closing, Purchaser receives or becomes aware that it holds any asset, property or right which constitutes an Excluded Asset, then Purchaser shall transfer such asset, property or right to Sellers as promptly as practicable for no additional consideration.

## ARTICLE 3

## CLOSING AND TERMINATION

3.1.    <u>Closing</u>.  Subject to the satisfaction of the conditions set forth in <u>Section 9.1</u>, <u>Section 9.2</u> and <u>Section 9.3</u>, or the waiver thereof by the party entitled to waive the applicable condition, the closing of the transactions contemplated by this Agreement (the "<u>Closing</u>") shall take place at the offices of Kramer Levin Naftalis & Frankel LLP at 1177 Avenue of the Americas, New York, New York 10036 (or at such other place as the parties may mutually designate in writing) on the date that is no later than the second (2nd) Business Day following the date on which all of the conditions set forth in <u>Section 9.1</u>, <u>Section 9.2</u> and <u>Section 9.3</u> are satisfied or waived by the party entitled to waive the applicable condition (other than conditions that by their nature are to be satisfied at the Closing).  The date on which the Closing is held is referred to in this Agreement as the "<u>Closing Date</u>".

3.2.    <u>Closing Deliveries by Sellers</u>.  At the Closing, Sellers shall deliver:

(a)     to the Escrow Agent, Joint Written Instructions, duly executed by Sellers, directing the Escrow Agent to deliver the Escrow Amount (together with all accrued interest thereon, if any) to Sellers;

(b)     to Purchaser, a duly executed bill of sale and assignment and assumption agreement, substantially in the form attached as <u>Exhibit A</u> hereto, with respect to (i) conveyances by Sellers of the Purchased Assets to Purchaser and (ii) the assignment by Sellers and the assumption by Purchaser of the Assumed Liabilities by Purchaser;

(c)     to Purchaser, a true and correct copy of the Sale Order and case docket reflecting that the Sale Order is in effect;

(d)     to Purchaser, the officer's certificates required to be delivered pursuant to <u>Sections 9.3(a)</u> and <u>9.3(b)</u>;

(e)     to Purchaser, a certificate executed by each Seller in accordance with Treasury Regulation Section 1.1445-2(b)(ii) to the effect that such Seller is not a "foreign person" within the meaning of the Code section 1445 or successor statute;

6

(f)    to Purchaser, one or more deeds of transfer, each in a customary form as mutually reasonably agreed between Seller and Purchaser, to be executed by Seller and, if required by applicable Law, Purchaser in respect of the Owned Real Property, each of which shall be a quitclaim deed, or the equivalent in the applicable jurisdiction; and

(g)    to Purchaser, all other previously undelivered Seller Ancillary Agreements required by this Agreement to be delivered by any Seller at or prior to the Closing in connection with the transactions contemplated by this Agreement.

3.3.    <u>Closing Deliveries by Purchaser</u>.  At the Closing, Purchaser shall deliver:

(a)    to the Escrow Agent, Joint Written Instructions, duly executed by Purchaser, directing the Escrow Agent to deliver the Escrow Amount (together with all accrued interest thereon, if any) to Sellers;

(b)    to Sellers, an amount equal to the Purchase Price (less the Escrow Amount), by wire transfer of immediately available funds to the account of Sellers in accordance with written wire instructions delivered by Sellers to Purchaser on or prior to the Closing Date;

(c)    to Sellers, a duly executed bill of sale and assignment and assumption agreement, substantially in the form attached as <u>Exhibit A</u> hereto, with respect to (i) conveyances by Sellers of the Purchased Assets to Purchaser and (ii) the assignment by Sellers and the assumption by Purchaser of the Assumed Liabilities by Purchaser; and

(d)    to Sellers, the officer's certificates required to be delivered pursuant to <u>Sections 9.2(a)</u> and <u>9.2(b)</u>.

3.4.    <u>Termination of Agreement</u>.  This Agreement may be terminated prior to Closing as follows:

(a)    by the mutual written consent of Sellers and Purchaser at any time prior to the Closing;

(b)    by Purchaser or Sellers, if the Closing shall not have been consummated on or prior to [___], 2016 (the "<u>Outside Date</u>"); <u>provided</u>, <u>however</u>, that the right to terminate this Agreement under this <u>Section 3.4(b)</u> shall not be available to Purchaser or Sellers, as applicable, if Purchaser is or any Seller is, as applicable, in material breach or violation of any of their respective representations, warranties, covenants or agreements under this Agreement;

(c)    by Purchaser or Sellers, if there shall be any Law that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited, or there shall be in effect a final non-appealable order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; it being agreed that the parties hereto shall promptly appeal any adverse determination which is appealable (and pursue such appeal with reasonable diligence);

KL2 2963598.4

(d)     by Purchaser, if any Chapter 11 Case as it relates to any Seller and its assets, as a result of acts or failures to act of any Seller, is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs, the business or the reorganization of any Seller is appointed in any Chapter 11 Case;

(e)     by Purchaser, if (i) the Sale Order shall not have been entered by the Bankruptcy Court by 11:59 p.m. (New York City time) on [___], 2016 or (ii) following entry of the Sale Order, the Sale Order shall (A) have been reversed or (B) have been modified or amended in any manner materially adverse to Purchaser without the prior written consent of Purchaser; provided, that the right of Purchaser to terminate this Agreement under this Section 3.4(e) shall not be available if Purchaser is then in material breach of its representations, warranties, covenants or other agreements contained in this Agreement;

(f)     by Purchaser, (i) if any Seller shall have breached or failed to perform any of its representations, warranties, covenants or other agreements contained in this Agreement, or if any representation or warranty of any Seller in this Agreement shall have become untrue, and (ii) any such breach, failure to perform or occurrence referred to in clause (i) (A) would result in a failure of any condition set forth in Section 9.3(a) or Section 9.3(b) and (B) is not curable or able to be performed, or, if curable or able to be performed, is not cured or performed prior to the earlier of (x) the Outside Date and (y) twenty (20) days after written notice of such breach, failure or occurrence is given to Sellers by Purchaser; provided, that the right of Purchaser to terminate this Agreement under this Section 3.4(f) shall not be available if Purchaser is then in material breach of its representations, warranties, covenants or other agreements contained in this Agreement;

(g)     by Sellers, (i) if Purchaser shall have breached or failed to perform any of its representations, warranties, covenants or other agreements contained in this Agreement, or if any representation or warranty of Purchaser in this Agreement shall have become untrue, and (ii) any such breach, failure to perform or occurrence referred to in clause (i) (A) would result in a failure of a condition set forth in Section 9.2(a) or Section 9.2(b) and (B) is not curable or able to be performed, or, if curable or able to be performed, is not cured or performed prior to the earlier of (x) the Outside Date and (y) twenty (20) days after written notice of such breach, failure or occurrence is given to Purchaser by Sellers; provided, that the right of Sellers to terminate this Agreement under this Section 3.4(g) shall not be available if any Seller is then in material breach of its representations, warranties, covenants or other agreements contained in this Agreement; or

(h)     by Sellers or Purchaser, if (i) Sellers enters into a definitive agreement with respect to a Competing Bid, (ii) the Bankruptcy Court enters an order approving a Competing Bid and (iii) the Person making the Competing Bid consummates the Competing Bid;

(i)     by Purchaser, if the Back-up Termination Date has occurred; or

(j)     by Purchaser, at any time on or after the date that is six (6) Business Days following the Hearing, if the Purchaser is not accepted as the Successful Bid or the Backup Bid (each as defined in the Sale Procedures).

8

3.5.    <u>Procedure Upon Termination</u>.  In the event of a termination of this Agreement by Purchaser or Sellers, or all of them, pursuant to <u>Section 3.4</u>, (a) written notice of such termination shall be given promptly by the terminating party to the other parties hereto, specifying the provision hereof pursuant to which such termination is made, and (b) except as set forth in <u>Section 3.6</u>, this Agreement shall thereupon terminate and become void and of no further force or effect, and the consummation of the transactions contemplated by this Agreement shall be abandoned without further action of the parties hereto; <u>provided</u>, <u>however</u>, notwithstanding anything contained in this Agreement to the contrary, such termination shall not relieve Purchaser from Liability for its breach of this Agreement prior to such termination.   Any termination of this Agreement by Purchaser or Sellers, or all of them, pursuant to <u>Section 3.4</u> shall be effective on the date that written notice of such termination is given by the terminating party to the other parties hereto.

3.6.    <u>Effect of Termination</u>.  In the event of any termination of this Agreement pursuant to <u>Section 3.4</u>, this Agreement (other than the provisions set forth in <u>Section 2.2(b)</u>, <u>Section 3.4</u>, <u>Section 3.5</u>, this <u>Section 3.6</u>, and <u>Article 12</u>) shall become null and void ab initio and be of no further force and effect, it being agreed that such termination shall not relieve Purchaser from liability of any breach of this Agreement prior to such termination.

# ARTICLE 4

## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the Seller Disclosure Schedules, Sellers hereby make the representations and warranties in this <u>Article 4</u> to Purchaser as of the Execution Date.

4.1.    <u>Corporate Organization</u>.  Each Seller is a limited liability company or corporation, duly organized, validly existing and in good standing under the Laws of its formation or incorporation.  Each Seller has all requisite power and authority to own, lease, develop and operate the Purchased Assets that it owns, leases, develops and operates and to conduct the Business as it is now being operated by it.  Each Seller is duly licensed or qualified and in good standing to do business in each jurisdiction in which the properties owned or leased by it or the operation of its business makes such licensing or qualification necessary, except where the failure to be so qualified, licensed or in good standing would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

4.2.    <u>Authority Relative to This Agreement</u>.  Subject to entry of the Sale Order, each Seller has all requisite corporate power, authority and legal capacity to (a) execute and deliver this Agreement, (b) execute and deliver such Seller Ancillary Agreements to be executed by such Seller, and (c) perform its obligations hereunder and under each of the Seller Ancillary Agreements to be executed by such Seller, and to consummate the transactions contemplated hereby and thereby.   The execution and delivery of this Agreement and each of the Seller Ancillary Agreements to be executed by it, and the consummation of the transactions contemplated hereby and thereby, have been duly authorized by all requisite action on the part of each Seller.  This Agreement has been, and at or prior to the Closing, each of the Seller Ancillary Agreements will be, duly and validly executed and delivered by each applicable Sellers party

9

thereto and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, and the entry of the Sale Order) this Agreement constitutes, and each of Seller Ancillary Agreements, when so executed and delivered, will constitute, legal, valid and binding obligations of the applicable Seller, enforceable against such Seller in accordance with its respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at Law or in equity) (the "Bankruptcy Exceptions").

4.3.    Conflicts; Consents of Third Parties.

(a)    Subject to entry of the Sale Order, neither the execution and delivery of this Agreement or any of the Ancillary Agreements by any Seller, nor the consummation of the transactions contemplated hereby or thereby, nor compliance by any Seller with any of the terms or provisions hereof or thereof, will (i) conflict with or result in a breach of any provision of the charter documents, bylaws, limited liability company agreement or other governing documents of such Seller, (ii) conflict with or result in a breach of any Law applicable to such Seller or (iii) conflict with, violate, result in the breach or termination of or the loss of a benefit under, or constitute (with or without notice or lapse of time or both) a default (or give rise to any right of termination, cancellation, payment or acceleration) or adverse modification of any terms or rights under, any Contract or Permit or (iv) result in any Encumbrance (other than Permitted Encumbrances) on any of the Purchased Assets, except in each case clauses (i) through (iv) above, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    Subject to entry of the Sale Order, as of the date hereof, no consent, approval, license, permit, order, qualification or authorization of, or registration, declaration, notice or filing with, any Governmental Body or any other Person is required for or in connection with the execution and delivery by any Seller of this Agreement and each Ancillary Agreement to which any Seller is a party, and the consummation by each Seller of the transactions contemplated hereby and thereby.

4.4.    Litigation.    There is no litigation, action, claim, suit, proceeding, investigation, examination, hearing, arbitration, inquiry, subpoena or audit, whether in law or equity, or whether civil, criminal, regulatory, arbitral or administrative (except as filed as part of the Bankruptcy Cases) related to the Purchased Assets (collectively, "Actions"), pending or, to the Knowledge of Seller, threatened.    Except as filed as part of the Bankruptcy Cases, no Seller is subject to any judgment, decree, injunction, subpoena, order, ruling, writ, assessment or award of any court, arbitration panel or other Governmental Body that relates to the Purchased Assets or the Assumed Liabilities and for which such Seller has continuing obligations or Liabilities.

4.5.    Intellectual Property.    Section 4.5 of the Seller Disclosure Schedule sets forth a true, complete and correct list of (i) all of the patents, registered trademarks, registered copyrights, Internet domain names, and applications for any of the foregoing, in each case that constitute the Seller Intellectual Property ("Registered IP") and (ii) all software included in the

10

Seller Intellectual Property.  To the Knowledge of Seller, (x) no Registered IP has been adjudged invalid or unenforceable in whole or in part and (y) all Registered IP is valid and enforceable.

4.6.    <u>Permits</u>.

(a)    All of the Permits that are (i) required for the ownership or use of the Purchased Assets and (ii) for the operation of the Business (collectively, the "<u>Permits</u>") are held by the applicable Seller in full force and effect, except in each case of <u>clauses (i)</u> and <u>(ii)</u> above, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Each such Permit is listed in <u>Section 4.6(a)</u> of the Seller Disclosure Schedule.

(b)    Each Seller is in compliance with its obligations under each of its Permits and the rules and regulations of the Governmental Body issuing such Permits, except in each case, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(c)    There is no pending, or to the Knowledge of Sellers threatened, action, investigation or proceeding with respect to revocation, cancellation, suspension or nonrenewal of any such Permit.  No Seller has received any written notice from any Governmental Body (x) asserting the violation of the terms of any such Permit, (y) threatening to revoke, cancel, suspend or not renew the terms of any such Permit, or (z) seeking to impose fines, penalties or other sanctions for violation of the terms of any such Permit, except in each case of <u>clauses (x)</u> through <u>(y)</u> above, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

4.7.    <u>Brokers and Finders</u>.  No Seller has employed, and no other Person has made any arrangement by or on behalf of any Seller with, any investment banker, broker, finder, consultant or intermediary in connection with the transactions contemplated by this Agreement which could give rise to any claim against Purchaser for any investment banking, brokerage, finder's or similar fee or commission in connection with this Agreement or the transactions contemplated hereby.

4.8.    <u>Title to Assets; Condition of Assets</u>.  Each Seller has good and marketable title, a valid leasehold interest, or with respect to the Owned Real Property, fee simple title, as applicable, in and to each of the Purchased Assets owned or leased by it and has the right to use the respective Purchased Assets necessary for the conduct of its respective Business as currently conducted.  Subject to entry of the Sale Order, Seller has, and at the Closing Purchaser shall receive, good, valid and marketable title, valid leasehold interest in, or with respect to the Owned Real Property, fee simple title, as applicable, to the material Purchased Assets, free and clear of all Encumbrances (except Permitted Encumbrances).

4.9.    <u>Contracts</u>.  Except in each case as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, each Contract listed on the Execution Date Contract Schedule is valid, binding and enforceable against the applicable Seller(s) party thereto and, to the Knowledge of Sellers, the other parties thereto, in accordance with its terms, in each case subject to the Bankruptcy Exceptions.  To the Knowledge of Sellers, (i) there is no material default by any Seller under any Contract listed on the Execution Date Contract Schedule

11

and (ii) no event has occurred which, with due notice or lapse of time or both, would constitute such a default, in each case of clauses (i) and (ii) above, that will not be cured by compliance with the Sale Order at Closing, including payment of any Cure Costs that the Purchaser is required to pay pursuant to this Agreement.  To the knowledge of Sellers, (x) no other party to any Contract listed on the Execution Date Contract Schedule is in material default in respect thereof and (y) no event has occurred which, with due notice or lapse of time or both, would constitute such a default, except in each case clauses (x) and (y) above, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

    4.10.    Real Property.

        (a)    Section 4.10(a) of the Seller Disclosure Schedule sets forth a complete and correct list of all Owned Real Property specifying the address or other information sufficient to identify all such Owned Real Property.  The applicable Seller has good, marketable fee simple title to the Owned Real Property, free and clear of any Encumbrances, except for Permitted Encumbrances.

        (b)    Section 4.10(b) of the Seller Disclosure Schedule sets forth a complete and correct list of all Leased Real Property specifying the address or other information sufficient to identify all such Leased Real Property.

        (c)    No Seller has assigned, mortgaged, pledged or otherwise encumbered its interest under any Owned Real Property owned by it and no Seller has entered into any written lease, sublease or otherwise entered into any written agreement which granted to any Person the right to access, enter upon, use, occupy, lease, manage or operate any portion of such Seller's interest in the Owned Real Property owned by it that is not otherwise a Permitted Encumbrance or that will not otherwise be terminated on or prior to the Closing Date.

    4.11.    Compliance with Law.  Each Seller: (i) is in compliance with all applicable Laws relating to the Purchased Assets, (ii) as of the Execution Date, has not received written notice of any alleged violation of any Law applicable to the Purchased Assets, and (iii) is not subject to, or in default in any respect with, any order of any Governmental Body applicable to the Purchased Assets or the transactions contemplated under this Agreement, except in each case of clauses (i) through (iii) above, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

    4.12.    Employees; Employee Benefits.

        (a)    Section 4.12(a) of the Seller Disclosure Schedule sets forth a true and complete list of individuals that are currently employed by any Seller in the Business and all individuals that are on temporary or permanent lay-off or furlough status ("Business Employees"), including name, title, date of hire, former or current base salary or wage rate, position, title, bonus opportunity, and whether such employee is out on disability or other permitted leaves of absence and/or is on temporary or permanent lay-off or furlough status.

        (b)    No Seller is a party to any labor or collective bargaining agreement that covers any Business Employees.  To the Knowledge of Sellers, there are no union organizing

12

activities pending or overtly threatened with respect to the Business Employees.  There are no strikes, lockouts or other material labor disputes pending or, to the Knowledge of Seller, overtly threatened by or with respect to any Business Employees.  Each Seller has complied in all respects with applicable Laws regarding the employment of employees, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(c)    Section 4.12(c) of the Seller Disclosure Schedule sets forth a list of all of the material pension, retirement, profit-sharing, deferred compensation, equity compensation, severance, change in control, vacation, medical, dental, disability, life insurance, bonus or other plans, programs, arrangements or agreements (including all "employee benefit plans" as that term is defined in Section 3(3) of ERISA) maintained, sponsored or contributed to by Seller or any of its Affiliates for the benefit of the Business Employees or any beneficiary or dependent thereof (collectively, the "Benefit Plans").

(d)    No Seller (i) maintains, contributes to or participates in, and no Seller has incurred any liability with respect to, any employee benefit plan that is subject to Title IV of ERISA, Code Section 412, or ERISA Section 302, or (ii) participates in or contributes to, and no Seller has incurred any liability with respect to, a multiemployer plan within the meaning of Section 3(37) of ERISA.  No Benefit Plan is (i) a voluntary employees' beneficiary association within the meaning of Code Section 501(c)(9), or (ii) a self-insured group health or other group welfare plan.

(e)    Each of the Benefit Plans intended to be "qualified" within the meaning of Code Sections 401(a) or 501 has received a favorable determination letter or may rely on a favorable opinion letter as to such plan's qualified status, and, to the Knowledge of Sellers, no circumstances exist that would reasonably be expected to result in the revocation of any such letter.  Each of the Benefit Plans has been (i) administered in compliance with its terms in all respects and (ii) maintained in accordance with ERISA, the Code and any other applicable Laws in all material respects, in each case of clauses (i) and (ii) above, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(f)    With respect to each Benefit Plan: (i) no actions, suits, claims or disputes are pending, or, to the Knowledge of Sellers, threatened; (ii) no audits, inquiries, reviews, proceedings, claims, or demands are pending with any Governmental Body; (iii) all material premiums, contributions, or other payments required to have been made under the terms of any Benefit Plan or any contract or agreement relating thereto as of the Closing Date have been made; and (iv) all material reports, returns and similar documents required to be distributed to any plan participant have been duly and timely distributed.

(g)    No Benefit Plan provides for medical or death benefits with respect to any employee or former employee of Seller or its predecessors after termination of employment, except as required under Section 4980B of the Code or Part 4 of Title I of ERISA or other applicable Laws.

(h)    Except as otherwise expressly contemplated by the terms of this Agreement, to the Knowledge of Sellers, the consummation of the transactions contemplated by this Agreement shall not give rise to any material liability under any Benefit Plan, or accelerate

13

the time of payment or vesting or increase the amount of compensation or benefits due to any employee, director or independent contractor of any Seller (whether current, former or retired) or their beneficiaries solely by reason of such transactions.

4.13.  <u>Insurance Policies</u>.  <u>Section 4.13</u> of the Seller Disclosure Schedule sets forth a complete list of all insurance policies with respect to which any Seller is a party, a named insured or otherwise the beneficiary of coverage with respect to any of the Purchased Assets or the Assumed Liabilities.

4.14.  <u>Tax Matters</u>.  Except in each case as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect:

(a)    Each Seller has (or will have by the Closing Date) filed all Tax Returns that are required to be filed before the Closing Date and such Tax Returns have been (or will be by the Closing Date) properly prepared and timely filed and were (or will be by the Closing Date) true, complete and accurate in all material respects;

(b)    Each Seller has fully and timely paid all Taxes due and payable (whether or not shown on any Return), and each Seller has withheld and timely paid over to the appropriate Taxing authority all  Taxes that they are required to withhold from amounts paid or owing to any employee, creditor, independent contractor or other third party in compliance with all Tax withholding and remitting provisions of applicable Laws and has complied in all respects with all material Tax information reporting provisions of all applicable Laws;

(c)    No Seller has waived any statute of limitations with respect to any Taxes or agreed to any extension of time with respect to the collection or assessment or reassessment of Taxes due from such Seller for any Taxable period and no request for any such waiver or extension is currently pending;

(d)    No audits or administrative or judicial or other proceedings are pending or being conducted or, to the Knowledge of Sellers, being threatened in writing with respect to the Taxes due from any Seller, no Governmental Body has given notice in writing of any intention to assert any deficiency or claim for additional Taxes against any Seller, no claim has been made by any Governmental Body in a jurisdiction where any Seller does not file a Return that any Seller is or may be subject to Taxation by that jurisdiction, and all deficiencies for Taxes asserted or assessed against Seller have been fully and timely paid or have otherwise been resolved;

(e)    None of the Purchased Assets are subject to any Encumbrance for Taxes (other than Permitted Encumbrances);

(f)    None of the Purchased Assets are "tax-exempt use property" within the meaning of Section 168(h) of the Code; and

(g)    No Seller has had a permanent establishment in any foreign country, as defined in any applicable Tax treaty or convention between the United States and such foreign country, and no Seller is engaged in a trade or business in any foreign country with which the United States does not have a Tax treaty or convention.

14

4.15.   <u>Customers and Suppliers</u>.   <u>Section 4.15</u> of the Seller Disclosure Schedule sets forth a true, complete and correct list of the ten (10) largest customers and ten (10) largest suppliers for each of the JFC Business, the CMF Business and the ZMI Business, in each case for the fiscal year ended December 31, 2015.

4.16.   <u>No Other Representations or Warranties</u>.   Except for the representations and warranties contained in this <u>Article 4</u>, no Seller, nor or any other Person on behalf of any Seller, makes any express or implied representation or warranty with respect to any of the Purchased Assets or with respect to any other information provided to Purchaser in connection with the transactions contemplated hereby, including, without limitation, as to the probable success or profitability of the ownership, use or operation of the Business, and the Purchased Assets following the Closing.  No Seller shall have or be subject to any liability to Purchaser resulting from the distribution to Purchaser, or Purchaser's use of, any such information, including any information, documents, projections, forecasts or other materials made available to Purchaser in expectation of the transactions contemplated by this Agreement, unless any such information is expressly included in a representation or warranty contained in this <u>Article 4</u>.

## ARTICLE 5

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby makes the representations and warranties in this <u>Article 5</u> to Sellers as of the Execution Date.

5.1.   <u>Corporate Organization</u>.   Purchaser is a [limited liability company/corporation], duly organized, validly existing and in good standing under the Laws of its jurisdiction of formation.

5.2.   <u>Authority Relative to This Agreement</u>.   Purchaser has all requisite [limited liability company/corporate] power, authority and legal capacity to (a) execute and deliver this Agreement, (b) execute and deliver the Ancillary Agreements to be executed by Purchaser, and (c) perform its obligations hereunder and under each of the Ancillary Agreements to be executed by Purchaser, and to consummate the transactions contemplated hereby and thereby.   The execution and delivery of this Agreement and each of such Ancillary Agreements, and the consummation of the transactions contemplated hereby and thereby, have been duly authorized by all requisite action on the part of Purchaser.  This Agreement has been, and at or prior to the Closing each of such Ancillary Agreements will be, duly and validly executed and delivered by Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, and the entry of the Sale Order) this Agreement constitutes, and each of such Ancillary Agreements when so executed and delivered will constitute, legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with its respective terms, subject to the Bankruptcy Exceptions.

5.3.   <u>Consents and Approvals; No Violation</u>.   Neither the execution and delivery of this Agreement or any of the Ancillary Agreements by Purchaser, nor the consummation of the transactions contemplated hereby or thereby, nor compliance by Purchaser with any of the terms or provisions hereof or thereof, will (i) conflict with or result in a breach of any provision of the

15

[certificate of formation, limited liability company agreement/certificate of incorporation, bylaws] or other governing documents of Purchaser, (ii) conflict with or result in a breach of any Law applicable to Purchaser or (iii) conflict with, violate, result in the breach or default under any Contract to which Purchaser is a Party.  The execution, delivery and performance by Purchaser of this Agreement does not require Purchaser to make any filing with or give notice to, or obtain any consent or Permit from, any Governmental Body, other than the Sale Order.

5.4.    <u>Brokers and Finders</u>.  Purchaser has not employed, and to the knowledge of Purchaser, no other Person has made any arrangement by or on behalf of Purchaser with, any investment banker, broker, finder, consultant or intermediary in connection with the transactions contemplated by this Agreement which could give rise to and claim against any Seller and its Affiliates for investment banking, brokerage, finder's or similar fee or commission in connection with this Agreement or the transactions contemplated hereby.

5.5.    <u>Sufficiency of Funds</u>.  Purchaser has as of the Execution Date, and shall have at the Closing, funds that are sufficient to pay the Purchase Price, assume the Assumed Liabilities and otherwise consummate all of the transactions contemplated hereunder.

## ARTICLE 6

## EMPLOYEES

6.1.    <u>Employees</u>.

(a)    From and after the date hereof until the Closing Date, Sellers shall not terminate the employment of any Business Employees (other than for cause), without the prior written consent of Purchaser.

(b)    Purchaser (or its Affiliates) may, in its sole discretion, make written offers of employment to any or all of the Business Employees (the "<u>Offer Employees</u>"), with such employment by Purchaser or its Affiliate (as applicable) to commence as of the Closing Date, conditional on Closing; provided that Purchaser shall make offers of employment to not less than 90% of the Business Employees for compensation and other terms and conditions substantially similar to those provided to such Business Employees by Seller immediately prior to the Closing Date (or with respect to those Business Employees on lay-off or furlough status, immediately prior to their lay-off or furlough).  Each such Offer Employee who executes and delivers an offer letter on or before the Closing Date and commences employment with Purchaser (or its Affiliates) on the Closing Date is hereinafter referred to as a "<u>Transferred Employee</u>".  Prior to the Closing, Sellers shall cooperate with Purchaser in its efforts to obtain an executed offer letter from each such Business Employee to whom Purchaser desires (or is required) to extend an offer of employment.  Subject to the foregoing provisions of this <u>Section 6.1(b)</u>, all such offers of employment shall be (i) subject to such compensation, benefit and other terms and conditions of employment as Purchaser shall determine in its sole discretion and (ii) contingent on such Business Employee's waiver of any claims to termination payments against Seller's bankruptcy estate.  On the Closing Date, Sellers shall terminate the employment of each Transferred Employee and Purchaser shall commence its employment of such Transferred Employee.

16

(c)      Nothing in this <u>Article 6</u> expressed or implied shall  confer any third party rights or remedies hereunder in any Person, including any Business Employees or Transferred Employees and nothing herein amends any Benefit Plan or any employee benefit plan of Purchaser.

(d)      Subject to applicable Law, Sellers shall cooperate with Purchaser and shall permit Purchaser a reasonable period during normal business hours prior to the Closing Date, to communicate with Business Employees on temporary or permanent lay-off or furlough status and meet with current Business Employees at such times as Purchaser shall reasonably request in connection with Purchaser determining which Business Employees shall be extended an offer of employment.

(e)      Following the Closing, Sellers and Purchaser shall cooperate reasonably with each other to provide an orderly administrative transition to Purchaser of the Transferred Employees, including the provision by Sellers to Purchaser of all necessary or appropriate documents, records, materials, accounting files and Tax information with respect to each Transferred Employee.

## ARTICLE 7

## BANKRUPTCY COURT MATTERS

7.1.    <u>Competing Transaction</u>.    This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers of higher or better competing bids in respect of all or any part of the Purchased Assets (whether in combination with other assets of any Seller or any of their respective Affiliates or otherwise) (each a "<u>Competing Bid</u>"). Sellers are permitted to and to cause their respective Representatives and Affiliates to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Affiliates and Representatives) in connection with any sale or other disposition of the Purchased Assets. In addition, Sellers and their respective Representatives and Affiliates shall have the authority to respond to any inquiries or offers to purchase all or any part of the Purchased Assets (whether in combination with other assets of any Seller or any of their respective Affiliates or otherwise) and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable Law, including supplying information relating to the Business and the assets of Sellers to prospective purchasers.

7.2.    <u>Bankruptcy Court Filings</u>.

(a)      Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to obtain the Bankruptcy Court's entry of the Sale Order, including a finding of adequate assurance of future performance by Purchaser, including by furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code. Purchaser shall not, without the prior written consent of Sellers, file, join in, or otherwise support in any manner whatsoever any motion or other pleading relating to the sale

17

of the Purchased Assets hereunder, except to the extent necessary to further the terms of this Agreement.

(b)     Sellers shall file such notices as may be appropriate or necessary to assume and assign the Assumed Contracts and to determine the amount of the Cure Costs; provided, that nothing herein shall preclude any Seller from filing motions to reject any Contracts that are not Assumed Contracts.

(c)     Sellers and Purchaser agree that, in the event that Purchaser is not the winning bidder at the auction undertaken pursuant to the Sale Procedures (the "Auction"), if and only if (i) Purchaser submits the second highest or second best bid at the Auction or the terms of this Agreement constitute the second highest or best bid, and (ii) Sellers give written notice to Purchaser on or before the Back-up Termination Date, stating that Sellers (A) failed to consummate the sale of the Purchased Assets with the winning bidder, and (B) terminated the purchase agreement with the winning bidder, Purchaser shall, subject to the fulfillment or waiver of the conditions set forth in Section 9.1 and Section 9.3, promptly consummate the transactions contemplated hereby upon the terms and conditions as set forth herein, including the Purchase Price, as the same may be increased by Purchaser at the Auction.

(d)     Provided Purchaser is selected as the winning bidder in respect of the Purchased Assets at the Auction, Sellers shall seek entry of the Sale Order and any other necessary orders to close the sale by the Bankruptcy Court as soon as reasonably practicable following the closing of the Auction in accordance with the terms and conditions hereof. Purchaser and Sellers understand and agree that the transaction is subject to approval by the Bankruptcy Court. Purchaser and Sellers agree to use their respective commercially reasonable efforts to, and promptly take all actions as are reasonably necessary to, obtain the entry of the Sale Order. In the event the entry of the Sale Order shall be appealed, Sellers shall use commercially reasonable efforts to defend such appeal.

## ARTICLE 8

## COVENANTS AND AGREEMENTS

8.1.     Conduct of Business.

(a)     During the period from the Execution Date and continuing until the earlier of the termination of this Agreement in accordance with Section 3.4 and the Closing Date, except (1) for any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, (2) as required by applicable Law, the Bankruptcy Court or the Bankruptcy Code, (3) as occurring as a result of Sellers being in bankruptcy under the Bankruptcy Code, (4) as and to the extent permitted by the lenders under the DIP Financing, (5) as otherwise expressly contemplated by this Agreement or as set forth in Schedule 8.1(a) or (6) with the prior written consent of Purchaser not to be unreasonable withheld, delayed or conditioned, each Seller shall:

(i)     maintain the Purchased Assets in their existing condition and repair, subject to ordinary wear and tear;

18

(ii)     use commercially reasonable efforts to maintain the Permits;

(iii)    comply with all applicable Laws in all material respects;

(iv)    maintain the Books and Records;

(v)     not sell, pledge, assign, lease, license, or cause, permit or suffer the imposition of any Encumbrance on, or otherwise dispose of, any of the Purchased Assets, except in each case in connection with (A) the sale or disposition of Inventory to customers, (B) the sale or disposition of obsolete assets or (C) the DIP Financing;

(vi)    other than as required by Law or existing plans or agreements, not agree to any increase in the rate of compensation, commission, bonus or other direct or indirect remuneration payable to any Business Employee;

(vii)   not authorize, declare or pay any dividends on or make any distribution with respect to its outstanding shares of capital stock or other equity interests (whether in cash, assets, stock or other securities);

(viii)  not agree to any limitations on engaging or competing in any line of business or in any geographic area or location or otherwise covering the Business;

(ix)    not enter in any settlement, consent decree or other agreement or arrangement with a third party or Governmental Body that would require the payment by Purchaser or any Affiliate thereof of any material funds after the Closing;

(x)     not expend any insurance proceeds, condemnation awards or other compensation in respect of loss or damage to any Purchased Asset to the extent occurring after the date hereof but prior to the Closing Date; and

(xi)    not enter into any agreement (whether written or oral) to do any of the foregoing, or authorize or publicly announce an intention to do any of the foregoing.

8.2.    Pre-Closing Access to Information.

(a)     Sellers agree that, between the Execution Date and the earlier of the Closing Date and the date on which this Agreement is terminated in accordance with Section 3.4, Purchaser and the directors, officers, employees, counsel, professionals, advisors, accountants, agents, contractors and other representatives (the "Representatives") of Purchaser, shall be entitled to have, and Sellers shall afford, such access to, and make such investigation and examination of the Books and Records, and the Purchased Assets and Assumed Liabilities as Purchaser or any of Purchaser's Representatives may reasonably request.   Any such investigations and examinations shall be conducted during regular business hours and upon reasonable advance notice to Sellers.

19

(b)     Notwithstanding anything to the contrary contained in <u>Section 8.2(a)</u>, no such access, examination, investigation, assessment, evaluation or testing shall unreasonably interfere with the operations of any Seller.

(c)     All information provided or obtained pursuant to this <u>Section 8.2</u> shall be governed by that certain confidentiality agreement, dated as of [__], 2016, executed by an Affiliate of Purchaser in connection with a possible transaction involving Sellers (the "<u>Confidentiality Agreement</u>").

8.3.     <u>Further Agreements</u>.   After the Closing, Sellers shall (i) promptly deliver to Purchaser any mail or other communication received by any Seller and relating to the Business, the Purchased Assets or the Assumed Liabilities, (ii) promptly transfer in immediately available funds to Purchaser any cash, electronic credits or deposits received by any Seller to the extent that such cash, electronic credits or deposits are Purchased Assets, and (iii) promptly forward to Purchaser any checks or other instruments of payment that it receives to the extent that such checks or other instruments are Purchased Assets.   After the Closing, Purchaser shall (x) promptly deliver to Sellers any mail or other communication received by Purchaser and relating to the Excluded Assets or the Excluded Liabilities, (y) promptly wire transfer in immediately available funds to Sellers, any cash, electronic credits or deposits received by Purchaser to the extent that such cash, electronic credits or deposits are Excluded Assets, and (z) promptly forward to Sellers any checks or other instruments of payment that it receives to the extent that such checks or other instruments are Excluded Assets.   From and after the Closing Date, Sellers shall refer all inquiries with respect to the Business, the Purchased Assets and the Assumed Liabilities to Purchaser, and Purchaser shall refer all inquiries with respect to the Excluded Assets and the Excluded Liabilities to Sellers.

8.4.     <u>Consent and Approvals</u>.   Prior to Closing, each of the parties hereto shall, at Purchaser's expense:  (i) use its commercially reasonable efforts, as promptly as practicable, to obtain all approvals, authorizations, clearances, consents and waivers of, and to file all notices and other filings with, regulatory and other Governmental Bodies and all other Persons that are necessary or required of it to consummate the transactions set forth herein; and (ii) provide such other information and communications to regulatory and other Governmental Bodies and other Persons as Purchaser or Seller, as applicable, or such Governmental Bodies or other Persons may reasonably request.  Without limiting the foregoing, Purchaser will make all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "<u>HSR Act</u>"), if applicable, and submit and pay the fees associated with all necessary filings under the HSR Act as soon as reasonably practicable.

8.5.     <u>Preservation of Records; Post-Closing Access to Information</u>.

(a)     Sellers and Purchaser agree that each of them shall preserve and keep the records held by them or their Affiliates relating to the Business, the Purchased Assets and the Assumed Liabilities until the later of the liquidation and winding up of each of the Seller's estates (including, without limitation, through liquidation under Chapter 7 of the Bankruptcy Code) (the "<u>Wind Down</u>") (but in no event later than three (3) years after the Closing Date except, in the case of Tax matters, until thirty (30) days following the expiration of the period of

20

any applicable statute of limitations) and shall make such records available during such time period to the other party as may be reasonably required by such other party in connection with, among other things, any insurance claims by, actions or tax audits against or governmental investigations of any Seller or Purchaser or any of their respective Affiliates, administration of any Seller's bankruptcy, or in order to enable any Seller or Purchaser to comply with their respective obligations under this Agreement or any of the Ancillary Agreements and each other agreement, document or instrument contemplated hereby or thereby.

(b)     Until the completion of the Wind Down, Purchaser shall give Sellers and their Representatives reasonable access, during normal business hours, upon reasonable advance written notice (which notice shall specify the intended use or purpose of such access) and in a manner as would not be unreasonably disruptive to the business or operations of Purchaser or any of its subsidiaries, to Purchaser's offices, facilities, plants, properties, assets, employees and Documents that were included in the Purchased Assets pertaining to (A) the conduct of the Business or ownership of the Purchased Assets prior to the Closing Date or (B) the Excluded Assets and the Excluded Liabilities, to the extent necessary for, and solely in order for, Sellers to effect the Wind Down, including, without limitation, reconciling and objecting to claims in the Bankruptcy Cases and compiling and filing tax returns. Purchaser shall, at Purchaser's expense, use commercially reasonable efforts to cause its Representatives to furnish to Sellers such financial, technical, operating and other information pertaining to (i) the conduct of the Business or ownership of the Purchased Assets prior to the Closing Date or (ii) the Excluded Assets and the Excluded Liabilities, in each case, as the Representatives of Sellers shall from time to time reasonably request in a written notice (which notice shall specify the intended use or purpose of any such information) and to discuss such information with such Representatives to the extent necessary for, and solely in order for, Sellers to effect the Wind Down.  Notwithstanding the foregoing, Purchaser shall not be required to provide any such access, or cause its Representatives to furnish any such information, to the extent that doing so, in the reasonable judgment of Purchaser, would constitute a waiver of the attorney-client privilege. Sellers acknowledge and agree that any and all information received from or on behalf of, or made available by or on behalf of, Purchaser pursuant to this Section 8.5(b) shall be used solely in respect of the Wind Down.   In addition, Sellers agree that, with respect to confidential information, only those Representatives who require the receipt of such information for the purposes allowed hereunder and who have been informed by Seller of the confidential nature of such information shall be provided access to such information.

8.6.   Publicity.  Except as required by applicable Law or for any filings by any Seller or Purchaser with the Bankruptcy Court, Sellers and Purchaser shall not (and shall cause their respective Affiliates not to) issue any press release or make any public statement concerning this Agreement or the transactions contemplated hereby without the other party's consent, in each case not to be unreasonably withheld, conditioned or delayed.

8.7.   Prohibition on Use of Purchased Names.  Each Seller hereby agrees that, on and at all times following the Closing Date, it shall not use and shall cease using, and shall cause its respective Affiliates not to use and to cease using, directly or indirectly, the Purchased Names; provided, however, that Sellers may use the Purchased Names solely for purposes of completing the Wind Down.

21

8.8.    <u>Further Assurances</u>.

(a)    Subject to the terms and conditions of this Agreement and applicable Law, Sellers and Purchaser shall use their respective commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable to ensure that the conditions precedent to the other party's obligations hereunder set forth in this Agreement are satisfied and to consummate and make effective the transactions contemplated by this Agreement as soon as practicable.

(b)    Subject to the terms and conditions of this Agreement, Sellers and Purchaser shall not take any action or refrain from taking any action the effect of which would be to materially delay or impede the ability of Sellers or Purchaser to consummate the transactions contemplated by this Agreement unless taking such action or refraining from taking such action is required by applicable Law.

(c)    Subject to the terms and conditions of this Agreement, at and following the Closing, each of the parties shall execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquaintances and such other instruments, and cooperate and take such further actions, as may be reasonably necessary or appropriate to transfer and assign fully to Purchaser and its successors and assigns, all of the Purchased Assets, and for Purchaser and its successors and assigns to assume the Assumed Liabilities, and to otherwise make effective the transactions contemplated hereby.  Nothing in this <u>Section 8.8</u> shall obligate any party hereto to waive any right or condition under this Agreement.

(d)    The obligations of Sellers pursuant to this <u>Section 8.8</u> shall be subject to any orders, approvals or authorizations granted or required by the Bankruptcy Court or under the Bankruptcy Code (including in connection with the Chapter 11 Cases), and each Seller's obligations as a debtor in possession to comply with any order of the Bankruptcy Court, and each Seller's duty to the estate and its creditors including the duty to seek and obtain the highest or otherwise best price for the Purchased Assets in compliance with, and not in a manner inconsistent with, the Sale Procedures, as approved by the Sale Procedures Order.

(e)    For the avoidance of doubt, nothing in this <u>Section 8.8</u> shall be deemed to obligate any Seller to take any action or execute or deliver any document which would (i) cause any Seller to incur any monetary cost or expense not provided for under the DIP Financing, (ii) impose on any Seller burdens not expressly imposed on Sellers pursuant to the other provisions of this Agreement, or (iii) cause any Seller to become involved in any litigation or proceeding.

**ARTICLE 9**

**CONDITIONS TO CLOSING**

9.1.    <u>Conditions Precedent to the Obligations of Purchaser and Sellers</u>.  The respective obligations of each party to this Agreement to consummate the transactions contemplated by this Agreement are subject to the satisfaction or written waiver, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by Sellers and Purchaser, in whole or in part, to the extent permitted by applicable Law):

(a)    no temporary restraining order, preliminary or permanent injunction or other order issued by any court of competent jurisdiction or other legal restraint or prohibition preventing the consummation of the transactions contemplated hereby shall have been issued, nor shall there be any statute, rule, regulation, order or other Law promulgated, enacted, entered, enforced which makes the consummation of the transactions contemplated by this Agreement illegal, void or rescinded;

(b)    all authorizations, consents, orders or approvals of, or declarations or filings with, or expirations of waiting periods imposed by, any Governmental Body, and set forth on Schedule 9.1(b), shall have been filed, occurred or been obtained; and

(c)    the Bankruptcy Court shall have entered the Sale Order, and such order shall be a Final Order; provided, however, if the Sale Order as entered contains a waiver of the requirements under the Federal Rules of Bankruptcy Procedure 6004(h) and 6006(d), then the requirement that such order be a Final Order shall not apply as long as such order is in full force and effect and has not been stayed.

9.2.    Conditions Precedent to the Obligations of Sellers.  The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by Sellers, in whole or in part, to the extent permitted by applicable Law):

(a)    each of (i) the representations and warranties of Purchaser in this Agreement shall have been true and correct on the Execution Date and as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date), except where the failure of such representations and warranties to be so true and correct (without giving effect to any limitation as to "material" or "material adverse effect") has not resulted in a material adverse effect on the ability of Purchaser to consummate the transactions contemplated hereby at the Closing, and Sellers shall have received a certificate signed by an authorized person of Purchaser, dated the Closing Date, to the foregoing effect;

(b)    Purchaser shall have performed and complied in all respects with all obligations and agreements required in this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date, except where the failure to so comply has not resulted in material adverse effect on the ability of Purchaser to consummate the transactions contemplated hereby as the Closing, and Sellers shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect;  and

(c)    Purchaser shall have delivered, or caused to be delivered, to Sellers (or at the direction of Sellers) all of the items set forth in Section 3.3; and

(d)    The lenders under the DIP Financing shall have consented to the closing of the transactions contemplated hereby.

9.3.    Conditions Precedent to the Obligations of Purchaser.    The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the

23

satisfaction, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by Purchaser, in whole or in part, to the extent permitted by applicable Law):

        (a)      each of (i) the representations and warranties of Sellers in this Agreement shall have been true and correct on the Execution Date and as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date), except where the failure of such representations and warranties to be so true and correct (without giving effect to any limitation as to "material" or "Material Adverse Effect") has not resulted in a Material Adverse Effect, and Purchaser shall have received a certificate signed by an authorized person of the Company, dated the Closing Date, to the foregoing effect;

        (b)      Sellers shall have performed and complied in all respects with all obligations and agreements required in this Agreement to be performed or complied with by them on or prior to the Closing Date, except where the failure to so comply has not resulted in a Material Adverse Effect, and Purchaser shall have received a certificate signed by an authorized officer of Seller, dated the Closing Date, to the foregoing effect; and

        (c)      Sellers shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in <u>Section 3.2</u>.

## ARTICLE 10

## DEFINITIONS

    10.1.  <u>Certain Definitions</u>.  As used herein:

        (a)      "<u>Accounts Receivable</u>" means all trade accounts receivable and other rights to payment from customers of any Seller, and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of goods shipped or products sold or services rendered to customers of any Seller prior to Closing, and any claim, remedy or other right of any Seller related to any of the foregoing.

        (b)      "<u>Additional Sellers</u>" means, collectively: (i) Metal Technology Solutions, Inc., a Delaware corporation; (ii) Steel Forming, Inc. (d/b/a Commercial Metal Forming), a Delaware corporation; (iii) Eclipse Manufacturing Co., a Delaware corporation; (iv)  JFC Holding Corporation, a Delaware corporation; (v) The Jorgensen Forge Corporation, a Washington corporation; (vi) Zero Corporation, a Delaware corporation; and (vii) Zero Manufacturing, Inc., a Delaware corporation.

        (c)      "<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to

direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

      (d)    "<u>Ancillary Agreements</u>" means, collectively, the Seller Ancillary Agreements and each agreement required pursuant to <u>Sections 3.2</u> and <u>3.3</u> hereto.

      (e)    "<u>Assumed Contracts</u>" means, collectively, the Contracts identified by Purchaser in accordance with <u>Section 1.5</u> hereto and listed on <u>Schedule 1.5(a)</u>, which Contracts shall be assumed by Seller and assigned to Purchaser pursuant to Section 365 of the Bankruptcy Code, the Sale Order or other order of the Bankruptcy Court and the bill of sale/assignment and assumption agreement.

      (f)    "<u>Back-up Termination Date</u>" means the consummation of the transaction with the winning bidder at the Auction.

      (g)    "<u>Bankruptcy Cases</u>" means, collectively, the Chapter 11 Cases and the bankruptcy cases of the Other Debtors filed in the Bankruptcy Court under the Bankruptcy Code on May 16, 2016 or May 17, 2016 under Case Nos. 16-11214 and 16-11215, respectively.

      (h)    "<u>Books and Records</u>" means all documents used by any Seller in connection with, or relating to, the Purchased Assets, the Assumed Liabilities, or the Business, including all files, data, reports, plans, mailing lists, supplier lists, customer lists, price lists, marketing information and procedures, advertising and promotional materials, equipment records, warranty information, records of operations, standard forms of documents, manuals of operations or business procedures and other similar procedures (including all discs, tapes and other media-storage data containing such information) with respect to the Business.

      (i)    "<u>Business Day</u>" means any day other than a Saturday, Sunday or other day on which commercial banks in Wilmington, Delaware or New York, New York are authorized or required by Law to be closed.

      (j)    "<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

      (k)    "<u>Contract</u>" means any written or oral contract, indenture, note, bond, lease, license, commitment or instrument or other agreement or arrangement primarily related to the operation of the Business or affecting or related to any of the Purchased Assets or the Assumed Liabilities or by which any Seller is bound or by which any property of any Seller is Encumbered.

      (l)    "<u>Cure Costs</u>" means, with respect to any Contract, the costs and expenses payable under Section 365 of the Bankruptcy Code in connection with the assumption and assignment of such contract.

      (m)    "<u>DIP Financing</u>" means the secured postpetition financing obtained by Sellers and the Other Debtors.

25

(n)    "Documents" means all of each Seller's written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, correspondence, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies and documents, Tax Returns, ledgers, journals, title policies, customer lists, supplier lists, vendor lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.) and other similar materials, in each case whether or not in electronic form primarily related to or primarily used, or held for use, in connection with any of the Purchased Assets or operation of the Business.

(o)    "Encumbrance" means any lien, encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interest, hypothecation, easement, right of way, encroachment, right of first refusal, preemptive right, judgment, conditional sale or other title retention agreement.

(p)    "Equipment" means all equipment, machinery, storage tanks, furniture, fixtures and other tangible personal property of every kind and description and improvements and tooling owned by or primarily used, or held for use, in connection with the operation of the Business by Seller, wherever located.

(q)    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

(r)    "Escrow Agent" means [__].

(s)    "Escrow Agreement" means that certain Escrow Agreement, dated as of the date hereof, by and among Sellers, Purchaser and the Escrow Agent.

(t)    "Estimated Wind Down Expenses" means the out-of-pocket administrative costs and expenses that Sellers expect to incur in connection with winding down their bankruptcy estates from and after the Closing Date in an aggregate amount set forth in the Wind Down Budget.

(u)    "Excluded Agreements" shall mean, collectively, the Contracts other than the Assumed Contracts.

(v)    "Final Order" means an order, ruling or judgment of the Bankruptcy Court (or other court of competent jurisdiction) entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Cases (or by the clerk of such other court of competent jurisdiction on the docket of such court) that:  (i) is in full force and effect and (ii) has not been stayed; and (iii) is no longer subject to review, reversal, modification or amendment, by appeal or writ of certiorari.

26

(w)    "<u>Governmental Body</u>" means any government, quasi-governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature or any self-regulatory agency, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private).

(x)    "<u>Hearing</u>" means the hearing to be held by the Bankruptcy Court to consider the Sale Order and the approval of the transactions contemplated hereby.

(y)    "<u>Intellectual Property</u>" means all intellectual property of any kind used, or held for use, in connection with the operation of the Business, including the following: (i) trademarks, service marks, trade names, slogans, logos, trade dress, internet domain names, brand names, and other similar designations of source or origin, together with all goodwill, registrations and applications related to the foregoing; (ii) patents, utility models and industrial design registrations (and all continuations, divisionals, continuations in part, provisionals, renewals, reissues, re-examinations and applications for any of the foregoing); (iii) copyrights and copyrightable subject matter (including, without limitation, any registrations and applications for any of the foregoing); (iv) trade secrets, proprietary processes, formulae, algorithms, models, and methodologies; and (v) computer software, computer programs, and databases (whether in source code, object code or other form).

(z)    "<u>Inventory</u>" means all of each Seller's inventories (including, without limitation, raw materials, processed scrap, packaging materials, supplies, work in process, finished goods, spare parts and replacement and component parts and fuel) that are used, or held for use, in connection with the operation of the Business.

(aa)    "<u>Joint Written Instructions</u>" means written instructions from Sellers and Purchaser, a form of which is attached to the Escrow Agreement as an exhibit thereto, directing the Escrow Agent to deliver the amounts to the released from escrow as provided for under this Agreement.

(bb)    "<u>Knowledge of Sellers</u>", "<u>Sellers' Knowledge</u>" and similar phrases means, with respect to any matter in question, in the case of Sellers, the actual knowledge, as of the Execution Date, of the chief executive officer and the chief financial officer, or persons fulfilling the equivalent roles, of such Seller with respect to the business in which such person is involved.

(cc)    "<u>Laws</u>" means all federal, state, local or foreign laws, statutes, common law, rules, codes, regulations or ordinances issued, promulgated, enforced or entered by, any and all Governmental Bodies, or other requirement or rule of law.

(dd)    "<u>Leased Real Property</u>" means any real property leased or subleased by any Seller.

(ee)    "<u>Liability</u>" means, as to any Person, any debt, adverse claim, liability, obligation, commitment, assessment, cost, expense, loss, charge, fee, penalty, fine, contribution or premium of any kind or nature whatsoever, whether known or unknown, asserted or

27

unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, including all costs and expenses relating thereto.

(ff)     "<u>Material Adverse Effect</u>" means any effect, change, condition, circumstance, development or event that, individually or in the aggregate with all other effects, changes, conditions, circumstances, developments or events has had, or would reasonably be expected to have, a material adverse effect on the business, assets, operation, condition (financial or otherwise) or results of operation of the Business or the Purchased Assets (excluding the Excluded Assets and the Excluded Liabilities), taken as a whole, other than any effect, change, condition, circumstance, development or event arising from or related to: (i) general business or economic conditions in any of the geographical areas in which the Business operates; (ii) any condition or occurrence affecting the industry in which any Seller operates generally; (iii) national or international political or social conditions, including the engagement by any country in hostilities, whether commenced before or after the date hereof and whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack; (iv) financial, banking, or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index); (v) the occurrence of any act of God or natural disaster, including any fire, flood, hurricane, tornado, or other weather event; (vi) changes in Law or accounting rules; (vii) the taking of any action expressly contemplated by this Agreement or any Ancillary Agreement or taken with the prior written consent of Purchaser; (viii) any filing or motion made under sections 1113 or 1114 of the Bankruptcy Code with respect to any unions, employees, retirees, retiree benefits or collective bargaining agreements; (ix) the sale of any other assets (other than the Purchased Assets) to any third parties by any Seller or any of its Affiliates; (x) any effects or changes arising from or related to the breach of the Agreement by Purchaser; (xi) the initiation of the Bankruptcy Cases or any actions taken in the Bankruptcy Cases in furtherance of the transactions contemplated herein; or (xii) any strike or labor dispute; provided, however, that in the case of the foregoing <u>clauses (i)</u> through <u>(vi)</u>, such effects, changes, conditions, circumstances, developments or events shall be taken into account in determining whether any material adverse effect has occurred to the extent that any such effects, changes, conditions, circumstances, developments or events have, or would reasonably be expected to have, a disproportionate effect on the Business (excluding the Excluded Assets and the Excluded Liabilities) or the Purchased Assets relative to other participants operating in the industries in which the Sellers operate.

(gg)     "<u>Ordinary Course of Business</u>" means the ordinary and usual course of normal day to day operations of the Business consistent with past practice during the period immediately preceding the date of this Agreement.

(hh)     "<u>Other Debtors</u>" means Columbus Holdings, Inc., a Delaware corporation, and Columbus Steel Castings Company, a Delaware corporation.

(ii)     "<u>Owned Real Property</u>" means the real property that is owned by any Seller, and that, subject to the terms and conditions hereof, will be sold, conveyed and transferred to Purchaser pursuant to this Agreement.

28

(jj)    "Permits" means all notifications, licenses, permits (including environmental, construction and operation permits), franchises, certificates, approvals, consents, waivers, clearances, exemptions, classifications, registrations, variances, orders, tariffs, rate schedules and other similar documents and authorizations issued by any Governmental Body to any Seller primarily used, or held for use, in connection with the operation of the Business or applicable to ownership of the Purchased Assets or assumption of the Assumed Liabilities.

(kk)    "Permitted Encumbrances" means (i) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Purchased Assets which do not, individually or in the aggregate, materially adversely affect the operation of the Business; (ii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law (but not restrictions arising from a violation of any such Law); (iii) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course of Business for sums not yet due and payable or that are due but may not be paid as a result of the commencement of the Bankruptcy Cases and that do not result from a breach, default or violation by a Seller of any Contract or Law; (iv) statutory liens for current Taxes, assessments or other governmental charges not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings or the making of appropriate demands, notices or filings; (v) easements, covenants, conditions, restrictions and other similar matters affecting title to real property and other encroachments and title and survey defects with respect to any real property that do not or would not reasonably be expected to adversely affect the current occupancy or use of such real property in any material respect; (vi) matters that would be disclosed on an accurate survey of the real property that do not or would not reasonably be expected to adversely affect the current occupancy or use of such real property in any material respect; (vii) any liens shown in any title commitment, report or policy, or otherwise of record that do not or would not reasonably be expected to adversely affect the current occupancy or use of the real property in any material respect; (viii) Encumbrances on equipment registered under the Uniform Commercial Code as adopted in any applicable state or similar legislation in other jurisdictions by any lessor or licensor of assets to Seller (in respect of the Business) or in respect of the purchase price therefor (it being understood that all such Encumbrances shall be discharged or released at the Closing); (ix) rights granted to any licensee of any Seller Intellectual Property in the Ordinary Course of Business; (x) Encumbrances that will be and are discharged or released either prior to, or simultaneously with the Closing; (xi) such other Encumbrances, title exceptions or imperfections of title as Purchaser may approve in writing in its sole discretion; and (xii) any Liabilities created by this Agreement or any of the Ancillary Agreements.

(ll)    "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, estate, Governmental Body or other entity or group.

(mm)    "Purchased Names" means the trade name[s] set forth on Schedule 1.1(a);

(nn)    "Sale Order" means the order of the Bankruptcy Court, in form and substance reasonably satisfactory to Purchaser, which shall, among other things, (i) authorize the

29

sale of the Purchased Assets to Purchaser pursuant to this Agreement free and clear of all liens, claims and Encumbrances (other than Permitted Encumbrances) pursuant to Section 363(f) of the Bankruptcy Code; (ii) authorize and finalize the assumption of the Contracts by Sellers and the assignment of the Contracts to Purchaser subject to payment of the Cure Costs; (iii) authorize the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements and all other transactions and agreements contemplated hereby or thereby; (iv) find that Purchaser is a good-faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code; (v) confirm that Purchaser is acquiring the Purchased Assets free and clear of the Excluded Assets and Excluded Liabilities; and (vi) retain jurisdiction of the Bankruptcy Court to interpret and enforce the terms and provisions of this Agreement.

(oo)    "Sale Procedures" means the bidding and auction procedures that were approved pursuant to the Sale Procedures Order.

(pp)    "Sale Procedures Order" means the order of the Bankruptcy Court approving the Sale Procedures (Docket No. 327).

(qq)    "Seller Ancillary Agreements" means, collectively, each certificate, agreement or document (other than this Agreement) that Seller is required to execute and/or deliver in connection with this Agreement.

(rr)    "Seller Disclosure Schedule" means the disclosure schedules which are attached hereto and delivered by Sellers.  The disclosures in the Seller Disclosure Schedules shall modify and relate to the representations and warranties in the corresponding section or subsection of Article 4 to which they refer and are intended to qualify such representations and warranties. The information set forth in one section or subsection of the Seller Disclosure Schedules that is specifically referred to in another section or subsection of the Seller Disclosure Schedules by appropriate cross-reference shall also be deemed to qualify such other section or subsection of Article 4, and the information set forth in one section or subsection of the Seller Disclosure Schedules shall also be deemed to qualify each other section or subsection of Article 4 to the extent that the relevance of a disclosure in one section or subsection of the Seller Disclosure Schedules to another section or subsection of Article 4 is reasonably apparent on its face.

(ss)    "Seller Intellectual Property" means any Intellectual Property that is owned by, licensed to, or primarily used, or held for use by, any Seller relating to or in connection with the operation of the Business.

(tt)    "Tax" and "Taxes" mean (i) any and all federal, state, local or foreign taxes, charges, fees, imposts, levies or other assessments, including all income, gross income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, production, premium, disability, worker's compensation, utility, windfall profit, environmental, registration, alternative, add-on minimum, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes, customs duties, fees, assessments and charges of any kind whatsoever, in each case imposed by any Governmental Body; (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any Governmental Body in connection with any item described

in <u>clause (i)</u>; and (iii) any Liability in respect of any items described in <u>clauses (i)</u> and/or <u>(ii)</u> payable by reason of Contract, assumption, transferee liability, operation of Law, Treasury Regulation Section 1.1502-6(a) (or any predecessor or successor thereof or any analogous or similar provision under Law) or otherwise.

(uu)     "<u>Tax Return</u>" means any return, report, information return, declaration, claim for refund or other document (including any schedule or related or supporting information) supplied or required to be supplied to any Governmental Body with respect to Taxes, including amendments thereto.

(vv)     "<u>Wind Down Budget</u>" means that certain budget attached hereto as <u>Exhibit B</u>.

10.2.     <u>Additional Defined Terms</u>.  The following terms have the meanings set forth in the Sections set forth below:

| **Defined Term** | **Location** |
| --- | --- |
| Actions | Section 4.4 |
| Additional Assumed Contract | Section 1.5 |
| Agreement | Preamble |
| Allocation | Section 11.1(b) |
| Assumed Liabilities | Section 1.2 |
| Auction | Section 7.2(c) |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bankruptcy Exceptions | Section 4.2 |
| Benefit Plans | Section 4.12(c) |
| Business | Recitals |
| Business Employees | Section 4.12(a) |
| Chapter 11 Cases | Recitals |
| Closing | Section 3.1 |
| Closing Date | Section 3.1 |
| CMF Business | Recitals |
| Company | Preamble |
| Competing Bid | Section 7.1 |
| Confidentiality Agreement | Section 8.2(c) |
| Escrow Amount | Section 2.2 |
| Excluded Assets | Section 1.1(a) |
| Excluded Liabilities | Section 1.3 |
| Execution Date | Preamble |
| Execution Date Contract Schedule | Section 1.5(a) |
| JFC Business | Recitals |
| Offer Employee | Section 6.1(b) |
| Outside Date | Section 3.4(b) |
| Permits | Section 4.6(a) |
| Purchase Price | Section 2.1 |

31

| Defined Term | Location |
|---|---|
| Purchased Assets | Section 1.1(a) |
| Purchaser | Preamble |
| Registered IP | Section 4.5 |
| Representatives | Section 8.2 |
| Seller | Preamble |
| Transfer Taxes | Section 11.1(a) |
| Wind Down | Section 8.5(a) |
| ZMI Business | Recitals |

## ARTICLE 11

### TAXES

11.1.  <u>Additional Tax Matters</u>.

(a)    Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes and recording charges which may be payable by reason of the sale of the Purchased Assets or the assumption of the Assumed Liabilities under this Agreement or the transactions contemplated herein, including any real property transfer taxes (all of the foregoing, "<u>Transfer Taxes</u>") shall be borne and paid by Purchaser.

(b)    Purchaser shall, not later than one hundred twenty (120) days after the Closing Date, prepare and deliver to Sellers for their consent (which consent shall not be unreasonably withheld, delayed or conditioned) a schedule allocating the Purchase Price (and any other items that are required for federal income tax purposes to be treated as purchase price, including Assumed Liabilities and including, as appropriate, Cure Costs) among the Purchased Assets (such schedule, the "<u>Allocation</u>").   If Sellers raise any reasonable objection to the Allocation in writing within ten (10) business days of the receipt thereof, Purchaser and Sellers shall negotiate in good faith to resolve such objection(s).  If Sellers do not raise any objection to the Allocation within ten (10) business days of the receipt thereof, Sellers shall be deemed to have conclusively accepted the Allocation.  Purchaser and Sellers shall report and file all Tax Returns (including amended Tax Returns and claims for refund) consistent with the Allocation as finally agreed upon, and shall take no position contrary thereto or inconsistent therewith (including, without limitation, in any audits or examinations by any Governmental Body or any other proceeding); <u>provided</u>, <u>however</u>, that nothing contained herein shall prevent Purchaser or Sellers from settling any proposed deficiency or adjustment by any Governmental Body based upon or arising out of the Allocation, and neither Purchaser nor any Seller shall be required to litigate before any court any proposed deficiency or adjustment by any Governmental Body challenging such Allocation.  Purchaser and Sellers shall cooperate in the filing of any forms (including Form 8594 under Section 1060 of the Code) with respect to the Allocation, including any amendments to such forms required pursuant to this Agreement with respect to any adjustment to the Purchase Price.  Notwithstanding any other provision of this Agreement, the terms and provisions of this <u>Section 11.1(b)</u> shall survive the Closing without limitation.

32

# ARTICLE 12

# MISCELLANEOUS

12.1.    <u>Payment of Expenses</u>.    Except as otherwise provided in this Agreement and whether or not the transactions contemplated hereby are consummated, each party hereto shall bear its own costs and expenses (including investment advisory and legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby; <u>provided</u>, <u>however</u>, that all Transfer Taxes (as well as the costs and expenses incurred in connection with the preparation and filing of all Tax Returns with respect thereto) shall be borne by Purchaser.

12.2.    <u>Survival of Representations and Warranties; Survival of Post-Closing Covenants</u>. All covenants and agreements contained herein which by their terms are to be performed in whole or in part, or which prohibit actions, subsequent to the Closing shall, solely to the extent such covenants and agreements are to be performed, or prohibit actions, subsequent to the Closing, survive the Closing in accordance with their terms. All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificated deliveries hereunder, shall not survive the Closing and shall thereupon terminate, including any Actions for damages in respect of any breach thereof.

12.3.    <u>Ultimate Limit of Liability</u>.    Notwithstanding anything to the contrary contained herein, under no circumstance will the aggregate Liability of Sellers to Purchaser under this Agreement and the Ancillary Agreements be anything other than the obligation to deliver Joint Written Instructions to the Escrow Agent directing the Escrow Agent to deliver the Escrow Amount (together with all accrued interest thereon, if any) to Purchaser if and to the extent required under <u>Section 2.2(b)</u>, and the Sellers shall have no other liability hereunder.

12.4.    <u>Entire Agreement; Amendments and Waivers</u>.    This Agreement (including the Schedules hereto), the Ancillary Agreements and the Confidentiality Agreement represent the entire understanding and agreement between the parties hereto with respect to the subject matter hereof.    Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed, in the case of an amendment, by each party hereto, or in the case of a waiver, by the party against whom the waiver is to be effective.    No action taken pursuant to this Agreement, including, without limitation, any investigation by or on behalf of any party shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.    The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.    No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

12.5.    <u>Counterparts</u>.    For the convenience of the parties hereto, this Agreement may be executed and delivered (by facsimile or PDF signature) in any number of counterparts, each such

33

counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

12.6.   <u>Governing Law</u>.   THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF (EXCEPT SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

12.7.   <u>Jurisdiction, Waiver of Jury Trial</u>.

(a)   THE BANKRUPTCY COURT WILL HAVE EXCLUSIVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE, THE COURTS OF THE STATE OF NEW YORK LOCATED IN NEW YORK, NEW YORK AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN THE SOUTHERN DISTRICT OF THE STATE OF NEW YORK WILL HAVE SOLE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY.

(b)   EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

12.8.   <u>Notices</u>.   Unless otherwise set forth herein, any notice, request, instruction or other document to be given, provided or furnished hereunder by any party to the other parties shall be in writing and shall be deemed duly given, provided or furnished (i) upon delivery, when delivered personally, (ii) one (1) Business Day after being sent by overnight courier or when sent by facsimile or e-mail transmission (with confirmation of transmission), and (iii) three (3) Business Days after being sent by registered or certified mail, postage prepaid, as follows:

If to Sellers:

Constellation Enterprises LLC
50 Tice Boulevard, Suite 340
Woodcliff Lakes, New Jersey 07677
Attn.:  Dana LaForge
Email: laforge@brera.com

with a copy (which shall not constitute effective notice) to:

Kramer Levin Naftalis &Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
Attention:  Adam C. Rogoff
Email:  arogoff@kramerlevin.com
Attention: Steven M. Goldman
Email:  sgoldman@kramerlevin.com


If to Purchaser:

[_____]
[_____]
[_____]
Attn.:  [_____]


with copies (which shall not constitute effective notice) to:

[_____]
[_____]
[_____]
Attn.:  [_____]


or to such other Persons, addresses or facsimile numbers as may be designated in writing by the party to receive such notice.

12.9.    Binding Effect; Assignment.  This Agreement shall be binding upon Purchaser and, subject to entry of the Sale Order, Sellers, and inure to the benefit of the parties and its respective successors and permitted assigns, including, without limitation, any trustee or estate representative appointed in any of the Chapter 11 Cases or any successor Chapter 7 case.  No assignment of this Agreement or of any rights or obligations hereunder may be made by any Seller or Purchaser (by operation of Law or otherwise) without the prior written consent of the other parties hereto and any attempted assignment without the required consents shall be void.

12.10.    Severability.  If any term, condition or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in a manner adverse to any party.  Upon such determination that any term, condition or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the fullest extent possible.

35

12.11.  <u>Injunctive Relief</u>.  The parties agree that damages at Law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement by the parties, and, accordingly, each Seller and Purchaser shall be entitled to injunctive relief with respect to any such breach, including, without limitation, specific performance of such covenants, promises or agreements or an order enjoining the other party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement by such party, all without the necessity of proving the inadequacy of money damages as a remedy and without the necessity of posting bond.  The rights set forth in this <u>Section 12.11</u> shall be in addition to any other rights which any Seller or Purchaser may have at Law or in equity pursuant to this Agreement.

12.12.  <u>Third Party Beneficiaries</u>.  This Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the parties hereto and such permitted assigns, any legal or equitable rights hereunder.

12.13.  <u>Certain Interpretations</u>.

(a)  Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)  All references in this Agreement to Articles, Sections, clauses, parts and Schedules shall be deemed to refer to Articles, Sections, clauses, parts and Schedules to this Agreement unless otherwise specified.

(ii)  All Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule but not otherwise defined therein shall be defined as set forth in this Agreement.

(iii)  The Article, Section and paragraph captions herein are for convenience of reference only, do not constitute part of this Agreement and shall not be deemed to limit or otherwise affect any of the provisions hereof.

(iv)  The words "include," includes" and "including," when used herein shall be deemed in each case to be followed by the words "without limitation" (regardless or whether such words or similar words actually appear).

(v)  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day.

(vi)  Any reference in this Agreement to "$" or "dollars" shall mean U.S. dollars.

36

(vii)    Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(viii)    The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(b)    The parties hereto agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any Law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

12.14.  <u>Non-Recourse</u>.    No past, present or future director, officer, employee, incorporator, member, partner or equity holder of the parties to this Agreement, nor any Other Debtor, will have any liability for any obligations or liabilities of Seller or Purchaser, as applicable, under this Agreement, or any agreement entered into in connection herewith of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby. Any claim or cause of action based upon, arising out of, or related to this Agreement or any agreement, document or instrument contemplated hereby may only be brought against Persons that are expressly named as parties hereto or thereto, and then only with respect to the specific obligations set forth herein or therein. Other than the parties hereto, no party shall have any liability or obligation for any of the representations, warranties, covenants, agreements, obligations or liabilities of any party under this Agreement or the agreements, documents or instruments contemplated hereby or of or for any action or proceeding based on, in respect of, or by reason of, the transactions contemplated hereby or thereby (including breach, termination or failure to consummate such transactions), in each case whether based on contract, tort, fraud, strict liability, other Laws or otherwise and whether by piercing the corporate veil, by a claim by or on behalf of a party hereto or another Person or otherwise. In no event shall any Person be liable to another Person for any punitive damages with respect to the transactions contemplated hereby.

12.15.  <u>Sellers' Representative</u>.    Each Seller hereby agrees as follows:

(a)    The Company is hereby appointed, and is authorized, and empowered to act, in connection with, and to facilitate the consummation of, the transactions contemplated by this Agreement and the Ancillary Agreements and in connection with any activities to be performed by Sellers under this Agreement and the Ancillary Agreements, for the purposes and with the powers, and authority set forth in this Agreement, which will include the sole power and authority:

(i)    to receive and distribute the Purchase Price or any other amount paid in connection with this Agreement or the Ancillary Agreements to Sellers;

(ii)    to enforce and protect the rights and interests of Sellers arising out of or under or in any manner relating to this Agreement and the Ancillary Agreements (including in connection with any claims related to the transactions contemplated hereby

37

and thereby) and, in connection therewith, to (A) assert any claim or institute any action, (B) investigate, defend, contest or litigate any action initiated by Purchaser or any other Person pursuant to this Agreement and the Ancillary Agreements and receive process on behalf of each Seller in any such action and compromise or settle on such terms as the Company will determine to be appropriate, give receipts, releases and discharges on behalf of all or any Seller with respect to any such action, (C) file any proofs, debts, claims and petitions as the Company may deem advisable or necessary, (D) settle or compromise any claims related to the transactions contemplated by this Agreement and the Ancillary Agreements, (E) assume, on each Sellers' behalf, the defense of any claims related to the transactions contemplated by this Agreement and the Ancillary Agreements, and (F) file and prosecute appeals from any decision, judgment or award rendered in any of the foregoing actions;

(iii)    to enforce or refrain from enforcing any right of any Seller (prior to the Closing) and/or of the Company arising out of or under or in any manner relating to this Agreement or the Ancillary Agreements;

(iv)    to take any action to be taken by one or more Sellers under or in connection with this Agreement or any Ancillary Agreement; or

(v)    to make, execute, acknowledge and deliver all such other Contracts, guarantees, orders, receipts, endorsements, notices, requests, instructions, certificates, stock powers, letters and other writings, and, in general, to do any and all things and to take any and all action that the Company, in its sole and absolute discretion, may consider necessary or proper or convenient in connection with or to carry out the activities described Section 12.15(a)(i) through Section 12.15(a)(iv) and the transactions contemplated by this Agreement and the Ancillary Agreements.

(b)    The Company's power and grant of authority is (i) coupled with an interest and is irrevocable and survives the bankruptcy or liquidation of any Seller and will be binding on any successor thereto and (ii) may be exercised by the Company acting by signing as the representative of any Seller.

(c)    Purchaser and its Affiliates and representatives may conclusively and absolutely rely, without inquiry, upon the action of the Company as the action of each Seller (and may ignore any action taken or notice given by any Seller other than the Company) in all matters relating to this Agreement, the Ancillary Agreements or the transactions contemplated hereby and thereby. Any document delivered or notice delivered by or on behalf of Purchaser or its Affiliates to, or action taken by or on behalf of Purchaser or its Affiliates with respect to, the Company shall be deemed to have been delivered to, or taken with respect to, all Sellers. Any amounts to be paid by Purchaser to Sellers pursuant to this Agreement shall be divided by Sellers among themselves, but may be paid by Purchaser to the Company. Sellers shall be jointly and severally liable for any amounts due to be paid or owed by Sellers to Purchaser pursuant to this Agreement.

*[Remainder of Page Intentionally Left Blank]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

<u>**SELLERS:**</u>

**CONSTELLATION ENTERPRISES LLC**

By: _____
Name:
Title:

**METAL TECHNOLOCY SOLUTIONS, INC.**

By: _____
Name:
Title:

**STEEL FORMING, INC.**

By: _____
Name:
Title:

**ECLIPSE MANUFACTURING CO.**

By: _____
Name:
Title:

[Signature Page to Asset Purchase Agreement]

**JFC HOLDING CORPORATION**

By:    _____
Name:
Title:


**THE JORGENSEN FORGE CORPORATION**

By:    _____
Name:
Title:


**ZERO COPRORATION**

By:    _____
Name:
Title:


**ZERO MANUFACTURING**

By:    _____
Name:
Title:


[Signature Page to Asset Purchase Agreement]

**<u>PURCHASER</u>**:


[_____]


By:_____
Name:
Title: